REDACTED VERSION

1

```
1                    UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF NEW JERSEY
2

3    _____

4    AIRTECH INTERNATIONAL INC.,
                                        CIVIL ACTION NUMBER:
         Plaintiff,
5                                       2:22-cv-668-MEF
             vs.
6                                       Preliminary Injunction
     BYUNG CHAN YIM, et al.,            Hearing
7
         Defendants.                    VOLUME I, Pages 1 - 148
8    _____

9        Frank R. Lautenberg Post Office and Courthouse
         Two Federal Square
10       Newark, New Jersey  07102
         January 29, 2024
11

12

13   B E F O R E:              THE HONORABLE MICHAEL E. FARBIARZ,
                               UNITED STATES DISTRICT COURT JUDGE
14

15   A P P E A R A N C E S:

16       KIM & BAE P.C. BY:
         CHRISTINE M. BAE, ESQ.
17       CARLTON R. ASHER, ESQ.
         2160 North Central Road
18       Suite 303
         Fort Lee, New Jersey  07024
19
             appeared on behalf of the Plaintiff;
20

21
             Lisa A. Larsen, RPR, RMR, CRR, FCRR
22                 Official Court Reporter
              Lisa_Larsen@njd.uscourts.gov
23                   (973)776-7741

24
          Proceedings recorded by mechanical stenography.
25       Transcript produced by computer-aided transcription.
```

1   **A P P E A R A N C E S**: (Cont'd.)

2       BRACH EICHLER LLC, BY:
        KEITH J. ROBERTS, ESQ.
3       THOMAS KAMVOSOULIS, ESQ.
        101 Eisenhower Parkway
4       Roseland, New Jersey  07068-1067
            and
5       BRACH EICHLER LLC, BY:
        JOHN SIMEONE, ESQ.
6       106 Summit Avenue
        Waldwick, New Jersey  07463

7
            appeared on behalf of the Defendants;
8
    **A L S O   P R E S E N T**:
9
        Lisa Kwon-Lee, Interpreter; and
10
        Joanna Koh, Interpreter.
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**I N D E X**

| WITNESSES: | DX | CX | RDX | RCX | FDX | FCX |
|---|---|---|---|---|---|---|
| JIN OUK LEE | 12 | | | | | |
| BYUNG CHAN YIM | 51 | 81 | 134 | 138 | 141 | |

**E X H I B I T S**

|  | MKD/ID | RECEIVED |
|---|---|---|
| Plaintiff's Exhibit No: | | |
| 1 | 31 | |
| 7 | 39 | 39 |
| 148 | | 84 |
| 88 | | 85 |
| 78 | | 91 |
| 75 | | 97 |
| 79 | | 101 |
| 77 | | 119 |
| 76 | | 125 |

1           (PROCEEDINGS held in open court before the

2           HONORABLE MICHAEL E. FARBIARZ, United States

3           District Court Judge, on January 29, 2024.)

4      THE DEPUTY CLERK:  All rise.

5      THE COURT:  Good morning everyone.  Let's please be

6  seated.

7      We're here for *Airtech International Inc. vs. Yim,*

8  *et al.*, 22-civ-668.

9      Appearances, please, for the record, beginning with the

10 plaintiff's counsel.

11     MS. BAE:  Good morning, Your Honor.  This is Christine

12 Bae from the law firm of Kim & Bae on behalf of Plaintiff,

13 Airtech International.

14     THE COURT:  Ms. Bae, good morning to you.

15     Ms. Bae, is your colleague to your right going to be

16 putting on any witnesses today or not?

17     MS. BAE:  Yes, Your Honor.

18     THE COURT:  Introduce him, if you don't mind, please.

19     MS. BAE:  Excuse me, Your Honor?

20     THE COURT:  Introduce your colleague to the right, if

21 you don't mind, please.

22     MS. BAE:  Yes.  This is Carlton Asher, of counsel to

23 Kim & Bae.

24     MR. ASHER:  Good morning, Your Honor.

25     THE COURT:  Good morning.  Thank you both.

1      The person to your left, Ms. Bae, is that a lawyer or

2  legal assistant?

3      MS. BAE:  She's my paralegal, and she will be helping

4  us with the exhibits.

5      THE COURT:  Terrific.  Ms. Bae, thank you very much.

6      And for the defendants.

7      MR. ASHER:  Your Honor, for the defendants, Keith

8  Roberts, Brach Eichler, Roseland, New Jersey.  I'm joined with

9  my partner Thomas Kamvosoulis, also from Brach Eichler, and

10  our associate John Simeone who is also with Brach Eichler.

11  Three of us will be participating today in some form,

12  Your Honor.

13      THE COURT:  Mr. Roberts -- forgive me, though.  It's

14  "Mr. Kamvasitis?"  Do I have your name right, sir?

15      MR. KAMVOSOULIS:  "Kamvosoulis."

16      THE COURT:  "Kamvosoulis."  I am sorry about that.

17  "Kamvosoulis."

18      MR. KAMVOSOULIS:  Correct.  It's a nice Irish name,

19  Judge.

20      THE COURT:  And Mr. Simeone?  Is that right?

21      MR. SIMEONE:  "Simeone."

22      THE COURT:  Thank you very much.

23      You can all be seated.

24      I got Mr. Kamvosoulis's letter -- have a seat -- with

25  respect to the order of presentation.  As I had indicated in

1  the text order, my preference is to have the plaintiffs go

2  first.

3       Is the client who the defendants have -- I know there

4  are two clients who wish to testify.  Is he going to be

5  leaving the United States or leaving the jurisdiction before

6  tomorrow?

7       MR. ROBERTS:  My understanding is that Mr. Roy Byung is

8  here today.  He will be leaving.  I don't know his exact

9  schedule, but he does have a flight to leave the United States

10  tonight.

11       THE COURT:  Leave the United States tonight?

12       MR. ROBERTS:  He moved his -- my mistake.  Iowa, Iowa.

13  He moved --

14       THE COURT:  What does the word "Iowa" mean?

15       MR. ROBERTS:  Iowa, the state of Iowa.

16       THE COURT:  So he's going to Iowa tonight?

17       MR. ROBERTS:  That's correct.  He moved -- when we got

18  this date, he moved plans so that he could be here the first

19  day.  We tried to arrange it so he could be here for the whole

20  hearing, but since the Court accommodated on virtual, if we

21  have to flex, Your Honor, we will.

22       THE COURT:  I'd rather start with the plaintiffs, then.

23       MR. ROBERTS:  That's fine.

24       THE COURT:  We'll see how the day goes.

25       MR. ROBERTS:  That's fine, Your Honor.

1          THE COURT:  When we were last together, we had

2   conversations about the scope of the relief that the

3   defendants are seeking, and I know there was some effort to

4   resolve things that just didn't work out.  That happens.

5          Just at a simple descriptive level, Mr. Roberts, speak

6   to this, if you don't mind.  I appreciate that people

7   negotiate as things move on.

8          Is your current position that the restraints that were

9   imposed by Judge Neals in 2022 should be lifted in whole, or

10  do you seek today a tailored modification?

11         MR. ROBERTS:  Your Honor, in order to properly respond

12  to that question, I think what we would have to know is what

13  the evidence is going to show in terms of supporting issuing a

14  preliminary injunction, converting the temporary restraints to

15  a preliminary injunction.

16         Now, we would be satisfied if the proofs are such that

17  the restraints would need to be substantially tailored.  That

18  may not be the case.  We may ask that, based upon the proofs

19  presented and given what we understand the applicable standard

20  of review to be, that the restraints -- the remedy is

21  extraordinary, the restraints should be specifically and

22  expressly tailored to protect the interests of the plaintiffs

23  and to demonstrate whether or not they actually have, with

24  specificity, identified trade secrets and unfair competition

25  that's being exploited by my client in this case.

1          As of right now, the procedural history is such that

2    for 20 months we have had a TRO in place that was issued

3    ex parte, multiple hearing dates for various reasons in the

4    record have been carried.  At this point they have been in

5    place for a very long time and they are expansive, they are

6    extremely expansive.

7          THE COURT:  I understand the -- look, there's a lot to

8    be said about how it came to be that this has been sitting

9    here for as long as it has, there's a lot to be said about the

10   substance, but I take your position to be although it's your

11   motion you don't have an answer for me?

12         MR. ROBERTS:  No, Your Honor, I do have an answer.

13   My --

14         THE COURT:  Here is what it is:  The question is,

15   are you seeking to dissolve the restraints in total?

16         MR. ROBERTS:  I am.

17         THE COURT:  Great.  Excellent.  Thank you very much.

18         Ms. Bae, I think, over to you to call your first

19   witness.  We need to swear in an interpreter if there is

20   going to be need for assistance through an interpreter.

21         MR. ASHER:  Your Honor, I call Jin O. Lee.

22         THE COURT:  Does Mr. or Ms. Lee need an interpreter

23   or not?

24         MS. BAE:  Yes.  The interpreter will join us by the

25   box, and then she can be sworn in.

1          THE COURT:  Great.  Everyone to approach.  Thank you.

2              (Brief pause.)

3              (Whereupon, Lisa Kwon-Lee, the Interpreter, was duly

4               sworn.)

5              (Whereupon, the witness was thereupon duly sworn.)

6          THE COURT:  I need to solve this technical issue.  I

7     see some people in the courtroom.

8          Ms. Bae, Mr. Roberts, are any of them proposed

9     witnesses here, and does anyone have an objection to their

10    presence if they are?

11         Ms. Bae.

12         MS. BAE:  They are the witnesses that were listed in

13    our letter to Your Honor, so they will be testifying today in

14    person.

15         THE COURT:  Great.  Mr. Roberts, do you have any

16    objection to their being present during this testimony?

17         MR. ROBERTS:  They should be sequestered, Your Honor.

18    I don't know who is being called and who doesn't.  It would be

19    news to me.  I would suggest that we sequester witnesses.

20         THE COURT:  But then good for the goose, good for the

21    gander.  Ms. Bae might want your client to step away.

22         MR. ROBERTS:  He's a party.  If they're parties, I

23    wouldn't.  If they're not parties, I would.

24         THE COURT:  So your position, Mr. Roberts, is that your

25    witnesses who are parties can stay and that those witnesses

1  who are not parties cannot.

2         MR. ROBERTS:  My position was always that a party to a

3  litigation can stay.  He is a party to the matter.

4         THE COURT:  Yes or no?  Is that your position?

5         MR. ROBERTS:  My position is that parties say,

6  witnesses get sequestered.

7         THE COURT:  Great.  Thank you.

8         Ms. Bae.

9         MS. BAE:  Judge, except for one witness that we have

10  sitting back there, they are all employees of -- part of

11  Airtech International, so I believe that they are part of the

12  party.

13         THE COURT:  I understand that.  I'm just asking which

14  of them is to be a witness.  Mr. Roberts' point, it's a

15  familiar point, is that if they're not parties and they're

16  gonna be testifying, he has a right to seek their stepping

17  away.

18         Is there anyone who meets that definition who is in the

19  room, someone who is a witness and who is not a party?

20         MS. BAE:  I believe one person, Judge.

21         THE COURT:  So that person should not be here.  If

22  Mr. Roberts opts to make that move, that's his to make.  He

23  should not be here or she should not be here doing this

24  testimony.

25         Ms. Bae, if that's Mr. Roberts' position, you should

 1    let that person know and they should step away.

 2            (Brief pause.)

 3            THE COURT:  Ms. Bae, tell us, please, the name of the

 4    person who has just stepped away so the record can reflect

 5    that he has stepped away.

 6            MS. BAE:  The gentleman's name is Boo Hyun Kang, and he

 7    is listed as one of the witnesses today.

 8            THE COURT:  Great.  The record can reflect that he has

 9    stepped away.  We'll keep an eye open, and he will not return

10    while another witness is testifying.

11            MS. BAE:  Thank you, Your Honor.

12            THE COURT:  Thank you.

13            (Brief pause.)

14            THE COURT:  Ms. Bae, are we ready to roll, you think?

15            MS. BAE:  Yes, Your Honor.

16            MR. ASHER:  Your Honor, I think we're in a position to

17    move forward.

18            THE COURT:  Okay.  Let's get started, then.

19            Mr. Asher, you're going to stand up when you examine

20    the witness.

21            MR. ASHER:  Okay.  Thank you very much, Your Honor.

22    ///

23    ///

24    ///

25    ///

1                        JIN OUK LEE,

2          having been first duly sworn, testified as follows:

3                      DIRECT EXAMINATION

4                        By Mr. Asher:

5   BY MR. ASHER:

6   Q.    Mr. Lee, could you please state your full name and

7   residence address for the record.

8   A.    My name is Jin Ouk Lee.  My address is 711 Bellaire

9   Drive, Demerest, New Jersey.

10  Q.    Please state your affiliation with the plaintiff, Airtech

11  International.

12  A.    I am a 100 percent owner of Airtech International, and I

13  am the CEO, the president.

14  Q.    When did you form Airtech?

15  A.    Year 2003.

16  Q.    Where is Airtech's offices or physical facilities located

17  at present?

18  A.    It's located at 2 Piermont Road, Cresskill, New Jersey.

19  Q.    Does it have any other offices?

20  A.    No.

21  Q.    What is the nature of Airtech's business?

22  A.    Basically, our clients are Korean clients, and we

23  supply -- and our clients are in defense industry, and we

24  supply service systems and material and electrical parts --

25  mechanical parts to our customers.

1  Q.   Does your company have an affiliate maintaining an office

2  in Korea?

3  A.   Yes.

4  Q.   How many personnel do you have in total today in your

5  New Jersey and in the Seoul office?

6  A.   Including myself, we have 13 people in New Jersey and

7  6 in Seoul, in Korea.

8  Q.   Did Airtech employ the defendant in this case, normally

9  referred to as Roy Yin -- Yun -- Yim?

10 A.   Yes.

11 Q.   Please tell us when did his -- Mr. Yim commence his

12 employment and when did it terminate, and then from time to

13 time during this period what did he do for Airtech?

14 A.   Mr. Yim started working for Airtech officially in June of

15 2006 -- '5, 2005.  At the time he was hired to develop

16 software for our system and he developed our software for our

17 system.  And then once that was done, he started doing --

18 working on general business affairs in the company, including

19 sales and purchasing.

20      He worked hard, so in 2010 I promoted him to general

21 manager of the company and gave all the rights or authorities

22 to conduct the business.  For example, he was able to take the

23 order and deal with the customers and communicate with the

24 customers, and also he was the one who contacted the vendors

25 and maintained contact.  And then also he managed employees

1  and oversaw the expenses.

2      Then all of a sudden in 2021 in early August, he told

3  me that he wanted to quit and he wanted to quit as of end of

4  September.  So I requested -- I asked him to -- I was in Korea

5  for business, and I asked him to postpone his resignation --

6      THE COURT:  Hold on for one second.

7      THE INTERPRETER:  I'm sorry.  The Interpreter also

8  missed one thing.  The witness said:  "I also gave him the

9  right to write checks.  I authorized him to write checks."

10     THE COURT:  Okay.  Okay.

11     Mr. Asher, I think we need to ensure that the witness

12  doesn't give such long, narrative answers.  Let's try and keep

13  the questions such that they won't have such long, narrative

14  answers.

15         There's no question before you, sir.

16     THE INTERPRETER:  This is part of the previous answer

17  that I had to stop him at that point, and he's adding his last

18  sentence to previous question, the answer when he quit, the

19  termination of his --

20     THE COURT:  Mr. Lee, why don't you finish your answer,

21  but it's important that you answer Mr. Asher's questions.  The

22  question he asked you was a little narrower than the answer

23  you're giving, and it would just be helpful to move things

24  along if you answered his questions -- just his questions that

25  he's putting to you.  But finish, please, now.

1  A.    (Continuing.)  So his termination was September 2021.

2         THE COURT:  Thank you.

3         Mr. Asher, over to you.

4         MR. ASHER:  Thank you very much, Your Honor.  I'll try

5  to keep these less-expansive questions.

6         MS. BAE:  Ms. Interpreter, perhaps you can translate

7  what the Judge just said to Mr. Lee so he can fully

8  understand.

9         THE INTERPRETER:  Sure.

10        THE COURT:  Let me just clarify something.  I perhaps

11 wrongly perceived that Mr. Lee understands English but prefers

12 an interpreter.

13        Does he not understand English?

14        MR. ASHER:  I believe that --

15        THE COURT:  Let me hear from the witness --

16        MR. ASHER:  He does from time to time speak and

17 understand English, but I believe from my encounter with

18 Mr. Lee in relation to this case that the use of the

19 interpreter would be important for this purpose.

20        THE COURT:  Great.  Understood.  Keep going, Mr. Asher.

21 Thank you.

22 BY MR. ASHER:

23 Q.    Did Mr. Yim also deal with customers?

24 A.    Yes.

25 Q.    Where were the customers located?

1    A.    In South Korea.

2    Q.    What was the -- and at this time, as well, what was the

3    nature of the business in which these customers were engaged?

4    A.    Most of our customers are located in Korea, and they work

5    in the defense industry and aerospace industry.  And our

6    re-supplied parts were sub-system parts to our customers.

7    That would be the nature of business.

8    Q.    At present, what is your principal customer in Korea?

9    A.    [Redacted] is our main customer, and we also have

10   [Redacted] and we have subcontractors for [Redacted].

11   Q.    Immediately prior to Mr. Yim's departure with Airtech,

12   what were the top 11 customers of Airtech?

13   A.    [Redacted]

14   [Redacted] (phonetic).

15         THE INTERPRETER:  Do you need a general spelling from

16   the Interpreter?

17         THE COURT REPORTER:  Yes, please.

18         THE INTERPRETER: [Redacted]

19   A.    (Continuing.) [Redacted].

20         THE COURT:  What are we at?

21         Mr. Asher, do we have 11?

22         THE INTERPRETER:  We have nine.

23         MR. ASHER:  Apparently it's nine, Your Honor.

24         THE COURT:  Okay.  Let's get to the next question.

25   ///

1    BY MR. ASHER:

2    Q.    Of the nine customers which you just identified, are they

3    included in the court order in this case dated March 28, 2022?

4    A.    All of them are except one.

5    Q.    Who is the exception, please?

6    A.    Redacted

7    Q.    So with that exception, the others which you just

8    identified are provided in a judge's order in this case dated

9    March 28, 2022; correct?

10    A.    Yes, they are.

11    Q.    After Roy Yim left your company in September 2021, did

12    Airtech lose any of those customers or where there was a

13    substantial reduction in its orders for Airtech?

14    A.    Yes, especially the two companies that I couldn't recall

15    one question ago, Redacted .

16         THE INTERPRETER:  General spelling, Redacted  And

17    second company is Redacted .

18    A.    (Continuing.)  Those companies' order decreased

19    substantially.  And Redacted , 90 percent of order from

20    Redacted  decreased.  Redacted  order became zero.  Redacted

21    also became zero.

22    BY MR. ASHER:

23    Q.    Why were those customers lost or sales diminished by your

24    company -- for your company?

25    A.    Byung Chan Yim told my customers beginning July of 2020

1  that he will be leaving my company and establishing a company

2  with his wife and he will be leaving, along with all my

3  employees, and Airtech's business will disappear.  And he told

4  ▮Redacted▮ and ▮Redacted▮ that.  That is why.

5       And Byung Chan Yim established a company under the name

6  of the woman that he was having extra-marital affair with.

7  Her name is Sejun Kim (phonetic.)  He established the company

8  Assure World [sic].

9       While he was working at my company, he had access to

10 all my information in the system.  He took orders from ▮Redacted▮

11 and ▮Redacted▮ by quoting lower price that was on my system.  That's

12 how he took my business.

13 Q.   After Mr. Yim left your company, did you speak with any

14 of your customers in Korea concerning Mr. Yim's departure?

15 A.   Yes.

16 Q.   Is ▮Redacted▮ one of the companies with whom you spoke on your

17 travel to Korea when you then spoke with ▮Redacted▮ concerning Roy?

18 A.   Yes.

19 Q.   What did the personnel at ▮Redacted▮ tell you concerning what, if

20 anything, Roy Yim had said to them regarding Airtech?

21 A.   I met with the president of ▮Redacted▮.  So when I met with the

22 president of ▮Redacted▮, he told me that --

23      MR. ROBERTS:  Excuse me, Your Honor.  I'm going to

24 object.  He's eliciting hearsay at this point.  It's one thing

25 for him to give generalizations about a meeting.  It's a

 1  different thing to elicit hearsay responses on what would be

 2  directly relevant to --

 3       THE COURT:  I hear, but the moment to object to that

 4  was when the question was asked, not when the answer started.

 5       MR. ASHER:  Your Honor, may I address this?

 6       THE COURT:  It's okay.  It's overruled.

 7       Just continue.

 8  A.   (Continuing.)  When I met the president of [Redacted], he told me

 9  that Roy had visited him and told me that since Roy knows

10  everything [Redacted] needs and its price, Roy would supply that at a

11  lower price.  And proposed to the president of [Redacted] to have

12  business with him.

13       And he also said that -- so the president actually is a

14  long-time customer.  And when he asked Roy:  "How could you do

15  that after working for Airtech for such a long time?" Roy had

16  replied to him that Airtech's -- all data and information is

17  in his hand.

18       Not only that, he also has witness's personal tax

19  information and company tax information.  Therefore, even Roy

20  thought something like that the witness would not be able to

21  do anything.

22       He also lied that I didn't pay -- I owe him $200,000 of

23  salary unpaid.  He lied to the president of [Redacted].

24  BY MR. ASHER:

25  Q.   Are there any other customers in Korea who told you about

 1   what Roy told them?

 2          MR. ROBERTS:  Objection.

 3          MR. ASHER:  That's his client's statements I'm asking

 4   for.  That was a "yes" or "no" question.

 5          THE COURT:  Mr. Asher, hold on for a second.

 6          The objection is overruled.  It is a "yes" or "no"

 7   question.  He's got to answer "yes" or "no" and not get into

 8   the communication, because Mr. Roberts has a hearsay objection

 9   he wants to make.

10          Your question is a "yes" or "no," but he's got to

11   answer it "yes" or "no."

12          Can you translate that?

13          THE INTERPRETER:  Yes.

14   A.   Yes.

15   BY MR. ASHER:

16   Q.   Identify any other Korean companies who told you

17   concerning what Roy told them regarding Airtech.

18          MR. ROBERTS:  Your Honor, to the extent that that will

19   elicit a hearsay response, I object.  It's a little bit tricky

20   with the interpreter.  I have been trying not to interrupt.  I

21   really haven't interrupted this at all, quite frankly, but

22   we're going to get into critical hearsay about something

23   that's going to go directly to the merits of the standard of

24   review for preliminary injunction.  I am going to start

25   objecting.

1          THE COURT:  So, Mr. Asher, I think the point

2    Mr. Roberts is making is a real one.  He's been -- he hasn't

3    objected much.

4          Some of this sounds like hearsay, and what I would say

5    is that question that you just put to him, I don't know if

6    that's hearsay, just asking for people with whom he's had

7    conversations.  But I take Mr. Roberts' point that because

8    there's an interpreter it's not clear what's gonna come next

9    and makes it hard for him to object.

10          So we've got to ensure that the witness is answering

11    the question you've put, which is simply, as I understand it,

12    with whom have you had conversations that cover this subject

13    area.

14          Hang on for one second.

15          Mr. Roberts, do you have an objection to that question?

16          MR. ROBERTS:  I do not, Your Honor, but I appreciate

17    the Court's understanding of the complication.

18          THE COURT:  It's a tough spot.  I hear you.

19          MR. ROBERTS:  I appreciate that.  But that specific

20    question, no.  But I'm listening carefully in the exchange.  I

21    want to be timely, having not been timely the first time.

22          THE COURT:  Okay.  Got it.  All right.

23          MR. ASHER:  Your Honor, I'm sure you understand I just

24    simply want to get from the witness the statements which

25    Mr. Yim said for the truth -- not for the truth by any means

1    of what Mr. Yim said, for the truth of its content.  It's

2    simply what are the defamatory and tortious and violative

3    statements that he himself made to my client.  That's all I

4    want.

5              THE COURT:  Just put questions.  Mr. Roberts will put

6    objections.

7              MR. ASHER:  Thank you.

8              THE COURT:  The question on the table is with whom did

9    he speak on this subject area.  Mr. Roberts already told us he

10   doesn't object to that.  So let's get that question

11   answered --

12             MR. ASHER:  Right.  Okay.

13   BY MR. ASHER:

14   Q.   Mr. Lee, you described a communication which you had with

15   an executive at [Redacted] concerning what Roy Yim told them regarding

16   Airtech.

17             When did you have that discussion with [Redacted]?

18   A.   November of 2021.

19   Q.   Did you, during that approximately same period of

20   time with any other customers of Airtech?  Yes or no?

21             MR. ROBERTS:  Objection, only to the extent that it

22   would elicit hearsay within hearsay.  In other words, I don't

23   want to attach hearsay from what somebody else said, by either

24   implication or direct attribution, to at this point an

25   unidentified witness for -- and attribute some statements to

1    that person that were repeated by somebody else who was giving

2    a hearsay response to.  We're just building hearsay upon

3    hearsay.

4         THE COURT:  Mr. Asher, here is the difficulty I think

5    we're having:  You're asking for information on what theory?

6    If it's a statement of a party opponent, I take Mr. Roberts'

7    point to be there's another level of hearsay you need to

8    account for.

9         If you're asking for something like state of mind, why

10   does that matter?

11        MR. ASHER:  All I'm seeking to do to obtain for the

12   record for Your Honor is that businesses were -- received

13   Mr. Yim's own statements.  I want to put on the record the

14   statements Mr. Yim himself said to these individuals in Korea.

15        THE COURT:  But you know what Mr. Roberts is gonna say.

16   He's gonna say you want to do the first part -- in other

17   words, the exception you would hope to use is of an admission

18   or rather a statement of party opponent, not state of mind.

19        But these are not statements of a party opponent.

20   There's an added layer of hearsay in here because these are

21   statements of a party opponent made to another person with

22   whom the witness interacted.

23        So how do you deal with that?

24        MR. ASHER:  Well, Mr. Lee's sources are simply -- or at

25   least it's my intent that Mr. Lee would testify concerning the

1    statements which his sources report solely in terms of what

2    Mr. Yim told these sources.  That's all I want to do.

3         THE COURT:  Isn't that hearsay?

4         MR. ASHER:  It's admissible hearsay.

5         THE COURT:  Why is it admissible?

6         MR. ASHER:  Because it's not for the truth of the

7    content.  This is what Mr. Yim said for -- it's defamatory,

8    it's actionable.  It's simply -- whether it's true or false,

9    he made the statement, whether it's true or false.

10        We can later find out perhaps from Mr. Yim and others

11   whether it's true or false, but the fact is he's making --

12        THE COURT:  There are some very abstract questions

13   here.  A lot of this feels very directly, to me, like hearsay

14   at this point.  I would imagine that there is certainly a way

15   to elicit that -- Mr. Roberts, who is being very thoughtful on

16   the Rules of Evidence, I can't imagine would object.

17        There's a way to elicit that Mr. Yim left, there was a

18   decline in business from certain people.  You elicited that.

19   Mr. Roberts didn't object.  And we can sort of take it from

20   there.

21        The idea that we need to get Mr. Yim's allegedly

22   defamatory statements, whether that's relevant or not, it's

23   pretty hard for me to see how they survive a Rule of Evidence

24   challenge.

25        Why don't you move on from this and get to what I think

1    to be the substance of what Airtech accuses Mr. Yim of doing,

2    which is engaging in some improper activity that gave him

3    access to things he shouldn't have.  And then we can take it

4    from there.

5         MR. ASHER:  I understand your point, Your Honor, but

6    whether it's admissible or not, this is one of our claims of

7    defamation and a breach of this fiduciary duty, all of those

8    other obligations.  He made these statements to destroy the

9    competition.

10        THE COURT:  How are you going to prove up defamatory

11   statements may be entirely collateral to this question?

12        MR. ASHER:  I understand your point.  I'm just saying

13   that these were -- that may be -- all I'm suggesting is that

14   these were statements that were made and what was the impact

15   to these people.

16        Now, that may be what did these people actually tell

17   him in terms of whether they discontinued their business with

18   Airtech by reason of the statements that Mr. Yim gave to them.

19        THE COURT:  Mr. Roberts, I'll hear from you in half a

20   second.

21        But the thing -- the core allegation that Airtech is

22   making is that one of the defendants took trade secrets.

23   That's the way you have a federal law hook, and then there's

24   all kinds of state claims that follow along with it.  Got all

25   of that.  Then he did all of that, and, therefore, he needs to

1    be restrained/enjoined so that he won't make use of it.

2        I take your point that it's relevant to all of that,

3    that on your account he did make use of it; but what I'm

4    suggesting is that before we get into that back-end proof

5    which has all kinds of tricky hearsay issues in it of one of

6    the defendant's alleged use of the trade secret information, I

7    think it would be helpful to get to the underlying story

8    first, which is what happened in the run-up to Mr. Yim's

9    departure, what was learned afterward.

10       That is the crux of the matter, which is whether or not

11   trade secrets and other things were purloined.  Some of what

12   you're talking about is maybe, maybe relevant later but only

13   later.

14       I would suggest if you could, Mr. Asher, why don't you

15   start with that part of the story first.  It's chronological.

16   BY MR. ASHER:

17   Q.   Mr. Lee, does Airtech have trade secrets?

18   A.   Yes.

19   Q.   Could you briefly describe the types of trade secrets

20   which your company owns?

21   A.   I can divide our trade secrets in two broad categories.

22   First category is proprietary items and information; and the

23   second category is all our record of inquiry, offer, order,

24   and quality-related expert licenses and all our data,

25   including accounting information.

1    Q.   I'd like to show you a document that was pre-marked as

2    180.

3         Mr. Lee, can you see the document that's shown on the

4    screen at the far wall of the court?

5    A.   Yes.

6    Q.   The first page that's shown -- as they begin to scroll

7    through the document, these are supplemental responses to a

8    prior discovery interrogatory propounded by Mr. Yim and the

9    co-defendants.

10        Do you see that?  Do you see that?

11   A.   Yes.

12   Q.   Now, let me scroll you to a page which I believe shows

13   your signature.

14        Is that your signature on that page?

15   A.   Yes.

16   Q.   On the immediately preceding page, the prior page, do you

17   see there's a list?

18   A.   Yes.

19        MR. ASHER:  Excuse me.  Could you show me the prior

20   page, the one I'm looking at with Mr. Lee?

21        (Brief pause.)

22   BY MR. ASHER:

23   Q.   There is a list.  Can you read this, or do you have a

24   hard copy in front of you to read it?

25        MS. BAE:  He has a hard copy.

1          MR. ASHER:  I couldn't see that.  Thank you.

2   BY MR. ASHER:

3   Q.    This lists shows a number of contracts or letters.

4          Do you see that?

5   A.    Are you referring to paragraph 84?

6   Q.    That's a "yes" or "no."

7          MR. ASHER:  Does he see it?

8          THE INTERPRETER:  He has the hard copy.

9          THE COURT:  Hold on for a second.  Mr. Asher,

10  Mr. Asher, you can't put questions to the interpreter.  The

11  questions have to go to the witness.

12         What are we doing with this document?  Give me a quick

13  proffer, one moment.

14         MR. ASHER:  I want him to describe what these are

15  generally and then to briefly identify all the other pages

16  that follow after that in this document that Your Honor will

17  see in a minute.

18         These are a description of agreements and letters that

19  are used in his company.  And we'll find out whether he --

20         THE COURT:  But is your purpose -- forgive me for

21  cutting you off.  Is your purpose to offer these documents

22  through him?

23         MR. ASHER:  I would offer through him the -- this page

24  and the subsequent appendix which follows after this.

25         THE COURT:  Any objection to offering that,

1    Mr. Roberts?

2        MR. ROBERTS:  Yes.  I'd like to hear a foundation as to

3    how he would offer it through the witness.  The way he's

4    approaching it is he assumes it's in evidence, and he's asking

5    questions without laying a foundation with this witness or to

6    the extent the knowledge of the witness.  Who created the

7    document?  How was the document created?  What --

8        THE COURT:  Mr. Roberts, hang on for a second, if you

9    don't mind.  I don't know what is to come.  Forgive me.

10       Are these documents contracts between Airtech and

11   another entity?

12       MR. ASHER:  That's right.

13       THE COURT:  Is the testimony going to elicit that in

14   the course of running Airtech he was familiar with these

15   documents?

16       MR. ASHER:  That is correct.

17       THE COURT:  Mr. Roberts, do you have an issue with

18   getting these in?  It's not even clear if the Rules of

19   Evidence obviously apply here.

20       Do you have an issue with Airtech contracts --

21       MR. ASHER:  I have all week, Your Honor, to introduce

22   each of those documents with my colleague here.

23       THE COURT:  Mr. Asher, hang on for a second here.

24       MR. ROBERTS:  So do I.

25       THE COURT:  Mr. Roberts, do you have an issue with just

1   putting these in?

2        MR. ROBERTS:  He's not putting in the contracts.  What

3   he's moving to next is an Excel spreadsheet of which we

4   really, quite frankly, have no -- we don't know what the

5   origin of it is, why it's created, the specificity of where

6   the data came from.  This is what he's moving to.  He's not

7   moving the contracts.

8        I wouldn't object if he was going to put a contract in

9   that he signed that I knew about.  But he's got a lengthy

10  Excel spreadsheet with --

11       MR. ASHER:  He's way ahead of me --

12       (Simultaneous crosstalk.)

13       MR. ASHER:  I'm just asking about --

14       MR. ROBERTS:  Your Honor, it's the next page.  I'm just

15  going by what he said.

16       THE COURT:  Fair enough.  I asked Mr. Roberts the

17  question, Mr. Asher.  Let's continue with the examination, and

18  let's get to whatever document you want to admit and how we

19  know something about it.

20  BY MR. ASHER:

21  Q.   Generally speaking, do you recognize the -- generally the

22  business records that are shown on this page that's in front

23  of you?  "Yes" or "no"?

24       THE INTERPRETER:  May I ask for repetition?  I'm sorry,

25  counsel.

1          MR. ROBERTS:  Your Honor, I'll object to the extent

2    that there are no business records being currently shown.

3          THE COURT:  Sustained.

4          Mr. Asher, it's not clear to me what is in front of the

5    witness at all.  What I see on the screen is a document marked

6    "paragraph 19" that is -- appears to be an interrogatory

7    response.

8          I don't know what you're asking about.  Maybe the

9    witness has something else in front of him, but I think we

10   need to clear that up.

11         MR. ASHER:  I'd like to have this document marked as

12   Plaintiff Identification 1.

13         MR. ROBERTS:  I have no objection to the witness's --

14         THE COURT:  It's marked Plaintiff Exhibit 1.

15         MR. ASHER:  Thank you, Your Honor.

16              (Plaintiff's Exhibit No. 1 was marked

17               for identification.)

18   BY MR. ASHER:

19   Q.   Please describe the types of agreements or correspondence

20   that you have with vendors and customers --

21         THE COURT:  Mr. Asher, hang on for a second.  Hang on

22   for a second.  First of all, I don't have a copy of

23   Plaintiff's Exhibit No. 1.  I don't know what's being

24   discussed.  Just pass that up.

25              Thank you so much.  I appreciate that.  You can pass it

1  through the Courtroom Deputy, please.  Thank you.  Thank you

2  very much.

3      So now I have in front of me Plaintiff's Exhibit 1 for

4  identification only.

5      Over to you, with thanks.

6  BY MR. ASHER:

7  Q.   Mr. Lee, please describe the types of agreements that you

8  have with customers and vendors with the exception of purchase

9  orders and invoices.

10 A.   We have exclusive agent agreement.  We also have

11 designated exclusive items that only Airtech can handle.  With

12 some vendors -- some vendors gave us exclusive contracting

13 rights to all of Korea for their products.

14      We also have letters from other vendors that we can --

15 we are authorized to sell in Korea.  With some other vendors

16 we may not have written papers, but through our long-standing

17 relationship we have mutual agreement that we will be the sole

18 supplier for their products to certain customers.

19 Q.   All right, sir.  Let me turn to the other pages in

20 Plaintiff's 1 for identification.  Let me turn to the very

21 next page.

22      The very next page shows your signature; correct?

23 A.   Yes.

24 Q.   The page thereafter is the first of an approximately

25 20-page spreadsheet which is headed "Exhibit A - Airtech

1    Proprietary and Other Protected Products - Confidential."

2         Do you see that title and this one page?

3    A.   Yes.

4    Q.   Who prepared to document, referring specifically to

5    Exhibit A beginning on the page in front of you all the way to

6    the end of the document which actually ends on page 20.

7    A.   One of my employee Daniel Chun prepared it.

8    Q.   Who is Mr. Chun?

9    A.   He is the current general manager.

10   Q.   And he took over as general manager after Roy Yim left;

11   correct?

12   A.   Correct.

13   Q.   In general terms, what is the information that's set

14   forth on Exhibit A?

15   A.   These are the list of our exclusive items and our vendors

16   and customer list, including our exclusive program names and

17   our products that we can sell to our Korean customers.

18   Q.   From the standpoint of what represents an exclusive

19   arrangement, is that on the basis of an actual written

20   agreement between the vendor and Airtech?

21   A.   Yes.

22   Q.   Or are there other arrangements whereby an exclusivity

23   may exist outside of the exclusive agreement itself?

24        THE INTERPRETER:  May the interpreter request a

25   repetition, please.

1    BY MR. ASHER:

2    Q.    Are there other situations where an exclusive arrangement

3    may exist outside of a formal written exclusive agreement?

4    A.    Yes.

5    Q.    Please, the types of exclusive arrangements of that

6    nature?

7    A.    Basically, the way of our business is that when a

8    customer comes up with their need, we begin to search for

9    companies that can provide for the need within the

10   United States as well as in other countries globally.

11          So when we find such company, we approach and contact

12   with the specification presented by the customer and see if

13   those specifications can be met.  So when the company can meet

14   those requirements, we cooperate with the company to develop

15   and complete the product meeting the customer's specification

16   and we make the sales, we sell it.

17   Q.    What types of steps does Airtech perform in connection

18   with the development of products?

19   A.    So basically when we get the specification from the

20   customer, we find the vendor who can meet the requirement, and

21   then we continuously work with them to meet the requirement,

22   and sometimes we have to adjust the specification so that the

23   vendor can produce it.

24          This process is done with the customers.  So we have to

25   make sure that the specifications are attainable by the

1    selected vendor.  So we work with both the vendor and

2    customers, and then we complete the specification of the

3    product together.  We complete it together.

4         So when the product is completed, we have to inspect

5    it.  And if all the requirements are met -- so after the

6    specification is completed, we have to take the order from the

7    customer and then give the order to the vendor; and when the

8    product is made, we have to make sure that it passes

9    inspection.  And then when the process is completed, we can

10   supply the product to our customers.

11   Q.   The process which you've just described, does that apply

12   to the customized part of your business?

13   A.   Yes.

14   Q.   In terms of transactions, what's the percentage of your

15   business that involves the customized product?

16   A.   In terms of workload, I would say it's about 20 percent;

17   but in terms of our revenue and profit, it would be about

18   80 percent.

19   Q.   With regard to the balance, is it fair to call it a

20   standard product business?

21   A.   Yes.

22   Q.   Now, in the case of your personnel dealing with the

23   standardized business of Airtech, what is the type of

24   information, if at all, on which they use in connection with

25   determining how to complete inquiries from your Korean

1    customers to fulfill those requests?

2    A.   So they would need the customer's product information and

3    then vendor information, which can make the product possible,

4    and then they would need information about the price and

5    quality of the vendor.  And they have to find out who is the

6    more reliable vendor among the vendors with price

7    competitiveness.

8         And through the system history with each vendor, they

9    can find it out.  And even for the customers to set the price,

10   they would need to go over the previous history with that

11   customer to come up with the proper price.

12   Q.   How is that information sourced for purposes of

13   addressing a Korean customer's product inquiry?

14   A.   They would basically begin with our own company's data

15   system and look at the history, and we also have some paid

16   trade sites that we use to confirm information.

17        MR. ASHER:  I'd like to have the answer read back.

18   Please.

19        (The requested portion is read back by the Official

20        Court Reporter as follows:

21        A. They would basically begin with our own

22        company's data system and look at the history, and

23        we also have some paid trade sites that we use to

24        confirm information.)

25   ///

1    BY MR. ASHER:

2    Q.    I believe you testified earlier that when Roy Yim joined

3    Airtech he had worked on IT systems for Airtech.

4    A.    Yes.

5    Q.    Are there categories of data contained in the computer

6    systems at Airtech?

7    A.    Yes.

8    Q.    Are there specific categories setting forth historical

9    data on prices, preferences, quotations, transactions, and

10   other data?

11   A.    Yes.

12   Q.    Does Airtech actually refer to that data in order to

13   determine how to put together a purchase and sale transaction

14   with prices acceptable to the three parties?

15   A.    Yes.

16   Q.    Has the data continued to be preserved in a computer

17   system which Roy Yim established?

18   A.    We developed a new system after Roy left.  We still

19   have -- we preserved all the data, though.

20   Q.    From the Roy Yim period; is that correct?

21   A.    Correct.

22   Q.    Now, after Roy Yim left, did you see anything that was

23   missing physically?

24   A.    A lot of data disappeared.

25   Q.    What about in terms of hardware or computers?

 1  A.    Yes.

 2  Q.    Tell us about any missing computers.

 3  A.    The computer that Byung Chan Yim used to use and also my

 4  own computer, those two disappeared.

 5  Q.    Did anybody obtain a photograph that may explain the

 6  missing of computers?

 7  A.    Yes.

 8  Q.    All right.  In front of you is a document showing

 9  four photographs.

10  A.    I see it.

11        THE COURT:  Mr. Asher, why don't you specify for

12  the record what the document is.  I think we're seeing

13  six photographs.  It would be helpful to just specify what

14  document we're looking at.

15        MR. ASHER:  These are screenshots of --

16        THE COURT:  What's the Bates number?  What is the

17  document, just so the record can know what we are looking at.

18        MR. ASHER:  Thank you, Your Honor.  It is PX-7, and it

19  has another control number on it.

20        THE COURT:  Has that been marked for identification,

21  Mr. Asher?  Mr. Asher, has that been marked for

22  identification?

23        MR. ASHER:  Not yet.  I am now asking to have it marked

24  for identification.  I'm going to do that.

25        THE COURT:  Terrific.

1              MR. ASHER:  I also want to identify one other control

2      number reference that may be useful.  It's PI000165.

3              THE COURT:  Mr. Asher, why don't you mark this for

4      identification, and then you can pass around copies.

5              MR. ASHER:  Right.

6                 (Brief pause.)

7              MR. ASHER:  They have a copy, Your Honor.

8              MR. ROBERTS:  No objection.

9              MR. ASHER:  No objection.

10             THE COURT:  Are you offering this into evidence?

11             MR. ASHER:  I haven't offered it into evidence.  Yes,

12     I am.

13             THE COURT:  Mr. Roberts, do you object?

14             MR. ROBERTS:  I do not.

15             THE COURT:  Mr. Asher, what has been marked for

16     identification as Plaintiff's Exhibit 7 has been offered into

17     evidence and is admitted into evidence.  Plaintiff's Exhibit 7

18     in evidence.

19                 (Plaintiff's Exhibit No. 7 was marked and received

20                  in evidence.)

21             MR. ASHER:  Yes, Your Honor.  It has been just put and

22     received in evidence.  Thank you.  I just would ask for Mr. On

23     [sic] to identify what appears to be shown on these

24     photographs.

25             THE COURT:  Maybe we can pass up Plaintiff's Exhibit 7

1    and we can have all that, and then you can ask the witness, as

2    you would like to, Mr. Asher, to speak about what this piece

3    of evidence is.

4            MR. ASHER:  I think they already have it.

5            MR. ROBERTS:  I don't object.

6            May I use the restroom.

7            THE COURT:  Sure.  Some people need to have a break.

8    Why don't we take a five-minute break.  Why don't we come back

9    at noon.  That's a little more than five minutes.

10           MR. ASHER:  Thank you, Judge.

11           MR. ROBERTS:  Thank you, Judge.

12           (Recess taken.)

13           THE COURT:  Mr. Asher, we're ready for you.

14           MR. ASHER:  Thank you, Judge.

15   BY MR. ASHER:

16   Q.   Mr. Lee, did -- please describe the ways in which your

17   company was embezzled money by Mr. Yim.

18   A.   When I returned from my business trip to Korea in January

19   of 2020, my employees reported to me that Byung Chan Yim

20   issued fake order and invoice and embezzled money.  There were

21   three incidents that were reported to me.

22           So I invested [sic] those three incidents.  I confirmed

23   the amount of money and the next -- so after I confirmed the

24   amount, the next day I called him into my office and asked him

25   why he stole the money.

1        Byung Chan Yim told me that he lost a lot of money by

2    making a bad investment in stocks, so I told him to return the

3    money to the company and I took away his authorization to

4    issue company check.  And he told me that he will really work

5    hard from that point on.

6        And the most important reason that I could not fire him

7    that day was I knew that his wife had fourth-stage cancer at

8    the time and was undergoing treatment.  He would have lost his

9    health insurance if I fired him, and I remembered that he

10    worked hard prior to those incidents.  And he promised not to

11    do it again.

12        I received his return of $12,000 out of

13    30-plus thousand -- I mean $30,000-plus embezzled.  So he

14    returned only 12,000 out of 30,000.  I told my three employees

15    who made the report of stolen embezzled account that he

16    returned most of the money.  And then he promised not to steal

17    again, and I would like to just keep him and work together

18    going forward.

19        And I didn't tell the entire amount to my employees, so

20    until Byung Chan Yim left in September of 2021, they didn't

21    know about the other money stolen.  After he left, the

22    employees stumbled upon that information in the process of

23    doing some other business, so I had them investigate the whole

24    account.  So I found out through that entire account

25    investigation that he had been stealing, beginning in 2014,

1   and issuing fake invoices.

2   Q.   Mr. Lee, you found out about his stealing dating back to

3   2014.

4        Did you learn about that before he left or after he

5   left?

6   A.   After he left.

7   Q.   Now, after he left, did you learn that he set up

8   four companies with which to conduct business with Airtech

9   itself?

10  A.   Yes.

11  Q.   Briefly describe what he did with respect to those

12  four companies.

13  A.   He had set up four companies under his -- under the woman

14  that he was having -- the name of the woman with whom he had

15  extra-marital affair with, he had set up four companies.  And

16  it was in Florida and Tennessee he had set up virtual offices

17  and told my employees to purchase certain items from those

18  fake companies.

19       So he made -- he told my employees to make a purchase

20  at a price which was $200,000 higher than actual price.  And

21  later on he would transfer that money to Assure World company

22  that he had also set up.

23       Using that money and the Assure World company which

24  were set up under his lover's name, he did business with the

25  Redacted       and Redacted    .  He did business using that

1    money with [Redacted] and [Redacted].  He set up those

2    four companies beginning in 2020 and 2021.  That was while he

3    was working for my company.

4    Q.    In the case of Assured, that was not one of the

5    four companies; correct?

6    A.    No, no.

7    Q.    Describe what Assured did.

8          MR. ROBERTS:  Your Honor, I'd just like to be heard for

9    a moment.  Your Honor, I'm going to object to the line.

10          I've been listening to the line of questioning for some

11    time, and it's developing on really a conversion claim, a

12    damages claim, you know, as it concerns issues in the case

13    that relate to direct economic damages arising from whether

14    it's breach of duty of loyalty or whether it's from

15    essentially just conversion of assets of the company

16    improperly.

17          It doesn't go to the heart of why we're here in terms

18    of the protected activity by the order, whether or not trade

19    secrets have been taken, continue to be taken, and whether

20    that's resulting in unfair competition by which this Court

21    would either continue an order, which is at the moment very

22    broad or narrow, that order, or not allow the order to be in

23    place any further.

24          I'm trying to avoid the trial of the matter at this

25    time on the damages claims that do not speak directly to a

1    preliminary injunction and what the standard is and why we're

2    here, especially with some new cases that have evolved within

3    the last 90 days in this district, and to keep focused on

4    trade secrets, whether or not they have -- the defendant

5    should be enjoined from conduct.

6         Because essentially the specific purpose of this

7    hearing is to determine whether or not the TRO should stay in

8    place or be dissolved, as I'd like it to be, or the Court

9    fashions another remedy and narrows that TRO based upon proofs

10   that he heard that they were in fact compromised by protected

11   trade secrets that continue to be compromised by definition

12   within the application of federal Rule 65 and prevailing case

13   law to date, particularly in this jurisdiction, to include an

14   opinion recently written by Judge Martinotti within the last

15   90 days, which we're prepared to talk about, which is called

16   *Ho-Ho-Cus* vs. an aerospace company which is insightful and

17   almost directly on point.

18        What I'm trying to avoid is the wasting of time and

19   resources that is an expense to all of us as it concerns the

20   larger damage claim in the trial.  I understand the plaintiffs

21   want to demonstrate there was a bad actor.  It's not directly

22   relevant to why we're here and ultimately to the Court's

23   determination, unless they're going to bring out the conduct,

24   which I haven't heard today yet, that should be enjoined and

25   for the specific reasons why.

1        Not generally:  "He slandered me, he put in a fake

2   invoice and took $12,000 or took 30 and repaid 12."

3        That's not why we're here.  I'm just trying to focus

4   the hearing that way.

5        THE COURT:  Mr. Asher --

6        MR. ASHER:  We didn't even get to the point, which he,

7   of course, is fully familiar with, Your Honor; that Assured,

8   through Yim and his girlfriend, later wife, were competing --

9   using trade secret confidential information, were trading

10  directly with our own customers, which is the focal point of

11  our -- and the focal point -- he's trying to avoid

12  Your Honor's direction right now with the speech he just

13  gave.  Okay.

14       I want us to take about five minutes to go through

15  Assured and Hans, which simply demonstrate the means by which

16  he was competing based on confidential information which, of

17  course, was uniquely about Assured, for starters, is that he

18  was still working at the time.

19       Now, maybe that's why he's saying to characterize it as

20  a damage case.  But the point is, it's a pattern in which he

21  has operated.  He started in these means and shown by

22  embezzlement using the four sham companies, and now he's set

23  up companies that were just trading off the information

24  as well.  That's where he started.

25       THE COURT:  Mr. Asher, I'm going to let you put on your

1  witness how you like fundamentally.  But here is the

2  difficulty that Mr. Roberts is getting at a little bit, and

3  I'll tell you candidly it's a difficulty I'm to having, too.

4      Which is:  The core of this matter is that Airtech had

5  trade secrets, that's what you want to show; that it protected

6  them, number two; that the defendants took them; and the

7  defendants were/are making use of them.

8      Those four things come before a lot of the things

9  you're now getting into, which are efforts to show that the

10 defendant -- one of the defendants is a bad actor, which may

11 be relevant in any number of ways.

12     Mr. Roberts thinks it's relevant just for damages.  I

13 may think it's relevant to his credibility.  But we're

14 skipping over -- we spent a lot of time already, it's 12:15,

15 but we're skipping over some of the very basic stuff:  Was it

16 a trade secret, was it protected, was it taken?

17     I haven't even heard that it was taken.  And, number

18 four, did the defendant stay in the business/make use of the

19 stuff?

20     I think if we focus on that, it will help us all and it

21 will certainly help me as the factfinder.  I'm not saying that

22 things about converting property or embezzlement are not

23 relevant.  They could well be relevant, for example, on a

24 cross of a defendant, and they could be relevant to the kind

25 of remedy that I fashion here.

 1          But remedies, cross, kind of come after the four things

 2     we just talked about.  I think if you focus there that would

 3     be helpful.

 4          MR. ASHER:  Thank you, Your Honor.

 5          THE COURT:  Thank you, Mr. Asher.

 6     BY MR. ASHER:

 7     Q.   Mr. Lee, a few minutes ago I had asked about the fact

 8     that Mr. Yim utilized a company called Assured.  You also

 9     mentioned a company called Hans.

10          Did they conduct business with your company, your own

11     customers?

12     A.   Not with Airtech.  They did business with Airtech's

13     customers.

14     Q.   Okay.  What was the period of time during which he took

15     business from your customers?

16     A.   Beginning July of 2020.

17     Q.   Until when?

18     A.   Until present, and he still is.

19     Q.   With regard to the present for a moment, have you been

20     informed that with regard to one of the vendors, Redacted

21     engaged into a multi-million dollar transaction with Mr. Yim

22     relating to one of your products?

23     A.   Yes.

24     Q.   Please describe the product in question.

25     A.   In September of 2021 one of my Korean customers Redacted, we

1    received an inquiry.  We had gotten an estimate under Airtech

2    name, but when he was leaving at the end of September, he

3    received the exact same estimate from the same company about

4    the same product using the company name Hans.

5            After that, he took the order from ▓Redacted▓ and placed the

6    order to ▓Redacted▓.  So he took the order away from Airtech.

7    So as the specifications were being specified, some very

8    little was changed.  The part number, the last letters were

9    changed from CX to DX, and the transaction progressed.

10           And after that, related to this matter, he continued

11   his business with ▓Redacted▓.  And last October he made a

12   transaction using the same product but with larger capacity

13   and made a deal -- made a $2 million deal.

14   Q.   That's the --

15           THE COURT:  Mr. Asher, I'm going to ask you to hold for

16   just one moment.

17           How long do you think you have with this witness left?

18           MR. ASHER:  On the direct about no more than one hour.

19           THE COURT:  Okay.  Thank you.

20           Mr. Roberts, how long -- your client, you indicated, is

21   leaving tonight for Iowa.  May I ask what time his flight is.

22           MR. KIM:  6:45 p.m.

23           THE COURT:  Mr. Roberts, how long do you think it would

24   take for your client to testify?

25           MR. ROBERTS:  One hour, roughly.

1          THE COURT:  Okay.  Mr. Asher, do you have any guess as

2    to how long your cross or one of your colleague's cross of the

3    defendant will be?

4          MR. ASHER:  No more than 45 minutes.  I also intend to

5    read in from his deposition, as well, which would -- I could

6    give it to you from the transcripts which are in the binders,

7    and I have the designations for it.

8          THE COURT:  There's a premium here, I think, given what

9    I've heard so far and hearing from the defendant live if it's

10   possible.  The time now is 12:25.  Would anybody object to --

11   this is slightly unorthodox but it's obviously a bench

12   proceeding -- having this witness step down?  He'll step away,

13   of course.  He remains under oath and we continue with the

14   defendant so we can have his testimony come in and the cross

15   be completed.

16         Mr. Roberts, do you have any objection to that?

17         MR. ROBERTS:  None.

18         THE COURT:  Mr. Asher, do you have any objection to

19   that?

20         MR. ASHER:  No.

21         THE COURT:  Why don't we do that.  It's a little bit

22   unusual, but the reasons to do it is simply because having him

23   testify live is better than having him testify by video for

24   the truth-seeking process.

25         So if you could translate, please, for the witness.

```
 1        Sir, we're going to ask you to step down from the
 2   witness stand so that the defendant can testify live and in
 3   person.  During the time that he testifies, you remain under
 4   oath, and we will finish your testimony tomorrow morning.
 5   Thank you very much.
 6        Mr. Roberts, any objection to him remaining as the
 7   client representative in the room?
 8        MR. ROBERTS:  No, Your Honor.
 9        THE COURT:  Sir, you can stay in the room here.  Thank
10   you.
11        Thanks everyone for being flexible on that.
12        Does your client need an interpreter?  I don't know.
13        MR. KAMVOSOULIS:  We do have one, Your Honor.
14        MR. ROBERTS:  Your Honor, what's the Court's scheduling
15   for this afternoon in terms of --
16        THE COURT:  I would love to finish your client and then
17   call it a day, wherever it is.  But that does not mean direct
18   expanse to fill the time allotted.  Let's just try and get
19   this done.  It will be helpful to have finished that.
20        Mr. Roberts, over to you.
21        MR. ROBERTS:  At this time, Your Honor, we'll call Roy
22   Yim.
23             (Brief pause.)
24             (Whereupon Joanna Koh, the Interpreter, was duly
25              sworn.)
```

BYUNG CHAN YIM - DX - BY MR. ROBERTS                    **51**

1          (Whereupon, the witness was thereupon duly sworn.)

2          THE DEPUTY CLERK:  Have a seat.  Pull the microphone

3   close to your mouth and state your name for the record.

4          THE WITNESS:  Byung Chan Yim is my name.

5                      BYUNG CHAN YIM,

6      having been first duly sworn, testified as follows:

7                    DIRECT EXAMINATION

8                    By Mr. Roberts:

9   Q.   Good afternoon.  Roy, for the benefit of the Court, would

10  you please tell His Honor your background, please.

11         THE INTERPRETER:  I'm sorry, could the interpreter hear

12  the question again?

13  BY MR. ROBERTS:

14  Q.   For the benefit of the Court, would you kindly give

15  His Honor your background, please?

16  A.   So in 2005 my major in college was electronic

17  engineering.  I graduated from a graduate school in the

18  United States as a computer science major.  And starting from

19  2005, I worked at Airtech as a software engineer.  And

20  starting from 2006, I started working as a software marketing

21  engineer.  Starting from 2010, I worked as a general manager.

22  I ended up having to stop working at Airtech in September

23  2021.

24  Q.   Tell us about what your first responsibilities were when

25  you began working at Airtech, please.

1   A.   As a software engineer --

2        THE COURT:  Hang on for one second.  I think there was

3   an objection being made.

4        MR. ASHER:  Your Honor, just from the fast-moving

5   events that have changed the circumstances at this point, I

6   have conducted a deposition for two full days of this witness

7   which was done exclusively in English, and he was perfectly

8   fluent.

9        I now realize he's using an interpreter.  It's creating

10  a delay.  He's telling us about an airplane schedule.  I don't

11  understand how this could just completely -- why he's hiding

12  behind an interpreter for this purpose.

13       THE COURT:  Mr. Roberts.

14       MR. ROBERTS:  Your Honor, when the depositions went

15  forward, I offered him one way or the other.  It's clear that

16  English is not his first language.  I believe that's true for

17  all the witnesses.

18       So he's appearing in federal court, this is a serious

19  matter.  I think there's a comfort level.

20       THE COURT:  Mr. Roberts, I hear you.  Why don't you ask

21  three or four foundational questions to establish some of the

22  things you've just proffered, and we can take it from there.

23       MR. ROBERTS:  Very well.

24  BY MR. ROBERTS:

25  Q.   Roy, is English your first language?

1    A.    No, it is not.

2    Q.    Were you offered the opportunity to speak either in

3    English or with an interpreter today and you felt more

4    comfortable with an interpreter?  Is that a true statement?

5    A.    Yes.  I would like to proceed in Korean.

6    Q.    Did we have a discussion about you using an interpreter

7    in order to be certain that you could communicate most

8    effectively to His Honor?  Is that the discussion that we had?

9    A.    Yes.

10   Q.    Did we speak about your important travel schedule --

11        THE COURT:  Let's bracket the travel stuff.  It doesn't

12   matter to me.  Why don't you ask him why he didn't do the

13   deposition in English.

14   BY MR. ROBERTS:

15   Q.    You remember when we had, I believe almost two years ago

16   now, depositions in this case?

17   A.    Yes, I remember.

18   Q.    My recollection is at the deposition you did have an

19   interpreter.

20        THE COURT:  No testimony, just questions.

21   BY MR. ROBERTS:

22   Q.    Mr. Asher believes otherwise.

23        Were you offered the opportunity to have a translator

24   at your deposition?

25   A.    Yes.

1    Q.    What was your decision at that time?

2    A.    I wanted to use an interpreter.

3          THE COURT:  Did you use an interpreter at the

4    deposition?

5          THE WITNESS:  Yes, yes.

6          THE COURT:  Do you feel that you would be able to speak

7    more accurately and listen to questions more effectively if

8    you used an interpreter here?

9          THE WITNESS:  In order to convey my thoughts, I do need

10   an interpreter.

11         THE COURT:  Okay.

12         Mr. Roberts, you can proceed through the interpreter.

13   I find that regardless of what one might ultimately be asked

14   to conclude with respect to Mr. Yim's credibility, I don't

15   think there's any reason whatsoever to doubt that he is

16   credibly suggesting that English is not his first language and

17   that it would assist him to understand and speak accurately if

18   he does so through an interpreter.

19         That assists the truth-seeking process.  The Court is,

20   of course, open to everybody's evidence.  Here the best way to

21   get Mr. Yim's evidence is through an interpreter.

22         Mr. Asher, your objection is overruled.  In addition,

23   the reference to the travel, there's nothing suspect or

24   strange about it, indeed.  I appreciate that Mr. Roberts is

25   making his client available out of order.

1          And, Mr. Asher, I appreciated your willingness to do so

2     as well.  It helps the truth-seeking process.

3          Mr. Roberts, let's continue.

4          MR. ROBERTS:  Thank you.

5     BY MR. ROBERTS:

6     Q.   I had asked you your education background, and I believe

7     I asked you what various roles you performed at Airtech.

8          The next question:  At any time were you elevated at

9     Airtech to a higher position than your original one?

10    A.   So are you taking about the fact that I was a general

11    manager in 2010?

12    Q.   Correct.  How did you attain that role?

13    A.   Because I managed Airtech as far as the overall

14    operation, I thought that Airtech was my company.  I

15    thought -- I considered Airtech as if it's my own.  Except for

16    the time that I needed to sleep, including the times on

17    weekends, I kept working.

18    Q.   Did you develop any systems or assist Airtech with the

19    development of any products or computer systems or development

20    of its customer base?  What contributions did you make to the

21    company?

22    A.   The work that I did at Airtech was the general work

23    involving being a broker, when there are items that the

24    customers were looking for, when the customers were having

25    trouble, and I did the work of resolving those troublesome

1    issues.

2          It was mainly done on the internet.  I got the sources

3    from the internet, and I looked for the manufacturing

4    companies, and I did the work of connecting the manufacturing

5    companies and customers together.

6    Q.   Can you tell the Court what type of business Airtech is

7    in, generally speaking?

8    A.   So from the defense company in Korea, when the part

9    numbers are sent over, we take those part numbers and we

10   source from the internet or certain sources on the internet

11   and we add our mark-ups on that and we issue our quotations to

12   the customer companies.

13   Q.   Now, when you started as a software engineer, what was

14   your starting salary?

15   A.   It was $50,000.

16   Q.   And when you were promoted to general manager, what was

17   your salary?

18   A.   It was about $100,000.

19   Q.   And what were your responsibilities --

20   A.   It was $100,000.  I'm sorry.

21   Q.   Were you ever raised higher than $100,000?

22   A.   Yes.

23   Q.   To what number?

24   A.   I received $300,000 in the year 2020.

25   Q.   So for one year you were raised to 300,000; am I right?

1  A.   Yes, yes.  It was from $50,000 to $300,000.  That is

2  correct.

3  Q.   Okay.  What authority did you have as the general manager

4  to act on behalf of the company?

5  A.   To tell you the truth, I did have authority over

6  everything as far as managing the customers, managing the

7  vendors, managing the employees, managing the finances, and

8  managing the software.  I had authority over almost

9  everything.

10 Q.   What was the reason for the increase in salary from 100

11 in 2020 to 300 in 2021?

12 A.   It was because I produced more profits for the company.

13 Q.   How much more?

14 A.   It was approximately Redacted.

15 Q.   Did you have an employment agreement with Airtech at any

16 time?

17 A.   No.

18 Q.   Did you ever have any written agreement with Airtech

19 concerning what we call either non-competition or restriction

20 of employment?  Did you ever sign an agreement of any nature

21 with Airtech?

22 A.   No.

23 Q.   Now, just briefly before we touch upon some other topics,

24 I want to ask you about Airtech's data retention policy.

25      Are you familiar with it?

1  A.    Yes, I am familiar with it.

2  Q.    And would information such as pricing and delivery of

3  goods and customer lists, vendor lists, would these things be

4  kept in a database at Airtech?

5  A.    Yes.

6  Q.    Now, information such as price lists, quantity of parts,

7  the names of vendors or customers, is that useful for a person

8  to have going out into the market to seek to compete against

9  Airtech?

10  A.    They are not useful.

11  Q.    Why not?

12  A.    So the information regarding pricing and the delivery

13  dates and things like that change every day and they change

14  every hour, too.  And because of that reason the data from the

15  past does not affect the current orders.

16  Q.    So you're telling the Court that if you have access to

17  pricing and customer lists and things of these nature, it is

18  not useful for you to compete against Airtech in the open

19  market?

20        Is that what you're telling the Court?

21  A.    Right.  It is absolutely not necessary.

22        THE COURT:  Mr. Roberts, what does pricing mean here?

23  BY MR. ROBERTS:

24  Q.    So what is with pricing?

25  A.    It's the pricing information about that product.

1   Q.   So how does it -- how does Airtech function in terms

2   of --

3          THE COURT:  Let's just make sure the record is clear,

4   Mr. Roberts.

5          MR. ROBERTS:  Yes.

6          THE COURT:  All the questions that you've just asked

7   him that he's answered are about the prices in the market, not

8   the prices that an individual customer has previously paid.

9   So if you want to get to the ladder, which I suspect you do,

10  the record has to reflect it.

11         MR. ROBERTS:  Yes.

12  BY MR. ROBERTS:

13  Q.   Explain to the Court how you would put an order together

14  for Airtech for parts that would be available from vendors for

15  a specific customer.

16  A.   Could you just ask me that question one more time,

17  please.

18  Q.   Sure.  Explain to the Court how you would price a

19  specific order that a customer requests from Airtech.  Explain

20  the process of how you would do that for a specific order from

21  a specific customer.

22  A.   So for the items that were requested by customers, they

23  are considered public items and they are available for

24  anybody, for any company to be able to source them themselves.

25  They are not just limited to certain customers.

1    Q.    Does Airtech manufacture or have technology that is

2    exclusive to Airtech only that they sell to the public?

3    A.    Airtech is a middleman, so they do not have such things

4    at all, no.  They don't have such technology at all.

5    Q.    So when you say they're a middleman, when you create a

6    quote for an order that a customer requests, where do you

7    source the parts from?

8    A.    Most of the search is done on Google, and mostly there

9    are certain sites that we use, so those sites are used.

10   Q.    Why would the customer not just source orders themselves?

11   What's the utility in the process that Airtech provides that

12   makes the customer look to Airtech for a service?

13   A.    So the customers cannot directly source from the USA, and

14   they do have the language barrier, too.  Because the

15   currencies are different, that creates another problem, too.

16   Q.    So does the fact that you're -- so does technical

17   expertise and the fact that you're in the United States

18   assist you with gathering parts and creating orders to sell to

19   customers?

20   A.    No.

21   Q.    Okay.  What is then the exclusive process or exclusive

22   technology that Airtech has that they provide to their

23   customers?

24   A.    When customers request for certain requirements, we

25   source ourselves to the companies that could make those items,

1    and after we render to the vendor what the customers want and

2    whatever vendor wants is rendered to the company.  And

3    whatever was requested by the customer is rendered back to the

4    vendor.  It's the work of looking for the specific vendor

5    finally.

6    Q.   Did you receive -- while you were at Airtech, did you

7    receive any specific training or did you come into any

8    specific --

9         THE COURT:  Mr. Roberts, can I pause you?

10        MR. ROBERTS:  Yes, sir.

11        THE COURT:  You haven't asked about whether or not --

12   you don't have to.  You haven't asked about whether when

13   Mr. Yim worked at Airtech deciding the price that Airtech as

14   pure middleman would quote to a potential customer, whether

15   Airtech or its agents referred back to information, whether in

16   the computer database or elsewhere, about the prior orders of

17   that customer, including the pricing.

18        That is, I would say, close to the heart of the matter.

19   I just note that we haven't gotten there.

20        MR. ROBERTS:  I think we should get there right now.

21   BY MR. ROBERTS:

22   Q.   Did you understand the colloquy with myself and the Court

23   just now?  The Court asked that I have not yet asked you about

24   whether when you're putting an order together did you use

25   information -- for example, you're at Airtech -- if I get this

1  right, you're at Airtech and you're going to fill an order and

2  you're going to source various vendors and get the parts

3  together.

4       In order to price it out, do you need to rely upon

5  pricing information that you either obtained or had at Airtech

6  and relied upon prior pricing, or was there another

7  methodology that you would, you know, determine your prices

8  based upon other variables, the order itself, et cetera?

9  A.   So basically when an inquiry is made by a customer, we

10  always have to receive a new quotation for everything because

11  the information that's contained in the quotation changes

12  every day.  That is why it is not necessary to use the past

13  information.  Otherwise we end up losing.

14  Q.   All right.  So let me ask a few follow-up questions.

15       Customers, when they request a quote -- they're

16  requesting a quote.  Are they also sourcing that quote from

17  other suppliers other than Airtech?  Are they shopping their

18  quote?

19  A.   So customers send the same quotation request to at least

20  two or more companies, and they select the company that

21  provided with the best price and the best delivery date.

22  Q.   So when you say the numbers are always changing, I'm

23  asking you are you talking about the numbers in the market or

24  are you talking about the numbers at Airtech?  Are you saying

25  that market drives the price or that Airtech drives the price

1  based upon its own formulation?

2  A.   It's the market price, so they change every day.

3       MR. ROBERTS:  Your Honor, is there any follow-up to

4  that that you would want me to drill down on?

5       THE COURT:  Just continue.

6       MR. ROBERTS:  Okay.

7  BY MR. ROBERTS:

8  Q.   Were all of the parts that you sourced while working at

9  Airtech -- were they available in the public?

10 A.   Yes, they were available.

11 Q.   Now, while you were at Airtech, did you receive any

12 special training or did you come into any knowledge that was

13 proprietary?  In other words, that Airtech had specific

14 information about parts that no one else had or that they

15 could modify parts that no one else could.

16      Was there anything that you came into in an educational

17 way of training or just the knowledge itself while you were at

18 Airtech that was in fact proprietary -- and I mean exclusive

19 to Airtech -- to be able to source and sell?

20 A.   No.

21 Q.   Can you expand on that answer?  Why not?  Why not?  It's

22 certainly being alleged that that's not true.  What's being

23 alleged, is it true that --

24      THE COURT:  No testimony, no testimony.  Just

25 questions.

1    BY MR. ROBERTS:

2    Q.   Let me ask you this question:  Is it true or have you at

3    any time removed any information from Airtech that was

4    exclusive to the company or proprietary or result of a

5    confidential disclosure to you or training or a process by

6    either -- an engineering process by which a part came known to

7    you by modification that was exclusive to Airtech?  Did that

8    ever occur, and did you remove any of that information?

9         THE COURT:  Sustained; compound, vague.

10        MR. ROBERTS:  I'll back it up.

11   BY MR. ROBERTS:

12   Q.   First, did you come into any information that was --

13        THE INTERPRETER:  I'm sorry.  Could the interpreter

14   hear the first portion again, please.

15   BY MR. ROBERTS:

16   Q.   Did you come into any information while you were at

17   Airtech that was proprietary as it concerns the parts that you

18   were sourcing from vendors?

19   A.   I did.

20   Q.   Did you remove any of that information from the company

21   and use it to compete against Airtech?

22   A.   No.

23        MR. ROBERTS:  Now I'd like to bring up the order that

24   was entered, please.

25             (Brief pause.)

1          MR. ROBERTS:  Could you scroll -- this is in the

2    record.  It's the order of the Court, March 28, 2022.

3          Would you just scroll up, please.

4    BY MR. ROBERTS:

5    Q.   Have you seen this document before?

6    A.   Yes.

7          MR. ROBERTS:  Can you scroll up a little bit?

8    BY MR. ROBERTS:

9    Q.   Have you had an opportunity to examine paragraphs 2, 3,

10   and 4 as it concerns restraints imposed against you for doing

11   business with these entities?

12         Have you had the opportunity to look at that?

13   A.   Yes.

14   Q.   Did at any time you violate the Court's order?

15   A.   It was not discernable.

16   Q.   When you say it's not discernable, have you been doing

17   business with any of these companies --

18         MR. ROBERTS:  Can you scroll up, please.

19   BY MR. ROBERTS:

20   Q.   Have you been doing business with any of these companies

21   since the date of the entry of the order?

22   A.   Yes, I have.

23   Q.   And in what capacity did you do business with these

24   companies?

25   A.   There were transactions that happened about the public

1   items.

2   Q.    Okay.   Now, when you say the order wasn't discernable,

3   what does that mean to you?   In other words, why were you able

4   to do business, in your mind, with some of these companies for

5   items that were generally available in the public?

6   A.    So the court order was such that I was prohibited to deal

7   with items that were from Airtech when I was there.   So while

8   I was working at Airtech there were more than several -- tens

9   of thousands of items that I dealt with while I was working

10  there, and there were more than tens of thousands of items

11  that could have been requested by the public and they were

12  available to the public.   I cannot remember each and every

13  single item.

14  Q.    Okay.   Now, at some point after this order the parties

15  identified --

16        MR. ROBERTS:   Can you bring up what Mr. Asher had

17  previously shown the Court, Exhibit A to interrogatory

18  responses tendered by the plaintiffs.

19        (Brief pause.)

20        MR. ROBERTS:   This, for the moment, was marked for ID

21  as Lee 2.

22        Scroll through the list.

23  BY MR. ROBERTS:

24  Q.    I'm not going to take you through all of the items, but

25  do you remember being served with this list of items that the

1  plaintiff claimed to be proprietary items?

2  A.    Yes, I was provided.

3  Q.    Now, since this list was provided to you, which was I

4  believe in July of 2022 -- since that time, have you sold any

5  of these items to any of the 11 named companies in the order?

6  A.    I have never sold it, no.

7  Q.    I'm sorry?

8  A.    I have never sold it, no.

9  Q.    Again, since the items -- so going back now, in the

10  original order no items were identified; correct?

11  A.    Correct.

12  Q.    And upon request 824 items were provided; correct?

13  A.    Yes.

14  Q.    And your statement to the Court, as I understood it, was

15  that you have not sold any of these 824 items to the parties

16  identified that you're restricted from doing business with in

17  the order; correct?

18  A.    Correct.

19  Q.    Have you had a chance to look at the 824 items yourself

20  and just evaluate as to whether or not these items are

21  available in the public domain today?

22  A.    Yes, I have reviewed.

23  Q.    Are the items available if you were to -- could you

24  source them outside of Airtech in the public domain?

25  A.    Yes, you can.

BYUNG CHAN YIM - DX - BY MR. ROBERTS

1    Q.   Are any of these items manufactured or exclusively within

2    the possession of Airtech for distribution?

3         THE INTERPRETER:  Could the interpreter hear the

4    question again, please?  I'm sorry.

5         MR. ROBERTS:  Yes.  I'll break it in two parts.

6    BY MR. ROBERTS:

7    Q.   First, are any of these items manufactured by Airtech?

8    A.   No.

9    Q.   Any of the 824 items represent a piece of technology that

10   is exclusive to Airtech for distribution?

11   A.   No.

12   Q.   Why did you quit Airtech?

13   A.   I worked at that company with myself dedicating my whole

14   life to it.  And it didn't even matter, it was daytime or

15   nighttime, I worked so hard there.  Airtech used against me

16   with their promises that were given to me saying that they

17   would share the company share or make me the CEO.  They did

18   not keep their promise and they try to keep using me.  And

19   that's the biggest reason.

20   Q.   So you became angry with the company; correct?

21   A.   Yes.

22   Q.   You removed computers from the company, is that correct,

23   one that belonged to you at your work station and another I

24   think that belonged to Mr. Lee?

25        Am I right?

1  A.    Yes, that's correct.

2  Q.    Why did you do that?

3  A.    When a new computer comes into the company, it's supposed

4  to be that the old computer is either thrown away or it's

5  given to the employee.

6  Q.    What was the purpose for you taking two computers from --

7  what purpose did you gain from removing any computers from

8  Airtech?

9  A.    You can either connect it to the TV or to use it for

10  games, and that's why they were taken.

11  Q.    Did you remove any information from the computers --

12  well, first off, let me ask you this:

13         Did you come to learn that any of the computers

14  contained trade secrets or proprietary information?

15  A.    In my computer there was the company information.

16  Q.    Did you remove any company information that you retained

17  after your employment?

18  A.    I never removed it.

19  Q.    Now, what information -- let me back up.

20         Did any time you remove information from Airtech

21  concerning how they put together customer orders for specific

22  customers in order that you could use that information to

23  compete against them?

24  A.    No, because it is not necessary.

25  Q.    Why is it not necessary?

1  A.   In order to proceed with the current order, the past

2  information is not necessary.  The reason is because it's

3  always changing.

4  Q.   How are you conducting business now?  What business are

5  you in now?

6  A.   I work as a broker, so I do the same line of work.

7  Q.   How are you now -- without -- as you've testified to,

8  without selling any of the 842 items which you have agreed --

9  which you have agreed apply to the order, without selling any

10  of those 842 items, how are you now conducting business in the

11  public domain with your new company?

12  A.   So your question is a little long, so just a moment.  So

13  I cannot understand your question exactly.

14  Q.   Okay.  You've testified that you're not selling 842 items

15  as a result of a court order.

16  A.   Yes.

17  Q.   You've testified that these items are available in the

18  public.

19  A.   Yes, yes.

20  Q.   But my question now is tell us about how you're acting as

21  a broker in the same line of business.  What exactly is your

22  workflow?  How are you putting together customer items?  Where

23  are you getting information?

24      If you don't need information from Airtech, as you've

25  testified, how is it that you're conducting business today

BYUNG CHAN YIM - DX - BY MR. ROBERTS                71

1   without using trade secrets from Airtech?

2   A.    So when the customers provide us with the part numbers,

3   quantity, and the manufacturing company -- so within that part

4   number all of the required specifications are contained in

5   there, and that part number is available on the internet to

6   the public.

7   Q.    So the customer is providing you with specifications to

8   fill a specific quote; correct?

9   A.    Yes, that's correct.

10  Q.    And you're using your technical knowledge to obtain these

11  knowledge from the public domain to fill the quote; am I

12  right?

13  A.    Yes, that's correct.

14  Q.    Now, the 842 items or 24 we had on the screen moments

15  ago, you've testified those items are available in the public

16  domain.

17        Is it -- would it be useful to you to be able to access

18  those items in order to be able to act as a middleman and fill

19  quotes and facilitate distribution of those items as well?

20  A.    No.

21  Q.    So before you left Airtech --

22        THE COURT:  Mr. Roberts, hang on for a second.  Do you

23  mind if I ask the witness a question?

24        MR. ROBERTS:  Please.

25        THE COURT:  You currently work as a broker; right?

1          THE WITNESS:  Yes, that's correct.

2          THE COURT:  Do you have any repeat customers; that is,

3    any customers who have bought through you parts on two, three,

4    four, or five occasions?

5          THE WITNESS:  I do.

6          THE COURT:  When you were dealing with a repeat

7    customer who makes a request for an item, you check the

8    internet for a price; correct?

9          THE WITNESS:  Yes.

10          THE COURT:  Then you give the potential customer a

11    quote, a possible price; is that correct?

12          THE WITNESS:  Yes, that's correct.

13          THE COURT:  And when you think about what quote or what

14    possible price to give the repeat customer, do you consider

15    the prior prices you have offered to that customer?

16          THE WITNESS:  I cannot consider that because pricing

17    always changes.  Unless I give the current price, the

18    possibility of me obtaining the order decrease.

19          THE COURT:  When you worked at Airtech with repeat

20    customers and you quoted a repeat customer a price, did you

21    think about the prior price that had been offered when you

22    offered a price?

23          THE WITNESS:  You cannot do that, absolutely not, no.

24          THE COURT:  Is it for the same reason as with your

25    current business?

1           THE WITNESS:  Yes, that's correct.

2           THE COURT:  Mr. Roberts.

3    BY MR. ROBERTS:

4    Q.   You would think the prices at least would -- for some

5    items would be the same.  You've testified multiple times that

6    there's significant market fluctuations.

7           Why is it -- can you explain to the Court, why do

8    prices change?  Why is the current -- why is doing research on

9    the current price of that piece of technology so important?

10   A.   So from the vendors that we use to purchase goods, it's

11   possible that 10 items are purchased, 50 items are purchased,

12   or 100 items are purchased, so the prices are different for

13   each bundle of the quantity.

14          Because the price changes according to the quantity,

15   the quantity is different for each vendor, too.  And it

16   depends on the vendors that we contact.  The pricing can be

17   good or the pricing can be bad, too.  In those the role that

18   we play is to give -- is to source the best pricing.

19   Q.   Is the work that you do in researching out -- can you

20   give some examples to the Court about what the products are

21   that you would broker?  Give a few examples of what the

22   products would be.

23   A.   So if a customer requests for a quotation for ten TV sets

24   and we source on the internet the pricing for ten sets of TVs

25   and the pricing for ten sets of TVs is different for all

1    vendors -- and the specifications for each TV can be different

2    for each vendor, too.  So the work that we do is to connect

3    the right item to the appropriate vendor to source the

4    pricing.

5    Q.    Now, you're doing this in the aerospace industry;

6    correct?

7    A.    Yes.  It's the same kind of work that's being done now.

8    Q.    And is it -- what's involved in lining up the

9    specifications of a part that's gonna be used in the aerospace

10   industry and pricing it out?  What is the process for that?

11   A.    Could you ask me that question one more time?

12   Q.    Sure.  Just explain to the Court your work process when

13   you're going to spec what's involved.  In other words, it

14   would seem you would just be able to look up the part and give

15   the price.  But it's not so simple; right?

16        Why don't you explain the process of matching up the

17   customer with the part and the specification and then

18   determining the price.  What goes into that?

19   A.    So within the part number that's given by the customer

20   for each letter, the specification is contained in each

21   letter.  Even if it's just one letter that's wrong, it totally

22   becomes a completely different product, and that's why I

23   should only source the items that match the exact part numbers

24   exactly.

25   Q.    We explained the circumstances upon which you left

1    Airtech.  I want to get into some of the things that were

2    discussed.  Explain the circumstances upon your leaving

3    Airtech.

4    A.    Just like I told you before, too, because I came to a

5    determination that it was no longer hopeful for me to work at

6    Airtech, that's why I ended up leaving the company.

7    Q.    Now, there are allegations that were made that you on

8    multiple occasions submitted invoices that were either

9    up-charged or not real so that you could personally profit

10   from invoices that you submitted to the company.  Fake

11   invoices, ghost invoices.

12        Is that true?

13   A.    So partially that is correct, and partially that is not

14   correct.

15   Q.    Which is the part that's partially correct?

16   A.    Four companies were created.  It is correct that it was

17   re-sold to Airtech.

18   Q.    Why did that occur?  Why did you create four companies to

19   re-sell products to your employer?

20   A.    For the items that were difficult to be obtained by

21   Airtech, I sourced those items myself.  After completing the

22   quality check, I supplied Airtech with those items again.

23        And from Airtech there is an -- there were instances

24   where the company Airtech did not approve or did not accept

25   the quality-control process of those items because the items

1   that were wrong must be trashed.

2   Q.   More directly, did you disclose to Airtech, your employer

3   at the time, that you had set these companies up and were

4   re-selling parts to your employer?  Did you disclose that?

5   A.   I did not disclose.

6   Q.   Why not?

7   A.   If it's found out that I been re-selling these items,

8   then it will not be recognized at all, and that's the reason

9   why.

10  Q.   Now, you recognize that you re-selling items to your

11  employer was wrong; correct?

12  A.   Yes.

13  Q.   And at the time, is it true that you had anger toward the

14  company and that you did this and it was improper?

15  A.   Yes.

16  Q.   Now, during the time, whether it be submitting invoices

17  with higher prices that you re-sold items to your company --

18  during the time that you operated those four entities for

19  those purposes, at any time do you remove confidential

20  information or did any time you remove proprietary information

21  or use --

22          THE COURT:  Sustained; complicated, vague --

23          MR. ROBERTS:  I'm trying to speed it up.  I'll break

24  it up.

25          THE COURT:  Please.

```
 1   BY MR. ROBERTS:

 2   Q.    Did you use confidential information of Airtech while

 3   operating the four entities?

 4   A.    No.

 5   Q.    Did you utilize proprietary information of any kind of

 6   Airtech during that process?

 7   A.    No.

 8   Q.    What you essentially did is you made money behind -- from

 9   your employer behind your employer's back; correct?

10   A.    Yes, that's correct.

11   Q.    And you acknowledge to the Court that that was wrong and

12   you should not have done that; correct?

13   A.    Yes, I recognize that and I acknowledge that.

14   Q.    Have you since -- since departing Airtech, have you

15   utilized any technology that you removed from Airtech or that

16   belongs to Airtech in order to compete against them?

17   A.    No, no.

18   Q.    Why not?

19   A.    Because it is not necessary to use information from the

20   past.

21   Q.    Have you utilized any information that you gained from

22   Airtech concerning modification of parts to re-sell?

23   A.    There was one time when it was done with [Redacted].

24   Q.    What is [Redacted]?

25   A.    It's a company that manufactures a receiver protector.
```

1   Q.   When you say "one time," what exactly are you

2   referring to?

3   A.   The part number was changed from the company that I was

4   operating.  It was for the purpose of being able to use that

5   part and to be able to utilize that part.

6   Q.   Who did the part belong to?  Where did the part come

7   from?

8   A.   It belonged to a customer while it was manufactured by a

9   manufacturer.

10  Q.   Did the part -- the specific example that we're talking

11  about with Redacted, was the part manufactured or created by

12  Airtech?

13  A.   No.

14       THE COURT:  Mr. Roberts, how much more do you have on

15  direct?

16       MR. ROBERTS:  Not much, not much.  Just give me one

17  minute.  I'm going to step away for one minute.

18         (Brief pause.)

19  BY MR. ROBERTS:

20  Q.   Mr. Yim, you're here to ask the Court to dissolve

21  restraints that have been placed in a temporary restraining

22  order.

23       What has the impact of the temporary restraining order

24  been on you for the past 20 months to operate your current

25  business?

1   A.   So after I received a TRO by Airtech to all the customers

2   that I've known, the TROs were e-mailed to them and they were

3   threatened to not engage in any transactions with me.  And

4   because of that, a certain customer broke off doing

5   transactions with me.

6   Q.   Which customer?

7   A.   [Redacted] -- and the list is over there -- [Redacted]

8   [Redacted].  They don't transact with me, but some

9   customers kept having transactions with me.  And because of

10  that, I'm not even able to do 50 percent of the business that

11  I used to do.

12  Q.   Are other brokers who have -- who operate in the same

13  business with you transacting business with these companies or

14  are these companies exclusive to Airtech?

15  A.   There are so many other companies that do the same kind

16  of work.

17  Q.   Do you need any specific parts or specific information

18  from Airtech to do business with these companies?

19  A.   No.  That's absolutely not necessary.

20  Q.   Are you relying today on any information that you

21  removed -- and I mean any information that you removed from

22  Airtech in order to conduct business either with these

23  companies or any companies in your industry?

24  A.   No.  It's not necessary at all, no.

25  Q.   Do you require any specific proprietary technology that

1   belongs to Airtech in order to do business with the

2   11 companies listed in the order?

3   A.   No.  It is not required, no.

4   Q.   Last question:  Are you using any information, any

5   information that you gained from Airtech that gives you an

6   unfair advantage to compete against them in the marketplace

7   that other companies don't have?

8   A.   No, no.

9        MR. ROBERTS:  I have no further questions at this time.

10        THE COURT:  Mr. Roberts, thank you.

11        Here is what we're going to do:  We're going to take a

12   little break before the cross begins.  It's now 1:31.  We'll

13   be back and start the cross at 1:55.  We are adjourned until

14   then.

15        (Recess taken.)

16        THE DEPUTY CLERK:  All rise.

17        THE COURT:  Let's be seated.

18        Mr. Asher, you're ready to begin cross?

19        Let's have the witness resume the witness box.

20        (Brief pause.)

21        THE COURT:  Mr. Yim, I want to remind you that you

22   remain under oath.

23        THE WITNESS:  Yes.  I understand.

24        THE COURT:  Have a seat.

25        Mr. Asher, over to you.

1          MR. ASHER:  Thank you, Your Honor.

2                      CROSS-EXAMINATION

3                      By Mr. Asher:

4    Q.   Are you going to Iowa to conduct business there?

5    A.   Yes.

6    Q.   You knew that this hearing was going to be scheduled for

7    the 29th and 30th --

8          MR. ROBERTS:  Objection.

9          MR. ASHER:  Yes.

10         THE COURT:  I'll allow it.

11   BY MR. ASHER:

12   Q.   -- from the Court?

13   A.   Yes.

14   Q.   Why did you choose to make this appointment right in the

15   middle of this Court hearing in a case in which you've been

16   named as a defendant?

17   A.   So it was a trip that was already scheduled before the

18   hearing; and originally the trip was supposed to be from

19   Monday, but because of this hearing I had to postpone it by

20   one day.  So that's why it's today.

21         THE COURT:  Mr. Asher, let's move on to another topic.

22   BY MR. ASHER:

23   Q.   When was it scheduled --

24         THE COURT:  Mr. Asher, Mr. Asher.

25         MR. ASHER:  Yes, Your Honor.

 1   BY MR. ASHER:

 2   Q.   When was it scheduled?

 3        THE COURT:  Mr. Asher, let's move on to another topic.

 4        MR. ASHER:  I'd like to show the witness PX-148 for

 5   identification.

 6   BY MR. ASHER:

 7   Q.   Do you recognize the first page, Plaintiff's 148 for

 8   identification?  "Yes" or "no"?

 9   A.   Yes, I recognize.

10   Q.   On the second page do you recognize that as well?

11   A.   So I don't see the second page.

12        MR. ASHER:  Let's go with the second page.

13   BY MR. ASHER:

14   Q.   Do you now see in front of you on the screen the second

15   page Plaintiff's Exhibit 148 for identification?

16   A.   Yes.

17   Q.   And concerning the third page, do you recognize that

18   page, as well?

19   A.   Yes.

20   Q.   Please identify each of these three pages.

21   A.   While I was working at Airtech -- so these are the

22   proprietary items that Airtech had and exclusive agents with

23   the manufacturer.  That's the list of that.

24   Q.   That's shown on the second page; is that correct?

25   A.   So second page is the list of proprietary items.

1    Q.    Turning to the third page, is that a list of vendors?

2    A.    Yes.

3    Q.    On the first page, Plaintiff's Exhibit 148, is that the

4    category referred to agent and proprietary item and then some

5    additional words in Korean?

6         THE INTERPRETER:  Could the interpreter hear the

7    question again, please?  I'm so sorry.

8    BY MR. ASHER:

9    Q.    I'm referring to the first page of the exhibit, numbered

10   in text the agent and proprietary item.

11   A.    Yes.

12   Q.    Is that a reference to the third page?

13   A.    Yes.

14   Q.    What do they represent?

15   A.    This is a list of exclusive vendors that Airtech had.

16   Q.    Now, the first page is an e-mail that you sent to Mr. Yim

17   on September 20, 2021; is that right?

18   A.    Yes, September 20th.  Yes, that is correct.

19   Q.    So on that date you informed him that one of the

20   proprietary items was a Redacted with Redacted, number 3.

21         Do you see that?

22   A.    Yes, I see it.

23   Q.    Also in numbers 1 and 2 it shows proprietary items with a

24   vendor named Redacted.

25         Do you see that?

1   A.    Yes.

2   Q.    And also under line item 11 for a company called ▮Redacted▮ for

3   a rotary joint.

4         Do you see that, also?

5   A.    Yes.

6   Q.    Do you agree with me that the items set forth on page 2

7   of PX-148 were proprietary to Airtech as of the date of your

8   e-mail, September 20, 2021?

9   A.    Yes.

10        MR. ASHER:  I'd offer into evidence this e-mail and the

11  attachments to it.

12        MR. ROBERTS:  No objection.

13        THE COURT:  Received.

14        (Plaintiff's Exhibit No. 148 was received in

15        evidence.)

16  BY MR. ASHER:

17  Q.    Notwithstanding the proprietary nature for the

18  transaction with respect to the receiver protector of ▮Redacted▮

19  shown at line item 2 of Plaintiff's 148 for identification,

20  you were seeking to get business from ▮Redacted▮ yourself; correct?

21  A.    Yes, that's correct.

22  Q.    It's also true that you also were continuing to do

23  business with them on behalf of your company Hans Aerospace in

24  September and October 2021?

25  A.    It started from October.  It was told to be started from

1    October.

2    Q.    Now, as of December 21, '21, you said in an e-mail to

3    ████████████████████████████████████████████, an e-mail that

4    said: (Reading.)

5              I have concluded that we need to change the

6         part number from ██████████████████ to avoid legal

7         issue which Airtech may suggest.

8         Do you see that?  Let me show that you to.

9    A.    Yes, I remember.

10         MR. ASHER:  Show it to him.

11         THE COURT:  Hold on for just one second.  In front of

12    the witness is Plaintiff's Exhibit 88 for identification.

13         Mr. Asher, are you going to offer this document?

14         MR. ASHER:  Yes.

15         THE COURT:  Mr. Roberts, do you object to this document

16    being offered, coming into evidence?

17         MR. ROBERTS:  I do not.

18         THE COURT:  Okay.  It's in evidence.  Let's move on.

19              (Plaintiff's Exhibit No. 88 was received in

20              evidence.)

21    BY MR. ASHER:

22    Q.    You previously testified that you didn't have any

23    Airtech-related information of the technical and marketing

24    information after you left, but here is an instance in

25    Plaintiff 88, the e-mail -- in an e-mail from you to ████████

BYUNG CHAN YIM - CX - BY MR. ASHER                    *86*

1    [Redacted] in December 2021.

2          How can you explain that you were actually utilizing

3    Airtech information after you left Airtech?

4    A.   So about the [Redacted], at the time when I was at Airtech, this

5    is a vendor that I came up with because I developed that

6    vendor.  So the name [Redacted] was made with [Redacted]

7    because of being in a friendship -- friendly relationship.

8          So about the item [Redacted] in order for Hans Aerospace

9    to be able to handle this item, that's why this e-mail was

10   written.

11   Q.   I understand.

12         Is that your idea?

13   A.   Yes.  That's the truth.

14   Q.   And you suggested it to [Redacted] to accommodate

15   your, quote, suggestion, end of quote.  Correct?

16   A.   Yes, that's correct.

17   Q.   Now, just several weeks before, you had just told your

18   former boss that this is a proprietary item; correct?

19   A.   So we have to discuss again about the word "proprietary."

20   So the word --

21   Q.   Well, I'm gonna --

22         (Simultaneous crosstalk.)

23         THE COURT:  Mr. Asher, Mr. Asher, Mr. Asher, you put a

24   question to the witness.  He's answering.  He will be

25   permitted to finish his answer.

1          MR. ASHER:  Certainly.  Thank you, Your Honor.

2    A.    (Continuing.)  So it's not to say that someone has

3    exclusive rights to that item.  It's to give the authority --

4          MR. ASHER:  I move to strike.

5          THE COURT:  Mr. Asher, let him finish his answer.

6    A.    (Continuing.)  It's to give the authority to sell that

7    item.  And the right for that privilege belongs to the final

8    end customer.  And if the end customer wants, they can always

9    change the broker any time because it was something that was

10   agreed upon by the vendor.  And that's the reason why ▮Redacted▮

11   suggested -- that's why ▮Redacted▮ provided me with the quotation.

12   BY MR. ASHER:

13   Q.    Now, you agree with me that for many years Airtech had a

14   protected product letter, given its work with ▮Redacted▮ on this

15   product, even dating back to 2012; correct?

16   A.    It was received at the beginning.  It's the right to make

17   a sale.

18   Q.    But you induced him -- you induced ▮Redacted▮ to

19   change their contractual or protected product relationship

20   with Airtech yourself; correct?

21   A.    Yes, that's correct.

22   Q.    Let me go back to the question I raised with you before.

23        How did you get this information concerning an Airtech

24   product after you left Airtech?

25   A.    Like I told you before, so I was in charge of

1   communication with all of the vendors, and the items that were

2   contained in there were the items that I discovered and that I

3   developed myself.  And because of that reason, even if it's

4   not Airtech -- so the manufacturing companies that were

5   contained within that, they can engage with salespeople and

6   also with engineering people.  And so there was a relationship

7   that I had with them.

8   Q.   I'd like to draw your attention to the bottom of the

9   first page and the top of the second page of Plaintiff 88 for

10  identification.  It shows an e-mail from you to Redacted,

11  also dated December 21, 2021.

12        Do you see that?

13  A.   I don't have the material in front of me, so I cannot

14  see it.

15        MS. BAE:  It's up there.  I'm sorry, we don't have one

16  more copy.

17        THE WITNESS:  Could you expand the letters?

18        (Brief pause.)

19        THE WITNESS:  Yes, now I see.

20  BY MR. ASHER:

21  Q.   Can you read it from where you're sitting, Mr. Yim?

22  A.   So from where to where would you like me to read?

23        THE COURT:  He just means are you able to read the

24  letters.  You don't have to read it out loud.

25        THE WITNESS:  Yes, I see.

1   BY MR. ASHER:

2   Q.   Is this typical of the type of communication that you

3   made in connection with your communication concerning Airtech

4   after you left Airtech?

5   A.   No.

6   Q.   What's different about this communication versus

7   communications that you made with other customers?

8   A.   So generally for vendors or customers I share e-mails

9   concerning quotations, so this particular e-mail is something

10  from a different vendor.  Because I heard from a different

11  vendor that I was blocked from doing a transaction, so that's

12  why this e-mail is written.

13  Q.   Did you tell any of your customers or vendors that they

14  knew -- that you knew all of their needs?

15  A.   I don't understand your question.

16  Q.   What did you say to ▮Redacted▮ concerning the new

17  business that you were then entering into in December 2021?

18  A.   Could you expand the e-mail, because I cannot see it

19  right now.

20  Q.   There's no document.  I'm just asking you what did you

21  say to ▮Redacted▮ concerning the new business that you

22  just began conducting as of December 2021?

23  A.   I don't recall now.

24  Q.   Give me your best recollection.

25  A.   So how can I remember something that happened three years

1    ago?

2    Q.    I'm not answering your questions, sir.

3    A.    I cannot remember now.

4    Q.    I'm asking for your best recollection.

5    A.    So there were so many e-mails that were exchanged between

6    myself and ▮Redacted▮, so I cannot remember certain -- a certain

7    particular date out of all those e-mails.

8    Q.    I understand.  Please give your best recollection

9    concerning what you said to ▮Redacted▮ concerning the

10   fact that you set up a new company.

11   A.    I don't recall.

12   Q.    Did you tell her that you would want to continue to

13   conduct business with CPI?

14   A.    Yes.

15   Q.    What's the nature of your new business?

16   A.    It's the same business as Airtech.

17   Q.    Did you tell ▮Redacted▮ that that's the case?

18   A.    I cannot recall.

19   Q.    Let me direct your attention to Plaintiff's 78 for

20   identification.

21        THE COURT:  Mr. Asher, are you going to offer this

22   document?

23        MR. ASHER:  Yes.

24        THE COURT:  Are you going to object to it, Mr. Roberts?

25   It appears to be e-mails that the witness is on.

1        MR. ROBERTS:  I object in that he's not the author of

2   the --

3        THE COURT:  He's the author of many of the e-mails in

4   this chain, at least the way it looks on paper.

5        MR. ROBERTS:  My apologies.

6        THE COURT:  Take a look.  Take your time.  I didn't

7   mean to rush you.

8             (Brief pause.)

9        MR. ROBERTS:  No.

10        THE COURT:  Plaintiff's Exhibit 78 is in evidence.  No

11   objection from the defendants.

12             (Plaintiff's Exhibit No. 78 was received in

13             evidence.)

14   BY MR. ASHER:

15   Q.   Mr. Yim, placing Plaintiff's 78 for your -- can you see

16   the exchange of e-mail that's set forth on these pages between

17   your new company Hans Aerospace and Redacted ?  Have you

18   seen it?

19   A.   Yes.

20   Q.   Did you tell Redacted that you had brought a lawsuit

21   against Airtech?

22   A.   No.

23   Q.   Your e-mail shows that you represented to Redacted that

24   you brought a lawsuit against Airtech.

25             Do you see that?

1   A.   I was saying that I could possibly be sued by Airtech.

2   Q.   But are you claiming that you did not say in your e-mail

3   that you were suing Airtech?

4   A.   Just a moment.  I will take a look at it again because

5   this is something that happened such a long time ago, so I

6   will try to gather my recollection.

7        THE COURT:  Mr. Asher, do you want to direct him to a

8   particular place in this long exhibit.

9        MR. ASHER:  I think it's the third page of the exhibit,

10  Your Honor.

11  BY MR. ASHER:

12  Q.   On the top of the third page of the exhibit, it says,

13  quote: (Reading.)

14           I sue him for various things, including

15           employment, defamation, and more.  This monster

16           will be in trouble, exclamation mark.  This

17           monster is afraid of me because I have strong

18           mutual relationship with all my customers and

19           vendors.

20  A.   Yes, I saw that.

21  Q.   So it's a false statement?

22  A.   I could not remember because it was something that

23  happened a long time ago.

24  Q.   Do you remember false or true statements in your

25  recollection?

1          MR. ROBERTS:  Objection.

2          THE COURT:  Sustained.

3          You don't have to answer it.

4    BY MR. ASHER:

5    Q.   Let me turn to the next page, which is control

6    No. P1000531.

7          In the middle of this page it shows an e-mail from you

8    to █████████████ .  On the second

9    paragraph of this e-mail from you to ████████  it says:

10         (Reading.)

11              In the meanwhile, I am wondering you can do,

12         quote, no bid, end of quote, when Airtech will ask

13         a quote for ████████████████ as saying

14         ████████████ will work with Roy for this

15         project, end of quote.

16         Do you see that?

17   A.   Yes, I see it.

18   Q.   How did you get that information in December 2021?

19   A.   So this manufacturer -- this is a manufacturer that I

20   developed myself, so because I had a relationship with this

21   manufacturer and that's why I was able to get this part

22   number.

23   Q.   Was it in your substantial memory, sir?

24   A.   In my memory?  Which one are you talking about?

25   Q.   These numbers which I just quoted to you, sir.

1  A.   Yes, I know.  I can know.

2  Q.   Where did you get these numbers?

3  A.   It's a manufacturer that I developed myself, and of

4  course I know.

5  Q.   In December you no longer worked at Airtech; correct?

6  A.   Right.

7  Q.   Did you have any documents or records with you?

8  A.   That's not necessary because I worked with this company

9  for six years.

10  Q.   And?

11  A.   And that's why of course I know the part number.

12  Q.   You knew from memory?

13  A.   Of course, yes.

14  Q.   What was the nature of the product?

15       THE INTERPRETER:  What was the nature of the what?  I'm

16  sorry.

17       MR. ASHER:  The product.

18       THE INTERPRETER:  The product.

19  A.   It's the bearing.

20  BY MR. ASHER:

21  Q.   Did you carry around part numbers on material items that

22  you worked on as to what you developed while you were employed

23  as the general manager of Airtech?

24  A.   No.  I didn't have to do that.  Because I worked with

25  them for such a long time together, it was absolutely not

1  necessary to do that at all.

2  Q.    Did you continue to do business with [Redacted]

3  after December 2021?

4  A.    No, no.

5  Q.    Why not?

6  A.    Airtech prevented, so that this business could not go on.

7  Q.    Is it because of the identity of the product?

8  A.    No.

9  Q.    What was the reason?

10  A.    So the manufacturer said that they don't want to be

11  involved with the legal matters with Airtech so they broke off

12  the transactions with me.

13  Q.    In the case of [Redacted] -- did you ever request [Redacted]

14  [Redacted] to change the price of their product for

15  Airtech?

16  A.    I did.

17  Q.    Why did you do that?

18  A.    From the customer.  They did not want to deal with

19  Airtech and they wanted to work with me, and that's the reason

20  why.

21  Q.    But what did -- occasioned you to suggest to [Redacted]

22  to change the price?

23  A.    So from the customer -- that was to obtain the orders

24  from the customers.

25  Q.    I'd like to show you Plaintiff's 75 for identification.

1      THE COURT:  Mr. Asher, are you going to offer

2  Plaintiff's 75?

3      MR. ASHER:  Yes, Your Honor.

4      THE COURT:  Okay.  We'll wait for Mr. Roberts to review

5  this e-mail chain as well as an associated document and then

6  give us the defendants' position.

7      MR. ASHER:  Specifically, Your Honor --

8      THE COURT:  Mr. Asher, let Mr. Roberts tell us his

9  position.

10      MR. ROBERTS:  We just want -- we would want to confirm

11  what attachments go with what e-mails.  Other than that, I

12  don't have an objection.

13      THE COURT:  Okay.

14      Mr. Asher, do you want to handle that, to the extent

15  it's relevant.  I don't know what is relevant in this

16  document, but to the extent it's relevant to offer it, you may

17  want to lay a foundation to get Mr. Roberts' assent or you may

18  want to offer it.

19  BY MR. ASHER:

20  Q.   Mr. Yim, looking through the pages of this document with

21  particular reference to the third page, which is an e-mail

22  from you to ▮▮▮Redacted▮▮▮ dated October 7, 2021, do you

23  recognize these pages?

24  A.   Yes.

25  Q.   Specifically, with regard to the e-mail from you to

1    Redacted    on October 7, 2021, did you send that e-mail

2    to her on or about that date?

3    A.   Yes, that's correct.

4    Q.   In this e-mail --

5         THE COURT:  Are you offering the document, Mr. Asher,

6    or not?

7         MR. ASHER:  Yes, I am.  Thank you, Your Honor.

8         THE COURT:  You're offering all of Plaintiff's

9    Exhibit 75?

10         MR. ASHER:  Yes.

11         THE COURT:  Mr. Roberts.

12         MR. ROBERTS:  I don't object to Plaintiff's marking

13    00453.  That's the e-mail that's being referenced right now.

14    The rest of this stuff I can't make heads or tails of what its

15    relevance is or why it's being introduced.  I imagine we'll

16    get there.

17         THE COURT:  If your objection is under Rule -- it

18    sounds like your objection is Rule 401 of evidence.  It's

19    overruled.  Plaintiff's Exhibit 75 is in evidence.

20              (Plaintiff's Exhibit No. 75 was received in

21               evidence.)

22         THE COURT:  Mr. Asher.

23         MR. ASHER:  Yes.

24         THE COURT:  Onward.

25    ///

1   BY MR. ASHER:

2   Q.   On the second page, which is the e-mail from you to

3   [Redacted] on October 7, is this an e-mail that you said that:

4   (Reading.)

5           I hope you provide a quote a little higher

6           than last March quote which was 49,500.

7           Do you see that?

8   A.   Yes.

9   Q.   This is what we were talking about five or ten minutes

10  ago; correct?

11          MR. ROBERTS:  Objection.

12          THE COURT:  Overruled.

13  A.   Yes, that's correct.

14  BY MR. ASHER:

15  Q.   Where did you get the information 49,500?

16  A.   So this is a case where I got a quotation.  This was done

17  at [Redacted] in March.

18  Q.   In March you were general manager and COO of another

19  company; correct?

20  A.   Yes, yes.

21  Q.   So did you retain that data when you moved over to

22  another company which you formed?

23          THE INTERPRETER:  Could the interpreter hear the

24  question again, please?  Sorry.

25  ///

1  BY MR. ASHER:

2  Q.   Did you retain that information to the new company which

3  you formed?

4  A.   It's not that I retained it.  It's something that I knew

5  about, just like I remember the part numbers.  The important

6  items for the company, I remember the part numbers and the

7  product information for those items.

8  Q.   Generally speaking, how many part numbers do you recall

9  personally without reference to a computer or a notebook or

10 some other record, written or electronic record?

11 A.   So besides the ones that I developed which are not

12 public -- so about the manufacturing companies that I had

13 dealings with for a long time, because the company retained a

14 huge profit, that's why I remember.

15 Q.   Given the long-standing relationship that you had with

16 your prior employer, would it be fair to restrain you from

17 competing against your former employer with regard to this

18 product?

19 A.   Could you just repeat the question, please.

20      MR. ASHER:  I'll ask the reporter to read it back.

21          (The requested portion is read back by the Official

22          Court Reporter as follows:

23          Q.  Given the long-standing relationship that you

24          had with your prior employer, would it be fair to

25          restrain you from competing against your former

1          employer with regard to this product?)

2    A.   I think it is proper if I can do it.

3    BY MR. ASHER:

4    Q.   Why?

5    A.   For these products these are the items that I been

6    developing for a long time, and the vendors are good to me,

7    too.  Because they're favorable -- because they have a

8    favorable perspective of me, customers wanted to do it with me

9    directly.  Yes.

10   Q.   You developed this product as an employee of Airtech;

11   correct?

12   A.   Yes, that's correct.

13   Q.   You were not an owner; correct?

14   A.   Correct.

15   Q.   And in the last year you were with that company, you

16   actually earned $400,000 a year; correct?

17   A.   No.  It's $120,000.

18   Q.   I thought you testified that in one year you had $300,000

19   in the prior year.

20        Am I mistaken?

21   A.   That was in the year 2020.

22   Q.   All right.  What about 2021?

23   A.   It was $120,000.

24   Q.   Because that's -- because you left before the actual

25   fiscal year-end; correct?

1   A.   Yes, that's correct.

2          MR. ASHER:  Now I'd like to show you Plaintiff's 79 for

3   identification.

4          THE COURT:  As it gets passed up, why don't you give a

5   copy to Mr. Roberts and let us know if you're going to offer

6   it so we can resolve any evidentiary objection.

7               (Brief pause.)

8          THE COURT:  Mr. Roberts, what's your position on

9   People's Exhibit 79?

10         MR. ROBERTS:  So on 79 I would agree -- I would not

11  object to Bates markings 534 through 552.  Those are business

12  records.

13         The rest of it, I don't know what it is.  It's --

14  they're e-mails.  They may or may not be related.  I object to

15  those.

16         THE COURT:  Overruled.  Plaintiff's Exhibit 79 comes in

17  as pages 534 to 552 on consent to the defendant.  Pages 553 to

18  the end of this exhibit, which is to say until 556, are

19  plainly relevant to the proceedings before us.

20         Mr. Asher, why don't you continue.

21              (Plaintiff's Exhibit No. 79 was received in

22               evidence.)

23         MR. ASHER:  Thank you.

24  BY MR. ASHER:

25  Q.   Pending your review of this exhibit -- following your

```
 1   completion of your review, tell us why you have two virtually

 2   identical Airtech sales agreement forms for a company called

 3   Redacted

 4          In one case it is for Redacted

 5   and Airtech, and the other, which appears at control

 6   No. P1000543, which purports to be an agreement with Redacted

 7   Redacted        and Hans Aerospace.

 8          My question is, can you explain why they are virtually

 9   identical to one another?

10   A.   So this is a general contract.

11   Q.   All right.  It's a general contract.

12          What type of general contract is it?

13   A.   It's a contract as far as sales agents.

14   Q.   Did you prepare this at Airtech?

15   A.   Yes, that's correct.

16   Q.   And you used it when you joined the new company; correct?

17   A.   Yes, that's correct.

18   Q.   Now, turning back to one of the documents within the

19   exhibit, control No. P1000553 --

20   A.   Yes.

21   Q.   -- it shows your e-mail to Redacted in which you said, quote:

22   (Reading.)

23          Please let me know whether you have sent a

24          termination letter to Airtech or not, end quote.

25          Do you see that?
```

1   A.   Yes, I see.

2        THE COURT:  Mr. Asher, what's the relevance of that?

3        MR. ASHER:  He took all of our data in a computer which

4   he left, and that's one of the principal components of the

5   restraints set forth in the current -- pending in the current

6   order.

7        THE COURT:  How does anything in this e-mail tend to

8   support that?

9        MR. ASHER:  This shows that these are documents which

10  he inevitably held in his hands after he left.  It seemed to

11  me, in my experience, that these documents are available only

12  in the form of a -- sorry, Judge -- in the form of a computer.

13  He previously denied that that's the case --

14       THE COURT:  We can have a further conversation about

15  this, but much of what you're doing here is trying to

16  establish that the defendant, for whatever reasons, was trying

17  to go back to former customers and take them, the kind of

18  thing that a noncompete would prohibit.

19       MR. ASHER:  Also, there were other forms --

20       THE COURT:  Mr. Asher, hang on a second.

21       But the temporary restraining order is not sought to

22  enforce a noncompete.  It's sought to -- it was sought and

23  obtained on the basis of trade secrets.

24       MR. ASHER:  That's true.

25       THE COURT:  Is the position, for example, you're

1    putting forward with respect to Plaintiff's Exhibit 79 that

2    this 2015 form agreement is a trade secret?

3        MR. ASHER:  No.  I'm saying that the data pertaining to

4    the transactions on -- transactions he dealt with as an

5    employee of Airtech he's precluded to later conduct business

6    with respect to that type of product.

7        THE COURT:  But, Mr. Asher, I think you would agree

8    that that is one thing with respect to the data if the data is

9    a trade secret and that's another thing if the data is simply

10   data that, based on the common law or another source of law,

11   is owned by his employer.

12       You haven't sought an injunction based on, so far as

13   I can tell, common law conversion or misuse of fiduciary

14   information.  You've sought it based on trade secret.

15       What I would urge you to do is to focus here on

16   purloined -- allegedly purloined trade secrets as a basis for

17   an injunction.  Much of this sounds like, at most, using

18   information that was acquired in the course of being an

19   employee for a long time, which may give you a damages claim,

20   maybe.

21       But I don't think that's the injunction you sought.

22   It's very hard to understand how these materials connect up to

23   trade secrets.  There's some faint connections.  I see some of

24   what you're doing.  But, for instance, with respect to

25   Plaintiff's Exhibit 79, as I sit here, I'm struggling.

 1         MR. ASHER:  Today I was seeking to address the issue in

 2   terms of the fact that Mr. Yim was in possession of the -- all

 3   forms of trade secrets as contained in our computer, which he

 4   walked out the door and is shown in that photograph --

 5         THE COURT:  Let's finish with the witness, and I'll

 6   give you some further reflections on today after we're done.

 7         MR. ASHER:  He has denied under oath that he took

 8   anything from the computer, but these and many other examples

 9   of exhibits we could present to the Court would show that

10   he --

11         THE COURT:  Mr. Asher, let's have the conversation

12   after you're done with the witness.  Why don't you continue

13   with him.

14         How much more do you have, Mr. Asher?  How much more do

15   you have, Mr. Asher?

16         MR. ROBERTS:  Your Honor, may I just --

17         THE COURT:  Mr. Asher, answer my question.

18         MR. ROBERTS:  I'm sorry.  I didn't know there was a

19   question pending.

20         MR. ASHER:  Your Honor, just conferring and I'll give

21   you an answer.

22            (Brief pause.)

23         MS. BAE:  Maybe an hour, Your Honor.

24         THE COURT:  I think an hour is --

25         MR. ASHER:  I have other --

 1          THE COURT:  It's an hour limit.  Let's move on a little

 2    more quickly, Mr. Asher.

 3          MR. ASHER:  Thank you, Judge.  Let me show Mr. Yim

 4    Plaintiff's Exhibit 130 for identification.

 5          THE COURT:  Mr. Asher, let's pass it around so we can

 6    decide if it's going to be objected to if it's offered.

 7          Mr. Roberts, grab, please, People's Exhibit 130.

 8          Mr. Asher, I assume you're offering this document.

 9          MR. ASHER:  Yes, I am.

10          MR. ROBERTS:  Your Honor, may we be heard?

11          THE COURT:  I don't have the document yet.

12          MR. ROBERTS:  I'm sorry.

13          (Brief pause.)

14          THE COURT:  Mr. Asher, you're going to try and offer

15    this document through this witness, or are you simply going to

16    try and cross him on the basis of this document?

17          MR. ASHER:  Yes, Your Honor.  And the reason --

18          THE COURT:  Which one?

19          MR. ASHER:  He already -- I asked him --

20          THE COURT:  Hold on for a second.  Are you going to

21    offer this document through this witness?

22          MR. ASHER:  Yes.

23          THE COURT:  Has he seen this document?

24          MR. ASHER:  Yes.  And at his deposition, Your Honor, he

25    told me that he agreed with what it said.  I can read from the

1    transcript.  He said he agreed with what the report says.

2         THE COURT:  Mr. Roberts.

3         MR. ROBERTS:  Your Honor, it's an expert report, so if

4    he's going to offer it -- first off, I don't know that the

5    Court would admit an expert.  But you certainly would call the

6    expert and you would lay the foundation to get the evidence in

7    through the appropriate witness.

8         Now, if you want to use it to collaterally cross the

9    witness, I mean, even that's a very difficult thing to do,

10   given that this is not the author of the report.  I imagine

11   you could try and say:  "Hey, do you agree with this or

12   disagree with that?"

13        That's one thing that would get the document --

14   depending on how the questions were asked --

15        THE COURT:  Let's stop the conversation and continue at

16   sidebar.

17             (Sidebar conference held on the record in the

18             presence of the Court and counsel.)

19        MR. ROBERTS:  So you would call the expert and attempt

20   to lay a foundation for whatever piece you may introduce, and

21   that would be the Court's decision.  Here at this juncture

22   you're trying to cross him collaterally on someone else's work

23   product.

24        Number one, just even a foundation with this witness

25   would have to be laid.  I would object.  I don't think that

1    could be done.

2        Secondly, if he wanted to use whether a statement of

3    this person or any person -- if he wanted to use the

4    deposition transcript, the appropriate way to do it is:  "Do

5    you remember giving testimony on this particular date?  Do you

6    remember being asked this question?  Do you remember giving

7    this answer?" to impeach him with his own testimony.

8        This is an expert opinion that I have absolutely no way

9    of vetting.  I can't cross-examine the document.  Quite

10   frankly, there isn't an evidentiary foundation to admit it.

11       If he's calling that witness, at some point he'll get

12   that testimony in, he'll get that evidence in.  But to move it

13   into evidence with this witness is clearly improper.

14       THE COURT:  Mr. Asher, do you want to cross your

15   witness with -- do you want to cross the witness with this?

16   What's the theory -- hold on a second.  What's the theory on

17   admitting this document through this witness?

18       MR. ASHER:  This confirms --

19       THE COURT:  Mr. Asher, hang on for a second.  Hang on

20   for one second, sir.

21       It's a document he has seen.  It is not a document he

22   has authored.  What is the theory on offering it into evidence

23   through this witness?

24       MS. BAE:  Judge, he has seen this document at his

25   deposition already, he has gone through it, and he is the IT

1  person.  He's the most knowledgeable person.

2        THE COURT:  That's not a theory of admissibility.

3        MS. BAE:  He had agreed with all of the findings that

4  were --

5        THE COURT:  That's not a theory of admissibility.

6        MR. ASHER:  What the report says is that when he

7  returned his hard drive -- he took the hard drive before he

8  left.  When he was asked after he left, he returned it and an

9  expert inspected it, and he then reported upon -- I asked him,

10 I said:  "As an IT person familiar with your own computer, do

11 you agree?" and he agreed with the conclusion.

12        The conclusion was that they put a Windows 10 operating

13 system in it which precluded anybody, including the expert, to

14 see anything that happened before the key date, October 18 --

15        THE COURT:  Here is my ruling --

16        MR. ASHER:  -- and he agreed.

17        THE COURT:  My ruling is you can elicit that testimony.

18 You cannot offer what looks like a forensic/expert report

19 through a witness who did not in any way participate in its

20 preparation.

21        If you want to elicit verbally that the conclusion of

22 the report was such-and-such and if you want him to provide --

23 the witness to provide his opinion as an IT professional at

24 the company as to whether that is correct, you can do that.

25 But you can't offer this document, Plaintiff's Exhibit 130,

BYUNG CHAN YIM - CX - BY MR. ASHER

1   through this witness who saw it at a deposition but did not

2   participate in its preparation.  Okay.  Let's move on.

3        MR. ASHER:  I don't know if it's an appropriate

4   reference.  I'm not trying to re-argue the point, but the

5   additional steps.  I would just simply ask him what exactly he

6   did with the computer and what the effect of it is.

7        THE COURT:  If you ask him questions, I will take

8   objections as they come.  I have simply ruled here on

9   Plaintiff's Exhibit 130.

10       MR. ASHER:  Thank you very much.

11           (Sidebar discussion is concluded.)

12       THE COURT:  Thanks.  We are back.

13       Mr. Asher, why don't you continue.

14       The record should reflect that there was no break in

15   the proceedings.

16  BY MR. ASHER:

17  Q.   Mr. Yim, did you remove your hard drive computer at

18  Airtech prior to your departure from the company?

19  A.   No, I did not.

20  Q.   You've seen earlier in the proceedings today a photograph

21  which showed you taking computers from Airtech.

22       Did you see them?

23  A.   Yes, I saw.

24  Q.   We're going to show it to you right now.

25       MR. ASHER:  What are they now?

1          THE COURT:  This is People's Exhibit 7, I believe.

2          MR. ASHER:  Have they been received in evidence?

3              (Brief pause.)

4          MR. ASHER:  They already were received.

5          THE COURT:  I don't recall if it was received.

6          Mr. Roberts, do you have any objection to this

7    coming in?

8          MR. ROBERTS:  I do not.

9          THE COURT:  People's Exhibit 7 is in evidence, if

10   it was not already in evidence.

11         (Plaintiff's Exhibit 7 previously received in

12          evidence.)

13         MR. ASHER:  Thank you, Judge.

14   BY MR. ASHER:

15   Q.   You yourself, Mr. Yim, do you recognize these

16   photographs?

17   A.   Yes.

18   Q.   Do they show pictures of you?

19   A.   Correct.

20   Q.   Does it show you holding a computer in two of those

21   screens -- frames?

22   A.   Yes, I see.

23   Q.   Is your hard drive computer that you use at Airtech shown

24   in one of those pictures?

25   A.   It is a computer.  It was the computer that was brought.

1    Yes.

2    Q.   It was the computer that was brought?

3    A.   Yes.  It's the scene where the computer is being taken.

4    Q.   Okay.  In other words, you're saying that the picture

5    shows you were taking a computer out of the Airtech office;

6    right?

7    A.   Correct.

8    Q.   Which of those -- is it your computer?

9    A.   One of the two is my computer.

10   Q.   Is that the one on the top?

11   A.   I don't know about that.

12   Q.   Well, the two dates that are shown, one in June 2021 and

13   the other is in September 2021.  Which one -- I withdraw that.

14        When did you take your own computer out of their

15   offices?

16   A.   It was in June, the computer.

17   Q.   Looking at the size of the box and dimension of the

18   computer, would you agree with me that the one at the top was

19   your computer?

20   A.   I don't know about that.

21   Q.   The other computer was removed at a later date; is that

22   right?

23   A.   Yes.

24   Q.   Whose computer is that?

25   A.   It was Jin Lee's computer.

1  Q.   You were taking out a computer used by the president of

2  Airtech; is that right?

3  A.   When I was taking it, I did not know that it was Jin

4  Lee's computer.  It was one of those computers that was in the

5  storage room, that's all.

6  Q.   Why do you now say it is Jin Lee's computer?

7  A.   Last time when I had a deposition, this is something that

8  came up at that time about the computer.

9  Q.   Did you agree then at the time of your deposition that

10  the computer in question was Jin Lee's deposition -- was Jin

11  Lee's computer?

12  A.   Yes, yes.

13  Q.   Did you receive any information at the time of your

14  deposition that provided you with identification concerning

15  the ownership of the computer that you didn't otherwise

16  possess?

17  A.   I don't recall.

18  Q.   What did you do with the two computers shown in these

19  photographs?

20  A.   Even though -- I took them for the purpose of connecting

21  to a TV or connecting to a game, but I did not use them

22  at all.

23  Q.   Then why did you put a new operating system in one of

24  them, sir?

25  A.   That was a computer that I used for five years.  That's

BYUNG CHAN YIN - CX - BY MR. ASHER

1  the reason why.  Because of that reason, it had all of the

2  personal information and the financial information in it.

3  Q.   Whose financial information?

4  A.   It's my own information.  It's the personal information

5  that belonged to me.

6  Q.   Now, you agree with me that there were three partitions

7  in the computer?

8  A.   Yes.

9  Q.   Did you make any change to any of those partitions during

10  the time that you had possession of your office computer?

11  A.   No.  Before returning it, I removed the -- I removed my

12  own personal information from the CRT [sic] drive.

13  Q.   Which partition?

14  A.   C and D drive.

15  Q.   C and D?

16  A.   Yes.

17  Q.   Anything else that you took off besides your personal

18  information?

19  A.   No.

20  Q.   Was it personal information?  Given everything that

21  you've testified this afternoon about what you viewed to be

22  what you developed personally, was it information for Redacted,

23  Redacted or any of the other companies where you developed product

24  yourself, sir?

25  A.   No.  It's not necessary to do that.

1  Q.   What do you mean by "personal" in this context?

2  A.   It's my personal information, my individual information.

3  For example, my family photos and things like that and

4  accounting.

5  Q.   Once again, you took your personal information out of two

6  of the partitions; right?

7  A.   Yes, correct.  I removed -- I deleted from two.

8  Q.   I understand.  On the basis of your effort to do so, why

9  did you then put a new operating system in the computer?

10  A.   In the C drive there was so much personal information

11  that I don't know about, so C drive needed to be formatted.

12  So as far as the Window operating system, without me realizing

13  it -- a lot of information without me realizing it gets stored

14  in the C drive, and that's my personal information that gets

15  saved there.

16  Q.   Where is [Redacted] -- I withdraw that.

17       Where on your computer was the [Redacted] data?  C or --

18  A.   It was not C.  I don't remember exactly now.

19  Q.   What is all that large amount of data that you just

20  mentioned about two minutes ago that was on the C drive?  Was

21  it personal or was it just simply some other data?

22  A.   In the C drive the only thing there was the operating

23  system and the personal information only.  That's all.

24  Q.   So why is personal information in an operating partition?

25  A.   Like I told you before, in Windows -- Windows just

BYUNG CHAN YIM - CX - BY MR. ASHER

1  automatically saves the information that I used.

2  Q.   What you used for personal or business purposes was in

3  one of the other partitions; correct?

4  A.   It was in both, personal information and -- personal

5  information was in both.

6  Q.   Both what?

7  A.   C and D drives.  The personal information was in both C

8  and D drive.

9  Q.   Are you saying that you took data out of both of those

10  partitions, both drives in the hard drive?

11  A.   Yes, that's correct.

12  Q.   You found personal data of yours, according to you,

13  out of both drives, separate partitions, but you didn't take

14  all of it out.

15      Am I correct?

16  A.   Yes.  I removed.

17  Q.   But some of yours was left?

18  A.   I did not leave anything behind.

19  Q.   Okay.  I understand.

20      If that's true, then why did you put a new operating

21  system into the computer?

22  A.   It's the same thing that I told you about.  In the

23  Windows operating system it protects and it saves the personal

24  information without even -- without even myself realizing it.

25  It does it automatically.

1    Q.    The effect of it -- tell me if you agree or disagree.

2          The installation of the new operating system precluded

3    anybody later to understand what you did with a computer after

4    you installed the new operating system.

5    A.    No.  That was not for that purpose, no.

6    Q.    Did you understand that that was the effect of the

7    installation of the new operating system?

8    A.    I'm not sure about that.

9    Q.    Do you agree with me that anybody who looked at your

10   computer later would never know what you did with the

11   computer?

12   A.    It is possible that that is correct, so yes.

13   Q.    In your deposition on July 8, 2022, you were asked:

14   (Reading.)

15          As an IT specialist, you agree with me that the

16          effect of including the Windows operating system

17          reinstallation prevented anyone after October 24,

18          2021, to learn what, if anything, you did with

19          regard to the data partition of the computer.

20          You answered:  I installed it in order to

21          delete my personal information.

22    I asked you to repeat it.

23    Then you said:  I agree with that.

24    To the question -- you agreed to the question that no

25   one could learn what, if anything, you did with regard to the

 1  data partition in the computer.

 2          THE INTERPRETER:  Maybe the interpreter have the

 3  deposition transcript so that the interpreter can just

 4  read it.

 5          THE COURT:  Mr. Asher, what's the question?

 6          MR. ASHER:  Withdraw whatever I did, Judge, and I'll

 7  ask in line with what Your Honor said.

 8  BY MR. ASHER:

 9  Q.   Do you believe that what you testified at the deposition

10  concerning the effect of the installation of the new operating

11  system was correct?

12  A.   Yes, that was correct.

13  Q.   Were you shown at deposition a report that was prepared

14  regarding an inspection of the computer?

15  A.   Yes, I saw.

16  Q.   Did you agree with the conclusion set forth in the

17  report?

18          MR. ROBERTS:  Objection.

19          THE COURT:  I'll allow it.

20          MR. ASHER:  It's his admission.

21          THE COURT:  I said I'll allow it.

22          MR. ROBERTS:  My only point, in clarification, is all

23  of the conclusions or a specific one?

24          THE COURT:  I'll allow it in the form it was asked.

25          Mr. Yim, answer the question, please.

1          THE WITNESS:  Just a moment.

2          Yes, that's correct.

3          THE COURT:  Mr. Asher, next question.

4          MR. ASHER:  I'd like to show the witness Plaintiff's 77

5     for identification.

6          THE COURT:  If you're going to offer it or even if

7     you're not, please show it to Mr. Roberts so he can weigh in

8     quickly on whether it's going to come in without objection.

9          Mr. Asher, are you going to offer People's Exhibit 77?

10         MR. ASHER:  Yes.

11         THE COURT:  Mr. Roberts.

12         MR. ROBERTS:  I'm just looking at each page for a

13    moment.

14             (Brief pause.)

15         MR. ROBERTS:  No objection.

16         THE COURT:  Plaintiff's Exhibit 77 is in.

17         Mr. Asher, proceed.

18             (Plaintiff's Exhibit No. 77 was received in

19              evidence.)

20         MR. ASHER:  I'd like to show to the witness Plaintiff's

21    Exhibit 77 in evidence.

22    BY MR. ASHER:

23    Q.  Mr. Yim, as you go through the pages of Plaintiff 77, let

24    me tell you that the principal question I have for you is

25    whether you recognize these pages and specifically with

1    reference to the first page itself.

2    A.    Yes, yes.

3    Q.    The first page appears to be an e-mail from you to an

4    Airtech customer called Redacted .

5          Do you see that?

6    A.    Yes, yes.

7    Q.    In the e-mail it says:  (Reading.)

8              I think we need to change your part number

9          from Redacted to...

10         Another number.

11         It goes on to say this new number:  (Reading.)

12            ...(HA means Hans Aerospace) because of the

13         attached protection letter provided to Airtech.

14         Would you please give me a quote with using new

15         number, the Hans number, and change the attached

16         specification from Airtech to Hans Aerospace and

17         protection letter with the new number for me.

18         Do you see that?

19   A.    Yes.

20   Q.    This shows an e-mail.  Namely -- the e-mail that I have

21   been reading into the record says it was January 19, 2022.

22         Do you see that date?

23   A.    Yes.

24   Q.    Where did he get all this information concerning Airtech?

25   A.    So this is a manufacturing company that I have been

1  developing since 2010.  So by using my private e-mail, there

2  were times when something like this was communicated in the

3  e-mail when the company e-mail did not work.  So there were

4  such documents as these at that time.

5  Q.    You just referred to private e-mail.

6        What are you referring to?

7  A.    So not the company computer.  And when the company e-mail

8  did not work -- so there were times -- and also there were

9  times when the researcher would send something about the item

10 from 2010, so that's when.

11 Q.    Whose researcher are you referring to?

12 A.    A researcher that's at [Redacted].

13 Q.    At whose?

14 A.    A researcher that was at [Redacted].

15 Q.    That's a company in Korea?

16 A.    Yes.  That's correct.

17 Q.    Here in early January 2021 -- excuse me, January 2022,

18 [Redacted] the company in question, is located in [Redacted] isn't

19 that true?

20 A.    Yes, that's true.

21 Q.    Did you get any pricing information with respect to

22 entering into a transaction for Hans Aerospace with [Redacted]

23 A.    Yes, I did.

24 Q.    Where did you get that information?

25 A.    The quotation was received from [Redacted]

1  Q.   Where and when?

2  A.   I received it in my private e-mail.

3  Q.   Your private e-mail, is it a -- it's an e-mail account?

4  A.   Yes.

5  Q.   What account is it?

6  A.   It's my Gmail.

7  Q.   Okay.  You're saying that in January 2021 -- excuse me,

8  January 2022 you were receiving into an account -- a private

9  account?

10  A.   Yes, yes.

11  Q.   Isn't it a fact that this is information that you've had

12  over a number of years for Airtech in your dealings with

13  Redacted

14  A.   It's not that Airtech is the only one who had it.  Like I

15  told you before, I had it as well, too, in my own private

16  e-mail.

17  Q.   Tell us, from your memory, what is your Gmail e-mail

18  address?

19  A.   It's BCYIN0526@gmail.com.

20  Q.   None of it's been produced in this case.  None.

21     Did you give the e-mail from that account to your

22  lawyers or not?

23  A.   I did not.

24  Q.   Is there a reason why you didn't?

25  A.   That was because that's my private e-mail.

1   Q.   Did you -- withdraw that.

2        Let me turn to, in Plaintiff's Exhibit 77, a specific

3   page which is about three or four pages into the exhibit.  The

4   control number is PI000498.

5        THE COURT:  Mr. Asher, do you anticipate seeking access

6   to that e-mail, for example, through a subpoena?

7        MR. ASHER:  We have sought numerous requests in front

8   of the magistrate judge, and we've obtained pursuant to

9   various efforts, and ultimately we have served subpoenas on

10  Redacted --

11       THE COURT:  I'm asking if you're anticipating

12  subpoenaing the Gmail account that's just been described.

13       MR. ASHER:  We haven't done that.

14       THE COURT:  I'm asking if you're anticipating that.

15       MR. ASHER:  Yes.  That would be useful and appropriate.

16       THE COURT:  Mr. Yim, it is possible that the lawyer for

17  the plaintiff will apply to the Court for permission to get

18  access to your e-mail.  Knowing that that is the situation as

19  you now know, deleting e-mails from your account could cause

20  very serious legal difficulties.

21       I'm going to direct you to discuss that with your own

22  lawyer, and he can give you guidance as to how to proceed, but

23  you do not want to make a mistake.

24       Mr. Roberts, can you make sure that after the

25  proceedings today you discuss with your client the spoliation,

 1    other obligations that may attach at this point?

 2         MR. ROBERTS:  Positive.

 3         THE COURT:  Mr. Asher, how much more do we have?

 4         MR. ASHER:  Give me two minutes, Your Honor.

 5              (Brief pause.)

 6         MR. ASHER:  I'd like to offer --

 7         THE COURT:  Mr. Asher, my question is how much more do

 8    you have?

 9         MR. ASHER:  Two minutes, Your Honor, or less, or less.

10              (Brief pause.)

11         MR. ASHER:  I think we have basically two documents and

12    a question.

13         THE COURT:  Okay.

14    BY MR. ASHER:

15    Q.   Previously you testified in response to your counsel's

16    question that you had changed the part number only once of...

17              (Brief pause.)

18         MR. ASHER:  I'd like to show the witness Plaintiff's

19    Exhibit 76.

20         THE COURT:  You're going to offer that, I assume.

21         MR. ASHER:  Yes.

22         THE COURT:  Mr. Roberts will take a look at it and give

23    us his position.

24         MR. ASHER:  I'm showing it to Mr. Roberts.

25              (Brief pause.)

```
 1              MR. ASHER:  Any objections?

 2              MR. ROBERTS:  No.

 3              THE COURT:  Here the defendant has indicated, through

 4    Mr. Roberts, there is no objection.  Mr. Asher has offered the

 5    document Plaintiff's Exhibit 76.  It's received in evidence.

 6              (Plaintiff's Exhibit No. 76 was received in

 7               evidence.)

 8    BY MR. ASHER:

 9    Q.   Concerning Plaintiff's 76 in evidence, which begins with

10    a product exclusivity agreement with [Redacted] and Airtech, I'd

11    like you to turn to the fourth page of the exhibit where --

12    the control number of which is PI000469.

13              At the bottom it shows an e-mail from you to [Redacted] at

14    [Redacted].  There you said in your e-mail of January 19, 2022:

15    (Reading.)

16              Good morning, [Redacted]  I think we need to change

17         your part number...

18              And it shows these numbers.  This is what we were

19    dealing with before.  This was already covered in your prior

20    testimony.

21              And here, a further page into Plaintiff's 76 at page

22    PL000476, you said in your e-mail:  (Reading.)

23              I assume that Airtech sends you a subpoena for

24         e-mails between you and me today.

25              Then on the next page, P1000477, it says in your e-mail
```

1  to Redacted  (Reading.)

2         I want you to respond back to Airtech like

3         Redacted  does not have any business with Hans

4         relevant to your court order.

5         Do you see those language?

6  A.   Yes.

7  Q.   You actually asked Redacted representative to inform

8  Airtech that Redacted does not have any business with Hans

9  relative to your court order?  Why did you --

10        THE COURT:  What's the answer to that question?

11        THE WITNESS:  Just a moment.

12            (Brief pause.)

13  A.   Yes, that's correct.

14        THE COURT:  Mr. Yim, it is exceedingly important --

15  Mr. Yim, listen to me.

16        It is exceedingly important that you do not delete or

17  change anything at all in your Gmail account.  The

18  consequences could be very serious.

19        Do you understand that?

20        THE WITNESS:  Yes, yes.

21        THE COURT:  Are you sure you understand?

22        THE WITNESS:  Yes.

23        THE COURT:  Mr. Roberts, I'm going to direct you to

24  discuss this with your client as soon as we're done today.

25        MR. ROBERTS:  I understand the issue already, Judge.

1          THE COURT:  What I would say is the document we have

2    just looked at, the testimony we have just heard as to 477,

3    whatever else might be said about it, is so serious that I

4    think you should talk to him right away.

5          You'll do that, Mr. Roberts?

6          MR. ROBERTS:  I do, Your Honor, but at the same time,

7    the colloquy here with the individual concerns what the court

8    order means and -- because when you read it, it has to do with

9    trade secrets --

10         THE COURT:  I'm not making any findings or referrals or

11   anything of the kind.  I'm talking about making sure that

12   there's nothing that could later seem like spoliation if a

13   subpoena issues.

14         MR. ROBERTS:  I understand, Your Honor.  The Gmail

15   account issue came up today.  He's been told not to delete his

16   Gmail account.  I'm happy for them to pursue the Gmail

17   account.

18         What I'm remained focused on is that he's got a

19   colloquy with an individual here.  He's perfectly free to

20   compete with the company on part numbers that are available,

21   things that are not exclusively produced, designed, and

22   manufactured -- which they don't manufacture anything -- by

23   Airtech.

24         If you read the -- I know the Court has -- language

25   in the order is such that it attributes very specific

 1  trade secret-type properties for the order to be enforceable

 2  against him.  What he's saying here is that doesn't exist

 3  here.  You have an exclusivity agreement.  We change the new

 4  part number, I got a contract, and they're out.  That's

 5  competition.  That's not:  "I stole your design idea."

 6  That's --

 7       THE COURT:  I understand the interpretation.  I do.

 8  BY MR. ASHER:

 9  Q.   Turning, Mr. Yim, to another page of the e-mail, it's

10  P1000476, at the top it says explicitly:  (Reading.)

11       I am sending this e-mail using my personal

12       e-mail address because this is very important

13       information to me and ████████  It should

14       be only under you and me.

15       Who are you trying to mask or withhold this

16  information, especially important given this relates to a

17  pending subpoena for --

18       THE COURT:  Let him answer the question you put to him.

19  A.   So to answer this question about the subpoena that came

20  for the company, in order to prepare for that, I used my

21  private e-mail.

22       MR. ASHER:  Just one minute, Your Honor.

23       (Brief pause.)

24       MR. ASHER:  One last thing, Your Honor, would be to ask

25  this witness what he said at his deposition earlier in this

 1  case.  I'm just reading the question and answer from the
 2  deposition.
 3        THE COURT:  Why are you reading out loud from the
 4  deposition?
 5        MR. ASHER:  It's just I want him to address it, if I
 6  could.
 7        THE COURT:  Okay.  Can you just ask him the question
 8  directly?
 9        MR. ASHER:  It was to explain why he said what he said.
10        THE COURT:  Okay.
11  BY MR. ASHER:
12  Q.   It says: (Reading.)
13        Have you communicated with Redacted in any event
14        post court order with regard to the transaction?
15        Answer:  Yes.
16        Question:  Did you write an e-mail to Redacted in
17        May this year?
18        Answer:  I think I did.
19        Question:  At that time did you e-mail Redacted
20        stating that if the preliminary injunction does
21        not go your way that you would have another plan
22        to make up a new company?
23        The answer:  Yes.
24  A.   What was it?
25  Q.   This is on page 158, lines 6 to 14.  You said "yes" to my

1    question:  (Reading.)

2           At that time, did you e-mail [Redacted] stating that

3       if the preliminary injunction does not go your way

4       that you should have another plan to make up a new

5       company?

6       My question is, why would you have made a statement

7    like that to one of your customers?

8    A.   So I don't really understand anything about what you said

9    and what you read just now.

10   Q.   Okay.  I understand.  Go back to Plaintiff Exhibit 76 in

11   evidence at control page P1000487 where you wrote to [Redacted] of

12   [Redacted]   You said: (Reading.)

13          If Hans loses the litigation or have a

14      different court order like stopping all business

15      with previous customers, I will forward the

16      current order to another company who is already

17      registered in [Redacted]

18      Do you see that statement?

19   A.   So where is that?

20   Q.   That's on page P1000487, about three-quarters of the way

21   down that page of your e-mail to [Redacted] on April 18, 2022.

22   A.   So what is your question?

23   Q.   What is your explanation for making this statement to

24   [Redacted]

25   A.   In order to keep the order without any regard for the

1    court order, without having the litigation be an issue.

2    Q.   Did you, in fact, set up another company?

3    A.   No, I did not.

4    Q.   Well, there is also another -- there are two Hans at this

5    point; correct?

6    A.   There is INC and LLC.

7    Q.   What does LLC do in relation to this -- the business that

8    you're currently conducting?

9    A.   In order to have a business in Vegas, I needed to make up

10   a separate entity.

11   Q.   You previously testified before the Court that you are

12   having a financial hardship.

13        Is that what you previously testified under oath?

14   A.   So are you asking me if I said that today at this witness

15   stand?

16   Q.   Yes, I am.

17   A.   No.

18   Q.   I may have misunderstood.

19        Are you now saying under oath you are not having any

20   financial hardship?

21   A.   Right.

22   Q.   So your financial condition is robust and strong today;

23   correct?

24   A.   It's not like that.

25   Q.   Well, what is it like right now?

1    A.    It has gotten to the point where running of the company

2    became possible.

3    Q.    Well, isn't it a fact that right now you're conducting

4    business with Redacted  with Unione, and --

5         THE INTERPRETER:  I'm sorry.  May the interpreter hear

6    the question from the beginning, please?  I'm sorry.

7    BY MR. ASHER:

8    Q.    Isn't it a fact that as of today you're conducting

9    business with a number of prominent Korean companies engaged

10   in the military and aerospace business, such as Redacted

11   and other companies?

12   A.    Yes.

13   Q.    What was your gross income for the year 2023?

14        MR. ROBERTS:  Objection.

15        THE COURT:  I'll allow it.

16   A.    $300,000.

17   BY MR. ASHER:

18   Q.    Was that enough to support your $150,000 Mercedes?

19        MR. ROBERTS:  Objection.

20        THE COURT:  I'll allow it.

21   A.    It's a lease.  It's a lease.  It's been financed.

22   BY MR. ASHER:

23   Q.    What's the monthly charge?

24   A.    It's $1,200.

25   Q.    $1,200?

1    A.    Yes.

2    Q.    And you live in Las Vegas?

3    A.    Yes.

4    Q.    And your expenses are less than the gross income that you

5    received last year?

6    A.    I haven't checked.

7    Q.    You've seen the records that have been submitted in

8    oppositions to your lawyers' motions that show that hundreds

9    of thousands of dollars of sales had been received by your

10   company with ███Redacted███  and certain of those companies

11   involving in one instance $2.5 million of sales.

12        Are you living in a satisfactorily comfortable manner

13   at present?

14        MR. ROBERTS:  Judge, I'm just going to object.  It's so

15   far afield of what's relevant to the preliminary injunction --

16        THE COURT:  I'll sustain it.

17        Mr. Asher, I think we're really close to being done for

18   today.  Also, we can't testify in our questions.  It's

19   sustained.

20        Do you have any other questions, Mr. Asher, or are we

21   done?

22        Mr. Yim should not answer the question.  There was an

23   objection sustained.

24        Mr. Asher, do you have any other questions?

25        MR. ASHER:  No, Your Honor.  No further questions.

1        THE COURT:  Mr. Roberts, a brief redirect.

2        MR. ROBERTS:  Yes, Your Honor.

3        Could we please put up the court order of March 22,

4   please.

5                    REDIRECT EXAMINATION

6                    By Mr. Roberts:

7   Q.   Mr. Yim, directing your attention to the name of the

8   companies that you are prohibited from doing business with as

9   per the Court's order of March 22 --

10        MR. ROBERTS:  Actually, do you want to go to the top,

11  please -- 3/28/2022.

12  BY MR. ROBERTS:

13  Q.   Is █Redacted█ listed as one of the companies you're

14  prohibited from doing business with?

15  A.   No.

16  Q.   Okay.  You competed with your own company against Airtech

17  for -- to get an exclusive arrangement for a certain product;

18  correct?

19  A.   Yes.

20  Q.   And the product -- you were shown what was marked as 76.

21  The product number, it's lengthy, but it ends in █Redacted█ as the

22  product ID.

23        Was that product something that was manufactured or

24  designed or the proprietary technology of Airtech?

25  A.   No.  It's not there, no.

1    Q.    There's two products listed.  I want to make sure we

2    cover both.  There's a product part number and a product ID

3    number listed on the document.

4         Any of that technology designed, engineered, prepared,

5    or proprietary to Airtech?

6    A.    No, no.

7    Q.    You were also asked about Plaintiff's 77.  Here you're

8    having -- at Redacted you're having an e-mail exchange with a

9    gentleman named Redacted and you're also discussing sales

10   business and changing of at least one part number; correct?

11   A.    Yes, yes.  Correct.

12   Q.    Any of the technology there discussed in e-mails in PX-77

13   the product of Airtech's design, manufacturing, engineering

14   process, or proprietary information?

15   A.    No, no.

16   Q.    So here you're again competing to be a distributor and a

17   broker for a product that was not proprietary to Airtech but

18   otherwise available to you through a competitor vending

19   process; am I right?

20   A.    Yes, correct.

21   Q.    You were shown Plaintiff's 148.  This is mostly in

22   Korean, and a lot was made of one particular part number,

23   Redacted  a Redacted      Redacted was the vendor.

24         Did Airtech, engineer, design, or otherwise have

25   proprietary technology for that particular product?

1  A.    No, no.

2  Q.    You were also shown 88 -- Plaintiff's 88 where you were

3  exchanging e-mails with a ▀Redacted▀      Also again clearly

4  competing to be the vendor or broker for a product.

5        Was that product number, which here is listed

6  ▀Redacted▀ - was that product designed, engineered, or otherwise

7  the proprietary information of Airtech?

8  A.    No, no.

9  Q.    So what we see here is you trying to change part numbers

10 so that you can be a broker and a vendor for products that are

11 available but assigned different part numbers; correct?

12        MR. ASHER:  Objection; form.

13        THE COURT:  Sustained.

14        Don't answer the question.

15 BY MR. ROBERTS:

16 Q.    Mr. Yim, here we're seeing you in these examples compete

17 for products that are not proprietary technology of Airtech;

18 is that right?

19 A.    It's not there.

20 Q.    You were also shown Plaintiff's 75.  Here ▀Redacted▀ is listing

21 the ▀Redacted▀ product descriptor on an invoice.

22        Are companies other than Airtech able to obtain that

23 product in the public domain?

24 A.    That's why I got the quotation.

25 Q.    I didn't hear you.

1   A.   That's why I got the quotation.

2   Q.   78 you were also shown.  That's discussing with

3   Redacted -- by the way, is Redacted one of the companies that

4   you're prohibited doing business with as per the Court's order

5   of 3/28/2022?  I can bring the list back up.

6   A.   No.

7   Q.   Now, the part numbers that you're discussing in

8   Plaintiff's 78, are they proprietary or otherwise engineered

9   or processes technology that belongs to Airtech?

10  A.   No.

11  Q.   Plaintiff's 79 you were shown an Airtech International

12  sales agreement.

13       Now, here, is it true that the agreement is discussing

14  solely the sales of products and not the design, engineering,

15  or proprietary information whatsoever?  Is that correct?

16  A.   Yes, that's correct.

17  Q.   And you drafted many of these agreements while you were

18  at Airtech; is that right?

19  A.   Yes, yes.

20  Q.   Any of the products by which -- that were the subject of

21  this agreement and this sales agreement proprietary or

22  engineering processes that belonged or developed by Airtech?

23  A.   No.  It's just a sales agreement.

24       MR. ROBERTS:  I have no further questions.

25       THE COURT:  Mr. Roberts, thank you.

1          Mr. Asher, any very, very, very brief re-cross?

2          MR. ASHER:  One second, Your Honor.

3              (Brief pause.)

4          MR. ASHER:  Your Honor, just one minute, please.

5              (Brief pause.)

6          MR. ASHER:  I think I have only one or two questions,

7    Your Honor.

8          THE COURT:  Okay.

9                        RECROSS-EXAMINATION

10                       By Mr. Asher:

11   Q.   How do you maintain today your price, preference, RFQ,

12   and other data relating to actual or historical transactions

13   at Hans Aerospace?

14         MR. ROBERTS:  Objection --

15         THE COURT:  I'll allow it.

16   A.   So within our company there is a database system that's

17   in place ourselves.

18   BY MR. ASHER:

19   Q.   Do you actually record in the ordinary course of your

20   business a price, RFQ, preferences, and other information

21   relating to other transactions which Hans has engaged in since

22   the time that Hans was formed?

23   A.   We do record it.

24   Q.   Why do you do so?

25   A.   Because I need the information that I used to get the

1   quotation, and it's to prove the -- it's to do the order

2   processing.

3   Q.   I understand.  You needed for some purposes historical

4   information as to customers and/or products; correct?

5   A.   Yes.  It's the pricing information and it's the

6   information for the quotation that I gave.

7   Q.   You had indicated in your testimony earlier today that

8   prices vary; correct?

9   A.   Yes.

10  Q.   Isn't it a fact that for certain standard products for

11  the Korean military and industrial business that the end users

12  quite often require a -- constant, steady prices with respect

13  to certain standard products?  Is that right?

14  A.   There are times when they require the same price if the

15  order comes as one order.

16  Q.   But from time to time, quarter to quarter, year over

17  year, the end user in Korea, to fulfill budget expectations or

18  requirements, they prefer to see steady prices offered to

19  them?

20  A.   To satisfy that condition, that has to be done in one

21  order at that particular time.

22  Q.   What about the next year?

23  A.   I'm talking about one order at that particular time.

24  Q.   In any event, they have a requirement for steady pricing?

25  A.   So with one order we can get the supply dates either for

1  one year or two years.

2  Q.   What about six months later?  How do you know what your

3  price was six months before?

4  A.   So if it's not possible to get one order at one time, if

5  it's going to be done six months later, a new order -- a new

6  quotation has to be obtained.

7          THE COURT:  Mr. Asher, you've got to wrap it up.

8          MR. ROBERTS:  Thank you, Your Honor.  One last

9  question.

10 BY MR. ASHER:

11 Q.   Given the historical record requirements, how could

12 you conduct business at Hans without the information,

13 preferences, pricing, RFQ, and quotations which you collected

14 at Airtech?

15 A.   So there are more than ten companies that are present in

16 the United States that do the same type of business as us,

17 including Airtech, and the same products are provided to the

18 Korean defense industry.  And the reason for that is because

19 all of the products are public and anybody who has anything to

20 do with customers can start a business.

21 Q.   From a traceability standpoint, how can you obtain

22 information pertaining to these so-called competitors?

23 A.   Tracing is not necessary.  Like I told you before, too,

24 as soon as we receive a quotation letter, we always have to

25 give a new quotation.  This regulation is the basic regulation

BYUNG CHAN YIM - FDX - BY MR. ROBERTS

1    in this industry.

2    Q.   Which regulation are you referring --

3        THE COURT:  Mr. Asher, Mr. Asher, you've got to wrap

4    this up.

5        MR. ASHER:  No further questions, Your Honor.

6        MR. ROBERTS:  Your Honor, may I have one?

7        THE COURT:  One.

8                    FURTHER DIRECT EXAMINATION

9                         By Mr. Roberts:

10   Q.   Since your departure from Airtech in September of 2021,

11   of what value now in March -- excuse me, it's March already

12   for me -- in January of 2024 does the pricing list of Airtech

13   have for your current company?

14   A.   It's zero.

15       MR. ROBERTS:  Thank you, Your Honor.

16       THE COURT:  Mr. Yim, thank you.  You can step down.  I

17   urge you to remember what I told you today about your e-mail.

18          (Witness excused.)

19       THE COURT:  Let's just talk for one very brief minute.

20   We have tomorrow.  There should be no expectation we have

21   beyond tomorrow.  The pace here is not -- it is what it is but

22   we're gathering enough information that tomorrow is the end of

23   our proceedings.

24       I'm grateful that Mr. Lee was willing to be taken

25   out of order.  We'll start tomorrow morning with him.

1          I think that there are all the questions suggested by

2    both parties' papers that are relevant here.  I would also say

3    to both parties that one of the live issues here is whether or

4    not there are trade secrets and if so whether or not they

5    still have value or meaning.

6          That is a question that is particular to the

7    prospective relief that was ordered and that remains in place.

8    It's not necessarily relevant to some of the retrospective

9    matters raised by the plaintiff in this case; but that is a

10   set of questions, about whether there are trade secrets and

11   about whether they continue to have value today, that are

12   suggested by today's proceedings.

13         And I mention that not because I have a view, and I

14   won't form one until I get the benefit of the parties' views

15   and the conclusion of the evidence.  But it's something that,

16   as you reflect overnight on how to prepare for tomorrow, that

17   the parties may wish to reflect on.

18         I would say that to make tomorrow move a little more

19   quickly, if there are documents that anybody wants to put into

20   evidence, pre-mark them, have them ready.  I think it's

21   probably a good idea to show them to your adversary to get a

22   view on whether there's going to be an issue on offering them,

23   and it will save us a bunch of time.

24         Mr. Asher, anything that we can very quickly

25   accomplish?

1       Over to you, Ms. Bae.

2       MS. BAE:  Judge, tomorrow morning we have scheduled the

3 testimony of Mr. Chan Yong Um who is in Korea.  So if we can

4 begin the proceeding tomorrow with Mr. Um at ten o'clock, it

5 will be 12 midnight there, rather than have him wait.

6       THE COURT:  That's what we already planned, if I

7 remember.

8       MS. BAE:  Yes.  Your Honor just indicated --

9       THE COURT:  I completely appreciate that.  That's a

10 great point.  We'll stick with the schedule we had planned,

11 and then we'll fit Mr. Lee in when the right time comes.

12       MS. BAE:  Thank you.

13       THE COURT:  Mr. Roberts, anything you need to add

14 before we adjourn today?

15       MR. ROBERTS:  Your Honor, well, it's going to be

16 difficult to get everybody in tomorrow, it seems.  We'll

17 certainly make an effort.

18       I'm going to consider maybe just -- if we could get

19 some concession on calling our witness list, I'd be willing

20 to -- I had three witnesses.  I'm willing to go to two.  If we

21 could call our witness list by consent, I think that would be

22 wise.

23       Also, given that there has been newly reported

24 decisions in the jurisdiction, one only nine days old, I'd

25 request respectfully that the Court allow some brief

1    post-hearing position papers.

2         THE COURT:  My intention is to allow that.  Look, my

3    reflection on this litigation in general is I have been

4    surprised that there are a lot of things that strike me as

5    relatively small procedural issues that lawyers of your

6    experience and caliber could resolve.

7         So I would say I think it makes sense to call the

8    witness list on consent, to do things on consent.  I don't

9    know how open I'm going to be to more testimony after

10   tomorrow.  I don't mean that as a bluff.  I don't engage in

11   bluffing.  I don't know what I think about that yet.

12        This is a lot of taking of evidence for, frankly, a

13   pretty narrow set of factual questions, as to which there's

14   already something of a developed record.

15        I would urge both sides to try and cull things down.  I

16   think that's a helpful idea.

17        Yes, Mr. Roberts, with or without the new decisions

18   from Judge Martinotti and others, my intention was to hear

19   from the parties.  I don't think I'll do it tomorrow right

20   after the evidence is taken.

21        MR. ROBERTS:  Your Honor, I am very receptive and

22   appreciate the Court's words on presenting evidence in a

23   limited fashion and a return date of a preliminary injunction.

24        I will say that what we're dealing with in terms of

25   facts with products is just a little bit outside of the norm

1    and there's a little bit of technical -- from my perspective,

2    there's some technical evidence that could assist the Court in

3    its fact finding, in my view.  I'm certainly not trying to

4    protract the proceedings.

5         THE COURT:  Understood.  Okay.

6         Ms. Bae.

7         MS. BAE:  Judge, one more thing.  To expedite the

8    proceeding, we have witnesses that have already previously

9    submitted their declarations in connection with this case.  If

10   we could just offer all of those declarations and exhibits

11   into the record as our exhibits and move on and we can just

12   focus on Your Honor's direction of trade secrets tomorrow, I

13   think that that would be most helpful.

14        THE COURT:  The likelihood that I am going to say no to

15   any party that wants to offer sworn evidence that's been

16   collected is very, very, very low.  Obviously the value of

17   non-live testimony, non-crossed testimony is lower; but if

18   people want to offer that kind of information, I'm very likely

19   to take it.

20        Part of what you do at a hearing is use the live

21   possibility to focus on the evidence that you think really

22   matters enough that you want to have the factfinder see it

23   live and you want to have it be crossed.

24        MS. BAE:  So the witnesses could be here subject to

25   cross and we could just hand in their declarations if there

1    are no more than their declarations, if Your Honor is so --

2         THE COURT:  Mr. Roberts, are you going to have an

3    objection to directs coming in by declaration to the extent

4    the defendants want to do that and then you'll simply rise for

5    cross?

6         MR. ROBERTS:  Can I answer that in 30 minutes and we'll

7    report back to the --

8         THE COURT:  Sure.

9         MR. ROBERTS:  Conceptually I want to move this forward.

10   I just want to take another look to see if agreeing to

11   something that --

12        THE COURT:  Okay.  That's fine.

13        MR. ROBERTS:  But I'm not against it.

14        THE COURT:  Okay.

15        MS. BAE:  They will be here for --

16        MR. ROBERTS:  I'll answer it now.  I don't want to be

17   unfair and make them -- I'll answer it right away.  I just

18   need a couple of minutes.

19        THE COURT:  Take a few minutes and you can perhaps find

20   a way to report back.  Just tell me tomorrow morning.  I'm

21   going to be here tomorrow, regardless of what you put on.

22        MR. ROBERTS:  Very well.

23        THE COURT:  Anything else?

24        MR. ROBERTS:  No.

25        THE COURT:  We're adjourned for the day.

1          Ms. Bae, something else?

2          MS. BAE:  No.  Thank you, Your Honor.

3          THE COURT:  We'll see each other tomorrow morning.

4     Thank you.

5              (Which were all the proceedings held in the

6               above-entitled matter on said date.)

7                          *   *   *   *   *

1      **FEDERAL OFFICIAL COURT REPORTER'S CERTIFICATE**

2

3          I, **Lisa A. Larsen, RPR, RMR, CRR, FCRR,** Official Court

4    Reporter of the United States District Court for the District

5    of New Jersey, do hereby certify that the foregoing

6    proceedings are a true and accurate transcript from the

7    record of proceedings in the above-entitled matter.

8

9

10              */S/Lisa A. Larsen, RPR, RMR, CRR, FCRR*

11              Official U.S. District Court Reporter ~

12                   District of New Jersey

13

14              DATED this February 3, 2024

15

16

17

18

19

20

21

22

23

24

25

## $

13,

2:12

9:21,

1:13
56:22,
14,

- 100:12
- 56:13,

## '

84:25

## /

**sa** [1] - 147:10

## 0

**453** [1] - 97:11
**024** [1] - 1:18
**7068-1067** [1] - 2:4
**7102** [1] - 1:10
**07463** [1] - 2:6

## 1

**1** [8] - 3:11, 31:11,
31:13, 31:15, 31:22,
32:2, 32:19, 83:21
**10** [2] - 73:9, 109:7
**100** [3] - 12:12, 57:8,
73:10
**101** [2] - 2:3, 3:14
**10189/1060** [1] - 93:11
**106** [1] - 2:6
**11** [5] - 16:12, 16:22,
67:2, 80:2, 83:25
**119** [1] - 3:15
**12** [3] - 3:4, 45:1,
142:22
**12,000** [1] - 41:14
**124** [1] - 3:15
**12:15** [1] - 46:12
**12:25** [1] - 49:8
**13** [1] - 13:6
**130** [4] - 105:25,

106:3, 109:20, 110:4
**13024** [1] - 134:13
**13189/1060** [1] - 93:11
**133** [1] - 3:5
**138** [1] - 3:5
**14** [1] - 129:18
**140** [1] - 3:5
**148** [7] - 3:12, 82:5,
82:13, 83:1, 84:12,
84:17, 135:13
**158** [1] - 129:18
**18** [2] - 109:9, 130:14
**180** [1] - 27:1
**19** [3 - 31:5, 120:14,
125:7
**1:** [1] - 80:12
**1 55** [1] - 80:13

## 2

**2** [8] - 12:18, 48:11,
65:6, 66:18, 83:21,
84:4, 84:17, 147:14
**2.5** [1] - 133:5
**20** [6] - 8:2, 33:5,
35:16, 78:24, 83:15,
84:6
**20-page** [1] - 32:24
**2003** [1] - 12:15
**2005** [3] - 13:15,
51:14, 51:17
**2006** [2] - 13:15, 51:18
**2010** [5] - 13:20,
51:19, 55:9, 120:19,
121:3
**2012** [1] - 87:13
**2014** [2] - 41:25, 42:3
**2015** [1] - 103:23
**2020** [7] - 17:24,
40:19, 43:2, 47:14,
56:22, 57:9, 100:17
**2021** [27] - 14:2, 15:1,
17:11, 22:17, 41:20,
43:2, 47:23, 51:21,
57:9, 83:15, 84:6,
84:22, 85:24, 88:9,
89:15, 89:20, 93:16,
95:1, 96:20, 96:24,
100:18, 112:6,
112:7, 117:11,
121:10, 121:25,
141:2
**2022** [7] - 7:9, 17:3,
17:9, 64:24, 67:1,
117:6, 120:14,
121:10, 122:1,
125:7, 130:14
**2023** [1] - 132:7
**2024** [4] - 1:10, 4:3,
141:4, 147:14

## 20th

**20th** [1] - 83:16
**21** [2] - 84:25, 88:9
**2160** [1] - 1:17
**22** [2] - 133:21, 1
**22-civ-668** [1] -
**24** [2] - 71:11
**28** [3] - 17:3
64:24
**29** [2] -
**29th**
**2:2**                 [1] -

8
34:3,

5:23
14
1:13

56:23

7

:20, 18:15,
8:18, 18:20,
9:7, 19:9,
9:22, 22:14,
79:7

## 4

5:7
- 97:16
49:2
] - 126:20
**00** [2] - 98:3,
12

## 5

[1] - 13:15
[2] - 73:9, 79:10
**1** [1] - 3:5
**34** [2] - 101:7, 101:13
**552** [2] - 101:7, 101:13
**553** [1] - 101:13
**556** [1] - 101:14

## 6

**6** [2] - 13:7, 129:18
**65** [1] - 44:11
**6:45** [1] - 48:20

## 7

5

,

2,

22,

4,
0,

0:17,
91:13,
:25
100:23,
6,
1:17,
04:21,

## 8

:6
5:18
:5
67:9, 67:12,
, 68:6
3:12, 28:4
- 70:5, 70:7,
1, 71:11
- 3:13
- 3:13, 85:10,
17, 85:23, 88:7,
5:19

## 9

[3] - 17:19, 44:2,
44:14
**1** [1] - 3:13
**97** [1] - 3:14
**973)776-7741** [1] -
1:23

## A

**able** [16] - 13:22,
19:19, 54:4, 59:22,
63:17, 65:25, 71:14,
71:15, 74:12, 78:4,
78:5, 79:10, 86:7,
88:21, 93:19, 136:14

**above** [2] - 146:23,
147:7
**above-entitled** [2] -
146:23, 147:7
**absolutely** [5] - 58:19,
72:20, 79:19, 94:23,
108:3
**abstract** [1] - 24:11
**accept** [1] - 75:23
**acceptable** [1] - 37:14
**access** [6] - 18:8,
25:2, 58:14, 71:14,
122:23, 123:11
**accommodate** [1] -
86:12
**accommodated** [1] -
6:20
**accomplish** [1] -
142:17
**according** [2] - 73:12,
116:5
**account** [16] - 23:7,
26:2, 41:15, 41:24,
121:21, 121:23,
122:1, 122:2,
122:14, 123:5,
123:12, 126:10,
127:8, 127:9, 127:10
**accounting** [2] -
26:24, 114:22
**accurate** [1] - 147:6
**accurately** [2] - 54:5,
54:15
**accuses** [1] - 24:25
**acknowledge** [2] -
77:11, 77:13
**acquired** [1] - 104:14
**act** [2] - 57:2, 71:15
**acting** [1] - 70:17
**ACTION** [1] - 1:4
**actionable** [1] - 24:7
**activity** [2] - 25:1,
43:17
**actor** [2] - 44:20, 46:8
**actual** [4] - 33:18,
42:20, 100:20, 138:4
**actually** [10] - 7:23,
19:12, 25:15, 33:5,
37:12, 85:25,
100:12, 125:25,
134:2, 138:11
**add** [2] - 56:9, 143:5
**added** [1] - 23:19
**adding** [1] - 14:17
**addition** [1] - 54:20
**additional** [2] - 83:3,
109:24
**address** [7] - 12:7,
12:8, 19:4, 104:22,
122:11, 128:5,

128:23
**addressing** [1] - 36:13
**adjourn** [1] - 143:6
**adjourned** [2] - 80:13, 146:17
**adjust** [1] - 34:22
**admissibility** [2] - 108:22, 108:25
**admissible** [3] - 24:3, 24:4, 25:5
**admission** [2] - 23:16, 118:13
**admit** [3] - 30:17, 107:1, 108:5
**admitted** [1] - 39:17
**admitting** [1] - 108:12
**advantage** [1] - 80:6
**adversary** [1] - 142:13
**aerospace** [5] - 16:5, 44:15, 74:3, 74:7, 132:4
**Aerospace** [10] - 16:10, 17:6, 84:21, 86:6, 91:15, 102:3, 120:5, 120:9, 121:15, 138:5
**affair** [2] - 18:5, 42:15
**affairs** [1] - 13:18
**affect** [1] - 58:13
**affiliate** [1] - 13:1
**affiliation** [1] - 12:10
**afield** [1] - 133:9
**afraid** [1] - 92:15
**afternoon** [3] - 50:13, 51:7, 114:14
**afterward** [1] - 26:8
**again** [14] - 41:11, 41:17, 51:10, 64:12, 67:6, 68:1, 75:21, 83:5, 86:17, 92:2, 98:21, 114:23, 135:8, 135:20
**against** [15] - 58:6, 58:16, 64:18, 65:7, 68:12, 69:20, 77:16, 80:6, 91:19, 91:22, 99:13, 99:21, 127:20, 134:8, 146:5
**agent** [3] - 32:9, 83:2, 83:8
**agents** [3] - 61:13, 82:20, 102:9
**ago** [9] - 17:15, 47:5, 53:13, 71:12, 89:24, 92:3, 92:21, 98:7, 115:13
**agree** [14] - 84:4, 87:11, 101:6, 104:3, 107:7, 109:6, 112:12, 113:3,

113:24, 116:19, 117:2, 117:8, 117:16, 118:9
**agreed** [9] - 70:5, 70:6, 87:8, 106:21, 106:22, 108:23, 109:6, 109:11, 117:17
**agreeing** [1] - 146:2
**agreement** [18] - 32:9, 32:16, 33:19, 33:22, 34:3, 57:13, 57:16, 57:18, 101:23, 102:2, 103:23, 125:3, 127:21, 137:4, 137:5, 137:13, 137:15
**agreements** [4] - 28:17, 31:18, 32:6, 137:9
**ahead** [1] - 30:10
**aided** [1] - 1:25
**Air** [2] - 47:18, 48:4
**airplane** [1] - 52:8
**AIRTECH** [1] - 1:3
**Airtech** [186] - 4:7, 4:13, 10:11, 12:10, 12:12, 12:14, 13:8, 13:13, 13:14, 16:11, 16:12, 17:12, 17:13, 18:19, 19:14, 20:16, 22:15, 22:19, 24:25, 25:17, 25:20, 26:16, 29:9, 29:13, 29:19, 32:10, 32:24, 33:19, 34:17, 35:23, 37:3, 37:6, 37:12, 42:8, 46:2, 47:10, 47:24, 48:4, 51:17, 51:20, 51:23, 55:5, 55:7, 55:11, 55:12, 55:13, 55:16, 55:20, 56:4, 57:13, 57:16, 57:19, 58:2, 58:7, 58:16, 58:24, 59:12, 59:17, 59:24, 59:25, 60:1, 60:9, 60:10, 60:20, 61:4, 61:11, 61:13, 61:23, 61:24, 62:3, 62:15, 62:22, 62:23, 63:7, 63:9, 63:11, 63:16, 63:17, 64:1, 64:5, 64:14, 64:18, 66:4, 66:5, 67:21, 67:24, 68:4, 68:7, 68:9, 68:12, 69:5, 69:17, 70:21, 70:23, 71:18, 72:16, 74:25, 75:2, 75:5, 75:16, 75:20, 75:21, 75:22,

75:23, 76:1, 77:2, 77:6, 77:14, 77:15, 77:16, 77:22, 78:12, 79:1, 79:14, 79:18, 79:22, 80:1, 80:5, 82:19, 82:20, 83:13, 84:5, 85:5, 85:21, 86:1, 86:2, 87:11, 87:18, 87:21, 87:22, 88:2, 89:1, 89:2, 90:14, 91:19, 91:22, 91:24, 92:1, 93:10, 94:3, 94:21, 95:4, 95:9, 95:13, 95:17, 100:6, 101:23, 102:1, 102:10, 102:20, 104:1, 110:13, 110:16, 111:17, 111:24, 112:21, 119:22, 120:6, 120:9, 120:17, 122:5, 122:7, 125:3, 125:16, 125:20, 126:1, 127:16, 134:8, 134:16, 134:22, 135:9, 135:16, 135:24, 136:9, 136:14, 137:1, 137:3, 137:10, 137:14, 140:6, 140:9, 141:2, 141:4
**Airtech's** [7] - 12:16, 12:21, 18:2, 19:15, 47:10, 57:22, 135:5
**Airtech-related** [1] - 85:21
**al** [2] - 1:6, 4:8
**allegation** [1] - 25:20
**allegations** [1] - 75:6
**alleged** [3] - 26:5, 63:20, 63:21
**allegedly** [2] - 24:20, 104:12
**allotted** [1] - 50:16
**allow** [10] - 43:21, 81:10, 118:12, 118:14, 118:17, 132:9, 132:14, 138:7, 143:17, 143:19
**almost** [3] - 44:16, 53:13, 57:6
**along** [3] - 14:24, 18:1, 25:23
**already** [15] - 22:8, 40:4, 46:12, 81:16, 106:15, 108:20, 110:23, 111:4,

125:12, 126:18, 130:9, 141:3, 142:23, 144:6, 144:25
**although** [1] - 8:10
**always** [7] - 10:2, 62:8, 62:20, 69:25, 72:14, 87:6, 140:16
**am** [21] - 5:16, 8:16, 12:12, 12:13, 20:23, 38:23, 39:12, 56:23, 57:24, 68:22, 71:8, 93:9, 97:5, 100:16, 106:5, 116:8, 128:4, 131:9, 135:11, 144:13, 145:6
**among** [1] - 36:6
**amount** [4] - 40:23, 40:24, 41:19, 115:12
**and/or** [1] - 138:21
**anger** [1] - 76:12
**angry** [1] - 68:17
**another** [24] - 11:10, 23:6, 23:20, 29:10, 38:19, 44:8, 60:13, 62:4, 68:20, 81:20, 82:1, 98:15, 98:19, 102:5, 104:5, 104:6, 120:3, 128:2, 129:14, 129:22, 130:9, 130:20, 130:22, 146:2
**answer** [31] - 8:11, 8:12, 14:16, 14:18, 14:20, 14:21, 14:22, 19:3, 20:6, 20:10, 36:17, 63:19, 86:23, 87:3, 93:1, 105:13, 105:17, 108:2, 118:18, 126:3, 128:11, 128:12, 128:19, 129:8, 129:11, 129:16, 133:15, 136:6, 145:23, 146:8, 146:9
**answered** [4] - 14:24, 22:10, 59:5, 117:13
**answering** [3] - 21:9, 86:22, 89:25
**answers** [2] - 14:12, 14:14
**anticipate** [1] - 122:23
**anticipating** [2] - 123:4, 123:7
**anybody** [8] - 38:5, 49:8, 59:22, 109:8, 116:21, 117:2, 140:11, 142:11
**anyone** [3] - 9:9, 10:18, 117:10

**anything** [19] - 18:19, 19:20, 37:22, 63:14, 103:3, 105:4, 105:9, 114:10, 116:11, 117:11, 117:18, 126:10, 127:4, 127:15, 130:1, 140:11, 142:16, 143:5, 146:15
**AOS** [3] - 101:25, 102:17, 114:16
**Aperture** [3] - 101:24, 101:25, 102:2
**apologies** [1] - 91:3
**apparently** [1] - 16:24
**appearances** [1] - 4:9
**appeared** [2] - 1:19, 2:7
**appearing** [1] - 52:16
**appears** [5] - 31:5, 39:23, 90:23, 102:1, 119:21
**appendix** [1] - 28:23
**applicable** [1] - 7:19
**application** [1] - 44:11
**apply** [4] - 29:18, 35:11, 70:6, 123:10
**appointment** [1] - 81:13
**appreciate** [7] - 7:6, 21:15, 21:18, 31:24, 54:22, 143:1, 144:14
**appreciated** [1] - 54:24
**approach** [2] - 9:1, 34:11
**approaching** [1] - 29:3
**appropriate** [5] - 74:1, 107:3, 107:24, 109:23, 123:8
**approve** [1] - 75:23
**approximately** [1] - 22:18, 32:23, 57:12
**April** [1] - 130:14
**area** [2] - 21:12, 22:8
**argue** [1] - 109:24
**arising** [1] - 43:13
**around** [3] - 39:4, 94:19, 106:1
**arrange** [1] - 6:19
**arrangement** [3] - 33:18, 34:2, 134:9
**arrangements** [2] - 33:21, 34:5
**Asher's** [1] - 14:21
**ask** [24] - 7:18, 30:23, 39:22, 40:1, 48:13, 48:19, 49:24, 52:18, 53:10, 57:22, 59:14,

62:12, 63:25, 69:9, 71:20, 74:9, 78:20, 93:10, 99:16, 109:25, 110:2, 117:25, 128:17, 128:25
**assent** [1] - 96:15
**assets** [1] - 43:15
**assigned** [1] - 136:3
**assist** [4] - 54:15, 55:16, 60:16, 144:19
**assistance** [1] - 8:20
**assistant** [1] - 5:2
**assists** [1] - 54:17
**associate** [1] - 5:10
**associated** [1] - 96:3
**assume** [3] - 106:4, 124:13, 125:16
**assumes** [1] - 29:3
**Assure** [3] - 18:7, 42:21, 42:23
**Assured** [6] - 43:4, 43:7, 45:6, 45:13, 45:15, 47:6
**attach** [1] - 22:22, 123:19
**attached** [2] - 120:6, 120:8
**attachments** [2] - 84:9, 96:9
**attain** [1] - 55:10
**attainable** [1] - 34:25
**attempt** [1] - 107:15
**attention** [3] - 88:6, 90:17, 133:24
**attribute** [1] - 22:24
**attributes** [1] - 127:18
**attribution** [1] - 22:23
**August** [1] - 14:2
**author** [3] - 90:24, 91:1, 107:6
**authored** [1] - 108:17
**authorities** [1] - 13:22
**authority** [5] - 57:1, 57:3, 57:6, 87:1, 87:4
**authorization** [1] - 41:3
**authorized** [2] - 14:9, 32:14
**automatically** [2] - 115:19, 116:18
**available** [16] - 54:23, 59:12, 59:21, 63:7, 63:8, 66:2, 66:9, 67:18, 67:20, 70:14, 71:2, 71:12, 103:7, 127:13, 135:10, 136:3
**Avenue** [1] - 2:6

**avoid** [4] - 43:23, 44:17, 45:10, 85:4
**away** [13] - 9:21, 10:17, 11: , 11:4, 11:5, 1  9, 41:3, 48:4  49:10, 69:1, 7    7, 126:22, 146:9

## B

**B** [2] - 1:12, 3:8
**back** [25] - 10:10, 26:3, 36:17, 36:19, 40:8, 42:2, 61:1, 61:13, 64:8, 67:6, 69:16, 77:9, 80:13, 87:13, 87:20, 99:16, 99:17, 102:14, 103:13, 110:7, 125:20, 130:3, 136:22, 145:24, 146:12
**back-end** [1] - 26:3
**background** [3] - 51:8, 51:13, 55:4
**bad** [4] - 41:2, 44:20, 46:8, 73:15
**Bae** [18] - 4:12, 4:14, 4:15, 4:23, 5:1, 5:5, 8:18, 9:8, 9:11, 9:21, 10:8, 10:25, 11:3, 11:14, 142:18, 144:23, 146:18
**BAE** [27] - 1:15, 1:16, 4:11, 4:17, 4:19, 4:22, 5:3, 8:24, 9:12, 10:9, 10:20, 11:6, 11:11, 11:15, 15:6, 27:24, 88:13, 105:19, 108:19, 108:23, 142:19, 142:25, 143:4, 144:24, 145:16, 146:7, 146:19
**balance** [1] - 35:19
**barrier** [1] - 60:12
**base** [1] - 55:18
**based** [8] - 7:18, 44:8, 45:14, 62:6, 62:24, 104:6, 104:8, 104:10
**basic** [2] - 46:13, 140:17
**basically** [7] - 12:22, 34:7, 34:19, 36:14, 36:21, 62:7, 124:4
**basis** [3] - 33:18, 103:19, 104:12, 106:12, 115:1
**Bates** [2] - 38:16, 101:7

**BCYIN0526@gmail.com** [1] - 122:12
**bearing** [1] - 94:17
**Bearing** [5] - 83:22, 91:15, 93:6, 93:12, 94:25
**became** [4] - 17:20, 17:21, 68:17, 131:20
**becomes** [1] - 74:21
**began** [2] - 51:23, 89:20
**begin** [6] - 27:5, 34:8, 36:14, 36:21, 80:18, 142:21
**beginning** [8] - 4:9, 17:24, 33:4, 41:25, 43:2, 47:14, 87:14, 131:24
**begins** [2] - 80:12, 125:2
**behalf** [5] - 1:19, 2:7, 4:12, 57:2, 84:21
**behind** [4] - 52:10, 77:8, 77:9, 116:11
**being** [23] - 7:25, 9:16, 9:18, 24:14, 31:1, 31:22, 48:5, 50:9, 52:1, 55:21, 63:20, 66:22, 74:5, 78:4, 85:14, 86:5, 97:11, 97:13, 104:14, 108:1, 111:22, 133:11
**believe** [12] - 10:11, 10:20, 15:14, 15:17, 27:11, 37:2, 52:14, 53:13, 55:4, 67:1, 110:21, 118:2
**believes** [1] - 53:20
**Bellaire** [1] - 12:8
**belong** [1] - 78:6
**belonged** [5] - 68:20, 68:21, 78:8, 113:23, 137:14
**belongs** [4] - 77:16, 80:1, 87:5, 137:1
**bench** [1] - 49:9
**benefit** [3] - 51:7, 51:12, 142:6
**besides** [2] - 99:7, 114:10
**best** [7] - 54:18, 62:19, 73:16, 89:22, 90:2, 90:6
**better** [1] - 49:21
**between** [5] - 29:9, 33:19, 90:3, 91:14, 125:17
**beyond** [1] - 141:13
**bid** [1] - 93:10

**biggest** [1] - 68:16
**binders** [1] - 49:4
**bit** [6] - 20:18, 45:25, 49:19, 65:4, 144:17, 144:18
**blocked** [1] - 89:9
**BLP2018** [5] - 85:4, 86:6, 135:15, 135:23, 136:13
**BLP2266** [1] - 85:4
**bluff** [1] - 144:2
**bluffing** [1] - 144:3
**Boo** [1] - 11:6
**boss** [1] - 86:16
**both** [13] - 4:25, 35:1, 115:22, 115:23, 115:24, 115:25, 116:2, 116:3, 116:6, 134:19, 141:19, 141:20, 144:7
**bottom** [2] - 88:6, 125:6
**bought** [1] - 71:25
**box** [3] - 8:25, 80:19, 112:11
**Brach** [3] - 5:8, 5:9, 5:10
**BRACH** [2] - 2:2, 2:5
**bracket** [1] - 53:9
**breach** [2] - 25:6, 43:13
**break** [6] - 40:7, 40:8, 68:2, 76:22, 80:12, 110:9
**brief** [4] - 133:19, 137:18, 141:11, 143:17
**Brief** [24] - 9:2, 11:2, 11:13, 27:20, 39:6, 50:21, 64:22, 66:16, 78:18, 80:20, 88:16, 91:6, 101:3, 105:18, 106:9, 119:7, 123:23, 124:3, 124:10, 124:18, 126:5, 128:16, 137:20, 137:22
**briefly** [4] - 26:18, 28:14, 42:11, 57:21
**bring** [4] - 44:22, 64:20, 66:13, 136:22
**broad** [2] - 26:20, 43:21
**broke** [2] - 79:4, 95:9
**broker** [9] - 55:21, 70:3, 70:18, 71:22, 73:19, 87:7, 135:9, 135:21, 136:2
**brokers** [1] - 79:12
**brought** [4] - 91:18,

91:22, 111:19, 111:21
**budget** [1] - 139:9
**building** [1] - 23:1
**bunch** [1] - 142:15
**bundle** [1] - 73:11
**business/make** [1] - 46:16
**businesses** [1] - 23:11
**BYUNG** [3] - 1:6, 3:5, 51:3
**Byung** [6] - 6:7, 17:24, 18:4, 38:3, 40:19, 41:1, 41:20, 51:2

## C

**C** [13] - 1:14, 2:1, 114:7, 114:8, 115:3, 115:4, 115:7, 115:10, 115:11, 115:13, 115:15, 115:25
**caliber** [1] - 143:23
**call** [10] - 8:18, 8:21, 35:19, 50:15, 50:19, 57:17, 107:1, 107:15, 143:13, 143:24
**called** [9] - 9:18, 40:24, 44:14, 47:6, 47:7, 83:25, 101:23, 119:22, 140:14
**calling** [2] - 108:6, 143:11
**came** [9] - 8:8, 30:5, 63:14, 64:4, 75:3, 86:3, 113:2, 127:8, 128:12
**can't** [6] - 24:15, 28:9, 97:12, 108:4, 109:20, 133:12
**cancer** [1] - 41:7
**candidly** [1] - 46:1
**cannot** [12] - 10:1, 60:11, 66:9, 70:10, 72:13, 72:20, 88:11, 89:16, 90:1, 90:4, 90:16, 109:13
**capacity** [2] - 48:10, 65:20
**carefully** [1] - 21:19
**CARLTON** [1] - 1:16
**Carlton** [1] - 4:22
**carried** [1] - 8:4
**carry** [1] - 94:19
**case** [22] - 7:18, 7:25, 13:8, 15:18, 17:3, 17:8, 35:22, 43:4,

43:12, 44:11, 45:18, 53:14, 81:14, 90:15, 95:11, 98:13, 101:25, 103:9, 122:13, 128:19, 142:1, 145:1
**cases** [1] - 44:1
**categories** [3] - 26:20, 37:5, 37:8
**category** [3] - 26:21, 26:22, 83:2
**cause** [1] - 123:12
**Central** [1] - 1:17
**CEO** [2] - 12:13, 68:14
**certain** [15] - 24:17, 32:17, 42:17, 53:5, 56:8, 59:23, 60:7, 60:22, 79:4, 90:4, 133:4, 134:9, 139:2, 139:5
**certainly** [7] - 24:13, 46:19, 63:20, 86:24, 107:1, 143:9, 144:20
**CERTIFICATE** [1] - 147:1
**certify** [1] - 147:5
**cetera** [1] - 62:6
**chain** [2] - 91:2, 96:3
**challenge** [1] - 24:23
**Chan** [8] - 17:24, 18:4, 38:3, 40:19, 41:1, 41:20, 51:2, 142:20
**CHAN** [3] - 1:6, 3:5, 51:3
**chance** [1] - 67:16
**change** [16] - 58:11, 62:25, 73:6, 85:3, 87:7, 87:17, 95:12, 95:20, 114:2, 120:1, 120:8, 125:9, 126:10, 127:21, 136:1
**changed** [5] - 48:6, 48:7, 52:3, 78:3, 124:9
**changes** [3] - 62:9, 72:14, 73:12
**changing** [2] - 62:20, 69:25, 135:2
**characterize** [1] - 45:17
**charge** [2] - 87:23, 132:17
**charged** [1] - 75:8
**check** [3] - 41:4, 72:4, 75:21
**checked** [1] - 132:25
**checks** [2] - 14:9
**choose** [1] - 81:13
**CHRISTINE** [1] - 1:16

**Christine** [1] - 4:11
**chronological** [1] - 26:14
**Chun** [2] - 33:6, 33:7
**circumstances** [3] - 52:3, 74:24, 75:1
**CIVIL** [1] - 1:4
**claim** [4] - 43:11, 44:19, 104:15
**claimed** [1] - 66:23
**claiming** [1] - 91:25
**claims** [3] - 25:5, 25:23, 43:24
**clarification** [1] - 118:15
**clarify** [1] - 15:10
**clear** [6] - 21:7, 29:17, 31:3, 31:9, 52:13, 59:1
**clearly** [2] - 108:8, 135:20
**CLERK** [3] - 4:4, 50:25, 80:16
**client** [12] - 6:3, 7:25, 9:21, 22:2, 48:18, 48:22, 50:5, 50:10, 50:14, 54:23, 123:18, 126:17
**client's** [1] - 20:2
**clients** [4] - 6:4, 12:22, 12:23
**close** [3] - 51:1, 61:16, 133:11
**co** [1] - 27:8
**co-defendants** [1] - 27:8
**collateral** [1] - 25:10
**collaterally** [2] - 107:4, 107:18
**colleague** [3] - 4:15, 4:20, 29:21
**colleague's** [1] - 48:25
**collected** [2] - 140:6, 145:8
**college** [1] - 51:14
**colloquy** [3] - 61:20, 126:25, 127:12
**come** [15] - 21:7, 29:8, 36:11, 40:8, 46:6, 46:24, 49:12, 61:5, 63:10, 64:10, 64:13, 69:10, 78:6, 110:3, 119:1
**comes** [5] - 34:8, 68:25, 101:12, 139:7, 143:3
**comfort** [1] - 52:17
**comfortable** [2] - 53:2, 133:6
**coming** [3] - 85:14,

111:1, 145:20
**commence** [1] - 13:11
**common** [2] - 104:6, 104:9
**communicate** [2] - 13:23, 53:5
**communicated** [2] - 120:20, 129:6
**communication** [6] - 20:7, 22:13, 87:24, 88:25, 89:1, 89:4
**communications** [1] - 89:5
**companies** [45] - 17:14, 18:15, 20:15, 34:9, 42:8, 42:12, 42:13, 42:15, 42:18, 43:2, 43:5, 45:20, 45:21, 56:2, 56:3, 56:10, 60:23, 62:18, 65:14, 65:17, 65:21, 66:1, 67:2, 75:15, 75:17, 76:2, 79:13, 79:14, 79:15, 79:18, 79:23, 80:2, 80:7, 88:2, 99:8, 114:16, 132:3, 132:5, 133:4, 133:25, 134:5, 136:14, 136:20, 140:7
**companies'** [1] - 17:18
**company's** [2] - 36:14, 36:22
**compete** [8] - 58:6, 58:16, 64:18, 69:20, 77:16, 80:6, 127:13, 136:8
**competed** [1] - 134:8
**competing** [6] - 45:7, 45:14, 99:13, 99:21, 135:8, 135:21
**competition** [5] - 7:24, 25:8, 43:19, 57:17, 127:23
**competitiveness** [1] - 36:7
**competitor** [1] - 135:10
**competitors** [1] - 140:14
**complete** [4] - 34:15, 35:2, 35:3, 35:25
**completed** [4] - 35:4, 35:6, 35:9, 49:13
**completely** [3] - 52:9, 74:21, 143:1
**completing** [1] - 75:20
**completion** [1] - 101:22

**complicated** [1] - 76:21
**complication** [1] - 21:16
**components** [1] - 102:25
**compound** [1] - 64:7
**compromised** [2] - 44:9, 44:10
**computer** [55] - 1:25, 37:5, 37:16, 38:3, 38:4, 51:16, 55:17, 61:14, 68:25, 69:1, 69:12, 99:5, 102:24, 103:8, 104:24, 105:4, 109:5, 110:1, 110:12, 111:14, 111:17, 111:19, 111:21, 111:22, 111:24, 112:2, 112:3, 112:8, 112:10, 112:12, 112:13, 112:15, 112:18, 112:19, 112:20, 112:23, 112:25, 113:2, 113:4, 113:5, 113:9, 113:18, 113:25, 114:3, 115:2, 115:10, 116:14, 116:21, 117:3, 117:4, 117:12, 117:19, 118:7, 120:25
**computer-aided** [1] - 1:25
**computers** [11] - 37:25, 38:2, 38:6, 68:19, 69:3, 69:4, 69:8, 69:10, 110:16, 112:23, 113:12
**conceptually** [1] - 146:1
**concerning** [21] - 18:13, 18:16, 18:18, 20:16, 22:14, 23:24, 57:17, 69:18, 77:22, 82:15, 87:21, 89:1, 89:7, 89:14, 89:19, 90:7, 113:8, 118:3, 120:17, 125:2
**concerns** [5] - 43:12, 44:18, 64:14, 65:7, 126:25
**concession** [1] - 143:11
**conclude** [1] - 54:12
**concluded** [2] - 85:3, 110:6
**conclusion** [5] -

109:6, 109:7, 109:16, 118:9, 142:6
**conclusions** [1] - 118:16
**condition** [2] - 131:15, 139:12
**conduct** [10] - 13:22, 42:8, 44:4, 44:22, 47:8, 79:22, 81:4, 90:11, 104:1, 140:4
**conducted** [1] - 52:4
**conducting** [7] - 70:1, 70:7, 70:22, 89:20, 131:1, 131:21, 132:2
**conference** [1] - 107:13
**conferring** [1] - 105:16
**Confidential** [1] - 32:25
**confidential** [5] - 45:8, 45:14, 64:3, 76:18, 77:2
**confirm** [3] - 36:16, 36:24, 96:8
**confirmed** [2] - 40:22, 40:23
**confirms** [1] - 108:13
**connect** [3] - 69:6, 73:25, 104:18
**connecting** [3] - 56:2, 113:14, 113:15
**connection** [4] - 34:17, 35:24, 89:1, 145:1
**connections** [1] - 104:19
**consent** [4] - 101:13, 143:13, 143:25
**consequences** [1] - 126:11
**consider** [3] - 72:11, 72:13, 143:10
**considered** [2] - 55:13, 59:21
**constant** [1] - 139:4
**Cont'd** [1] - 2:1
**contact** [3] - 13:25, 34:11, 73:14
**contacted** [1] - 13:24
**contained** [8] - 37:5, 62:9, 69:11, 71:1, 74:19, 87:25, 88:3, 104:24
**content** [2] - 21:25, 24:6
**context** [1] - 114:19
**continue** [1] - 19:6, 30:16, 43:18, 43:20, 44:10, 49:11, 55:1,

63:3, 90:10, 94:25, 101:16, 105:8, 107:11, 110:8, 142:3
**continued** [2] - 37:16, 48:8
**Continuing** [6] - 15:1, 16:20, 17:18, 19:7, 86:25, 87:4
**continuing** [1] - 84:20
**continuously** [1] - 34:21
**contract** [6] - 30:7, 102:6, 102:7, 102:8, 102:9, 127:22
**contracting** [1] - 32:11
**contracts** [5] - 28:2, 29:9, 29:19, 30:1, 30:6
**contractual** [1] - 87:17
**contributions** [1] - 55:18
**control** [9] - 38:19, 39:1, 75:24, 93:3, 102:1, 102:15, 122:22, 125:5, 130:4
**conversation** [3] - 103:10, 105:7, 107:11
**conversations** [3] - 7:2, 21:6, 21:11
**conversion** [3] - 43:11, 43:15, 104:9
**converting** [2] - 7:14, 46:20
**convey** [1] - 54:7
**COO** [1] - 98:15
**cooperate** [1] - 34:14
**copies** [1] - 39:4
**copy** [7] - 27:23, 27:24, 28:7, 31:21, 39:7, 88:14, 101:1
**core** [2] - 25:20, 46:2
**correspondence** [1] - 31:18
**couldn't** [2] - 17:14, 27:25
**counsel** [4] - 4:10, 4:22, 30:24, 107:14
**counsel's** [1] - 124:8
**countries** [1] - 34:10
**couple** [1] - 146:10
**course** [10] - 29:13, 45:6, 45:15, 49:11, 54:18, 94:2, 94:9, 94:11, 104:14, 138:11
**Court's** [8] - 21:16, 44:21, 50:12, 65:11, 107:17, 134:1,

136:21, 144:14
**Courthouse** [1] - 1:9
**courtroom** [1] - 9:7
**Courtroom** [1] - 31:25
**cover** [2] - 21:11, 134:19
**covered** [1] - 125:12
**CPI** [25] - 77:23, 77:24, 78:11, 83:18, 84:16, 84:18, 85:1, 85:24, 86:2, 86:4, 87:8, 87:9, 87:12, 90:4, 90:11, 95:12, 98:14, 114:15, 115:9, 115:10, 129:9, 129:12, 129:20, 135:15, 136:12
**create** [2] - 60:3, 75:17
**created** [1] - 29:5, 29:6, 30:4, 75:15, 78:11
**creates** [1] - 60:13
**creating** [2] - 52:7, 60:16
**credibility** [2] - 46:11, 54:12
**credibly** [1] - 54:14
**Cresskill** [1] - 12:18
**critical** [1] - 20:21
**CROSS** [1] - 81:2
**cross** [17] - 46:22, 46:24, 48:25, 49:12, 80:12, 80:13, 80:18, 106:12, 107:4, 107:18, 108:4, 108:9, 108:10, 137:18, 145:17, 145:22
**CROSS-EXAMINATION** [1] - 81:2
**cross-examine** [1] - 108:4
**crossed** [2] - 145:9, 145:15
**crosstalk** [2] - 30:11, 86:20
**CRR** [3] - 1:22, 147:3, 147:10
**CRT** [1] - 114:5
**crux** [1] - 26:9
**cull** [1] - 144:7
**currencies** [1] - 60:13
**current** [13] - 7:8, 33:8, 58:13, 69:23, 72:14, 72:22, 73:6, 73:7, 78:24, 103:1, 130:9, 141:5
**currently** [3] - 31:1, 71:22, 131:1

**Cus** [1] - 44:15
**customer** [43] - 16:8, 16:9, 19:13, 33:15, 34:8, 34:12, 34:20, 35:7, 36:11, 55:18, 56:10, 58:1, 58:15, 59:6, 59:13, 59:17, 59:19, 60:4, 60:8, 60:10, 61:1, 61:12, 61:15, 62:7, 69:18, 70:19, 71:4, 72:4, 72:7, 72:11, 72:12, 72:17, 73:21, 74:15, 74:18, 78:8, 79:4, 79:6, 87:6, 95:16, 95:21, 119:22
**customer's** [3] - 34:15, 36:2, 36:13
**customers** [62] - 12:25, 13:23, 13:24, 15:23, 15:25, 16:3, 16:4, 16:6, 16:12, 17:2, 17:12, 17:22, 17:24, 18:13, 19:24, 22:19, 31:19, 32:7, 32:17, 33:16, 34:24, 35:2, 35:10, 36:1, 36:9, 45:9, 47:9, 47:11, 47:13, 47:23, 55:22, 56:3, 57:4, 58:5, 59:20, 59:23, 60:11, 60:17, 60:21, 60:22, 60:24, 62:13, 62:17, 69:19, 70:24, 71:24, 71:25, 72:17, 79:1, 79:9, 89:5, 89:6, 89:11, 92:16, 95:22, 100:4, 103:13, 129:25, 130:8, 138:21, 140:12
**customized** [2] - 35:12, 35:15
**cutting** [1] - 28:20
**CX** [2] - 3:3, 48:7

**D**

**D** [5] - 3:1, 114:7, 114:8, 115:25, 116:1
**damage** [2] - 44:19, 45:18
**damages** [5] - 43:11, 43:13, 43:24, 46:10, 104:15
**Daniel** [1] - 33:6
**data** [29] - 19:15, 26:23, 30:5, 36:14, 36:22, 37:5, 37:9, 37:10, 37:12, 37:16,

37:19, 37:24, 57:22, 58:12, 98:18, 102:24, 103:24, 104:4, 104:5, 104:6, 115:10, 115:12, 115:14, 116:2, 116:5, 117:12, 117:19, 138:4
**database** [3] - 58:2, 61:14, 138:8
**date** [13] - 6:18, 44:12, 62:19, 83:17, 84:5, 90:5, 96:25, 107:25, 109:9, 112:15, 120:15, 144:15, 146:23
**dated** [4] - 17:3, 17:8, 88:9, 96:20
**DATED** [1] - 147:14
**dates** [5] - 8:3, 58:11, 65:18, 112:6, 139:17
**dating** [2] - 42:2, 87:13
**day** [10] - 6:19, 6:24, 40:24, 41:7, 50:15, 58:11, 62:10, 62:25, 81:19, 146:17
**days** [4] - 44:2, 44:14, 52:4, 143:16
**daytime** [1] - 68:11
**deal** [7] - 13:23, 15:23, 23:22, 48:11, 66:3, 95:16
**dealing** [4] - 35:22, 72:3, 125:12, 144:16
**dealings** [2] - 99:9, 122:5
**dealt** [2] - 66:6, 103:25
**December** [8] - 84:25, 85:24, 88:9, 89:15, 89:20, 93:16, 94:3, 95:1
**decide** [1] - 106:2
**deciding** [1] - 61:11
**decision** [2] - 53:24, 107:17
**decisions** [2] - 143:16, 144:9
**declaration** [1] - 145:20
**declarations** [4] - 145:1, 145:2, 145:17, 145:18
**decline** [1] - 24:17
**decrease** [1] - 72:15
**decreased** [2] - 17:18, 17:20
**dedicating** [1] - 68:10
**defamation** [2] - 25:6, 92:13

**defamatory** [4] - 22:1, 24:6, 24:21, 25:9
**defendant** [13] - 13:8, 44:3, 46:8, 46:16, 46:22, 49:1, 49:7, 49:12, 49:25, 81:15, 101:13, 103:12, 124:21
**defendant's** [1] - 26:5
**Defendants** [2] - 1:7, 2:7
**defendants** [11] - 5:6, 5:7, 6:3, 7:3, 25:21, 27:8, 46:4, 46:5, 46:8, 91:9, 145:21
**defendants'** [1] - 96:4
**defense** [4] - 12:23, 16:5, 56:6, 140:10
**definition** [2] - 10:18, 44:10
**delay** [1] - 52:8
**delete** [3] - 117:14, 126:9, 127:8
**deleted** [1] - 114:25
**deleting** [1] - 123:12
**delivery** [3] - 57:25, 58:10, 62:19
**Demerest** [1] - 12:9
**demonstrate** [1] - 7:23, 44:20, 45:13
**denied** [2] - 103:9, 105:3
**departing** [1] - 77:14
**departure** [5] - 16:11, 18:13, 26:8, 110:13, 141:2
**depending** [1] - 107:10
**depends** [1] - 73:14
**deposition** [21] - 49:3, 52:4, 53:11, 53:16, 53:22, 54:2, 106:20, 107:24, 108:20, 109:21, 113:1, 113:3, 113:4, 113:8, 117:6, 117:21, 118:2, 118:6, 128:18, 128:20, 128:22
**depositions** [2] - 52:12, 53:14
**Deputy** [1] - 31:25
**DEPUTY** [3] - 4:4, 50:25, 80:16
**describe** [8] - 26:18, 28:13, 31:18, 32:6, 40:16, 42:11, 43:7, 47:22
**described** [3] - 22:13, 35:11, 123:5

**description** [1] - 28:17
**descriptive** [1] - 7:5
**descriptor** [1] - 136:13
**design** [4] - 127:23, 135:5, 135:16, 137:6
**designated** [1] - 32:10
**designations** [1] - 49:5
**designed** [4] - 127:14, 134:16, 134:21, 135:23
**destroy** [1] - 25:7
**determination** [2] - 44:22, 75:4
**determine** [3] - 37:13, 44:6, 62:5
**determining** [2] - 35:25, 74:16
**develop** [3] - 13:15, 34:14, 55:16
**developed** [13] - 13:16, 37:18, 86:3, 88:1, 93:18, 94:1, 94:20, 99:7, 100:6, 114:15, 114:16, 137:14, 144:6
**developing** [3] - 43:11, 100:2, 120:19
**development** [3] - 34:18, 55:17
**didn't** [16] - 7:4, 19:21, 24:18, 41:19, 41:20, 45:5, 53:10, 68:11, 85:20, 91:4, 94:22, 105:14, 113:9, 116:6, 122:17, 136:17
**different** [12] - 18:25, 60:13, 73:10, 73:13, 73:23, 73:24, 74:21, 89:4, 89:8, 130:7, 136:3
**difficult** [3] - 75:19, 107:5, 143:8
**difficulties** [1] - 123:13
**difficulty** [3] - 23:3, 45:25, 46:1
**dimension** [1] - 112:11
**diminished** [1] - 17:22
**direct** [9] - 22:23, 43:13, 48:16, 50:15, 78:15, 90:17, 92:5, 123:14, 126:16
**DIRECT** [3] - 12:3, 51:5, 140:25
**directing** [1] - 133:24
**direction** [2] - 45:11, 145:4

**directly** [11] - 19:1, 20:22, 24:12, 43:24, 44:16, 44:20, 45:9, 60:11, 76:1, 100:5, 129:1
**directs** [1] - 145:20
**disagree** [2] - 107:8, 116:19
**disappear** [1] - 18:2
**disappeared** [2] - 37:24, 38:4
**discernable** [3] - 65:12, 65:13, 65:24
**disclose** [3] - 76:1, 76:3, 76:4
**disclosure** [1] - 64:3
**discontinued** [1] - 25:16
**discovered** [1] - 87:25
**discovery** [1] - 27:7
**discuss** [4] - 86:17, 123:14, 123:18, 126:17
**discussed** [3] - 31:23, 75:1, 135:4
**discussing** [4] - 135:1, 136:19, 136:24, 137:5
**discussion** [4] - 22:16, 53:4, 53:6, 110:6
**dissolve** [2] - 8:15, 78:20
**dissolved** [1] - 44:7
**distribution** [3] - 67:24, 68:7, 71:16
**distributor** [1] - 135:8
**DISTRICT** [3] - 1:1, 1:1, 1:13
**district** [1] - 44:2
**District** [5] - 4:3, 147:4, 147:11, 147:12
**divide** [1] - 26:20
**document** [41] - 26:25, 27:2, 27:6, 28:11, 28:15, 29:6, 30:17, 31:4, 31:10, 33:3, 33:5, 38:8, 38:12, 38:14, 38:17, 65:2, 85:11, 85:13, 89:18, 90:20, 96:3, 96:14, 96:18, 97:3, 106:4, 106:7, 106:11, 106:12, 106:17, 106:19, 107:9, 108:4, 108:12, 108:16, 108:19, 109:20, 124:23, 126:19,

134:20
**documents** [11] - 28:20, 29:9, 29:14, 29:21, 94:5, 102:14, 103:5, 103:7, 120:22, 124:4, 142:11
**doesn't** [6] - 9:18, 14:12, 22:9, 43:16, 53:9, 127:20
**dollar** [1] - 47:19
**dollars** [1] - 133:3
**domain** [6] - 67:18, 67:21, 70:8, 71:8, 71:13, 136:15
**door** [1] - 104:25
**doubt** [1] - 54:13
**down** [6] - 49:10, 49:24, 63:2, 130:14, 141:8, 144:7
**drafted** [1] - 137:9
**draw** [1] - 88:6
**drill** [1] - 63:2
**drive** [13] - 109:2, 110:12, 111:17, 114:5, 114:7, 115:3, 115:4, 115:7, 115:13, 115:15, 116:1, 116:3
**Drive** [1] - 12:9
**drives** [6] - 62:23, 115:25, 116:3, 116:6
**DSK** [1] - 16:13
**DST** [1] - 83:25
**duly** [6] - 9:3, 9:5, 12:2, 50:22, 50:24, 51:4
**during** [9] - 9:16, 13:13, 22:18, 47:12, 50:1, 76:15, 76:17, 77:6, 114:2
**duty** [2] - 25:6, 43:14
**DX** [2] - 3:3, 48:7

**E**

**e-mail** [59] - 83:14, 84:6, 84:8, 84:25, 85:1, 85:23, 86:7, 88:8, 89:7, 89:10, 89:16, 91:14, 91:21, 91:25, 93:5, 93:7, 96:3, 96:19, 96:23, 96:24, 97:2, 97:11, 97:24, 97:25, 102:17, 103:3, 119:21, 119:25, 120:13, 120:19, 120:21, 120:23, 120:25, 121:20,

121:21, 122:9, 122:10, 122:14, 122:18, 122:24, 123:11, 125:6, 125:7, 125:15, 125:18, 128:2, 128:4, 128:5, 128:14, 129:9, 129:12, 129:20, 130:14, 134:25, 135:20
**e-mailed** [1] - 79:2
**e-mails** [11] - 89:6, 90:3, 90:5, 90:23, 91:1, 96:9, 101:10, 123:12, 125:17, 135:4, 135:20
**each** [12] - 29:21, 36:8, 66:9, 73:11, 73:13, 73:24, 73:25, 74:19, 82:18, 119:5, 146:20
**earlier** [4] - 37:2, 110:15, 128:18, 138:24
**early** [2] - 14:2, 121:10
**earned** [1] - 100:12
**economic** [1] - 43:13
**education** [1] - 55:4
**educational** [1] - 63:14
**effect** [5] - 110:1, 116:19, 116:24, 117:9, 118:3
**effectively** [2] - 53:6, 54:5
**effort** [3] - 7:3, 115:1, 143:9
**efforts** [2] - 46:7, 123:2
**Eichler** [3] - 5:8, 5:9, 5:10
**EICHLER** [2] - 2:2, 2:5
**Eisenhower** [1] - 2:3
**either** [11] - 22:22, 43:20, 52:25, 57:17, 62:3, 64:4, 69:1, 69:6, 75:7, 79:22, 139:17
**electrical** [1] - 12:24
**electronic** [2] - 51:14, 99:6
**Electronics** [2] - 42:25, 43:1
**elevated** [1] - 55:6
**elicit** [8] - 18:25, 20:18, 22:21, 24:14, 24:16, 29:12, 109:12, 109:16
**elicited** [1] - 24:17

**eliciting** [1] - 18:23
**else** [9] - 22:22, 22:25, 31:8, 63:12, 63:13, 114:10, 126:21, 146:15, 146:18
**else's** [1] - 107:18
**elsewhere** [1] - 61:14
**embezzled** [4] - 40:17, 40:20, 41:13, 41:15
**embezzlement** [2] - 45:20, 46:20
**employ** [1] - 13:8
**employed** [1] - 94:20
**employee** [5] - 33:6, 69:2, 100:6, 104:1, 104:15
**employees** [10] - 10:10, 14:1, 18:2, 40:19, 41:14, 41:19, 41:22, 42:17, 42:19, 57:5
**employer** [10] - 75:18, 76:1, 76:3, 76:10, 77:9, 99:12, 99:13, 99:20, 99:22, 104:7
**employer's** [1] - 77:9
**employment** [5] - 13:12, 57:13, 57:18, 69:14, 92:13
**encounter** [1] - 15:17
**end** [16] - 14:3, 26:3, 33:5, 47:25, 62:11, 86:13, 87:6, 93:10, 93:13, 100:21, 101:14, 102:20, 139:3, 139:9, 141:14
**ended** [2] - 51:20, 75:5
**ends** [2] - 33:5, 134:13
**enforce** [1] - 103:18
**enforceable** [1] - 127:19
**engage** [3] - 79:3, 88:3, 144:2
**engaged** [4] - 16:3, 47:19, 132:3, 138:13
**engaging** [1] - 25:1
**engineer** [5] - 51:17, 51:19, 51:24, 56:11, 135:16
**engineered** [3] - 134:21, 135:23, 136:25
**engineering** [6] - 51:15, 64:4, 88:4, 135:5, 137:6, 137:14
**English** [9] - 15:11, 15:13, 15:17, 52:5, 52:14, 52:23, 53:1, 53:11, 54:14

enjoined [2] - 44:4, 44:23
enough [4] - 30:15, 132:12, 141:14, 145:14
ensure [2] - 14:11, 21:9
entered [1] - 64:21
entering [2] - 89:15, 121:15
entire [2] - 41:19, 41:24
entirely [1] - 25:10
entities [3] - 65:8, 76:17, 77:3
entitled [2] - 146:23, 147:7
entity [2] - 29:10, 131:3
entry [1] - 65:18
especially [3] - 17:14, 44:1, 128:9
ESQ [5] - 1:16, 1:16, 2:2, 2:3, 2:5
essentially [3] - 43:14, 44:5, 77:8
establish [2] - 52:19, 103:12
established [3] - 18:4, 18:6, 37:17
establishing [1] - 17:25
estimate [2] - 47:24, 48:1
et [3] - 1:6, 4:8, 62:6
evaluate [1] - 67:17
even [16] - 19:18, 29:17, 36:9, 45:5, 46:15, 68:11, 74:20, 79:10, 87:13, 88:1, 107:5, 107:20, 113:14, 116:17, 118:24
event [2] - 129:6, 139:16
events [1] - 52:3
ever [5] - 56:19, 57:16, 57:18, 64:6, 95:11
every [5] - 58:11, 58:12, 62:10, 62:25, 66:9
everybody [1] - 143:8
everybody's [1] - 54:18
everyone [3] - 4:5, 9:1, 50:9
everything [5] - 19:9, 57:4, 57:7, 62:8, 114:13
Evidence [3] - 24:15,

24:22, 29:18
evidence [45] - 7:13, 29:3, 39:10, 39:11, 39:17, 39:18, 39:20, 39:22, 40:3, 54:18, 54:19, 84:8, 84:13, 85:14, 85:16, 85:18, 91:8, 91:11, 97:16, 97:17, 97:19, 101:18, 107:2, 108:7, 108:8, 108:17, 110:22, 111:3, 111:4, 111:6, 119:12, 119:14, 124:23, 124:25, 125:2, 130:4, 142:7, 142:12, 144:4, 144:12, 144:14, 144:19, 145:7, 145:13
evidentiary [2] - 101:2, 108:5
evolved [1] - 44:1
ex [1] - 8:3
exact [2] - 6:8, 48:1, 74:22
exactly [6] - 70:10, 70:18, 74:23, 78:1, 109:25, 115:11
examination [1] - 30:16
EXAMINATION [6] - 12:3, 51:5, 81:2, 133:22, 138:1, 140:25
examine [3] - 11:19, 65:6, 108:4
example [7] - 13:22, 46:21, 61:23, 78:10, 103:21, 114:21, 122:24
examples [4] - 73:18, 73:19, 105:4, 136:8
exceedingly [2] - 126:7, 126:9
Excel [2] - 30:2, 30:9
excellent [1] - 8:17
except [3] - 10:9, 17:4, 55:13
exception [4] - 17:5, 17:7, 23:16, 32:7
exchange [3] - 21:19, 91:14, 134:25
exchanged [1] - 90:3
exchanging [1] - 135:20
exclamation [1] - 92:14
exclusive [22] - 32:9, 32:10, 32:11, 33:14,

33:15, 33:17, 33:22, 34:2, 34:3, 34:5, 59:25, 60:19, 63:16, 64:2, 64:5, 68:7, 79:14, 82:20, 83:13, 87:1, 134:9
exclusively [3] - 52:5, 67:23, 127:14
exclusivity [3] - 33:21, 125:3, 127:21
excuse [6] - 4:19, 18:22, 27:18, 121:10, 121:25, 141:3
excused [1] - 141:10
executive [1] - 22:14
exhibit [9] - 83:7, 92:6, 92:7, 92:10, 101:14, 101:21, 102:15, 122:21, 125:4
Exhibit [44] - 3:10, 31:13, 31:15, 31:22, 32:2, 32:24, 33:4, 33:13, 39:16, 39:17, 39:19, 39:25, 66:14, 82:13, 83:1, 84:12, 85:10, 85:17, 91:8, 91:10, 97:7, 97:17, 97:18, 101:5, 101:12, 101:17, 103:22, 104:21, 105:25, 106:3, 109:20, 110:4, 110:21, 111:3, 111:5, 119:2, 119:9, 119:11, 119:14, 122:20, 124:12, 124:23, 124:24, 130:3
exhibits [4] - 5:4, 105:5, 145:2, 145:3
exist [3] - 33:22, 34:3, 127:20
expand [2] - 63:19, 88:15, 89:16
expanse [1] - 50:16
expansive [3] - 8:5, 8:6, 15:5
expectation [1] - 141:12
expectations [1] - 139:9
expedite [1] - 144:24
expense [1] - 44:18
expenses [2] - 14:1, 132:23
experience [2] - 103:7, 143:23
expert [8] - 26:23,

106:24, 107:1, 107:2, 107:15, 108:3, 109:4, 109:8
expertise [1] - 60:15
explain [11] - 38:5, 59:11, 59:16, 59:17, 73:5, 74:10, 74:14, 75:1, 85:25, 102:4, 129:2
explained [1] - 74:24
explanation [1] - 130:16
explicitly [1] - 128:3
exploited [1] - 7:25
expressly [1] - 7:22
extent [7] - 20:17, 22:20, 29:5, 30:25, 96:12, 96:14, 145:20
extra [2] - 18:5, 42:15
extra-marital [2] - 18:5, 42:15
extraordinary [1] - 7:21
extremely [1] - 8:6
ye [1] - 11:9

**F**

F [1] - 1:12
facilitate [1] - 71:16
facilities [1] - 12:16
fact [15] - 24:10, 44:9, 47:5, 55:8, 60:14, 60:15, 63:16, 90:8, 104:23, 122:4, 130:20, 131:21, 132:2, 139:2, 144:20
factfinder [2] - 46:19, 145:14
facts [1] - 144:17
factual [1] - 144:5
faint [1] - 104:19
fair [4] - 30:15, 35:19, 99:12, 99:20
fake [5] - 40:20, 42:1, 42:18, 44:25, 75:9
false [5] - 24:7, 24:8, 24:10, 92:19, 92:22
familiar [6] - 10:15, 29:13, 45:6, 57:23, 57:24, 109:5
family [1] - 114:21
far [8] - 27:3, 49:7, 55:11, 57:4, 102:9, 104:8, 115:5, 133:9
FARBIARZ [2] - 1:12, 4:2
fashion [1] - 46:23, 144:15
fashions [1] - 44:8

fast [1] - 52:2
fast-moving [1] - 52:2
favorable [2] - 100:3, 100:4
FCRR [3] - 1:22, 147:3, 147:10
FCX [1] - 3:3
FDX [1] - 3:3
February [1] - 147:14
federal [3] - 25:22, 44:11, 52:16
FEDERAL [1] - 147:1
Federal [1] - 1:9
feel [1] - 54:4
feels [1] - 24:12
felt [1] - 53:1
few [4] - 47:5, 62:12, 73:19, 146:11
fiduciary [2] - 25:6, 104:9
fill [5] - 50:16, 61:24, 71:5, 71:8, 71:15
final [1] - 87:5
finally [1] - 61:3
financed [1] - 132:15
finances [1] - 57:5
financial [5] - 113:20, 113:21, 131:5, 131:13, 131:15
find [8] - 24:9, 28:18, 34:11, 34:20, 36:5, 36:9, 54:11, 146:11
finding [1] - 144:20
findings [2] - 108:23, 127:3
fine [3] - 6:23, 6:25, 146:4
finish [7] - 14:20, 14:25, 50:2, 50:14, 86:23, 87:3, 105:1
finished [1] - 50:17
fire [1] - 41:6
fired [1] - 41:9
firm [1] - 4:12
fiscal [1] - 100:21
fit [1] - 143:3
five [6] - 40:8, 40:9, 45:12, 72:1, 98:6, 113:18
five-minute [1] - 40:8
flex [1] - 6:21
flexible [1] - 50:9
flight [2] - 6:9, 48:19
Florida [1] - 42:16
fluctuations [1] - 73:4
fluent [1] - 52:6
focal [2] - 45:9, 45:10
focus [6] - 45:2, 46:18, 46:25,

104:11, 145:4,
145:13
**focused** [2] - 44:2,
127:11
**follow** [4] - 25:23,
28:15, 62:12, 63:1
**follow-up** [2] - 62:12,
63:1
**following** [1] - 101:21
**follows** [5] - 12:2,
28:23, 36:20, 51:4,
99:18
**FOR** [1] - 1:1
**foregoing** [1] - 147:5
**forensic/expert** [1] -
109:13
**forgive** [3] - 5:13,
28:19, 29:8
**form** [8] - 5:11, 12:14,
103:8, 103:23,
118:17, 136:4, 142:5
**formal** [1] - 34:3
**formatted** [1] - 115:4
**formed** [3] - 98:19,
98:24, 138:14
**former** [4] - 86:16,
99:13, 99:21, 103:13
**forms** [3] - 101:23,
103:15, 104:24
**formulation** [1] -
62:24
**Fort** [1] - 1:18
**forth** [6] - 33:13, 37:8,
84:4, 91:14, 103:1,
118:9
**forward** [6] - 11:17,
41:18, 52:13,
103:22, 130:8, 146:1
**found** [4] - 41:24,
42:2, 76:6, 116:5
**foundation** [7] - 29:1,
29:4, 96:15, 107:2,
107:16, 107:20,
108:5
**foundational** [1] -
52:19
**four** [18] - 38:9, 42:8,
42:12, 42:13, 42:15,
43:2, 43:5, 45:20,
46:6, 46:16, 46:24,
52:19, 72:1, 75:15,
75:17, 76:17, 77:3,
122:21
**fourth** [2] - 41:7, 125:4
**fourth-stage** [1] - 41:7
**frames** [1] - 111:15
**Frank** [1] - 1:9
**frankly** [4] - 20:20,
30:3, 108:5, 144:4
**free** [1] - 127:12

**friendly** [1] - 86:5
**friendship** [1] - 86:5
**front** [11] - 27:23,
30:21, 31:3, 31:8,
32:2, 33:4, 38:8,
82:12, 85:9, 88:11,
122:25
**fulfill** [2] - 36:1, 139:9
**full** [2] - 12:6  52:4
**fully** [2] - 15:7, 45:6
**function** [1] - 58:24
**fundamentally** [1] -
45:24
**further** [8] - 43:22,
80:  , 103:10, 105:2,
1  5:14, 133:18,
37:16, 140:22
**URTHER** [1] - 140:25

## G

**gain** [1] - 69:4
**gained** [2] - 77:21,
80:5
**game** [1] - 113:15
**games** [1] - 69:7
**gander** [1] - 9:21
**gather** [1] - 92:4
**gathering** [2] - 60:16,
141:14
**gave** [7] - 13:21, 14:8,
25:1, 25:17, 32:11,
45:11, 138:23
**general** [18] - 13:18,
13:21, 16:15, 17:16,
33:8, 33:9, 33:12,
51:19, 55:8, 55:20,
56:14, 57:1, 94:21,
98:15, 102:6, 102:7,
102:8, 143:20
**generalizations** [1] -
18:24
**generally** [8] - 28:14,
30:20, 44:25, 56:5,
66:2, 89:6, 99:4
**gentleman** [1] - 135:1
**gentleman's** [1] - 11:6
**gets** [3] - 100:25,
115:6, 115:7
**getting** [4] - 29:17,
45:25, 46:7, 70:20
**ghost** [1] - 75:10
**girlfriend** [1] - 45:7
**given** [13] - 7:19, 49:6,
68:13, 69:2, 74:18,
87:12, 99:11, 99:19,
107:6, 114:13,
128:9, 140:3, 143:15
**gives** [1] - 80:5
**giving** [4] - 14:23,

22:25, 107:25, 108:2
**globally** [1] - 34:10
**Gmail** [7] - 121:24,
122:10, 123:5,
126:10, 127:7, 127:9
**go** [7] - 6:1, 20:22,
28:10, 36:10, 43:16,
45:12, 82:10, 87:20,
95:4, 96:9, 103:13,
119:16, 129:14,
129:21, 130:3,
134:2, 143:12
**goes** [3] - 6:24, 74:17,
120:4
**gone** [1] - 108:20
**gonna** [6] - 10:16,
21:7, 23:14, 23:15,
74:7, 86:19
**good** [12] - 4:5, 4:11,
4:14, 4:24, 4:25,
9:20, 51:7, 73:15,
100:2, 125:9, 142:13
**goods** [2] - 58:1, 73:8
**Google** [1] - 60:6
**goose** [1] - 9:20
**gotten** [3] - 47:24,
61:17, 131:19
**grab** [1] - 106:3
**graduate** [1] - 51:15
**graduated** [1] - 51:15
**grateful** [1] - 141:16
**great** [7] - 8:17, 9:1,
9:15, 10:7, 11:8,
15:20, 143:2
**g oss** [2] - 132:7,
132:23
**guess** [1] - 48:24
**guidance** [1] - 123:15

## H

**H** [1] - 3:8
**HA** [1] - 120:5
**half** [1] - 25:18
**hand** [2] - 19:16,
145:17
**handle** [3] - 32:10,
86:7, 96:12
**hands** [1] - 103:6
**hang** [10] - 21:13,
29:7, 29:22, 31:20,
51:25, 71:19,
103:16, 108:14
**Hankook** [1] - 16:14
**HANKOOK** [1] - 16:18
**Hans** [19] - 45:13,
47:7, 48:2, 84:21,
86:6, 91:15, 102:3,
120:5, 120:8, 120:9,
121:15, 125:21,

126:1, 130:6,
130:22, 138:5,
138:13, 138:14,
140:4
**Hanwha** [4] - 16:9,
16:10, 16:13, 79:8,
121:5, 121:7, 128:6,
130:10
**happened** [6] - 26:7,
65:22, 89:23, 92:3,
92:21, 109:9
**happens** [1] - 7:4
**happy** [1] - 127:9
**hardship** [2] - 131:5,
131:13
**hardware** [1] - 37:25
**hasn't** [1] - 21:1
**haven't** [10] - 20:20,
39:11, 44:23, 46:15,
61:9, 61:10, 61:17,
104:8, 123:6, 132:25
**having** [18] - 12:2,
18:5, 21:20, 23:4,
42:14, 46:1, 49:10,
49:20, 49:21, 51:4,
51:20, 55:22, 79:9,
130:19, 131:5,
131:12, 134:25
**he'll** [3] - 49:10, 108:6,
108:7
**headed** [1] - 32:24
**heads** [1] - 97:12
**health** [1] - 41:9
**hear** [14] - 15:15, 19:2,
21:17, 25:18, 29:1,
51:9, 52:18, 64:12,
67:25, 83:4, 98:20,
131:23, 136:17,
144:10
**heard** [8] - 43:8, 44:9,
44:23, 46:15, 49:7,
89:8, 106:6, 126:20
**Hearing** [1] - 1:7
**hearing** [11] - 6:20,
8:3, 44:6, 45:3, 49:7,
81:6, 81:14, 81:17,
81:18, 143:18,
145:12
**hearsay** [19] - 18:23,
18:25, 20:7, 20:18,
20:21, 21:3, 21:5,
22:21, 22:22, 23:1,
23:2, 23:6, 23:19,
24:2, 24:3, 24:12,
26:4
**heart** [2] - 43:16,
61:16
**held** [4] - 4:1, 103:6,
107:13, 146:22
**help** [2] - 46:18, 46:19

**helpful** [7] - 14:23,
26:6, 38:13, 47:1,
50:17, 144:8, 145:5
**helping** [1] - 5:3
**helps** [1] - 54:25
**her** [3] - 18:6, 90:10,
96:25
**hereby** [1] - 147:5
**Hey** [1] - 107:7
**hiding** [1] - 52:9
**higher** [5] - 42:20,
55:7, 56:19, 76:16,
98:2
**himself** [2] - 22:2,
23:13
**hired** [1] - 13:15
**historical** [4] - 37:8,
138:4, 138:20, 140:3
**history** [5] - 8:1, 36:8,
36:10, 36:15, 36:22
**Ho** [2] - 44:15
**Ho-Ho-Cus** [1] - 44:15
**hold** [7] - 14:6, 20:4,
28:8, 48:13, 85:9,
106:16, 108:11
**holding** [1] - 111:14
**Honor's** [2] - 45:10,
145:4
**HONORABLE** [2] -
1:12, 4:2
**hook** [1] - 25:22
**hope** [2] - 23:16, 98:2
**hopeful** [1] - 75:4
**hour** [6] - 48:16,
48:23, 58:12,
105:19, 105:20,
105:22
**huge** [1] - 99:10
**hundreds** [1] - 133:2
**Hyun** [1] - 11:6

## I

**I've** [3] - 43:9, 49:7,
79:2
**ID** [3] - 66:17, 134:14,
134:19
**idea** [5] - 24:20, 86:10,
127:23, 142:13,
144:8
**identical** [2] - 101:23,
102:5
**Identification** [1] -
31:11
**identification** [20] -
31:16, 32:3, 32:19,
38:20, 38:22, 38:24,
39:4, 39:16, 82:3,
82:6, 82:13, 84:17,
85:10, 88:8, 90:18,

95:23, 100:24, 105:25, 113:8, 118:23
**identified** [6] - 7:24, 17:2, 17:8, 66:12, 67:7, 67:13
**identify** [5] - 20:15, 28:14, 39:1, 39:23, 82:18
**identity** [1] - 95:5
**imagine** [4] - 24:13, 24:15, 97:13, 107:6
**immediately** [2] - 16:11, 27:15
**impact** [2] - 25:13, 78:23
**impeach** [1] - 108:2
**implication** [1] - 22:23
**important** [10] - 14:21, 15:19, 41:6, 53:8, 73:7, 99:1, 126:7, 126:9, 128:5, 128:9
**imposed** [2] - 7:9, 65:7
**improper** [3] - 25:1, 76:13, 108:8
**improperly** [1] - 43:15
**Inc** [1] - 4:7
**INC** [2] - 1:3, 130:24
**incidents** [3] - 40:21, 40:22, 41:10
**include** [1] - 44:12
**included** [1] - 17:3
**including** [10] - 13:6, 13:18, 26:24, 33:15, 55:14, 61:15, 92:12, 109:8, 117:9, 140:9
**income** [2] - 132:7, 132:23
**increase** [1] - 57:8
**indeed** [1] - 54:22
**indicated** [5] - 5:25, 48:18, 124:21, 138:24, 142:25
**individual** [4] - 59:6, 114:20, 126:25, 127:12
**individuals** [1] - 23:13
**induced** [2] - 87:16
**industrial** [1] - 139:3
**industry** [8] - 12:23, 16:5, 74:3, 74:8, 79:23, 140:10, 140:18
**inevitably** [1] - 103:6
**inform** [1] - 125:25
**informed** [2] - 47:18, 83:17
**Injunction** [1] - 1:6
**injunction** [11] - 7:14,

7:15, 20:23, 43:25, 104:8, 104:13, 104:17, 129:13, 129:21, 133:9, 144:15
**inquiries** [1] - 35:25
**inquiry** [4] - 26:22, 36:13, 47:24, 62:7
**insightful** [1] - 44:15
**inspect** [1] - 35:4
**inspected** [1] - 109:4
**inspection** [2] - 35:9, 118:7
**installation** [3] - 116:20, 116:25, 118:3
**installed** [2] - 116:22, 117:13
**instance** [3] - 85:22, 104:20, 133:5
**instances** [1] - 75:22
**insurance** [1] - 41:9
**Intellics** [2] - 16:13, 79:7
**Intellics'** [1] - 17:20
**intend** [1] - 49:2
**intent** [1] - 23:24
**intention** [2] - 143:19, 144:10
**interacted** [1] - 23:21
**interests** [1] - 7:22
**INTERNATIONAL** [1] - 1:3
**International** [7] - 4:7, 4:13, 10:11, 12:11, 12:12, 79:8, 137:3
**internet** [7] - 55:25, 56:1, 56:8, 71:2, 72:5, 73:22
**interpretation** [1] - 127:25
**Interpreter** [4] - 9:3, 14:7, 16:16, 50:22
**INTERPRETER** [20] - 14:7, 14:16, 15:9, 16:15, 16:18, 16:23, 17:16, 20:12, 28:7, 30:23, 33:23, 51:9, 64:11, 67:25, 83:4, 94:13, 94:16, 98:20, 117:20, 131:23
**interpreter** [33] - 8:19, 8:20, 8:22, 8:24, 15:6, 15:12, 15:19, 20:19, 21:7, 28:9, 33:23, 50:10, 51:9, 52:7, 52:10, 53:1, 53:2, 53:4, 53:17, 53:25, 54:1, 54:6, 54:8, 54:10, 54:16,

54:19, 64:11, 67:25, 83:4, 98:20, 117:20, 117:21, 131:23
**interrogatory** [3] - 27:7, 31:5, 66:14
**interrupt** [1] - 20:19
**interrupted** [1] - 20:20
**introduce** [4] - 4:18, 4:20, 29:20, 107:16
**introduced** [1] - 97:13
**invested** [1] - 40:22
**investigate** [1] - 41:23
**investigation** [1] - 41:25
**investment** [1] - 41:2
**invoice** [3] - 40:20, 45:1, 136:13
**invoices** [7] - 32:8, 42:1, 75:7, 75:9, 75:10, 76:15
**involved** [3] - 74:6, 74:11, 95:9
**involves** [1] - 35:15
**involving** [2] - 55:21, 133:5
**Iowa** [8] - 6:12, 6:14, 6:15, 6:16, 48:19, 81:4
**Irish** [1] - 5:18
**isn't** [7] - 24:2, 108:5, 121:11, 122:4, 131:21, 132:2, 139:2
**issue** [11] - 9:6, 29:16, 29:19, 29:24, 41:4, 85:5, 104:22, 126:18, 127:8, 130:19, 142:14
**issued** [3] - 8:2, 40:20, 56:9
**issues** [6] - 26:4, 43:12, 55:24, 127:6, 141:20, 143:22
**issuing** [2] - 7:13, 42:1
**IT** [5] - 37:3, 108:20, 109:5, 109:18, 117:8
**item** [13] - 66:10, 72:4, 74:1, 83:2, 83:8, 83:25, 84:17, 86:6, 86:7, 86:16, 87:1, 87:5, 121:2
**itself** [5] - 33:22, 42:9, 62:6, 63:15, 119:19

---

**J**

**J** [1] - 2:2
**January** [10] - 1:10, 4:3, 40:18, 120:14, 121:10, 121:25,

122:1, 125:7, 141:4
**Jen** [2] - 88:8, 135:20
**Jennifer** [12] - 85:1, 85:23, 86:4, 86:12, 87:16, 89:14, 89:19, 90:7, 95:11, 96:20, 96:24
**JEONKWANG** [1] - 16:18
**Jeonkwang** [1] - 16:14
**JERSEY** [1] - 1:1
**Jersey** [11] - 1:10, 1:18, 2:4, 2:6, 5:8, 12:9, 12:18, 13:5, 13:6, 147:5, 147:12
**Jin** [7] - 8:21, 12:8, 112:19, 112:22, 112:25, 113:4
**JIN** [2] - 3:4, 12:1
**Joanna** [1 - 50:22
**John** [1] - 5:10
**JOHN** [1] - 2:5
**join** [1] - 8:24
**joined** [3] - 5:8, 37:2, 102:12
**joint** [1] - 84:1
**JUDGE** [1] - 1:13
**judge's** [1] - 17:8
**July** [4] - 17:24, 47:14, 67:1, 117:6
**juncture** [1] - 107:17
**June** [3] - 13:14, 112:6, 112:10
**urisdiction** [3] - 6:5, 44:12, 143:16

---

**K**

**Kamvasitis** [1] - 5:14
**KAMVOSOULIS** [4] - 2:3, 5:15, 5:18, 50:11
**Kamvosoulis** [4] - 5:9, 5:15, 5:16, 5:17
**Kamvosoulis's** [1] - 5:24
**Kang** [1] - 11:6
**keep** [9] - 11:9, 14:12, 15:5, 15:20, 41:17, 44:2, 68:15, 130:18
**Keith** [1] - 5:7
**KEITH** [1] - 2:2
**kept** [3] - 55:15, 58:2, 79:9
**key** [1] - 109:9
**KIM** [2] - 1:15, 48:20
**Kim** [3] - 4:12, 4:23, 18:6
**kind** [8] - 46:22, 46:24,

74:5, 77:5, 79:15, 103:13, 127:4, 145:10
**kindly** [1] - 51:12
**kinds** [2] - 25:23, 26:4
**knew** [7] - 30:8, 41:7, 81:6, 89:12, 94:10, 98:25
**knowing** [1] - 123:11
**knowledge** [5] - 29:5, 63:10, 63:15, 71:7, 71:8
**knowledgeable** [1] - 108:21
**known** [2] - 64:4, 79:2
**knows** [1] - 19:8
**Koh** [1] - 50:22
**Korea** [19] - 13:2, 13:7, 14:4, 16:1, 16:4, 16:8, 16:10, 17:6, 18:13, 18:16, 19:24, 23:13, 32:12, 32:14, 40:18, 56:6, 121:8, 139:9, 142:20
**Korean** [12] - 12:22, 20:15, 33:16, 35:25, 36:13, 47:23, 53:3, 83:3, 132:3, 135:14, 139:3, 140:10
**Kwon** [1] - 9:3
**Kwon-Lee** [1] - 9:3

---

**L**

**ladder** [1] - 59:7
**laid** [1] - 107:21
**language** [6] - 52:14, 52:23, 54:14, 60:12, 125:23, 127:17
**large** [1] - 115:12
**larger** [2] - 44:19, 48:10
**Larsen** [1] - 1:22, 147:3, 147:10
**Las** [1] - 132:21
**last** [13] - 7:1, 14:17, 44:2, 44:13, 48:6, 48:9, 80:4, 98:3, 100:11, 113:1, 128:17, 132:24, 139:25
**later** [12] - 24:9, 26:11, 26:12, 42:21, 45:7, 104:1, 112:15, 116:21, 117:3, 127:5, 139:19, 139:22
**Lautenberg** [1] - 1:9
**law** [6] - 4:12, 25:22, 44:12, 104:6, 104:9

**lawsuit** [2] - 91:18, 91:22
**lawyer** [3] - 5:1, 123:9, 123:15
**lawyers** [2] - 122:15, 143:22
**lawyers'** [1] - 133:2
**lay** [3] - 96:15, 107:2, 107:16
**layer** [1] - 23:19
**laying** [1] - 29:4
**learn** [5] - 42:4, 42:7, 69:10, 117:11, 117:18
**learned** [1] - 26:8
**lease** [2] - 132:15
**least** [5] - 23:24, 62:17, 73:2, 91:2, 135:2
**leave** [3] - 6:9, 6:11, 116:11
**leaving** [9] - 6:5, 6:8, 17:25, 18:1, 47:25, 48:19, 75:1, 75:5
**Lee** [23] - 1:18, 8:21, 8:22, 9:3, 12:6, 12:8, 14:20, 15:7, 15:11, 15:18, 22:13, 23:24, 26:16, 27:2, 27:19, 32:6, 40:16, 42:2, 47:5, 66:18, 68:21, 141:16, 143:3
**LEE** [2] - 3:4, 12:1
**Lee's** [6] - 23:23, 112:19, 112:23, 112:25, 113:4, 113:5
**left** [26] - 5:1, 17:11, 18:12, 24:16, 33:9, 37:18, 37:22, 41:20, 41:21, 42:4, 42:5, 42:6, 42:7, 48:15, 71:18, 74:24, 85:22, 86:1, 87:22, 89:2, 100:20, 102:25, 103:6, 109:3, 116:10
**legal** [4] - 5:2, 85:4, 95:9, 123:13
**lengthy** [2] - 30:8, 134:13
**less** [4] - 15:5, 124:2, 132:23
**letter** [10] - 5:24, 9:13, 74:19, 74:20, 87:12, 102:20, 120:6, 120:10, 140:16
**letters** [6] - 28:2, 28:17, 32:13, 48:6, 88:15, 88:22
**level** [3] - 7:5, 23:6, 52:17

**licenses** [1] - 26:23
**lied** [2] - 19:21, 19:22
**life** [1] - 68:11
**lifted** [1] - 7:9
**likelihood** [1] - 145:6
**likely** [1] - 145:10
**limit** [1] - 105:22
**limited** [2] - 59:23, 144:15
**line** [7] - 43:9, 43:10, 70:3, 70:18, 83:25, 84:17, 117:25
**lines** [1] - 129:18
**lining** [1] - 74:6
**Lisa** [3] - 1:22, 9:3, 147:3
**Lisa_Larsen@njd.uscourts.gov** [1] - 1:23
**list** [17] - 27:16, 27:22, 33:14, 33:15, 66:19, 66:22, 66:25, 79:7, 82:21, 82:23, 82:24, 83:13, 136:22, 141:4, 143:11, 143:13, 143:25
**listed** [7] - 9:12, 11:7, 80:2, 134:5, 134:18, 134:20, 135:22
**listen** [2] - 54:5, 126:8
**listening** [2] - 21:19, 43:10
**listing** [1] - 136:12
**lists** [5] - 28:2, 58:1, 58:4, 58:15
**litigation** [4] - 10:3, 130:6, 130:19, 143:20
**little** [14] - 14:22, 20:18, 40:9, 45:25, 48:6, 49:19, 65:4, 70:9, 80:12, 98:2, 105:22, 142:10, 144:17, 144:18
**live** [8] - 49:7, 49:21, 49:25, 132:21, 141:20, 145:9, 145:12, 145:15
**living** [1] - 133:6
**LLC** [4] - 2:2, 2:5, 130:24, 130:25
**located** [5] - 12:16, 12:18, 15:25, 16:4, 121:11
**long-standing** [3] - 32:15, 99:11, 99:19
**long-time** [1] - 19:13
**longer** [2] - 75:4, 94:3
**look** [12] - 8:7, 36:15, 36:22, 60:10, 65:9,

67:16, 74:12, 91:4, 92:2, 124:15, 143:19, 146:2
**looked** [3] - 56:1, 117:2, 126:20
**looking** [8] - 27:19, 38:14, 38:17, 55:22, 61:2, 96:18, 112:11, 119:5
**looks** [2] - 91:2, 109:13
**lose** [1] - 17:12
**loses** [1] - 130:6
**losing** [1] - 62:11
**lost** [3] - 17:22, 41:1, 41:8
**lot** [11] - 8:7, 8:9, 24:12, 37:24, 41:1, 46:6, 46:12, 115:6, 135:14, 143:21, 144:4
**loud** [ ] - 88:22, 128 21
**love** [1] - 50:14
**lover's** [1] - 42:24
**low** [1] - 145:8
**lower** [3] - 18:10, 19:10, 145:9
**oyalty** [1] - 43:14

# M

**M** [1] - 1:16
**magistrate** [1] - 123:1
**mail** [59] - 83:14, 84:6, 84:8, 84:25, 85:1, 85:23, 86:7, 88:8, 89:7, 89:10, 89:16, 91:14, 91:21, 91:25, 93:5, 93:7, 96:3, 96:19, 96:23, 96:24, 97:2, 97:11, 97:24, 97:25, 102:17, 103:3, 119:21, 119:25, 120:13, 120:19, 120:21, 120:23, 120:25, 121:20, 121:21, 122:9, 122:10, 122:14, 122:18, 122:24, 123:11, 125:6, 125:7, 125:15, 125:18, 128:2, 128:4, 128:5, 128:14, 129:9, 129:12, 129:20, 130:14, 134:25, 141:9
**mailed** [1] - 79:2
**mails** [11] - 89:6, 90:3,

90:5, 90:23, 91:1, 96:9, 101:10, 123:12, 125:17, 135:4, 135:20
**main** [1] - 16:9
**mainly** [1] - 55:25
**maintain** [1] - 138:3
**maintained** [1] - 13:25
**maintaining** [1] - 13:1
**major** [2] - 51:14, 51:16
**makes** [4] - 21:8, 60:10, 72:4, 143:24
**making** [9] - 21:1, 24:10, 25:21, 41:2, 46:5, 54:23, 127:3, 127:4, 130:16
**managed** [2] - 13:25, 55:11
**manager** [9] - 13:21, 33:8, 33:9, 51:19, 55:9, 56:14, 57:1, 94:21, 98:15
**managing** [5] - 57:4, 57:5, 57:6
**manner** [1] - 133:6
**manufacture** [2] - 59:24, 127:15
**manufactured** [6] - 67:23, 68:4, 78:8, 78:11, 127:15, 134:15
**manufacturer** [7] - 78:9, 82:21, 93:17, 93:19, 94:1, 95:8
**manufactures** [1] - 77:25
**manufacturing** [7] - 56:1, 56:2, 70:25, 88:2, 99:8, 120:18, 135:5
**many** [8] - 13:4, 79:15, 87:11, 90:3, 91:1, 99:4, 105:4, 137:9
**March** [10] - 17:3, 17:9, 64:24, 98:3, 98:14, 98:15, 133:21, 134:1, 141:3
**marital** [2] - 18:5, 42:15
**mark** [4] - 39:3, 56:9, 92:14, 142:12
**mark-ups** [1] - 56:9
**marked** [12] - 26:25, 31:4, 31:10, 31:13, 31:15, 38:20, 38:21, 38:23, 39:15, 39:19, 66:17, 134:12
**market** [7] - 58:6, 58:17, 59:5, 62:21,

62:23, 62:25, 73:4
**marketing** [2] - 51:18, 85:21
**marketplace** [1] - 80:6
**marking** [1] - 97:10
**markings** [1] - 101:7
**Martinotti** [2] - 44:13, 144:10
**mask** [1] - 128:8
**match** [1] - 74:22
**matching** [1] - 74:14
**material** [3] - 12:24, 88:11, 94:19
**materials** [1] - 104:18
**matter** [12] - 10:3, 23:9, 26:9, 43:23, 46:2, 48:8, 52:17, 53:10, 61:16, 68:11, 146:23, 147:7
**matters** [1] - 95:9, 142:1, 145:14
**maybe** [10] - 25:10, 26:11, 31:7, 39:25, 45:17, 104:16, 105:19, 117:20, 143:10
**mean** [11] - 6:14, 41:13, 50:15, 58:20, 63:16, 65:25, 79:21, 91:5, 107:5, 114:19, 144:2
**meaning** [1] - 141:22
**means** [6] - 21:24, 45:13, 45:19, 88:21, 120:5, 127:1
**meanwhile** [1] - 93:9
**mechanical** [2] - 1:25, 12:25
**meet** [3] - 34:13, 34:20, 34:21
**meeting** [2] - 18:24, 34:15
**meets** [1] - 10:18
**memory** [4] - 93:21, 93:22, 94:10, 122:10
**mention** [1] - 142:4
**mentioned** [2] - 47:7, 115:13
**Mercedes** [1] - 132:12
**merits** [1] - 20:22
**met** [6] - 18:20, 19:7, 34:13, 35:5
**methodology** [1] - 62:5
**MICHAEL** [2] - 1:12, 4:2
**microphone** [1] - 50:25
**middle** [2] - 81:14, 93:5

**middleman** [4] - 60:1, 60:3, 61:12, 71:15
**midnight** [1] - 142:22
**might** [3] - 9:21, 54:11, 126:21
**military** [2] - 132:4, 139:3
**million** [4] - 47:19, 48:11, 57:12, 133:5
**mind** [8] - 4:18, 4:21, 7:6, 23:8, 23:17, 29:8, 66:1, 71:20
**minute** [7] - 28:16, 40:8, 78:17, 128:15, 137:21, 141:11
**minutes** [11] - 40:9, 45:12, 47:5, 49:2, 98:6, 115:13, 123:22, 124:2, 145:23, 146:10, 146:11
**missed** [1] - 14:8
**missing** [3] - 37:23, 38:2, 38:6
**mistake** [2] - 6:12, 123:16
**mistaken** [1] - 100:16
**misunderstood** [1] - 131:11
**misuse** [1] - 104:9
**MKD/ID** [1] - 3:9
**MM** [1] - 16:13
**MM-SYS** [1] - 16:13
**modification** [3] - 7:10, 64:5, 77:22
**modify** [1] - 63:13
**moment** [12] - 19:2, 28:12, 43:9, 43:20, 47:17, 48:14, 66:17, 70:9, 92:2, 118:19, 119:6, 126:4
**moments** [1] - 71:11
**Monday** [1] - 81:18
**money** [12] - 40:17, 40:20, 40:23, 40:25, 41:1, 41:3, 41:16, 41:21, 42:21, 42:23, 43:1, 77:8
**monster** [2] - 92:13, 92:15
**monthly** [1] - 132:17
**months** [5] - 8:2, 78:24, 139:19, 139:20, 139:22
**more** [28] - 36:6, 40:9, 48:16, 49:2, 53:1, 54:5, 57:10, 57:11, 59:14, 62:18, 66:5, 66:7, 74:9, 76:1, 78:14, 88:14, 92:13,

105:10, 105:23, 123:21, 123:25, 140:7, 142:10, 144:1, 144:24, 145:18
**morning** [11] - 4:5, 4:11, 4:14, 4:24, 4:25, 50:2, 125:9, 141:17, 142:19, 146:12, 146:20
**most** [8] - 16:4, 41:6, 41:16, 53:5, 60:6, 104:13, 108:21, 145:5
**mostly** [2] - 60:6, 135:13
**motion** [1] - 8:11
**motions** [1] - 133:2
**mouth** [1] - 51:1
**move** [15] - 7:7, 10:22, 11:17, 14:23, 24:24, 81:20, 82:1, 85:16, 87:2, 105:22, 108:7, 109:22, 142:10, 145:3, 146:1
**moved** [5] - 6:12, 6:13, 6:17, 6:18, 98:18
**moving** [4] - 30:2, 30:5, 30:6, 52:2
**Mrs** [1] - 8:22
**MS** [25] - 4:11, 4:17, 4:19, 4:22, 5:3, 8:24, 9:12, 10:9, 10:20, 11:6, 11:11, 11:15, 15:6, 27:24, 88:13, 105:19, 108:19, 108:23, 142:19, 142:25, 143:4, 144:24, 145:16, 146:7, 146:19
**Ms** [19] - 4:14, 4:15, 5:1, 5:5, 8:18, 9:8, 9:11, 9:21, 10:8, 10:25, 11:3, 11:14, 15:6, 90:15, 95:19, 97:25, 142:18, 144:23, 146:18
**multi** [1] - 47:19
**multi-million** [1] - 47:19
**multiple** [3] - 8:3, 73:3, 75:7
**must** [1] - 75:25
**mutual** [2] - 32:16, 92:16
**myself** [9] - 13:6, 61:20, 68:10, 75:20, 88:1, 90:4, 93:18, 94:1, 116:17

**N**

**N** [3] - 1:14, 2:1, 3:1
**name** [16] - 5:14, 5:18, 11:3, 11:6, 12:6, 12:8, 18:4, 18:6, 42:14, 42:24, 47:25, 48:2, 51:1, 51:2, 86:4, 133:24
**named** [4] - 67:2, 81:15, 83:22, 135:1
**namely** [1] - 120:13
**names** [2] - 33:15, 58:5
**narrative** [2] - 14:12, 14:13
**narrow** [2] - 43:21, 144:5
**narrower** [1] - 14:22
**narrows** [1] - 44:8
**nature** [12] - 12:21, 16:3, 16:7, 34:6, 57:18, 58:15, 84:15, 90:13, 94:12, 94:13
**Neals** [1] - 7:9
**necessarily** [1] - 141:25
**necessary** [12] - 58:19, 62:10, 69:21, 69:22, 69:24, 77:19, 79:19, 79:24, 94:6, 94:24, 114:18, 140:15
**needed** [4] - 55:14, 115:4, 131:2, 138:20
**needs** [3] - 19:9, 25:24, 89:12
**negotiate** [1] - 7:7
**never** [4] - 67:3, 67:5, 69:15, 117:3
**NEW** [1] - 1:1
**new** [29] - 37:18, 44:1, 62:8, 68:25, 70:8, 89:14, 89:19, 90:8, 90:13, 91:15, 98:23, 102:12, 113:16, 115:2, 116:13, 116:20, 116:22, 116:25, 118:3, 120:4, 120:7, 120:10, 127:21, 129:15, 129:22, 139:22, 140:17, 144:9
**New** [11] - 1:10, 1:18, 2:4, 2:6, 5:8, 12:9, 12:18, 13:5, 13:6, 147:5, 147:12
**Newark** [1] - 1:10
**newly** [1] - 143:15

**news** [1] - 9:19
**next** [13] - 16:25, 21:7, 30:2, 30:13, 32:20, 32:21, 40:23, 40:24, 55:6, 93:3, 118:21, 125:18, 139:14
**nice** [1] - 5:18
**nighttime** [1] - 68:12
**nine** [4] - 16:23, 16:24, 17:2, 143:16
**non** [3] - 57:17, 145:9
**non-competition** [1] - 57:17
**non-crossed** [1] - 145:9
**non-live** [1] - 145:9
**noncompete** [2] - 103:14, 103:18
**none** [3] - 49:15, 122:13
**noon** [1] - 40:9
**norm** [1] - 144:17
**normally** [1] - 13:8
**North** [1] - 1:17
**note** [1] - 61:17
**notebook** [1] - 99:5
**nothing** [2] - 54:21, 127:5
**notwithstanding** [1] - 84:15
**November** [1] - 22:17
**number** [37] - 28:2, 38:16, 38:19, 39:2, 46:4, 46:9, 46:15, 48:6, 56:21, 71:1, 71:2, 74:18, 78:3, 85:4, 93:3, 93:20, 94:9, 102:1, 107:20, 120:1, 120:3, 120:4, 120:8, 120:10, 122:5, 122:22, 124:9, 125:5, 127:22, 132:3, 134:13, 134:19, 134:20, 135:2, 135:14, 135:22
**NUMBER** [1] - 1:4
**number..** [1] - 125:10
**numbered** [1] - 83:7
**numbers** [19] - 56:7, 62:20, 62:21, 62:22, 70:24, 74:22, 83:21, 93:23, 93:25, 94:19, 99:1, 99:2, 99:4, 125:11, 127:13, 136:1, 136:3, 136:24
**numerous** [1] - 122:25

**O**

**O** [2] - 1:12, 8:21
**o'clock** [1] - 142:21
**oath** [6] - 49:11, 50:2, 80:22, 105:3, 131:6, 131:12
**object** [21] - 18:23, 19:2, 20:18, 21:8, 22:9, 24:15, 24:18, 30:7, 30:25, 39:13, 40:5, 43:9, 49:8, 85:13, 90:22, 90:24, 97:10, 101:7, 101:10, 107:21, 133:8
**objected** [2] - 21:2, 106:2
**objection** [36] - 9:9, 9:16, 20:1, 20:5, 20:7, 21:14, 22:20, 28:24, 31:12, 39:8, 39:9, 49:14, 49:16, 50:4, 52:1, 54:20, 81:8, 84:10, 91:9, 92:24, 96:10, 97:15, 97:16, 98:8, 101:2, 110:25, 118:11, 119:1, 119:8, 124:22, 132:8, 132:13, 133:16, 136:4, 138:6, 145:20
**objections** [4] - 20:24, 22:5, 110:3, 124:19
**obligations** [2] - 25:7, 123:19
**obtain** [6] - 23:10, 38:5, 71:7, 95:21, 136:14, 140:13
**obtained** [5] - 62:3, 75:19, 103:19, 123:1, 139:23
**obtaining** [1] - 72:15
**obviously** [3] - 29:18, 49:9, 145:8
**occasioned** [1] - 95:19
**occasions** [2] - 72:1, 75:7
**occur** [2] - 64:6, 75:17
**October** [9] - 48:9, 84:22, 84:23, 84:24, 96:20, 96:24, 97:25, 109:9, 117:10
**OF** [1] - 1:1
**of..** [1] - 124:9
**off** [7] - 28:20, 45:21, 69:9, 79:4, 95:9, 106:25, 114:10
**offer** [23] - 26:22,

28:20, 28:22, 29:2, 84:8, 85:11, 90:19, 95:24, 96:14, 96:16, 101:1, 106:10, 106:17, 106:25, 109:13, 109:20, 118:24, 119:2, 123:24, 124:13, 145:2, 145:7, 145:10
**offered** [12] - 39:11, 39:16, 52:13, 52:25, 53:21, 72:12, 72:18, 72:19, 85:14, 106:2, 124:22, 139:10
**offering** [7] - 28:24, 39:10, 97:3, 97:6, 106:4, 108:17, 142:14
**office** [5] - 13:1, 13:5, 40:24, 111:24, 114:3
**Office** [1] - 1:9
**offices** [4] - 12:16, 12:19, 42:17, 112:9
**Official** [5] - 1:22, 36:19, 99:17, 147:3, 147:11
**OFFICIAL** [1] - 147:1
**officially** [1] - 13:14
**often** [1] - 139:4
**old** [2] - 69:1, 143:16
**once** [3] - 13:17, 114:23, 124:9
**ones** [1] - 99:7
**onward** [1] - 97:22
**open** [5] - 4:1, 11:9, 54:18, 58:16, 144:1
**operate** [2] - 78:24, 79:12
**operated** [2] - 45:19, 76:17
**operating** [15] - 77:3, 78:4, 109:7, 113:16, 115:2, 115:5, 115:15, 115:17, 116:13, 116:16, 116:20, 116:22, 116:25, 117:9, 118:3
**operation** [1] - 55:12
**opinion** [3] - 44:13, 108:3, 109:18
**opponent** [4] - 23:5, 23:17, 23:18, 23:20
**opportunity** [4] - 52:25, 53:21, 65:6, 65:9
**oppositions** [1] - 133:2
**Optical** [3] - 101:24, 101:25, 102:3
**opts** [1] - 10:22

**ordered** [1] - 141:24
**orders** [9] - 17:13, 18:9, 32:8, 58:13, 60:8, 60:16, 61:14, 69:18, 95:21
**ordinary** [1] - 138:11
**origin** [1] - 30:4
**original** [2] - 55:7, 67:7
**originally** [1] - 81:17
**others** [3] - 17:7, 24:9, 144:10
**otherwise** [7] - 53:20, 62:11, 113:9, 135:10, 135:16, 135:23, 136:25
**OUK** [2] - 3:4, 12:1
**Ouk** [1] - 12:8
**ourselves** [2] - 60:23, 138:9
**outside** [4] - 33:22, 34:3, 67:21, 144:17
**over** [17] - 8:18, 15:3, 32:4, 33:9, 36:10, 46:12, 46:13, 50:18, 56:7, 57:3, 57:6, 79:7, 80:25, 98:18, 122:5, 139:8, 142:18
**overall** [1] - 55:11
**overnight** [1] - 142:7
**overruled** [6] - 19:5, 20:5, 54:20, 97:17, 98:9, 101:12
**oversaw** [1] - 14:1
**owe** [1] - 19:21
**own** [16] - 23:12, 36:14, 36:21, 38:4, 45:9, 47:8, 55:13, 62:24, 108:2, 109:5, 112:8, 113:22, 114:5, 122:8, 123:14, 134:8
**owned** [1] - 104:7
**owner** [2] - 12:12, 100:9
**ownership** [1] - 113:9
**owns** [1] - 26:19

**P**

**P** [4] - 1:14, 2:1
**P.C** [1] - 1:15
**p.m** [1] - 48:20
**P1000476** [1] - 128:3
**P1000477** [1] - 125:18
**P1000487** [2] - 130:4, 130:13
**P1000531** [1] - 93:4
**P1000543** [1] - 102:2
**P1000553** [1] - 102:15

**pace** [1] - 141:13
**pages** [11] - 28:14, 32:18, 82:18, 91:14, 96:18, 96:21, 101:13, 119:16, 119:18, 122:21
**paid** [3] - 36:15, 36:23, 59:6
**paper** [1] - 91:2
**papers** [3] - 32:15, 141:19, 143:18
**paragraph** [3] - 28:4, 31:5, 93:7
**paragraphs** [1] - 65:6
**paralegal** [1] - 5:3
**Parkway** [1] - 2:3
**parte** [1] - 8:3
**partially** [3] - 75:12, 75:14
**participate** [2] - 109:14, 109:22
**participating** [1] - 5:11
**particular** [10] - 89:7, 90:5, 92:6, 96:19, 107:25, 135:14, 135:17, 139:13, 139:15, 141:23
**particularly** [4] - 44:12
**parties** [12] - 9:22, 9:23, 9:25, 10:1, 10:5, 10:15, 37:14, 66:11, 67:12, 141:20, 142:8, 144:11
**parties'** [2] - 141:19, 142:6
**partition** [4] - 114:6, 115:17, 117:12, 117:19
**partitions** [6] - 113:24, 114:2, 114:24, 115:21, 116:3, 116:6
**partner** [1] - 5:9
**parts** [18] - 12:24, 12:25, 16:6, 58:4, 59:12, 60:5, 60:16, 61:25, 63:6, 63:12, 63:13, 64:14, 68:2, 71:25, 76:3, 77:22, 79:17
**party** [10] - 9:22, 10:2, 10:3, 10:12, 10:19, 23:5, 23:17, 23:18, 23:20, 145:7
**pass** [5] - 31:23, 31:24, 39:4, 39:25, 106:1
**passed** [1] - 100:25
**passes** [1] - 35:8

**past** [5] - 58:13, 62:10, 69:23, 77:20, 78:24
**pattern** [1] - 45:18
**pause** [25] - 9:2, 11:2, 11:13, 27:20, 39:6, 50:21, 61:7, 64:22, 66:16, 78:18, 80:20, 88:16, 91:6, 101:3, 105:18, 106:9, 119:7, 123:23, 124:3, 124:10, 124:18, 126:5, 128:16, 137:20, 137:22
**pay** [1] - 19:21
**pending** [4] - 101:21, 103:1, 105:15, 128:10
**people** [10] - 7:6, 9:7, 13:6, 21:5, 24:17, 25:14, 25:15, 40:7, 88:4, 145:10
**People's** [6] - 101:5, 106:3, 110:3, 110:21, 111:3, 119:2
**per** [2] - 134:1, 136:21
**perceived** [1] - 15:11
**percent** [5] - 12:12, 17:19, 35:16, 35:18, 79:10
**percentage** [1] - 35:14
**perfectly** [2] - 52:5, 127:12
**perform** [1] - 34:17
**performed** [1] - 55:5
**perhaps** [4] - 15:6, 15:10, 24:9, 146:11
**period** [4] - 13:13, 22:18, 37:20, 47:12
**permission** [1] - 123:10
**permitted** [1] - 86:23
**person** [15] - 5:1, 9:14, 10:20, 10:21, 11:1, 11:4, 22:25, 23:20, 50:1, 58:5, 107:23, 108:21, 109:5
**personal** [22] - 19:17, 113:20, 113:22, 114:5, 114:10, 114:13, 114:19, 114:20, 114:23, 115:3, 115:7, 115:14, 115:16, 115:17, 115:20, 115:22, 115:25, 116:5, 116:16, 117:14, 128:4
**personally** [2] - 75:8, 99:5, 114:15

**personnel** [3] - 13:4, 18:18, 35:22
**perspective** [2] - 100:4, 144:18
**pertaining** [2] - 103:24, 140:14
**Pete** [1] - 93:6
**phonetic** [1] - 18:6
**phonetic)** [1] - 16:14
**photograph** [3] - 38:5, 104:25, 110:15
**photographs** [5] - 38:9, 38:13, 39:24, 111:10, 113:13
**photos** [1] - 114:21
**physical** [1] - 12:16
**physically** [1] - 37:23
**Phytron** [15] - 119:22, 121:11, 121:15, 121:18, 122:6, 123:3, 125:3, 125:7, 125:21, 126:1, 130:5, 130:14, 130:17, 134:5, 134:25
**Phytron's** [1] - 125:25
**PI000165** [1] - 39:2
**PI000469** [1] - 125:5
**PI000498** [1] - 122:22
**picture** [1] - 111:23
**pictures** [2] - 111:12, 111:18
**piece** [4] - 40:2, 68:6, 73:7, 107:16
**Piermont** [1] - 12:18
**PL000476** [1] - 125:15
**place** [7] - 8:2, 8:5, 43:22, 44:7, 92:6, 138:9, 141:24
**placed** [2] - 48:3, 78:21
**placing** [1] - 91:13
**plainly** [1] - 101:15
**plaintiff** [5] - 4:12, 12:10, 66:23, 123:10, 142:1
**Plaintiff** [8] - 1:4, 1:19, 31:11, 31:13, 85:23, 88:7, 119:16, 130:3
**Plaintiff's** [47] - 3:10, 31:15, 31:22, 32:2, 32:19, 39:16, 39:17, 39:19, 39:25, 82:5, 82:13, 83:1, 84:12, 84:17, 85:10, 85:17, 90:17, 91:10, 91:13, 95:23, 95:25, 97:6, 97:10, 97:17, 97:18, 100:23, 101:12, 101:17, 103:22,

104:21, 105:25, 109:20, 111:5, 118:22, 119:11, 119:13, 122:20, 124:11, 124:23, 124:24, 125:2, 125:14, 134:24, 135:13, 135:19, 136:12, 136:25
**plaintiff's** [4] - 4:10, 91:8, 119:9, 137:3
**plaintiffs** [5] - 6:1, 6:22, 7:22, 44:19, 66:15
**plan** [2] - 129:14, 129:22
**planned** [2] - 142:23, 143:2
**plans** [1] - 6:18
**play** [1] - 73:16
**plus** [1] - 41:13
**point** [27] - 8:4, 10:14, 10:15, 14:17, 18:23, 20:25, 21:6, 22:23, 23:6, 24:13, 25:4, 25:11, 26:1, 41:5, 44:16, 45:5, 45:9, 45:10, 45:18, 52:3, 66:11, 108:6, 118:15, 123:19, 130:23, 131:19, 143:2
**policy** [1] - 57:22
**portion** [3] - 36:19, 64:12, 99:17
**position** [15] - 7:8, 8:10, 9:24, 10:2, 10:4, 10:5, 10:25, 11:16, 55:7, 96:4, 96:7, 101:4, 103:21, 124:16, 143:18
**positive** [1] - 123:20
**possess** [1] - 113:10
**possession** [3] - 67:24, 104:23, 114:3
**possibility** [2] - 72:15, 145:13
**possible** [9] - 36:3, 49:8, 72:8, 72:11, 73:9, 117:5, 123:9, 131:20, 139:21
**possibly** [1] - 91:24
**post** [2] - 129:7, 143:18
**Post** [1] - 1:9
**post-hearing** [1] - 143:18
**postpone** [2] - 14:5, 81:18
**potential** [2] - 61:12,

72:7
**pre** [2] - 26:25, 142:12
**pre-mark** [1] - 142:12
**pre-marked** [1] - 26:25
**preceding** [1] - 27:15
**precluded** [3] - 104:1, 109:8, 116:20
**prefer** [1] - 139:10
**preference** [2] - 6:1, 138:3
**preferences** [3] - 37:9, 138:12, 140:5
**prefers** [1] - 15:11
**preliminary** [8] - 7:14, 7:15, 20:23, 43:25, 129:13, 129:21, 133:9, 144:15
**Preliminary** [1] - 1:6
**premium** [1] - 49:6
**preparation** [2] - 109:15, 109:22
**prepare** [3] - 102:10, 128:13, 142:8
**prepared** [5] - 33:3, 33:6, 44:14, 118:6, 134:21
**presence** [2] - 9:10, 107:14
**present** [8] - 9:16, 12:17, 16:8, 47:16, 47:17, 105:5, 133:7, 140:7
**presentation** [1] - 5:25
**presented** [2] - 7:19, 34:12
**presenting** [1] - 144:14
**preserved** [2] - 37:16, 37:19
**president** [8] - 12:13, 18:20, 18:21, 19:7, 19:10, 19:12, 19:22, 112:20
**pretty** [2] - 24:22, 144:5
**prevailing** [1] - 44:11
**prevented** [2] - 95:4, 117:10
**previous** [4] - 14:16, 14:18, 36:10, 130:8
**previously** [9] - 59:6, 66:14, 85:20, 103:9, 111:5, 124:8, 131:4, 131:6, 144:25
**price** [34] - 18:10, 19:9, 19:10, 36:4, 36:6, 36:9, 35:11, 42:20, 58:4, 59:16, 61:11, 62:2, 62:19,

62:23, 62:25, 72:5, 72:8, 72:11, 72:14, 72:17, 72:18, 72:19, 73:7, 73:12, 74:13, 74:16, 95:12, 95:20, 138:3, 138:12, 139:6, 139:20
**prices** [13] - 37:9, 37:14, 59:5, 59:6, 62:5, 72:12, 73:2, 73:6, 73:10, 76:16, 138:25, 139:4, 139:10
**pricing** [22] - 57:25, 58:10, 58:15, 58:20, 58:22, 58:23, 61:15, 62:3, 62:4, 72:13, 73:14, 73:15, 73:16, 73:22, 73:23, 74:2, 74:8, 121:14, 138:22, 139:16, 140:5, 141:4
**principal** [3] - 16:8, 102:25, 119:17
**prior** [14] - 16:11, 27:7, 27:15, 27:18, 41:10, 61:14, 62:4, 72:12, 72:18, 99:12, 99:20, 100:15, 110:13, 125:12
**private** [8] - 120:19, 120:23, 121:20, 121:21, 122:1, 122:8, 122:18, 128:14
**privilege** [1] - 87:5
**probably** [1] - 142:13
**problem** [1] - 60:13
**procedural** [2] - 8:1, 143:22
**proceed** [5] - 53:3, 54:10, 69:23, 119:10, 123:15
**proceeding** [3] - 49:10, 142:21, 144:25
**proceedings** [10] - 101:15, 110:10, 110:15, 123:18, 141:15, 142:4, 144:21, 146:22, 147:6, 147:7
**Proceedings** [1] - 1:25
**PROCEEDINGS** [1] - 4:1
**process** [19] - 34:24, 35:9, 35:11, 41:22, 49:22, 54:17, 54:25, 59:18, 60:9, 60:19,

64:3, 64:4, 74:8, 74:10, 74:14, 75:24, 77:6, 135:6, 135:11
**processes** [2] - 137:1, 137:14
**processing** [1] - 138:19
**produce** [1] - 34:23
**produced** [4] - 1:25, 57:10, 122:13, 127:14
**product** [47] - 34:15, 35:3, 35:4, 35:8, 35:10, 35:15, 35:20, 36:2, 36:3, 36:13, 47:22, 48:2, 48:10, 58:23, 74:21, 87:12, 87:13, 87:17, 87:22, 94:12, 94:15, 94:16, 95:5, 95:12, 99:3, 99:14, 99:22, 100:6, 104:2, 107:19, 114:16, 125:3, 134:9, 134:12, 134:13, 134:14, 134:15, 134:19, 135:5, 135:9, 135:17, 135:21, 135:22, 135:23, 136:13, 136:15
**products** [21] - 32:12, 32:17, 33:16, 34:18, 47:20, 55:17, 73:18, 73:20, 75:18, 100:1, 134:18, 136:2, 136:9, 137:6, 137:12, 138:21, 139:2, 139:5, 140:9, 140:11, 144:17
**Products** [1] - 32:25
**professional** [1] - 109:18
**proffer** [1] - 28:12
**proffered** [1] - 52:20
**profit** [3] - 35:17, 75:8, 99:10
**profits** [1] - 57:10
**program** [1] - 33:15
**progressed** [1] - 48:7
**prohibit** [1] - 103:14
**prohibited** [4] - 66:3, 133:25, 134:6, 136:21
**project** [1] - 93:13
**prominent** [1] - 132:3
**promise** [1] - 68:15
**promised** [2] - 41:10, 41:16
**promises** [1] - 68:13
**promoted** [2] - 13:20,

56:14
**proof** [1] - 26:3
**proofs** [3] - 7:16, 7:18, 44:8
**proper** [2] - 36:11, 99:23
**properly** [1] - 7:11
**properties** [1] - 127:19
**property** [1] - 46:20
**proposed** [2] - 9:8, 19:10
**propounded** [1] - 27:7
**Proprietary** [1] - 32:25
**proprietary** [30] - 26:21, 63:11, 63:16, 64:2, 64:14, 66:23, 69:11, 76:19, 77:5, 79:25, 82:20, 82:23, 83:2, 83:8, 83:18, 83:21, 84:5, 84:15, 86:16, 86:17, 134:16, 134:22, 135:6, 135:9, 135:17, 135:24, 136:9, 136:25, 137:7, 137:13
**prospective** [1] - 141:24
**protect** [1] - 7:22
**protected** [6] - 43:17, 44:9, 46:3, 46:14, 87:12, 87:17
**Protected** [1] - 32:25
**protection** [2] - 120:6, 120:10
**protector** [4] - 77:25, 83:18, 84:16, 135:15
**protects** [1] - 116:16
**protract** [1] - 144:21
**prove** [2] - 25:9, 138:18
**provide** [6] - 34:9, 60:20, 70:24, 98:2, 109:17, 109:18
**provided** [9] - 17:8, 62:19, 66:24, 66:25, 67:9, 87:9, 113:8, 120:6, 140:9
**provides** [1] - 60:9
**providing** [1] - 71:4
**public** [17] - 59:21, 59:25, 63:7, 65:22, 66:2, 66:8, 66:9, 67:18, 67:21, 70:8, 70:15, 71:3, 71:8, 71:12, 99:8, 136:15, 140:11
**pull** [1] - 50:25
**purchase** [5] - 32:7, 37:13, 42:17, 42:19,

73:8
**purchased** [3] - 73:9, 73:10
**purchasing** [1] - 13:19
**pure** [1] - 61:12
**purloined** [3] - 26:10, 104:12
**purports** [1] - 102:2
**purpose** [10] - 15:19, 28:19, 28:20, 44:5, 52:10, 69:3, 69:4, 78:4, 113:14, 116:23
**purposes** [4] - 36:12, 76:18, 115:20, 138:20
**pursuant** [1] - 123:1
**pursue** [1] - 127:9
**put** [22] - 21:4, 21:10, 22:4, 23:12, 28:9, 30:7, 37:13, 39:21, 44:25, 45:23, 59:11, 69:18, 86:21, 109:7, 113:16, 115:2, 116:13, 128:11, 133:21, 142:11, 146:13
**putt ng** [7] - 4:16, 14:25, 29:25, 30:1, 61:22, 70:19, 103:22
**PX-148** [1] - 84:5
**PX-7** [1] - 38:18
**PX148** [1] - 82:2
**PX77** [1] - 135:4

### Q

**Q** [1] - 99:19
**Qnion** [2] - 16:14, 129:6
**quality** [4] - 26:23, 36:5, 75:21, 75:24
**quality-control** [1] - 75:24
**quality-related** [1] - 26:23
**quantity** [5] - 58:4, 70:25, 73:11, 73:12, 73:13
**quarter** [2] - 139:8
**quarters** [1] - 130:13
**questioning** [1] - 43:10
**questions** [30] - 14:13, 14:21, 14:24, 15:5, 22:4, 24:11, 28:9, 28:10, 29:4, 52:19, 53:18, 54:5, 59:4, 62:12, 63:23, 80:9, 89:25, 107:10, 110:2, 133:12,

133:13, 133:17, 133:18, 137:16, 137:23, 140:22, 141:18, 142:2, 144:5
**quick** [1] - 28:11
**quickly** [4] - 105:23, 119:1, 142:11, 142:16
**quit** [4] - 14:3, 14:18, 68:9
**quite** [4] - 20:20, 30:3, 108:4, 139:4
**quotation** [14] - 62:8, 62:9, 62:17, 73:21, 87:9, 98:13, 121:18, 136:16, 136:18, 138:18, 138:23, 139:23, 140:16, 140:17
**quotations** [4] - 37:9, 56:9, 89:7, 140:5
**quote** [22] - 60:4, 61:12 62:13, 62:14, 62:16, 71:5, 71:8, 72:8, 72:10, 86:13, 92:11, 93:10, 93:11, 93 13, 98:2, 98:3, 102:17, 102:20, 120:7
**quoted** [2] - 72:17, 93:23
**quotes** [1] - 71:16
**quoting** [1] - 18:10

### R

**R** [5] - 1:9, 1:12, 1:14, 1:16, 2:1
**raised** [4] - 56:19, 56:23, 87:20, 142:1
**rather** [3] - 6:22, 23:17, 142:22
**RCX** [1] - 3:3
**RDX** [1] - 3:3
**re** [10] - 16:6, 75:16, 75:18, 76:3, 76:6, 76:9, 76:16, 77:22, 109:24, 137:18
**re-argue** [1] - 109:24
**re-cross** [1] - 137:18
**re-sell** [2] - 75:18, 77:22
**re-selling** [3] - 76:3, 76:6, 76:9
**re-sold** [2] - 75:16, 76:16
**re-supplied** [1] - 16:6
**read** [16] - 27:22, 27:23, 36:17, 36:19, 49:3, 88:19, 88:20,

88:21, 88:22, 99:16, 99:17, 106:21, 117:22, 127:1, 127:17, 130:2
**reading** [3] - 120:14, 128:19, 128:21
**Reading** [15] - 85:2, 92:11, 93:8, 98:1, 102:18, 117:7, 119:25, 120:4, 125:8, 125:15, 125:19, 128:3, 129:5, 129:19, 130:5
**ready** [4] - 11:14, 40:13, 80:18, 142:12
**real** [2] - 21:1, 75:8
**realize** [1] - 52:7
**realizing** [3] - 115:5, 115:6, 116:17
**really** [7] - 20:20, 30:3, 41:4, 43:11, 130:1, 133:11, 145:13
**reason** [18] - 25:17, 41:6, 54:13, 57:8, 58:12, 68:16, 69:24, 72:21, 76:7, 87:8, 88:1, 95:7, 95:18, 106:13, 113:19, 122:17, 140:10
**reasons** [4] - 8:3, 44:24, 49:20, 103:12
**recall** [7] - 17:14, 89:21, 90:9, 90:16, 99:4, 110:24, 113:11
**receive** [6] - 61:4, 61:5, 62:8, 63:9, 113:7, 140:16
**received** [26] - 23:11, 39:19, 39:22, 41:12, 47:24, 48:1, 56:22, 79:1, 84:11, 84:12, 85:17, 87:14, 91:10, 97:18, 101:17, 110:22, 110:23, 110:24, 111:5, 119:11, 121:18, 121:20, 124:23, 124:24, 132:24, 133:3
**RECEIVED** [1] - 3:9
**receiver** [4] - 77:25, 83:18, 84:16, 135:15
**receiving** [1] - 122:1
**recently** [1] - 44:13
**receptive** [1] - 144:13
**Recess** [2] - 40:12, 80:15
**recognize** [10] - 30:20, 76:9, 77:13, 82:5, 82:7, 82:8, 82:15,

96:21, 111:9, 119:18
**recognized** [1] - 76:7
**recollection** [6] - 53:16, 89:22, 90:2, 90:6, 92:4, 92:23
**record** [25] - 4:9, 8:4, 11:4, 11:8, 12:7, 23:11, 23:12, 26:22, 38:12, 38:17, 51:1, 59:1, 59:8, 64:24, 99:6, 107:13, 110:9, 120:14, 138:11, 138:15, 140:3, 144:6, 145:3, 147:7
**recorded** [1] - 1:25
**records** [5] - 30:21, 31:1, 94:5, 101:8, 133:1
**RECROSS** [1] - 138:1
**RECROSS-EXAMINATION** [1] - 138:1
**redirect** [1] - 133:19
**REDIRECT** [1] - 133:22
**reduction** [1] - 17:13
**refer** [1] - 37:12
**reference** [9] - 39:2, 54:21, 83:10, 96:19, 99:5, 109:24, 119:19
**referenced** [1] - 97:11
**referrals** [1] - 127:3
**referred** [4] - 13:9, 61:13, 83:2, 120:23
**referring** [7] - 28:4, 33:3, 78:2, 83:7, 120:24, 121:4, 140:19
**reflect** [6] - 11:4, 11:8, 59:8, 110:9, 142:7, 142:9
**reflection** [1] - 143:20
**reflections** [1] - 105:2
**regard** [10] - 35:19, 47:17, 47:18, 96:23, 99:13, 99:22, 117:12, 117:18, 129:7, 130:18
**regarding** [5] - 18:19, 20:16, 22:14, 58:10, 118:7
**regardless** [2] - 54:11, 146:13
**registered** [1] - 130:10
**regulation** [3] - 140:17, 140:19
**reinstallation** [1] - 117:10
**relate** [1] - 43:12
**related** [4] - 26:23,

48:8, 85:21, 101:10
**relates** [1] - 128:9
**relating** [3] - 47:20, 138:4, 138:13
**relation** [2] - 15:18, 130:25
**relationship** [8] - 32:16, 86:5, 87:17, 88:4, 92:16, 93:18, 99:11, 99:19
**relative** [1] - 126:2
**relatively** [1] - 143:22
**relevance** [2] - 97:13, 102:23
**relevant** [19] - 19:1, 24:21, 26:1, 26:11, 44:21, 46:9, 46:10, 46:11, 46:21, 46:22, 96:13, 96:14, 101:15, 125:22, 133:9, 141:19, 141:25
**reliable** [1] - 36:6
**relied** [1] - 62:4
**relief** [2] - 7:2, 141:24
**rely** [1] - 62:2
**relying** [1] - 79:20
**remain** [2] - 50:1, 80:22
**remained** [1] - 127:11
**remaining** [1] - 50:4
**remains** [2] - 49:11, 141:24
**remedies** [1] - 46:24
**remedy** [3] - 7:20, 44:8, 46:23
**remember** [19] - 53:13, 53:15, 66:9, 66:22, 85:7, 89:23, 90:1, 90:4, 92:20, 92:22, 99:1, 99:2, 99:10, 107:25, 108:1, 115:11, 141:9, 142:24
**remembered** [1] - 41:9
**remind** [1] - 80:21
**remove** [8] - 64:6, 64:17, 69:8, 69:13, 69:17, 76:18, 76:19, 110:12
**removed** [11] - 64:1, 68:19, 69:15, 77:15, 79:21, 112:15, 114:4, 114:25, 116:9
**removing** [1] - 69:4
**render** [1] - 60:24
**rendered** [2] - 60:25, 61:1
**repaid** [1] - 45:1
**repeat** [7] - 71:24,

72:3, 72:11, 72:16, 72:17, 99:15, 117:15
**repetition** [2] - 30:23, 33:24
**repleted** [1] - 22:25
**replied** [1] - 19:15
**report** [12] - 23:25, 41:15, 106:22, 106:24, 107:6, 109:1, 109:13, 109:17, 118:6, 118:10, 145:24, 146:12
**reported** [4] - 40:19, 40:21, 109:4, 143:15
**REPORTER** [1] - 16:17
**Reporter** [5] - 1:22, 36:20, 99:18, 147:4, 147:11
**reporter** [1] - 99:16
**REPORTER'S** [1] - 147:1
**represent** [2] - 68:6, 83:12
**representative** [2] - 50:5, 125:25
**represented** [1] - 91:21
**represents** [1] - 33:17
**request** [8] - 33:23, 60:22, 62:13, 62:17, 67:9, 72:4, 95:11, 143:17
**requested** [6] - 14:4, 36:19, 59:20, 61:1, 66:8, 99:17
**requesting** [1] - 62:14
**requests** [5] - 36:1, 59:17, 60:4, 73:21, 122:25
**require** [3] - 79:25, 139:4, 139:6
**required** [2] - 71:1, 80:3
**requirement** [3] - 34:20, 34:21, 139:16
**requirements** [5] - 34:14, 35:5, 60:22, 139:10, 140:3
**research** [1] - 73:6
**researcher** [4] - 121:2, 121:4, 121:5, 121:7
**researching** [1] - 73:17
**residence** [1] - 12:7
**resignation** [1] - 14:5
**resolve** [3] - 7:4, 101:2, 143:23
**resolving** [1] - 55:23

**resources** [1] - 44:18
**respect** [10] - 5:25, 42:11, 54:12, 84:16, 103:22, 104:2, 104:4, 104:20, 121:14, 139:4
**respectfully** [1] - 143:17
**respond** [2] - 7:11, 125:20
**response** [4] - 20:18, 23:1, 31:6, 124:8
**responses** [3] - 18:25, 27:6, 66:15
**responsibilities** [2] - 51:22, 56:17
**rest** [2] - 97:12, 101:9
**restrain** [2] - 99:12, 99:21
**restrained/enjoined** [1] - 25:25
**restraining** [3] - 78:21, 78:23, 103:17
**restraints** [9] - 7:8, 7:14, 7:17, 7:20, 7:21, 8:15, 65:7, 78:21, 103:1
**restricted** [1] - 67:13
**restriction** [1] - 57:17
**restroom** [1] - 40:6
**result** [2] - 64:2, 70:12
**resulting** [1] - 43:19
**resume** [1] - 80:19
**retain** [2] - 98:18, 98:23
**retained** [3] - 69:13, 98:25, 99:9
**retention** [1] - 57:22
**retrospective** [1] - 141:25
**return** [4] - 11:9, 41:2, 41:12, 144:15
**returned** [5] - 40:18, 41:14, 41:16, 109:2, 109:3
**returning** [1] - 114:4
**revenue** [1] - 35:17
**review** [5] - 7:20, 20:23, 96:2, 101:21, 101:22
**reviewed** [1] - 67:19
**RFQ** [3] - 138:3, 138:12, 140:5
**rights** [3] - 13:21, 32:12, 87:1
**rise** [3] - 4:4, 80:16, 145:21
**RMR** [3] - 1:22, 147:3, 147:10
**Road** [2] - 1:17, 12:18

**Roberts'** [5] - 10:14, 10:25, 21:6, 23:5, 96:15
**robust** [1] - 131:15
**role** [2] - 55:10, 73:15
**roles** [1] - 55:5
**roll** [1] - 11:14
**room** [4] - 10:19, 50:5, 50:7, 112:24
**Roseland** [2] - 2:4, 5:8
**rotary** [1] - 84:1
**roughly** [1] - 48:23
**Rover** [2] - 47:18, 48:4
**Roy** [24] - 6:7, 13:9, 17:11, 18:16, 18:19, 19:8, 19:9, 19:13, 19:14, 19:18, 19:25, 20:16, 22:14, 33:9, 37:2, 37:17, 37:18, 37:20, 37:22, 50:19, 51:7, 52:23, 93:12
**RPR** [3] - 1:22, 147:3, 147:10
**Rule** [4] - 24:22, 44:11, 97:15, 97:16
**ruled** [1] - 110:3
**Rules** [2] - 24:15, 29:17
**ruling** [2] - 109:10, 109:12
**run** [1] - 26:7
**run-up** [1] - 26:7
**running** [2] - 29:13, 131:19
**rush** [1] - 91:5
**Rymar** [2] - 93:6, 93:7
**RYMAR** [1] - 93:6

## S

**S** [3] - 1:14, 2:1, 3:8
**salary** [4] - 19:22, 56:12, 56:15, 57:8
**sale** [2] - 37:13, 87:15
**sales** [12] - 13:19, 17:22, 34:16, 101:23, 102:9, 133:3, 133:5, 135:1, 137:4, 137:6, 137:13, 137:15
**salespeople** [1] - 88:3
**same** [19] - 22:18, 48:1, 48:2, 48:10, 62:17, 70:3, 70:18, 72:21, 73:3, 74:5, 79:12, 79:15, 90:14, 116:15, 126:24, 139:6, 140:8, 140:9
**satisfactorily** [1] - 133:6

**satisfied** [1] - 7:16
**satisfy** [1] - 139:12
**save** [1] - 142:15
**saved** [1] - 115:8
**saves** [2] - 115:19, 116:16
**Savory** [17] - 85:1, 85:24, 86:4, 86:12, 87:16, 88:8, 89:14, 89:19, 90:7, 90:15, 95:12, 95:19, 96:20, 96:24, 97:25, 135:20
**SAVORY** [1] - 85:1
**saw** [4] - 92:18, 109:21, 110:18, 118:8
**says** [9] - 92:10, 93:7, 106:22, 109:1, 119:25, 120:14, 125:18, 128:3, 129:5
**scene** [1] - 111:22
**schedule** [4] - 6:9, 52:8, 53:8, 143:2
**scheduled** [5] - 81:6, 81:16, 81:21, 81:25, 142:19
**scheduling** [1] - 50:12
**Scheerer** [5] - 83:22, 91:18, 91:21, 136:20
**SCHEERER** [1] - 83:22
**school** [1] - 51:15
**Science** [3] - 101:24, 101:25, 102:3
**science** [1] - 51:16
**scope** [1] - 7:2
**screen** [4] - 27:3, 31:4, 71:11, 82:12
**screens** [1] - 111:15
**screenshots** [1] - 38:15
**scroll** [7] - 27:5, 27:11, 64:23, 64:25, 65:4, 65:15, 66:19
**Se** [5] - 17:15, 18:3, 18:10, 42:25, 43:1
**Se-A** [5] - 17:15, 18:3, 18:10, 42:25, 43:1
**search** [2] - 34:8, 60:6
**seat** [3] - 5:24, 50:25, 80:24
**seated** [3] - 4:6, 5:23, 80:17
**second** [29] - 14:6, 17:17, 20:4, 21:13, 25:19, 26:22, 28:8, 29:7, 29:22, 31:20, 31:21, 51:25, 71:19, 82:8, 82:9, 82:10, 82:12, 82:22, 82:23,

85:9, 88:7, 93:6, 97:24, 103:16, 106:16, 108:11, 108:14, 108:15, 137:19
**secondly** [1] - 107:22
**secret** [7] - 26:5, 45:8, 46:14, 103:23, 104:5, 104:10, 127:19
**secret-type** [1] - 127:19
**secrets** [20] - 7:24, 25:21, 26:10, 26:16, 26:18, 26:20, 43:18, 44:3, 44:10, 46:3, 69:11, 70:23, 103:19, 104:12, 104:19, 104:24, 127:2, 141:21, 142:2, 145:4
**seeing** [2] - 38:12, 136:8
**seek** [3] - 7:10, 10:16, 58:6
**seeking** [9] - 7:3, 8:15, 23:10, 49:22, 54:17, 54:25, 84:18, 104:22, 122:23
**seem** [2] - 74:12, 127:5
**seemed** [1] - 103:6
**seems** [1] - 143:8
**seen** [7] - 65:2, 91:16, 106:19, 108:16, 108:19, 110:15, 133:1
**Segi** [8] - 16:14, 17:20, 47:23, 48:3, 48:9, 131:22, 132:4, 133:4
**Sejun** [1] - 18:6
**select** [1] - 62:18
**selected** [1] - 35:1
**sell** [9] - 32:14, 33:16, 34:16, 59:25, 60:16, 63:17, 75:18, 77:22, 87:4
**selling** [6] - 70:5, 70:6, 70:11, 76:3, 76:6, 76:9
**send** [3] - 62:17, 96:24, 121:2
**sending** [1] - 128:4
**sends** [1] - 125:16
**sense** [1] - 143:24
**sent** [3] - 56:7, 83:14, 102:19
**sentence** [1] - 14:18
**Seoul** [5] - 13:5, 13:7,

16:13, 17:19, 17:20
**separate** [2] - 116:6, 131:3
**September** [13] - 14:4, 15:1, 17:11, 41:20, 47:23, 47:25, 51:20, 83:15, 83:16, 84:6, 84:22, 112:7, 141:2
**sequester** [1] - 9:19
**sequestered** [2] - 9:17, 10:6
**serious** [4] - 52:16, 123:13, 126:11, 126:21
**served** [2] - 66:22, 123:2
**service** [2] - 12:24, 60:10
**set** [19] - 33:12, 36:9, 42:7, 42:13, 42:15, 42:16, 42:22, 42:24, 43:1, 45:20, 76:2, 84:4, 90:8, 91:14, 103:1, 118:9, 130:20, 142:2, 144:5
**sets** [3] - 73:21, 73:22, 73:23
**setting** [1] - 37:8
**several** [2] - 66:5, 86:15
**SEWHA** [1] - 17:16
**sham** [1] - 45:20
**share** [3] - 68:14, 89:6
**she** [3] - 5:3, 8:25, 10:23
**she's** [1] - 5:3
**Sheerer** [4] - 91:15, 93:6, 93:12, 94:25
**shopping** [1] - 62:15
**shouldn't** [1] - 25:2
**show** [21] - 7:13, 26:25, 27:18, 46:3, 46:7, 82:2, 85:6, 85:8, 95:23, 100:23, 105:5, 105:24, 110:19, 111:12, 111:14, 118:22, 118:25, 119:13, 124:11, 133:2, 142:13
**showed** [1] - 110:16
**showing** [2] - 38:8, 124:17
**shown** [20] - 27:2, 27:5, 30:21, 31:1, 39:23, 45:19, 66:14, 82:22, 84:17, 104:25, 111:17, 112:6, 113:12, 118:6, 134:12,

135:13, 135:19, 136:12, 136:19, 137:3
**shows** [13] - 27:11, 28:2, 32:21, 83:21, 88:8, 91:21, 93:5, 102:17, 103:5, 111:24, 120:13, 125:6, 125:11
**sic** [3] - 39:23, 40:22, 114:5
**sic]** [2] - 16:19, 18:7
**sidebar** [1] - 107:12
**Sidebar** [2] - 107:13, 110:6
**sides** [1] - 144:7
**sign** [1] - 57:18
**signature** [3] - 27:12, 27:13, 32:21
**signed** [1] - 30:8
**significant** [1] - 73:4
**Simeone** [3] - 5:10, 5:20, 5:21
**SIMEONE** [2] - 2:5, 5:21
**simple** [2] - 7:5, 74:13
**simply** [13] - 21:10, 21:23, 22:1, 23:23, 24:7, 45:13, 49:20, 104:5, 106:11, 109:25, 110:3, 115:14, 145:21
**Simultaneous** [2] - 30:11, 86:20
**since** [11] - 6:20, 19:8, 65:18, 66:25, 67:1, 67:6, 77:14, 120:19, 138:13, 141:2
**single** [1] - 66:10
**sir** [12] - 5:14, 14:15, 32:18, 49:24, 50:7, 61:8, 89:25, 93:21, 93:23, 108:15, 113:17, 114:17
**sit** [1] - 104:21
**sites** [4] - 36:16, 36:23, 60:7
**sitting** [3] - 8:8, 10:10, 88:19
**situation** [1] - 123:11
**situations** [1] - 34:2
**six** [5] - 38:13, 94:7, 139:19, 139:20, 139:22
**size** [1] - 112:11
**skipping** [2] - 46:12, 46:13
**slandered** [1] - 44:25
**sleep** [1] - 55:14
**slightly** [1] - 49:9

**small** [1] - 143:22
**SNT** [1] - 79:7
**so-called** [1] - 140:14
**software** [7] - 13:16, 51:17, 51:18, 51:24, 56:11, 57:6
**sold** [6] - 67:1, 67:3, 67:5, 67:12, 75:16, 76:16
**sole** [1] - 32:16
**solely** [2] - 23:25, 137:6
**solve** [1] - 9:6
**somebody** [2] - 22:22, 22:25
**someone** [3] - 10:19, 86:25, 107:18
**something** [20] - 15:10, 19:19, 20:21, 23:8, 30:18, 31:8, 87:7, 89:7, 89:23, 92:3, 92:20, 98:25, 113:1, 120:20, 121:2, 134:15, 142:7, 144:6, 146:3, 146:18
**sometimes** [1] - 34:22
**soon** [2] - 126:17, 140:16
**sorry** [17] - 5:16, 14:7, 30:23, 51:9, 56:18, 64:11, 67:4, 68:1, 83:5, 88:13, 94:14, 98:21, 103:8, 105:14, 106:8, 131:23, 131:24
**sort** [1] - 24:18
**sought** [7] - 103:17, 103:18, 104:8, 104:10, 104:17, 122:25
**sounds** [3] - 21:3, 97:16, 104:13
**source** [14] - 56:8, 59:22, 60:5, 60:8, 60:11, 60:23, 61:25, 63:17, 67:21, 73:16, 73:22, 74:1, 74:22, 104:6
**sourced** [3] - 36:12, 63:6, 75:20
**sources** [5] - 23:23, 23:25, 24:1, 55:25, 56:8
**sourcing** [2] - 62:14, 64:15
**South** [1] - 16:1
**speak** [10] - 7:5, 15:16, 18:12, 22:8, 40:2, 43:24, 52:25,

53:8, 54:4, 54:15
**speaking** [3] - 30:20, 56:5, 99:4
**spec** [1] - 74:11
**special** [1] - 63:10
**specialist** [1] - 117:8
**specific** [21] - 21:18, 37:8, 44:5, 44:24, 59:13, 59:17, 59:18, 59:19, 61:2, 61:5, 61:6, 63:11, 69:18, 71:5, 78:10, 79:17, 79:25, 118:16, 122:20, 127:18
**specifically** [5] - 7:21, 33:3, 96:5, 96:23, 119:18
**specification** [9] - 34:12, 34:15, 34:19, 34:22, 35:2, 35:6, 74:15, 74:19, 120:9
**specifications** [7] - 34:13, 34:25, 48:5, 71:1, 71:4, 73:24, 74:7
**specificity** [2] - 7:24, 30:4
**specified** [1] - 48:5
**specify** [2] - 38:11, 38:13
**speech** [1] - 45:11
**speed** [1] - 76:22
**spelling** [2] - 16:15, 17:16
**spent** [1] - 46:12
**spoke** [2] - 18:15, 18:16
**spoliation** [2] - 123:18, 127:5
**spot** [1] - 21:17
**spreadsheet** [3] - 30:2, 30:9, 32:24
**Square** [1] - 1:9
**stage** [1] - 41:7
**stand** [3] - 11:19, 49:25, 131:8
**Standard** [3] - 16:13, 17:19, 17:20
**standard** [6] - 7:19, 20:22, 35:20, 43:25, 139:2, 139:5
**standardized** [1] - 35:23
**standing** [3] - 32:15, 99:11, 99:19
**standpoint** [2] - 33:17, 140:13
**start** [6] - 6:22, 20:23, 26:14, 80:13, 140:12, 141:17

**started** [10] - 11:18, 13:14, 13:17, 19:3, 45:19, 45:22, 51:18, 56:11, 84:23
**starters** [1] - 45:15
**starting** [4] - 51:16, 51:18, 51:19, 56:12
**state** [7] - 6:15, 12:6, 12:10, 23:8, 23:17, 25:23, 51:1
**statement** [10] - 23:5, 23:17, 24:8, 53:2, 67:11, 92:19, 107:23, 129:24, 130:11, 130:16
**statements** [15] - 20:2, 21:23, 22:2, 22:24, 23:12, 23:13, 23:18, 23:20, 23:25, 24:21, 25:7, 25:10, 25:13, 25:17, 92:22
**States** [9] - 4:2, 6:5, 6:9, 6:11, 34:10, 51:16, 60:15, 140:8, 147:4
**STATES** [2] - 1:1, 1:13
**stating** [2] - 129:13, 129:20
**station** [1] - 68:20
**stay** [5] - 9:25, 10:3, 44:6, 46:16, 50:7
**steady** [3] - 139:4, 139:10, 139:16
**steal** [1] - 41:16
**stealing** [2] - 41:25, 42:2
**stenography** [1] - 1:25
**step** [7] - 9:21, 11:1, 49:10, 49:24, 78:17, 141:8
**stepped** [3] - 11:4, 11:5, 11:9
**stepping** [1] - 10:16
**steps** [2] - 34:17, 109:25
**stick** [1] - 143:2
**still** [4] - 37:18, 45:16, 47:16, 141:22
**stocks** [1] - 41:2
**stole** [2] - 40:25, 127:23
**stolen** [2] - 41:15, 41:21
**stop** [3] - 14:17, 51:20, 107:11
**stopping** [1] - 130:7
**storage** [1] - 112:24
**stored** [1] - 115:6
**story** [2] - 26:6, 26:14
**strange** [1] - 54:22

**strike** [2] - 87:2, 143:21
**strong** [2] - 92:15, 131:15
**struggling** [1] - 104:21
**stuff** [4] - 46:13, 46:17, 53:9, 97:12
**stumbled** [1] - 41:22
**sub** [1] - 16:6
**sub-system** [1] - 16:6
**subcontractors** [1] - 16:10
**subject** [4] - 21:11, 22:8, 137:12, 145:16
**submitted** [4] - 75:7, 75:9, 133:1, 145:1
**submitting** [1] - 76:15
**subpoena** [5] - 122:24, 125:16, 127:6, 128:10, 128:12
**subpoenaing** [1] - 123:5
**subpoenas** [1] - 123:2
**subsequent** [1] - 28:23
**substance** [2] - 8:10, 24:25
**substantial** [2] - 17:13, 93:21
**substantially** [2] - 7:17, 17:19
**such-and-such** [1] - 109:17
**sudden** [1] - 14:2
**sue** [1] - 92:12
**sued** [1] - 91:24
**suggest** [4] - 9:19, 26:13, 85:5, 95:19
**suggested** [4] - 86:12, 87:9, 141:18, 142:4
**suggesting** [3] - 25:12, 26:3, 54:14
**suggestion** [1] - 86:13
**suing** [1] - 92:1
**Suite** [1] - 1:17
**Summit** [1] - 2:6
**supplemental** [1] - 27:6
**supplied** [2] - 16:6, 75:21
**supplier** [1] - 32:17
**suppliers** [1] - 62:15
**supply** [5] - 12:23, 12:24, 19:9, 35:10, 139:17
**support** [2] - 103:4, 132:12
**supporting** [1] - 7:13

**supposed** [2] - 68:25, 81:17
**sure** [14] - 15:9, 21:22, 34:25, 35:8, 40:7, 59:1, 59:16, 74:10, 117:1, 123:17, 126:14, 127:4, 134:18, 145:25
**surprised** [1] - 143:21
**survive** [1] - 24:22
**suspect** [2] - 54:21, 59:7
**sustain** [1] - 133:10
**sustained** [7] - 31:2, 64:7, 76:21, 92:25, 133:13, 133:16, 136:5
**swear** [1] - 8:19
**sworn** [8] - 8:25, 9:4, 9:5, 12:2, 50:23, 50:24, 51:4, 145:7
**SYS** [1] - 16:13
**system** [23] - 13:16, 13:17, 16:6, 18:9, 18:10, 36:8, 36:15, 36:22, 37:17, 37:18, 109:8, 113:16, 115:2, 115:5, 115:16, 116:14, 116:16, 116:20, 116:22, 116:25, 117:9, 118:4, 138:8
**System** [5] - 16:9, 16:10, 16:13, 121:5, 121:7
**systems** [5] - 12:24, 37:3, 37:6, 55:16, 55:17
**Systems** [2] - 128:6, 130:10

**T**

**T** [1] - 3:8
**T.V** [1] - 69:6
**table** [1] - 22:7
**tailored** [3] - 7:10, 7:17, 7:22
**tails** [1] - 97:12
**take** [26] - 8:10, 13:23, 21:6, 23:5, 24:18, 25:2, 26:1, 35:6, 40:8, 45:12, 48:22, 52:20, 56:7, 66:21, 80:11, 91:4, 92:2, 103:13, 110:2, 112:8, 116:6, 124:15, 145:11, 146:2, 146:11
**taken** [10] - 40:12,

43:18, 46:14, 46:15, 69:7, 80:15, 111:22, 141:16, 144:12
**taking** [7] - 55:8, 69:3, 110:16, 111:24, 112:20, 112:22, 144:4
**talk** [3] - 44:14, 126:22, 141:11
**talked** [1] - 46:25
**talking** [8] - 26:11, 62:21, 62:22, 78:10, 93:22, 98:6, 127:4, 139:15
**tax** [2] - 19:17, 19:18
**Tech** [2] - 42:25, 43:1
**technical** [4] - 9:6, 60:14, 71:7, 85:21, 144:18, 144:19
**technology** [13] - 59:24, 60:2, 60:20, 68:7, 73:7, 77:15, 79:25, 134:16, 134:21, 135:4, 135:17, 136:9, 137:1
**telling** [3] - 52:8, 58:14, 58:18
**temporary** [4] - 7:14, 78:21, 78:23, 103:17
**ten** [6] - 73:21, 73:22, 73:23, 98:6, 140:7, 142:21
**tend** [1] - 103:3
**tendered** [1] - 66:15
**Tennessee** [1] - 42:16
**tens** [2] - 66:5, 66:7
**terminate** [1] - 13:12
**termination** [3] - 14:19, 15:1, 102:20
**terms** [13] - 7:13, 23:25, 25:16, 33:12, 35:14, 35:16, 35:17, 37:25, 43:16, 50:13, 58:24, 104:23, 144:16
**terrific** [2] - 5:5, 38:25
**testified** [16] - 12:2, 37:2, 51:4, 70:4, 70:11, 70:14, 70:22, 71:12, 73:3, 85:20, 100:14, 114:14, 118:2, 124:8, 131:4, 131:6
**testifies** [1] - 50:1
**testify** [7] - 6:4, 23:24, 48:22, 49:21, 49:25, 133:12
**testifying** [3] - 9:13, 10:16, 11:10
**testimony** [19] - 9:16,

10:24, 29:12, 49:12, 50:2, 53:18, 63:22, 107:25, 108:2, 108:7, 109:12, 125:13, 126:20, 138:24, 142:20, 144:1, 145:9
**text** [2] - 6:1, 83:8
**thanks** [3] - 32:4, 50:9, 110:7
**theory** [6] - 23:4, 108:11, 108:17, 108:22, 108:25
**thereafter** [1] - 32:23
**therefore** [2] - 19:18, 25:24
**thereupon** [2] - 9:5, 50:24
**they're** [10] - 9:22, 9:23, 10:15, 44:22, 60:3, 62:13, 100:3, 101:10, 127:22
**thinks** [1] - 46:10
**third** [6] - 82:15, 82:24, 83:10, 92:7, 92:10, 96:19
**Thomas** [1] - 5:9
**THOMAS** [1] - 2:3
**though** [3] - 5:13, 37:19, 113:14
**thought** [4] - 19:19, 55:12, 55:13, 100:14
**thoughtful** [1] - 24:14
**thoughts** [1] - 54:7
**thousand** [1] - 41:13
**thousands** [3] - 66:6, 66:7, 133:3
**threatened** [1] - 79:3
**three** [13] - 5:11, 37:14, 40:21, 40:22, 41:14, 52:19, 71:25, 82:18, 89:23, 113:24, 122:21, 130:13, 143:12
**three-quarters** [1] - 130:13
**thrown** [1] - 69:1
**timely** [2] - 21:20
**times** [6] - 55:14, 73:3, 120:20, 121:1, 121:2, 139:6
**title** [1] - 33:1
**to..** [1] - 120:2
**today** [29] - 4:16, 5:11, 6:8, 7:10, 9:13, 11:7, 13:4, 44:23, 53:1, 67:18, 70:22, 79:20, 81:19, 104:22,

105:2, 110:15, 123:18, 125:17, 126:17, 127:8, 131:7, 131:15, 132:2, 133:12, 138:3, 138:24, 141:9, 142:3, 143:6
**today's** [1] - 142:4
**together** [12] - 7:1, 35:3, 37:13, 41:17, 56:3, 59:11, 61:22, 62:1, 69:18, 70:19, 94:23
**told** [30] - 14:2, 17:24, 18:2, 18:21, 19:7, 19:8, 19:24, 19:25, 20:15, 20:16, 22:8, 22:14, 24:1, 41:1, 41:2, 41:4, 41:14, 42:17, 42:19, 75:3, 84:23, 86:15, 87:23, 106:21, 115:18, 116:15, 122:8, 127:8, 140:15, 141:9
**tomorrow** [17] - 6:6, 50:2, 141:12, 141:13, 141:14, 141:17, 142:8, 142:10, 142:19, 142:21, 143:8, 144:2, 144:11, 145:4, 146:12, 146:13, 146:20
**tonight** [4] - 6:10, 6:11, 6:16, 48:19
**too** [11] - 46:1, 58:12, 60:12, 60:13, 73:13, 73:15, 73:25, 75:3, 100:3, 122:8, 140:15
**took** [18] - 18:9, 18:11, 25:21, 33:9, 41:3, 45:1, 46:4, 47:12, 48:3, 48:4, 102:24, 105:3, 109:2, 113:14, 114:10, 114:23, 116:2
**top** [7] - 16:12, 88:7, 92:10, 112:4, 112:12, 128:3, 134:2
**topic** [2] - 81:20, 82:1
**topics** [1] - 57:21
**tortious** [1] - 22:1
**total** [2] - 8:15, 13:4
**totally** [1] - 74:20
**touch** [1] - 57:21
**tough** [1] - 21:17
**toward** [1] - 76:12
**traceability** [1] - 140:13
**tracing** [1] - 140:15

**trade** [29] - 7:24,
25:21, 26:5, 26:10,
26:16, 26:18, 26:20,
36:16, 36:23, 43:17,
44:3, 44:10, 45:8,
46:3, 46:14, 69:11,
70:23, 103:19,
103:23, 104:5,
104:10, 104:12,
104:19, 104:24,
127:2, 127:19,
141:21, 142:2, 145:4
**trading** [2] - 45:8,
45:21
**training** [4] - 61:5,
63:10, 63:15, 64:3
**transact** [1] - 79:8
**transacting** [1] - 79:13
**transaction** [8] -
37:13, 47:19, 48:7,
48:9, 84:16, 89:9,
121:15, 129:7
**transactions** [11] -
35:14, 37:9, 65:22,
79:3, 79:5, 79:9,
95:10, 103:25,
138:4, 138:13
**Transcript** [1] - 1:25
**transcript** [4] - 106:22,
107:24, 117:21,
147:6
**transcription** [1] -
1:25
**transcripts** [1] - 49:4
**transfer** [1] - 42:21
**translate** [3] - 15:6,
20:11, 49:23
**translator** [1] - 53:21
**trashed** [1] - 75:25
**travel** [4] - 18:16, 53:8,
53:9, 54:21
**treatment** [1] - 41:8
**trial** [2] - 43:23, 44:19
**tricky** [2] - 20:18, 26:4
**tried** [1] - 6:19
**trip** [3] - 40:18, 81:16,
81:17
**TRO** [4] - 8:2, 44:6,
44:8, 79:1
**TROs** [1] - 79:2
**trouble** [2] - 55:23,
92:14
**troublesome** [1] -
55:23
**true** [18] - 24:7, 24:8,
24:10, 52:14, 53:2,
63:20, 63:21, 63:25,
75:11, 76:12, 84:20,
92:22, 103:20,
116:13, 121:12,

121:13, 137:5, 147:6
**truth** [9] - 21:24,
21:25, 24:5, 49:22,
54:17, 54:25, 57:3,
86:11
**truth-seeking** [3] -
49:22, 54:17, 54:25
**try** [9] - 14:12, 15:4,
50:16, 68:15, 92:4,
106:10, 106:11,
106:14, 107:5
**trying** [13] - 20:19,
43:23, 44:17, 45:2,
45:10, 76:22,
103:11, 103:12,
107:18, 109:24,
128:8, 136:1, 144:20
**turn** [5] - 32:18, 32:19,
93:3, 122:20, 125:4
**turning** [3] - 82:24,
102:14, 128:2
**TV** [3] - 73:21, 73:24,
113:15
**TVs** [2] - 73:22, 73:23
**two** [27] - 6:4, 17:14,
26:20, 38:4, 46:4,
52:4, 53:13, 62:18,
68:2, 69:3, 71:25,
101:22, 111:14,
112:3, 112:6,
113:12, 114:23,
114:25, 115:13,
123:22, 124:2,
124:4, 130:22,
134:18, 137:23,
139:18, 143:12
**Two** [1] - 1:9
**type** [7] - 35:23, 56:4,
88:25, 102:8, 104:2,
127:19, 140:8
**types** [5] - 26:18,
31:18, 32:6, 34:5,
34:17
**typical** [1] - 88:25

## U

**U.S** [1] - 147:11
**ultimately** [3] - 44:21,
54:11, 123:2
**Um** [1] - 142:20
**um** [1] - 142:21
**under** [14] - 18:4,
42:13, 42:24, 47:24,
49:11, 50:1, 80:22,
83:25, 97:15, 105:3,
128:7, 131:6, 131:12
**undergoing** [1] - 41:8
**underlying** [1] - 26:6
**understand** [32] -

7:19, 8:7, 10:13,
15:8, 15:13, 15:17,
21:10, 21:22, 25:4,
25:11, 44:19, 52:9,
54:15, 61:20, 70:10,
80:23, 86:9, 89:13,
90:6, 104:18, 115:1,
116:12, 116:21,
116:24, 126:12,
126:14, 126:18,
127:7, 127:25,
130:1, 130:3, 138:20
**understanding** [2] -
6:7, 21:16
**understands** [1] -
15:11
**understood** [3] -
15:20, 67:11, 144:22
**unfair** [4] - 7:24,
43:19, 80:6, 146:9
**unidentified** [1] -
22:24
**Unione** [9] - 17:15,
17:17, 18:3, 18:9,
42:25, 43:1, 131:22,
132:4, 133:4
**uniquely** [1] - 45:15
**United** [9] - 4:2, 6:5,
6:9, 6:11, 34:10,
51:16, 60:15, 140:8,
147:4
**UNITED** [2] - 1:1, 1:13
**unless** [2] - 44:22,
72:14
**unorthodox** [1] - 49:9
**unpaid** [1] - 19:22
**until** [6] - 41:20,
47:15, 47:16, 80:13,
101:14, 142:5
**unusual** [1] - 49:20
**up-charged** [1] - 75:8
**ups** [1] - 56:9
**urge** [3] - 104:11,
141:9, 144:7
**us** [24] - 5:4, 5:11,
8:24, 11:3, 13:11,
22:8, 32:11, 38:2,
44:18, 45:12, 46:18,
51:22, 52:8, 70:17,
70:24, 96:4, 96:6,
101:1, 101:15,
101:22, 122:10,
124:16, 140:8,
142:15
**USA** [1] - 60:11
**used** [14] - 28:18,
38:3, 54:6, 60:7,
68:12, 74:7, 79:11,
102:12, 112:20,
113:18, 115:19,

115:20, 128:13,
138:17
**useful** [6] - 39:2, 58:5,
58:8, 58:16, 71:14,
123:8
**user** [1] - 139:9
**users** [1] - 139:3
**utility** [1] - 60:9
**utilize** [1] - 77:5, 78:5
**utilized** [3] - 47:6,
77:15, 77:21
**uizing** [1] - 85:25

## V

**vague** [2] - 64:7, 76:21
**value** [4] - 141:3,
141:22, 142:3, 145:8
**variables** [1] - 62:6
**various** [5] - 8:3, 55:5,
61:25, 92:12, 123:2
**vary** [1] - 138:25
**Vegas** [2] - 131:2,
132:21
**vending** [1] - 135:10
**vendor** [27] - 33:19,
34:20, 34:23, 35:1,
35:7, 36:3, 36:5,
36:6, 36:8, 58:1,
60:24, 60:25, 61:2,
73:13, 73:25, 74:1,
83:22, 86:3, 86:4,
87:8, 89:8, 89:9,
135:15, 135:21,
136:2
**vendors** [25] - 13:25,
31:19, 32:7, 32:11,
32:13, 32:14, 33:14,
36:6, 47:18, 57:5,
58:5, 59:12, 61:25,
64:15, 73:8, 73:14,
73:24, 82:24, 83:13,
87:24, 89:6, 89:11,
92:17, 100:2
**verbally** [1] - 109:16
**Vermont** [1] - 121:11
**versus** [1] - 89:4
**vetting** [1] - 108:4
**video** [1] - 49:21
**view** [3] - 142:5,
142:14, 144:20
**viewed** [1] - 114:14
**views** [1] - 142:6
**violate** [1] - 65:11
**violative** [1] - 22:1
**virtual** [2] - 6:20,
42:16
**virtually** [2] - 101:22,
102:4
**visited** [1] - 19:8

**vs** [3] - 1:5, 4:7, 44:15
**VSS33.200.0.6-VGPL
32/100** [1] - 120:2

## W

**Wahid** [5] - 125:6,
125:9, 125:19,
130:4, 135:1
**wait** [2] - 96:2, 142:22
**Waldwick** [1] - 2:6
**walked** [1] - 104:25
**wall** [1] - 27:3
**wanted** [7] - 14:3,
53:25, 95:17, 100:4,
107:22, 107:23
**wants** [5] - 20:8,
60:25, 87:6, 142:11,
145:7
**wasn't** [1] - 65:24
**wasting** [1] - 44:17
**way** [20] - 24:13,
24:16, 25:22, 29:2,
30:10, 33:4, 34:7,
45:3, 52:13, 54:18,
63:15, 91:2, 107:24,
108:3, 109:14,
129:14, 129:21,
130:13, 136:20,
146:12
**ways** [2] - 40:16, 46:9
**we'll** [13] - 6:24, 11:9,
28:18, 50:19, 80:12,
96:2, 97:13, 141:17,
143:2, 143:3, 143:8,
145:23, 146:20
**we've** [2] - 21:9, 123:1
**week** [1] - 29:20
**weekends** [1] - 55:15
**weeks** [1] - 86:15
**weigh** [1] - 118:25
**well** [21] - 16:2, 23:23,
34:10, 45:22, 46:21,
49:3, 52:21, 54:25,
69:9, 71:16, 82:8,
82:16, 86:19, 96:3,
112:6, 122:8,
130:22, 131:18,
131:21, 143:7,
146:14
**went** [1] - 52:12
**were/are** [1] - 46:5
**whatever** [7] - 30:17,
60:25, 61:1, 103:12,
107:16, 117:24,
126:21
**whatsoever** [2] -
54:13, 137:7
**whereby** [1] - 33:21
**Whereupon** [4] - 9:3,

9:5, 50:22, 50:24
**wherever** [1] - 50:15
**whole** [4] - 6:19, 7:9, 41:23, 68:10
**whom** [6] - 18:15, 21:5, 21:11, 22:7, 23:21, 42:14
**whose** [4] - 112:18, 113:21, 121:4, 121:6
**wife** [3] - 18:1, 41:7, 45:7
**willing** [3] - 141:16, 143:11, 143:12
**willingness** [1] - 54:24
**Window** [1] - 115:5
**Windows** [5] - 109:7, 115:18, 116:16, 117:9
**wise** [1] - 143:14
**wish** [2] - 6:4, 142:8
**withdraw** [4] - 112:7, 115:9, 117:24, 122:19
**withhold** [1] - 128:8
**within** [11] - 22:21, 34:9, 44:1, 44:11, 44:13, 67:23, 70:25, 74:18, 88:3, 102:14, 138:8
**without** [15] - 29:4, 70:4, 70:5, 70:6, 70:23, 99:5, 115:5, 115:6, 116:17, 119:1, 130:18, 130:19, 140:4, 144:9
**WITNESS** [18] - 51:2, 54:3, 54:7, 71:23, 72:2, 72:6, 72:9, 72:13, 72:20, 72:23, 80:23, 88:15, 88:17, 88:23, 118:19, 126:4, 126:13, 126:15
**witness's** [2] - 19:17, 31:12
**witnesses** [12] - 4:16, 9:9, 9:12, 9:19, 9:25, 10:6, 11:7, 52:15, 143:12, 144:25, 145:16
**WITNESSES** [1] - 3:3
**woman** [3] - 18:5, 42:13, 42:14
**won't** [3] - 14:13, 25:25, 142:5
**wondering** [1] - 93:9
**word** [3] - 6:14, 86:17, 86:18
**words** [8] - 22:21, 23:16, 63:11, 65:25,

74:11, 83:3, 111:23, 144:14
**work** [27] - 7:4, 16:4, 34:21, 35:1, 41:4, 41:17, 55:20, 55:23, 56:2, 61:2, 68:20, 70:3, 71:22, 73:17, 73:25, 74:5, 74:10, 75:4, 79:16, 87:12, 93:12, 95:17, 107:18, 120:21, 121:1
**worked** [13] - 13:20, 37:3, 41:10, 51:17, 51:19, 61:11, 68:10, 68:12, 72:16  94:3, 94:6, 94:20, 94:22
**workflow** [1]  70:19
**working** [14]  13:14, 13:18, 18:  , 19:14, 43:3, 45:16, 51:18, 51:20, 51 23, 55:15, 63:6, 66  , 66:6, 82:19
**workloa**  [1] - 35:16
**World** [3 - 18:7, 42:21  42:23
**would   t** [2] - 9:23, 30:7
**wrap**   ] - 139:24, 140  0
**writ**   3] - 14:9, 129:9
**wri  en** [8] - 32:15, 3  18, 34:3, 44:13, 5  16, 86:8, 89:10, :6
**w ong** [4] - 74:20, 5:25, 76:10, 77:11
**rongly** [1] - 15:11

## X

**X** [2] - 3:1, 3:8

## Y

**year** [16] - 12:15, 56:22, 56:23, 100:11, 100:12, 100:14, 100:15, 100:17, 100:21, 129:10, 132:7, 132:24, 139:8, 139:9, 139:14, 139:18
**year-end** [1] - 100:21
**years** [7] - 53:13, 87:11, 89:23, 94:7, 113:18, 122:5, 139:18

**yet** [5] - 38:23, 44:23, 61:21, 106:7, 144:3
**Yim** [57] - 4:7, 13:9, 13:11, 13:14, 15:23, 17:11, 17:24, 18:4, 18:12, 18:19, 21:24, 21:25, 22:14, 23:13, 24:1, 24:6, 24:9, 24:16, 24:25, 25:17, 27:7, 33:9, 37:2, 37:17, 37:20, 37:22, 38:3, 40:17, 40:19, 41:1, 41:20, 45:7, 47:6, 47:19, 50:20, 51:2, 61:11, 78:20, 80:21, 83:14, 88:19, 91:13, 96:18, 104:23, 105:24, 110:12, 111:9, 118:18, 119:16, 123:9, 126:7, 126:8, 128:2, 133:15, 133:24, 136:8, 141:8
**YIM** [3] - 1:6, 3:5, 51:3
**Yim's** [7] - 16:11, 18:13, 23:12, 24:20, 26:7, 54:12, 54:19
**Yin** [1] - 13:9
**Yong** [1] - 142:20
**you'll** [2] - 126:23, 145:21
**yourself** [5] - 67:16, 84:18, 87:18, 111:9, 114:17
**Yun** [1] - 13:9

## Z

**zero** [3] - 17:20, 17:21, 141:6