<u>**CONFIDENTIAL**</u>

<u>**FILED UNDER SEAL**</u>

**EXHIBIT A**

**Proposed Verified Second Amended and Supplemental Complaint**

**IN**

*Airtech International Inc. v. Byung Chan Yim*

*a/k/a Roy Yim, et al.*

**Civil Action No. 22-00668-MEF-AME**

**CHO LAW GROUP, LLC**
Kenneth K. Cho (KC-3182)
22 Paris Avenue, Suite 110 D
Rockleigh, New Jersey 07647
Tel:  (201) 822-0032
Fax: (201) 822-0033
Email: kcho@cholawgrp.com
*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY
-------------------------------------------------------X
AIRTECH INTERNATIONAL, INC.,

                               Civil Case No. 22-0668 (MEF)(AME)

                  Plaintiff,

                               **SECOND AMENDED AND**
-against-                         **SUPPLEMENTAL COMPLAINT**


BYUNG CHAN YIM A/K/A ROY YIM,       **JURY TRIAL DEMANDED**
HYO SUN KIM,
ASSURED COMPONENTS LLC,
SENSA TECHNETICS LLC, GENUINE       **FILED UNDER SEAL**
AVIATION LLC, RFWAVE LAB INC.,
ARC-TECH INC., HANS AEROSPACE INC.,
HANS AEROSPACE LLC,
BIZARRAVENTURA INC.,
JOHN DOES 1-10, AND XYZ CO. 1-10,

                  Defendants.
-------------------------------------------------------X

       AIRTECH INTERNATIONAL, INC. ("Plaintiff" or "Airtech"), by and through its

attorneys, Cho Law Group, LLC, Semaya Law Firm and S. Kim Law Group, LLC, upon

personal knowledge with respect to itself and its own actions and upon information and belief as

to all other matters, complaining of BYUNG CHAN YIM a/k/a ROY YIM ( "Yim"), HYO SUN

KIM (or "Kim"), ASSURED COMPONENTS LLC ("Assured"), SENSA TECHNETICS LLC

("Sensa"), GENUINE AVIATION LLC ("Genuine"), RFWAVE LAB INC. ("RFWave"), ARC-

TECH INC. ("Arc-Tech"), HANS AEROSPACE INC. ("Hans Inc."),  HANS AEROSPACE

                                                  **CONFIDENTIAL**

LLC ("Hans LLC"),  and BIZARRAVENTURA INC. ("Bizarra") (collectively

"Defendants"), brings this action seeking damages, injunctive relief, and seizure of

misappropriated trade secrets against Defendants for violations of the Federal Racketeer

Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961, *et seq*., ("RICO"); the Economic

Espionage Act of 1996, 18 U.S.C. § 1831 *et seq*., including § 1836 (the Defend Trade Secrets

Act of 2016 ("DTSA"); the Computer Fraud and Abuse Act, 18 U.S.C. §1030 ("CFAA"), and

the New Jersey Trade Secrets Act, N.J.S.A. 56:15-2, et seq. ("NJTSA") and for conversion,

breach of fiduciary duty, quantum meruit, unjust enrichment, constructive trust, fraud, tortious

interference with contract, accounting, breach of contract, and defamation and hereby alleges as

follows:

## <u>INTRODUCTION</u>

1.        In this action, Airtech seeks to recover damages and injunctive relief against and

recover its trade secrets from its former employee, Yim, and his co-Defendants for

misappropriation of trade secrets, fraud, conversion, a pattern of racketeering activities for

schemes they perpetrated against Airtech and other claims for violations of law and breaches of

duty. Airtech is a New Jersey company engaged in selling military defense and aerospace parts

and products. Yim is a former employee of Airtech who was a computer programmer, head of

information technology, and general manager there over his course of employment from

approximately June 2005 to September 30, 2021.

2.        Yim was hired in June 2005 as a computer programmer to develop software for

Airtech's computer system. Defendant Yim spent a lot of time with the owner and President of

Airtech, Mr. Jin Lee ("Mr. Lee"), to learn about Airtech's business, customers, vendors,

2

**CONFIDENTIAL**

products, business processes and other proprietary information so that this information could be included in Airtech's computer system.

3.      Yim developed custom software that ran on Airtech's computer system and was also responsible for maintaining the computer system and backing up the proprietary information contained in Airtech's computer system. He was promoted to the head of information technology ("IT"), then to general manager, and retained these responsibilities until he left Airtech.

4.      From June 2005 to September 30, 2021, Yim was responsible for maintaining and upgrading Airtech's computer system, backing up all the proprietary information of the company, setting up new computers and email accounts for new employees, and upgrading the computer hardware and software for Airtech's employees.

5.      After Yim resigned from Airtech and prior to his last day at work, Mr. Lee requested that Yim return all confidential and proprietary information of Airtech and avoid working in a similar business with Airtech's customers and vendors.

6.      During his employment with Airtech, Yim, among other things, embezzled and stole hundreds of thousands of dollars from Airtech by creating false expense reimbursement receipts. Yim's deceitful and illegal activity using false expense reimbursement receipts began in or about 2014 and continued until February 2020 as a result of which Yim and his co-defendants improperly obtained from Airtech a total sum discovered to date of $111,929.92

7.      When Yim was caught by Airtech in the aforesaid fraudulent and illegal conduct on February 3, 2020, he began another scheme to defraud Airtech by setting up a network of companies in multiple states to submit false and grossly inflated invoices to Airtech. Yim did so with the aid of his mistress (now wife), Kim. Kim was the nominal owner of all of

3

**CONFIDENTIAL**

the companies formed for Yim's and Kim's illegal activities. Kim conspired with Yim to submit fake invoices to Airtech for phony sales and fictitious invoices under the guises of the different entities that Kim and Yim created. Additionally, Yim and Kim submitted fake invoices under the guise of Airtech's broker for commissions that Airtech did not owe. Through various illegal acts hereinafter set forth, Defendants improperly obtained over $500,000 in ill-gotten gains.[1]

8.      Airtech recently discovered that Yim had been forwarding and storing emails he received to and sent from his Airtech email account, all of which were confidential to Airtech including attachments containing confidential, proprietary information to his personal Gmail accounts while he was employed by Airtech, since at least 2006.

9.      Airtech more recently discovered that Yim also had been forwarding and storing emails that were received by Mr. Lee and other Airtech employees' Airtech email accounts, which were confidential to Airtech including attachments containing confidential, proprietary information, to his personal Gmail accounts using a server-level forwarding command that automatically forwarded Airtech emails to Yim's Gmail accounts.

10.     Airtech cannot locate the backup copies of Airtech data, all containing confidential, proprietary Airtech information, that were routinely made by Yim in his capacity as head of IT at Airtech.

11.      While employed by and unbeknownst to Airtech, Yim was secretly and improperly using confidential, proprietary customer and vendor information to secretly and improperly conduct business with Airtech through the Defendant companies.

---

[1] Airtech has continued to discover more instances of wrongdoing by Yim during the course of this action, including of the forged invoice scheme. The amounts alleged herein will be updated for trial.

4

**CONFIDENTIAL**

12.     Airtech discovered after Yim's resignation on September 30, 2021, that he stole two computers with all of the data from Airtech's computer systems which contain Airtech's customer and vendor information including telephone numbers and email addresses, product information including technical specifications, data, price histories, schematics, contracts, testing methods and results, quality assurance information, marketing strategies, regulatory compliance information, invoices, banking information, transaction and price history and ways of doing business (hereinafter referred to as "Trade Secrets"), and that, using these Trade Secrets Yim began to secretly and improperly conduct business with Airtech's customers directly in competition with Airtech. Such illegal conduct continues to this day. Yim has continued to do so even in violation of the temporary restraining order the Court entered in this action.

13.     The business records and data that Yim stole from Airtech contain highly sensitive, information from export licenses granted by the U.S. Government, confidential and competitive Trade Secrets pertaining to Airtech's operation, clients, some of which was subject to governmental secrecy laws.[2]

14.     Without this Court's intervention, Airtech will be irreparably and permanently damaged in its reputation and its ability to carry out its business.

## JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction over this action pursuant to 18 U.S.C. §§ 1030, 1962, 1964, 1832, 1836, and 2314. Additionally, this Court has supplemental jurisdiction over Airtech's state law claims pursuant to 28 U.S.C. §1367.

---

[2] For example, certain of the information contained in Airtech's computer systems, as Yim well knew, was and is covered by non-disclosure agreements between Airtech and third parties which obligates Airtech to strictly protect the confidentiality of such information.

**CONFIDENTIAL**

16.      This Court has personal jurisdiction over Yim and Kim in several ways. It has general jurisdiction over them because they resided in this jurisdiction at the time of the filing of the original Complaint as well as their and their companies' continuous and systematic conduct in New Jersey and specific jurisdiction by virtue of their commission of tortious acts within New Jersey and this judicial district, the injuries their acts caused to Airtech, which at all relevant times was a New Jersey corporation and had and has its principal place of business in New Jersey and this judicial district, and through their transaction of business within the State of New Jersey and this judicial district.

17.      This Court has personal jurisdiction over Defendant Companies. It has general jurisdiction over the Defendant Companies that had principal places of business in New Jersey and this District at the time of the filing of the original Complaint which was all of them named as Defendants in that Complaint and in the Amended and Supplemental Complaint because the only owners, officers and employees of those companies were Yim and Kim both of whom resided in New Jersey and this District at those times and conducted all of the business of the Defendant Companies. There is also general jurisdiction over the nonresident Defendant Companies added in this complaint because there were and are continuous and systematic contacts between those companies and New Jersey. There is also specific jurisdiction over the added Defendant Companies (as well as the originally sued Defendant Companies) by virtue of their commission of tortious acts within New Jersey and this judicial district, the injuries their acts caused to Airtech, which at all relevant times was a New Jersey corporation and had and has its principal place of business in New Jersey and this judicial district, and through their transaction of business within the State of New Jersey and this judicial district.

**CONFIDENTIAL**

18.     Upon information and belief, Defendants Yim and Kim resided in this district until July, 2022, before moving to Las Vegas, Nevada where it appears they continue to reside.

19.     Venue is proper in this district pursuant to 28 U.S.C.§1391(b) because a substantial part of the events and omissions that gave rise to this action occurred within this district and all Defendants were residents of New Jersey when the original Complaint was filed.

**PARTIES**

20.     Plaintiff, AIRTECH INTERNATIONAL, INC. ("Airtech"), is a corporation organized and existing under the laws of the State of New Jersey with its principal place of business located at 2 Piermont Road, Cresskill, NJ 07626.

21.     Defendant BYUNG CHAN YIM A/K/A "ROY YIM" ("Yim") resided in the State of New Jersey, with his last known address located at 5 Kings Court, Fort Lee, NJ 07024, until he moved to Las Vegas, Nevada in July 2022.

22.     Defendant HYO SUN KIM ("Kim") resided with Yim, in the State of New Jersey, with her last known address located at 5 Kings Court, Fort Lee, NJ 07024, until she moved to Las Vegas, Nevada with him in July 2022 where it appears she continues to reside with him.

23.     Defendant ASSURED COMPONENTS LLC ("Assured") is a limited liability company formed and organized under the laws of the State of New Jersey with its places of business located at 18-20 Lackawanna Plaza, Suite 300, Montclair, NJ 07042 and 5 Kings Court, Fort Lee, NJ 07024.

24.     Defendant SENSA TECHNETICS LLC ("Sensa") is a limited liability company formed and organized under the laws of the State of Tennessee with its places of business located at 6000 Poplar Avenue, Suite 252, Memphis, TN 38119 and 5 Kings Court, Fort Lee, NJ 07024.

**CONFIDENTIAL**

As of February 8, 2022, the date of filing of the original complaint in this action, Sensa's

principal place of business was in New Jersey as it was operated by Defendants Yim and Kim

who then resided in New Jersey and committed and conspired in the acts alleged herein

providing a basis for specific jurisdiction as to each such act and transaction alleged. Sensa was

dissolved on August 11, 2021 and currently is in liquidation.

25.     Defendant GENUINE AVIATION LLC ("Genuine") is a limited liability

company formed and organized under the laws of the State of Florida with its places of business

located at 4651 Salisbury Road, Suite 400, Jacksonville, FL 32256 and 5 Kings Court, Fort Lee,

NJ 07024. As of February 8, 2022, the date of filing of the original complaint in this action,

Genuine's principal place of business was in New Jersey as it was operated by Defendants Yim

and Kim who then resided in New Jersey and committed and conspired in the acts alleged herein

providing a basis for specific jurisdiction as to each such act and transaction alleged.

26.     Defendant RFWAVE LAB INC. ("RFWave")is a corporation formed and

organized under the laws of the State of Florida with its places of business located at 110 Front

Street, Suite 300, Jupiter, FL 33477 and 5 Kings Court, Fort Lee, NJ 07024. As of February 8,

2022, the date of filing of the original complaint in this action, RFWave's principal place of

business was in New Jersey as it was operated by Defendants Yim and Kim who then resided in

New Jersey and committed and conspired in the acts alleged herein providing a basis for specific

jurisdiction as to each such act and transaction alleged.

27.     Defendant ARC-TECH INC. ("Arc-Tech") is a corporation formed and

organized under the laws of the State of Florida with its places of business located at 6303 Blue

Lagoon Drive, Miami, FL 33126 and 5 Kings Court, Fort Lee, NJ 07024. As of February 8,

2022, the date of filing of the original complaint in this action, Arc-Tech's principal place of

8

**CONFIDENTIAL**

business was in New Jersey as it was operated by Defendants Yim and Kim who then resided in New Jersey and committed and conspired in the acts alleged herein providing a basis for specific jurisdiction as to each such act and transaction alleged.

28.     Defendant HANS AEROSPACE INC. ("Hans Inc.") is a corporation formed and organized under the laws of the State of New Jersey with its places of business located at 2225 Lemoine Avenue, Fort Lee, NJ 07024 and 5 Kings Court, Fort Lee, NJ 07024. Upon information and belief, in July 2022, Hans Aerospace moved its registered address to 4310 Cameron Street, Suite 13, Las Vegas, NV 89103 and moved its principal place of business to Nevada.

29.     Upon information and belief, Defendant HANS AEROSPACE LLC ("Hans LLC") is a Nevada Domestic Limited Liability Company formed and organized under the laws of the State of Nevada with its place of business located at 4310 Cameron Street, Suite 13, Las Vegas, NV 89103. The registered agent for HANS AEROSPACE LLC is Byungchan Yim. Hans LLC is operated by Defendants Yim and Kim who committed and conspired in the acts alleged herein which caused harm to Airtech in New Jersey providing a basis for specific jurisdiction as to each such act and transaction alleged.

30.     Defendant BIZARRAVENTURA INC. ("Bizarra") is a corporation formed and organized under the laws of the State of Nevada with its place of business located at 2290 S. Jones Blvd., Suite 100B, Las Vegas, NV 89146. Bizarra is operated by Defendants Yim and Kim who committed and conspired in the acts alleged herein which caused harm to Airtech in New Jersey providing a basis for specific jurisdiction as to each such act and transaction alleged.

**CONFIDENTIAL**

## FACTS COMMON TO ALL CAUSES OF ACTION

31.     Airtech is engaged in the business of selling defense and aerospace materials, parts, systems, and other electrical/mechanical parts. It has been in business since 2002 and currently has approximately 13 employees. Airtech's main customers are companies based in the Republic of Korea (also referred to as "South Korea") that do business in its defense and other military sectors. Airtech also does business with vendors located throughout the U.S. Due to the sensitive nature of Airtech's business, confidentiality and protection of information is critical to it.

32.     The products that Airtech provides to its customers are generally shipped from the United States to South Korea, many of Airtech's vendors are located in states throughout the United States of America, and Airtech provides services and engages in transactions with its vendors and customers which are located in various states in the U.S. and Korea.

33.     Over the past 22 years, Mr. Lee often told his employees that the work that they do for Airtech and information regarding their customers, vendors, products, price histories, financial information, transaction history and way of doing business is confidential (Airtech Trade Secrets) and is the lifeblood of the company that should not be disclosed or shared with others outside the company.

34.     Yim knew this policy of confidentiality well since he was responsible for setting up company computers and email accounts for new employees and would give similar instructions to new employees and require them to select passwords to protect against unauthorized access to their office computers and email accounts.

**CONFIDENTIAL**

35.     Airtech's business consists of 1) purchasing general parts necessary for defense and aircraft; and 2) finding vendors to manufacture parts tailored to its customers' needs ("Proprietary Items"). Accordingly, Airtech's business is highly concentrated, particular, and specialized.

36.     Yim began his employment with Airtech in or about June 2005. He began as a computer system programmer. Over the years, he gained the trust of Airtech and its owner, Mr. Lee, and was promoted to the position of General Manager with full authority, among other things to execute orders to buy and sell products and inventory; issue and sign corporate checks; approve or deny compensation to employees, contractors, and salespersons; review, approve and pay employees' expense reimbursements; and view, enter and correct the ledgers in Airtech's books and records. Yim was in charge of all of Airtech's computer and network operating systems and was the officer in charge of the company when Mr. Lee was absent, until September 30, 2021, when he abruptly resigned from Airtech.

**I.     MISAPPROPRIATION OF AIRTECH'S TRADE SECRETS**

           A.     **Yim's Access to and Management of Airtech's Trade Secrets**

37.     Airtech's customer and vendor information, product information including technical specifications, data, price histories, schematics, contracts, testing methods and results, quality assurance, marketing strategies, regulatory compliance, invoices, banking information, transaction history and ways of doing business (referred to herein as "Trade Secrets) were so important to Airtech's business that the company spent more than five hundred thousand dollars ($ 500,000.00) designing, creating, implementing, maintaining and updating its computer system that is used to collect, store, process, integrate and utilize Airtech's Trade Secrets and other proprietary information necessary to the operation of its business.

11

**CONFIDENTIAL**

38.    As computer technology and software continued to evolve from what existed when Airtech's initial computer system was created in 2005, the Airtech computer system was regularly maintained, backed up and continually updated. The most important system data was backed-up and continually updated in both a cloud-based system and the company's onsite server.

39.    For every update and evolution of Airtech's computer system, Airtech's Trade Secrets and other proprietary information was ported into each upgraded system. The Trade Secrets and other proprietary information were made accessible to and was used by all of Airtech's computer systems, which enabled each upgrade to access and use all the confidential Trade Secrets about customers, vendors, product specifications, price lists, sales history and price history.

40.    In addition to investing in designing and implementing its own proprietary computer system in order to maintain the secrecy of its Trade Secrets and other proprietary information, Airtech had a robust policy of password protection of each employee's work computer, and restricting and monitoring access to the Airtech premises and company email accounts.

41.    Mr. Lee told existing and new employees that the Trade Secrets and other proprietary information was the lifeblood of the company and instructed them not to share or discuss this information or Airtech's way of doing business with anyone outside the company.

42.    Mr. Lee also instructed Airtech employees to  describe their work only as an "import/export business" without any further details.

**CONFIDENTIAL**

43.    Airtech also maintained a company policy that its employees could only conduct business using their Airtech email accounts on the Airtech system whether accessed on site or remotely.

44.    Yim was the head of information technology ("IT") at Airtech and solely responsible for designing, implementing, maintaining, and upgrading Airtech's computer system. He was granted unlimited access to Airtech's Trade Secrets and other proprietary information and its computer systems as the head of IT.

45.    From the time of his hiring in 2005 and throughout his tenure at Airtech Yim was responsible for everything related to the company's computer network including but not limited to purchasing and upgrading the computer system when new software or hardware was necessary; onboarding new employees by setting up their computers, maintaining email accounts and passwords; conducting regular back-ups of Airtech's Trade Secrets and other proprietary information; maintaining a list of all the passwords for all of the Airtech employees; and network security against cyber intrusions and ransomware attacks.

46.    Upon information and belief, Yim made regular back-ups of the source code Trade Secrets and other proprietary information stored in and regarding Airtech's early computer system onto physical back up devices such as hard drives, removeable hard drives, tape back-ups, USB drives and the like.

47.    When computer and internet-based technology sufficiently advanced and improved and computer storage went from physical hard disks to the cloud, Yim backed up Airtech's Trade Secrets and other proprietary information into accounts in secure cloud-based platforms.

13

**CONFIDENTIAL**

48.     Yim maintained company back-ups of Airtech's Trade Secrets and other proprietary information on cloud-based storage services including Just Cloud, Amazon Cloud and Gmail's Google Drive (at least three accounts); and billed the monthly fees for excess storage capacity to Airtech's corporate credit card accounts or submitted invoices for reimbursement from Airtech for payments he made from his personal accounts.

49.     Upon information and belief, Yim maintains an account at Anaconda Cloud, another cloud-based data storage service and stored Airtech's Trade Secrets and other proprietary information on this platform.

50.     Upon information and belief, Yim maintains an account on Github, a computer developer platform for storing and sharing computer code, where he stored the source code for Airtech's computer system and other Airtech Trade Secrets and other proprietary information.

B.  **The Value of Airtech's Trade Secrets**

51.     When Yim joined Airtech as a computer programmer in 2005, he had no experience in the military defense and aerospace parts and systems industries. Yim learned everything about the industry as well as Airtech's business model, customers, vendors, products, methods of testing, quality assurance, marketing strategies, pricing and regulatory compliance from his time working at Airtech.

52.     During the period between 2005 to 2021, Airtech experienced an elevenfold growth in its sales. The growth was fueled by its use of its Trade Secrets and other proprietary information contained in its custom computer system.

53.     Airtech's Trade Secrets and other proprietary information are not known to the public because Airtech maintained and strictly enforced confidential treatment of them.

14

**CONFIDENTIAL**

54.     The misappropriation of Airtech's Trade Secrets and other proprietary information has seriously injured Airtech and is a direct and immediate threat to Airtech's business and its viability.

### C.     Defendants' Misappropriation of Airtech's Trade Secrets

55.     Even before Yim left Airtech, he was using Airtech's Trade Secrets and other proprietary information to run a series of sham companies (the "Sham Companies") to steal business away from Airtech and to charge inflated prices for products at the expense of Airtech.

56.     After Yim left Airtech, he used Airtech's Trade Secrets and other proprietary information to contact Airtech's customers and vendors in an attempt to lure these customers and vendors away from Airtech and to purchase the same products from or to sell the same products to his new company, Hans Inc.

57.     Yim was successful in using Airtech's Trade Secrets and other proprietary information to convince at least two of Airtech's customers to cease doing business with Airtech and instead deal directly with the Defendant Companies to purchase the same products that Airtech previously sold to those customers. Those two Customer companies and/or confederates of Yim employed by those companies, upon information and belief, were willing members of Defendants' scheme to steal business from Airtech and divert it to Defendants.

58.     Yim systematically forwarded confidential emails and attachments containing Airtech's Trade Secrets to his three (3) personal Gmail accounts maintained with Google.

59.     Yim also used his advanced computer skills to program Airtech's computer system and email servers to automatically forward confidential emails and attachments from Airtech containing Airtech Trade Secrets to his personal email accounts and to continue to do so even after he left Airtech.

**CONFIDENTIAL**

## II.  DEFENDANTS' SCHEME TO DEFRAUD

### A. Fake Expense Reimbursement Vouchers

60.     During his employment, Yim was given the authority to issue and sign checks on Airtech's bank account. He also had the authority to approve and pay employee expense reimbursement forms.[3]

61.     On or about February 3, 2020, Airtech discovered that some of the expense reimbursement forms submitted by Yim were inflated, containing fake receipts as follows:

| Check Date | Amount Yim Actually Paid | Amount Yim Claimed in Reimbursement | Items Actually Purchased |
|---|---|---|---|
| 1/14/20 | $663 | $13,175 | Integrated circuits from Funklind |
| 1/21/20 | $4,535 | $11,500 | EPM3128ATI100 from Analogic Ltd |
| 1/27/20 | $2,250 | $19,375 | OSC1758-400B from Regalo |
| Total | $7,448 | $44,050 | |

62.     When Mr. Lee confronted Yim with the above transactions, Yim admitted that he took the money wrongly and that he would reimburse Airtech for it. Thereafter, on February 4, 2020, Yim issued a check in the amount of $12,100 to Airtech which was a partial payment for the wrongful taking.

---

[3]From time to time, the employees of Airtech were reimbursed after purchasing inventory and other equipment necessary for Airtech's business.

16

**CONFIDENTIAL**

63.     At that time, Yim had worked for almost 15 years for Airtech, gaining

substantial knowledge and experience in conducting Airtech's business. As such, Yim was

considered an indispensable employee of Airtech, so Mr. Lee did not terminate him, but, rather,

stripped him of his check-signing authority.

64.     Thereafter, Yim continued to be employed by Airtech until his sudden and

unexpected resignation on September 30, 2021.

65.     Following Yim's resignation, Airtech accidentally learned of Yim's wrongdoing

and discovered that there was a history and pattern of Yim's submission of reimbursement

vouchers with fake receipts dating from 2014 to 2020.

66.     The false and misleading vouchers discovered so far are set forth below:

| Check Date | Amount Yim Actually Paid | Amount Yim Claimed for Reimbursement | Items purchased |
|---|---|---|---|
| 6/10/14 | $360 | $3,050 | Item OPA512SM |
| 9/19/14 | $540 | $5,025 | Item OPA512SM |
| 6/24/15 | $720 | $5,200 | Item OPA512SM |
| 10/15/15 | $1,226 | $5,313 | Item SP8830A |
| 10/20/15 | $692.78 | $2,309 | Item 622-4039-006 |
| 5/2/16 | $714 | $8,400 | Item OP07AJ/883B |
| 9/9/16 | $720 | $5,200 | Item OPA512SM |
| 1/25/17 | $5,142.96 | $8,910 | Item 4798 |
| 4/13/17 | $720.00 | $5,706.40 | Item OPA512SM |
| 9/24/18 | $1,985 | $14,040 | Part EP1K100QI208-2 from Regalo |
| 5/28/19 | $500 | $11,250 | Integrated circuits from GTZ |
| 9/10/19 | $500 | $14,745 | Integrated circuits from GTZ |
| 1/14/20 | $663 | $13,175 | Integrated circuits from Funklind |
| 1/27/20 | $2,250 | $19,375 | Part OSC1758-400B from Regalo |
| 1/21/20 | $4,535 | $11,500 | EPM3128ATI100-10 from Analogic |

----------------------------------------------------------------------------------------------------

| Total | $21,268.74 | $133,198.40 | The difference $111,929.66 |

17

**CONFIDENTIAL**

67.     In each such instance, Yim created fake receipts and invoices and submitted them to Airtech. He then utilized his authority to approve these fake receipts and invoices and Airtech paid each and every one of the false reimbursement vouchers that he submitted. Indeed, most of the checks were signed by Yim, himself, when Mr. Lee was away from the company.

**B.  Formation of Sham Companies to Deal with Airtech and Adversary Companies to Compete with Airtech**

68.     On or about February 5, 2020, two days after his fake reimbursement scheme was discovered, while he still was working at Airtech, Yim created Assured which was formed with a single member, Kim, and controlled by both Yim and Kim.

69.     Upon information and belief, Yim created the fictious name or alias for himself of "Jasmine Legrant," a non-existent employee of Assured, so that Yim could hide his true identity and conduct business as Jasmine Legrant from Assured Components LLC.

70.     On or about October 15, 2020, while still working at Airtech, Yim created the first Defendant Sham Company, Sensa which was formed with a single member, Kim, and was controlled by both Yim and Kim.

71.     On or about December 14, 2020, while still working at Airtech, Yim created the second Defendant Sham Company, Genuine, which was formed with a single member, Kim, and was controlled by both Yim and Kim.

72.     On or about April 21, 2021, while still working at Airtech, Yim created the third Defendant Sham Company, RFWave, which was formed with a single member, Kim, and was controlled by both Yim and Kim.

**CONFIDENTIAL**

73.     On or about May 3, 2021, while still working at Airtech, Yim created the fourth Defendant Sham Company, Arc-Tech, which was formed with a single shareholder, Kim, and was controlled by both Yim and Kim.

74.     On or about September 27, 2021, three days before his last day at Airtech, Yim created Hans Inc., which is owned by Yim and controlled by both Yim and Kim.

75.     During his employment with Airtech, Yim began using Sensa, Genuine, RFWave, and Arc-Tech (the "Sham Companies") to transact business with Airtech and use Assured and Hans Inc. (the "Adversary Companies") to divert business away from Airtech. All or substantially all of the Sham Companies and the Adversary Companies maintained virtual or front offices for his and their business, and Yim applied for and received grants from the Small Business Emergency Assistance Grant Program for Assured.

76.     Yim used the Sham Companies to sell products to Airtech at grossly inflated prices. He arranged for the Sham Companies to be presented as legitimate and unaffiliated vendors to Airtech. Whenever there was a need to purchase a part, Yim directed Airtech employees to purchase the parts from the Sham Companies.

77.     Thereafter, Yim created fake and fraudulent invoices from these Sham Companies and sent these invoices through email to Airtech. Upon receipt of the fraudulent invoices, Airtech paid them by wiring the payments to the bank accounts for the Sham Companies.

### 1.    Sensa Technetics, LLC

78.     Following its creation in October 2020 the mailing address for Sensa was 100 Park Avenue, Apt. 703, Fort Lee, NJ, Kim's previous residential address, whereas Sensa's purported head office address was listed as 6000 Poplar Avenue, Suite 250, Memphis, TN

19

**CONFIDENTIAL**

38119. Research regarding the Memphis address for Sensa shows that it is a virtual office in Memphis leased and operated by Regus.

79.     Upon information and belief, Yim created the fictious name or alias for himself of "Chloe Hans," as a purported employee of Sensa, so that he could hide his true identity and conduct business as Chloe Hans from Sensa Technetics, LLC.

80.     On or about October 27, 2020, Airtech needed to purchase I.C. processors for WIMAX. Yim directed an employee of Airtech to place the order for the processors to Sensa. Thereafter, Yim and Kim caused a pro forma invoice #10292020A to be sent via email to Airtech for the purchase in the amount of $1,450. The invoice included Sensa's bank account information.

81.     On or about October 30, 2020, Airtech wired to Sensa the amount of $1,450 representing the purchase price on the invoice.

82.     Subsequently, it was discovered that the actual cost of the processors was $79.60.

83.     The processors were delivered to Airtech through UPS via interstate commerce.

84.     On or about December 7, 2020, Yim directed an employee of Airtech to place another purchase order for IC processors to Sensa.

85.     On or about December 8, 2020, Yim and Kim caused a *pro forma* invoice #12082020A to be sent via email to Airtech for the purchase in the amount of $65,322.

86.     On or about December 9, 2020, Airtech wired to Sensa the amount of $65,322 representing the purchase price on the invoice.

87.     Subsequently, it was discovered that the actual cost of the processors in this second transaction was $4,561.08.

20

**CONFIDENTIAL**

88.     The processors were delivered to Airtech via UPS through interstate commerce.

## 2.     Genuine Aviation, LLC

89.     On December 14, 2020, Kim created the Sham Company Genuine. The purported address for Genuine was 4651 Salisbury Road, Suite 400, Jacksonville, Florida 32256. Research regarding the address for Genuine shows that it is also a virtual office leased and operated by Regus.

90.     Upon information and belief, Yim created the fictious name or alias for himself of "Nicole Amber," a non-existent employee of Genuine, so that he could hide his true identity and conduct business as Nicole Amber from Genuine Aviation LLC.

91.     On or about January 8, 2021, Airtech needed to purchase a relay part. Yim directed an employee in Airtech to place the order for the relay part to Genuine. Thereafter, Yim and Kim caused a pro forma invoice #29446 to be sent via email to Airtech for the purchase in the amount of $73,184. The invoice included Genuine's bank account information.

92.     On or about January 8, 2021, Airtech wired to Genuine the amount of $36,592 representing half of the purchase price on the invoice. Then on January 13, 2021, Airtech wired via Fedwire to Genuine the balance of the invoice in the amount of $36,592.

93.     Subsequently, it was discovered that the actual cost of the relays was $20,208.32.

94.     On or about January 13, 2021, the relays were delivered to Airtech via UPS through interstate commerce.

95.     On or about March 5, 2021, Airtech needed to purchase more relay parts. Yim directed an employee in Airtech to place the order for the relay part to Genuine. Thereafter, Yim

**CONFIDENTIAL**

and Kim caused a pro forma invoice #29512 to be sent via email to Airtech for the purchase in the amount of $70,897.

96.    On or about March 5, 2021, Airtech wired to Genuine the amount of $35,448.50 representing half of the purchase price on the invoice. Then on March 9, 2021, Airtech wired to Genuine the balance of the invoice in the amount of $35,448.50.

97.    Subsequently, it was discovered that the actual cost of the relays was $19,576.81.

98.    On or about March 9, 2021, the relays were delivered to Airtech via UPS through interstate commerce.

### 3.    RFWave Lab Inc.

99.    On April 21, 2021, Kim created the Defendant Sham Company, RFWave. The purported business address for RFWave is 110 Front Street, Suite 300, Jupiter, Florida 33477. Research regarding the address for RFWave revealed that it is also a virtual office leased and operated by Regus. The address for the sole officer of RFWave is registered as 5 Kings Court, Fort Lee, NJ 07024, the former home address for Yim and Kim.

100.    Upon information and belief, Yim created the fictious name or alias for himself of "Alex Macas" a non-existent employee of RFWave, so that he could hide his true identity and conduct business as Alex Macas from RFWave Lab LLC.

101.    On or about May 6, 2021, Airtech needed to purchase an attenuator part. Yim directed an employee in Airtech to place the order for the part to RFWave. Thereafter, Yim and Kim caused a pro forma invoice #IN002775 to be sent via email to Airtech for the purchase in the amount of $27,375. The invoice contained RFWave's account information.

22

**CONFIDENTIAL**

102.    On or about May 7, 2021, Airtech wired to RFWave the amount of $27,375 representing the purchase price on the invoice.

103.    Subsequently, it was discovered that the actual cost of the attenuators was $10,105.43.

104.    On or about May 11, 2021, the attenuators were delivered to Airtech via UPS through interstate commerce.

### 4.    Arc-Tech Inc.

105.    On May 3, 2021, Kim and Yim created Defendant Sham Company Arc-Tech. The purported business address for Arc-Tech is 6303 Blue Lagoon Drive, Suite 400, Miami, FL 33126. Research regarding the address for Arc-Tech revealed that it is also a virtual office leased and operated by Regus.

106.    Upon information and belief, Yim created the fictious name or alias for himself of "Jasmine Legrant," a non-existent employee of Arc-Tech (the same name he used in connection with Assured as alleged above), so that he could hide his true identity and conduct business as Jasmine Legrant from Arc-Tech, Inc.

107.    On or about August 9, 2021, Airtech needed to purchase flash lamps. Yim created a purchase order from Airtech to purchase the lamps in the amount of $67,500 which was duly sent to Arc-Tech.

108.    On or about November 30, 2021, Airtech wired via Fedwire to Arc-Tech an amount of $67,500 representing the purchase price on the flash lamps.

109.    Subsequently, it was discovered that the actual cost of the lamps was $32,500.

110.    On or about December 6, 2021, the lamps were delivered to Airtech via UPS through interstate commerce.

23

**CONFIDENTIAL**

111.     On or about August 23, 2021, Airtech needed to purchase more flash lamps.

Yim created a purchase order from Airtech to purchase the lamps in the amount of $1,150 which

was duly sent to Arc-Tech.

112.     On or about October 8, 2021, Airtech wired to Arc-Tech the amount of $1,150

representing the purchase of the lamps.

113.     Subsequently, it was discovered that the actual cost of the lamps was $260.

114.     On or about September 8, 2021, the lamps were delivered to Airtech via UPS

through interstate commerce.

115.     The summary of the transactions from Defendants' fraud are as follows:

| PO Date | Sham Company | Charge<br>Paid by Airtech | What should<br>have been paid |
|---------|--------------|---------------------------|-------------------------------|
| 10/27/20 | Sensa Technetics LLC | $1,450 | $79.60 |
| 12/7/20 | Sensa Technetics LLC | $65,322 | $4,561.08 |
| 1/8/21 | Genuine Aviation LLC | $73,184 | $20,208.32 |
| 3/5/21 | Genuine Aviation LLC | $70,897 | $19,576.81 |
| 5/6/21 | RFWave Lab Inc | $27,375 | $10,105.43 |
| 8/9/21 | ARC-Tech Inc | $67,500 | $32,500.00 |
| 8/23/21 | ARC-Tech Inc | $1,150 | $260.00 |
| Total: | | $306,878 | $87,291.24 |

116.     Every transaction described above was made through Defendants' concerted

effort to intentionally defraud Airtech.

117.     The discrepancy between what should have been paid by Airtech for the subject

equipment and the amount of the invoices billed and paid to the Sham Companies is

$219,586.76.

118.     The scheme perpetrated by Yim and Kim through their Sham Companies was

extensively planned, and it was orchestrated over a substantial period of time, spanning over a

year, with various false and fraudulent documents used to steal from Airtech.

**CONFIDENTIAL**

119.    After the transactions were executed and paid for by Airtech, Yim went further in his scheme by accessing account ledgers in Airtech's computer systems to change the names of the vendors. He changed the names of the Sham Companies to the names of legitimate vendors that Airtech frequently dealt with in the ordinary course of business. Yim did this to conceal the names of Sham Companies involved, making the discovery of such transactions extremely difficult. Yim changed the names as follows with the intent to further conceal his fraud:

| Date | Orig. Name | Changed Name | Amount |
|------|-----------|--------------|--------|
| 10/15/2020 | Sensa Technetics | Arrow Electric | $66,772 |
| 12/14/2020 | Genuine Aviation LLC | Arrow Electric | $144,081 |
| 1/08/2021 | Genuine Aviation LLC | TTI, Inc. | $73,184 |

### C.    Forged Commission Vouchers

120.    On or about October 8, 2019, Yim created a phony invoice in the amount of $11,250 from a broker company, EAU Group, for a consulting commission. He mailed the invoice to Airtech's accounting department and instead of directing the funds to EAU Group, Yim instructed that the funds should be wired to Kim. On October 8, 2019, Airtech wired the funds to Kim as was instructed.

121.    On or about September 30, 2020, Yim created another phony invoice in the amount of $40,000 from EAU Group for a consulting commission. He mailed the invoice to Airtech's accounting department, and as before, instead of directing the funds to EAU Group, Yim instructed the funds to be wired to Kim. On October 9, 2020, Airtech wired the funds to Kim as was instructed.

25

**CONFIDENTIAL**

122.    In February and October of 2018, Yim, on behalf of Airtech, received a refund of a broker commission in the amounts of $5,625 and $5,625, respectively, totaling $11,250 from EAU Group. To date, Yim has not remitted the said commission to Airtech.

###    D.    Amazon Account

123.    Similar to the fraudulent schemes set forth above, Yim created yet another method to defraud Airtech by creating a seller identity account on amazon.com under the name "Magic Audio Pro Net" to transact business with Airtech.

124.    Yim created the Magic Audio Pro Net account on Amazon to engage in fraudulent transactions with Airtech.

125.    On January 14, 2021, while still working at Airtech, Yim began using his seller identity account, Magic Audio Pro Net, on Amazon to sell HDLEXT-DVI to Airtech for $4,030.47. Yim then delivered the goods via interstate commerce to Airtech on January 19, 2021.

126.    Again, on March 4, 2021, Yim used his Magic Audio Pro Net seller identity account on Amazon to sell HDLEXT-DVI to Airtech and charged $7,135.38. Yim then delivered the goods via interstate commerce to Airtech on March 12, 2021.

127.    Upon investigation, Airtech discovered that those parts that it paid $11,165.85 for had a market price of only $5,520, resulting in the misappropriation from Airtech and unjust enrichment by Yim in the amount of $5,645.85.

128.    Airtech's investigation of fraud and theft relating to self-dealing and inflated invoices has uncovered a systematic and clandestine operation to steal from Airtech.

**CONFIDENTIAL**

## E.        Theft of Computers and Data

129.      On or about October 21, 2021, while reviewing its surveillance camera videos, Airtech discovered that on June 25, 2021 and September 17, 2021, Yim stole two computers from Airtech prior to his termination of employment with Airtech.[4] These computers contained highly sensitive and confidential Trade Secret information about Airtech's clients.

130.      On or about October 21, 2021, Airtech confronted Yim about the theft, and he agreed to return the stolen computers. On or about December 9, 2021, Airtech received the stolen computers from Yim and inspected them. Upon doing so it learned that Yim had removed at least one of the hard drives from the computer, which contained most of the valuable data, including Trade Secrets, that Airtech was seeking to protect from theft or misappropriation.

131.      It was Airtech's normal practice to order desktop computers with two hard drives, set up so that one hard drive contained the operating system and the second hard drive contained the data.

132.      After the return of the stolen computers, Airtech retained an expert to review the computer system artifacts, active and deleted files, internet history, file and folder access and other data sources of evidence of alteration of data on Yim's work computer. The expert concluded that the computer operating system on Yim's work computer had been reimaged on October 24, 2021, meaning, upon information and belief, he had copied all the data from his work computer and reinstalled the operating system to cover his tracks before returning the computer. Additionally, the expert concluded that since the Windows operating system was reinstalled on Yim's work computer on October 23, 2021 at roughly 10 PM UTC when it was in

---

[4] One computer was from Yim's desk and the other computer was from Mr. Lee's workstation.

CONFIDENTIAL

Yim's possession, any data showing the use of the computer before Yim's departure of Airtech was wiped.

133.    Upon information and belief, Yim also copied all the information contained in Mr. Lee's workstation computer.

134.  The stolen data contained the following Trade Secrets:

| Category | Information |
|---|---|
| Customer | Customer Name, Tel#, Address, Purchaser Name/Number/e-mail/Cell phone # |
| Vendor | Vendor Name, Tel#, Address, Buyer & Accounting Name/Number/e-mail/Cell phone # |
| Inquiry History | Customer inquiry history, customer parts requirements, End-user information, Program name/period/quantity |
| RFQ* History | Quotation history from 2014-2021 covering 5,698 vendors within the US, 131,434 quotes received, 630,309 items submitted to Request For Quote ("RFQ")<br>RFQ History and different quote prices for 78,789 items annually<br>• There are multiple pricing and sources for a given item where Airtech can verify which vendors to contact for the most competitive pricing. |
| Offer History | Offer history from 2014-2021 covering 34,037 offers for 564,128 items (Approximately 70,516 offers per year)<br>• All offers given to all Airtech customers for all items traded by Airtech for the past 8 years. Critical information for Airtech's business. |
| Purchase Order History | Purchase order history from 2014 to 2021 from the 2,096 vendors located mainly in the US covering 32,957 purchase orders for 83,848 items.<br>• The history of all prices that Airtech  paid to each vendor. |
| Export license | Information pertaining to the required export licensing applications to the United States government, the various government bureaus to submit the applications, different programs, and distinct information for regulated parts. |
| Accounting | Financial statements, payment history, commission history, inventories, and accounting records. |

135.    The stolen computers contained critical and sensitive Trade Secret information which Yim is currently using to undercut Airtech pricing and to illegally compete with Airtech.

28

**CONFIDENTIAL**

136.     Despite Airtech's continued demand to Yim for him to return the hard-drive and the Airtech Trade Secrets and other proprietary information stored thereon, Yim has refused to return the hard drive and is using the data to directly compete against Airtech.

137.     Yim has been caught "red handed" with Airtech Trade Secrets which include thousands of Airtech company emails with the names, email addresses, telephone numbers and contact information for Airtech's customers and vendors; confidential attachments; schematic diagrams, pictures of products, commercial invoices, Airtech invoices, vendor corrective action requests, inspection reports, certificates of conformance, purchase orders, acceptance test reports, certificate of remittances from South Korean banks; and the ID's personal identifying information and passwords for Airtech's employees and accounts.

138.     Defendant Yim's unauthorized and continued possession of Airtech's Trade Secrets was confirmed during the production of these materials from Yim's three (3) Gmail accounts and through discovery in the present case, and it appear as if there are two (2) additional Gmail accounts for a total of five (5).

**F.  Formation of Companies to Compete with Airtech Using Stolen Trade Secret Information and Collaboration with Certain Airtech Customers and their Officers and Employees with Defendants' Scheme**

139.     In yet another part of his scheme to defraud Airtech, Yim created companies that competed directly with Airtech for business from its existing customers, which were its customers when Yim was employed by Airtech, using the Trade Secret information Yim stole.

140.     Certain of the Airtech customers and their officers and employees, as a result of the defamatory statements about Airtech made to them by Yim, or for other reasons not yet discovered, knowing that Yim was using Airtech Trade Secrets and beginning while he was

29

**CONFIDENTIAL**

employed by Airtech participated in the Defendants' scheme and collaborated with Defendants by doing business with Yim through the Defendant Adversary Companies rather than Airtech.

### 1. Assured Components LLC

141. On February 5, 2020, two days after Yim was caught embezzling through the reimbursement voucher scheme and stripped of his check-signing authority, he created defendant Assured, as hereinabove described.

142. Kim, Yim's former mistress and now his wife, was and is the registered and authorized representative of Assured. The registered office address of Assured is 18-20 Lackawanna Plaza, Suite 300, Montclair, NJ 07042. Research concerning the registered address for Assured revealed that it is a virtual office leased and operated by Alliance Virtual Offices.

143. Yim was a signatory to the bank account maintained by Assured at JP Morgan Chase Bank. Assured was controlled, managed and operated by Yim.

144. On May 24, 2021, Assured received a grant of $10,000 from the United States Small Business Emergency Assistance Grant Program.

145. On or about February 6, 2020, Yim, on behalf of Assured, telephoned one of Airtech's customers, Unione Tech ("Unione"), a purchasing agent for SE-A Electronics ("SE-A"), and began soliciting business from Unione. Yoon Jung Ahn, the President of Unione, with knowledge that Yim was acting against the interests of his employer, Airtech, and using its Trade Secrets to steal business from it, cooperated with Yim in this scheme. In perpetrating the scheme, Yim, with the help of Yoon Jung Ahn, took the business of Unione as its customer away from Airtech to the detriment of Airtech. When one of Airtech's staff later raised with Yim the resulting loss of sales to Unione and asked Yim whether Airtech's owner should be informed,

30

**CONFIDENTIAL**

Yim instructed her not to inform Airtech's owner on this subject, which instructions she

followed since Yim was her boss.

146.    Unione began placing purchase orders through Assured from February 2020

until September 30, 2021, when Yim terminated his employment with Airtech. The business

stolen by Yim from Airtech is measured, in part, by the funds received from SE-A by Assured

Components while Yim was still employed by Airtech as follows:

| | |
|---|---|
| 11/30/2020 | $72,136.4 |
| 12/29/2020 | $69,877.52 |
| 1/28/2021 | $4,461.51 |
| 3/2/2021 | $71,291.64 |
| 3/31/2021 | $36,140.96 |
| 4/30/2021 | $79,132.52 |
| 6/1/2021 | $82,604.7 |
| 6/30/2021 | $95,148.38 |
| 7/30/2022 | $226,770.47 |
| 8/31/2021 | $128,243.52 |
| 9/30/2021 | $106,107.19 |
| Total | $971,914.81 |

The accumulated diverted orders to Assured from Unione (SE-A Electronics) were worth

approximately $970,000 during the time that Yim was employed with Airtech.

147.    In a Purchase Order dated June 23, 2023, at which time Yim was still employed

by Airtech and so known to all of its customers, Airtech customer Unione, in a Purchase Order

signed by its President, Yoon Jung Ahn, and showing its address in South Korea, ordered

$199,999.00 of products from Assured, with the P.O. showing the contact for Assured was

"Jasmine Legrand," shown above to have been an alias used by Yim.

31

**CONFIDENTIAL**

## 2.    Hans Aerospace Inc.

148.    Incredibly, three days before his departure from Airtech, on September 27, 2021, Yim formed Hans Inc., yet another company, which he established to defraud Airtech. Yim is the reported officer/director of the corporation with its registered address located at Yim's former home address at 5 Kings Court, Fort Lee, NJ 07024.

149.    Hans Inc. currently is engaged in the same business as Airtech. Yim has been soliciting business on behalf of Hans Inc. from Airtech's customers and reaching out to the customers of Airtech, substantially utilizing the data which he improperly obtained from Airtech's computer systems and related Trade Secrets.

150.    In November 2021, one of Airtech's vendors mistakenly sent an invoice to Airtech for an order placed by Yim. Airtech became suspicious and began to contact their customers. To Airtech's disbelief, Yim had contacted ALL of Airtech's customers and solicited their business.

151.    In or about August 2021, while still employed by Airtech, Yim learned that a customer was going to place an order of parts that were Proprietary Items to Airtech. Then in or about September 2021 while still employed at Airtech, Yim contacted the vendor who makes the Proprietary Items for Airtech's customer and sent a purchase order dated September 30, 2021 for seven (7) Proprietary Items in the amount of $321,160.00.

152.    On December 9, 2021, using Airtech's Trade Secrets, Yim ordered 14 Proprietary Items from Airtech's customer totaling $651,980.00.

153.    Thereafter, Yim spoke with all of Airtech's customers in Korea and other persons by telephone from New Jersey and via email, and Yim falsely stated that Airtech failed to pay his last salary payment and that he had sued Airtech for its alleged wrongdoing. These defamatory

32

CONFIDENTIAL

statements were made to Airtech's customers in an attempt to steal these customers and their business away from Airtech.

154.    Furthermore, Yim used Airtech's Trade Secret information, including the Trade Secret information contained in Airtech's computers, which he misused and stole, to contact substantially all of Airtech's customers and its important vendors that manufactured and sold parts to Airtech, including proprietary custom parts ("Proprietary Items"), and began placing orders. Yim used the Trade Secret information to undercut Airtech's pricing and placed orders for Proprietary Items and other products that were protected by Airtech's exclusive or technical agreements and letter commitments from vendors and manufacturers or where Airtech served as the sole source for the products based on its successful efforts to identify, develop and market those products over many years.

155.    When communicating with Airtech's customers, both during his employment with Airtech and thereafter, Yim made false statements to the customers for the purpose of alienating them from Airtech and taking their business for himself. These statements included, but were not limited to claims that Airtech had failed to pay his salary due to financial failure and was going out of business. He also falsely stated that he had filed a lawsuit against Airtech to recover his unpaid compensation. Airtech was and continues to be severely damaged by those defamatory statements.

156.    After leaving Airtech, Yim aggressively and maliciously sought to solicit and/or alienate Airtech's customers, vendors, manufacturers and suppliers using Airtech's Trade Secret sensitive, confidential and proprietary information he either learned while at Airtech, stole before he left, or received via automatic email forwarding instructions he left in Airtech's computer

**CONFIDENTIAL**

network, doing so even after this Court issued a Temporary Restraining Order prohibiting him from committing such acts.

157.    Yim willfully induced Airtech's customers, vendors, manufacturers and suppliers to violate the terms of exclusivity agreements and letter commitments which agreements prevented them from engaging in transactions prejudicial to Airtech and of which agreements Yim was well aware.

158.    Yim's tactics included making defamatory statements about Airtech's financial health, management competence and potential legal liability which were designed to cause Airtech's customers to lose confidence in it. In some cases, he succeeded in taking over the accounts for himself, in others he simply damaged Airtech's business reputation and made it more difficult or impossible for Airtech to secure future orders.

159.    Airtech lost substantial sales which resulted in its achieving lower profits in connection with its business with its customers SE-A Electronics, Intellics, Seoul Standard, and Segi (Century), among other customers.

160.    In the case of SE-A, Airtech lost profits from $2,074,679 worth of sales during the years 2020 to 2021 when its profit margin for the applicable products was approximately 15%. Airtech lost sales from Intellics during the period of 2021 to 2022 in the amount of $356,430. Such actions included, but were not limited to, the following:

a.    Among the transactions Yim executed after leaving Airtech, including but not limited to transactions occurring after the Court issued a Temporary Restraining Order against such conduct on March 15, 2022, transactions which he could not have executed without using sensitive, confidential and proprietary Trade Secret information were the following: First, on March 29, 2022, Yim sent an offer for

34

**CONFIDENTIAL**

item H202203009 to Airtech customer Intellics. Second, on April 2, 2022, Yim

sent a quotation to Airtech customer Hanwha for products that were previously

handled by Airtech from a restricted vendor. Third, Yim continued to transact

business with Qnion Co. Ltd. to sell parts that are proprietary to Airtech

(Proprietary Items). Fourth, Yim caused his company, Hans Aerospace Inc., to

engage in the following transactions with Airtech customer Seoul Standard:

| Hans Aerospace Inc. Transactions with Seoul Standard | | | | | | |
|---|---|---|---|---|---|---|
| Invoice Date | Part No | Desc. | Q'ty | U M | U/Price | Amount |
| 3/25/2022 | DCS 5R5 224 | CAPACITOR | 300 | EA | $2.17 | $651.00 |
| | HCM49S 14.318MHZ | OSCILLATOR | 1,000 | EA | $2.35 | $2,350.00 |
| | A8498SLJTR-T | IC | 200 | EA | $24.84 | $4,968.00 |
| | SN74AUP1T34DCKR | IC | 300 | EA | $18.98 | $5,694.00 |
| | W9825G6KH-5I | IC | 32 | EA | $25.00 | $800.00 |
| | OSD055A3949-81TS | DISPLAY | 3 | EA | $205.00 | $615.00 |
| | | | | | | |
| 3/31/2022 | NI2020ED29 | LITHIUM BATTERY | 6 | EA | $295.66 | $1,773.96 |
| | NI3020QE30 | LITHIUM BATTERY | 4 | EA | $299.22 | $1,196.88 |
| | | | | | | |
| 4/4/2022 | DO3316P-473MLB | INDUSTOR | 195 | EA | $1.20 | $234.00 |
| | CY7C1380KV33-167AXI | IC | 90 | EA | $54.79 | $4,931.10 |
| | EP2C35F672I8N | IC | 15 | EA | $210.49 | $3,157.35 |
| | TPS56528DDA | IC | 24 | EA | $13.05 | $313.20 |
| | PIC12F683-I/SN | IC | 250 | EA | $2.74 | $685.00 |
| | TCM2010-101-4P | COIL | 4,000 | EA | $0.36 | $1,440.00 |
| | CRCW0603127KFKEAHP | RESISTOR | 5,000 | EA | $0.03 | $150.00 |
| | 24LC02B-I/SN | IC | 110 | EA | $0.36 | $39.60 |
| | LT4356HMS-1 | IC | 105 | EA | $9.53 | $1,000.65 |
| | MBRB41H100CTT4G | SCHOTTK | 385 | EA | $1.09 | $419.65 |
| | MCR100JZHFLR100 | RESISTOR | 4,000 | EA | $0.13 | $520.00 |

CONFIDENTIAL

| | | | | | | |
|---|---|---|---|---|---|---|
| | MIC29501-3.3WU | IC | 150 | EA | $5.65 | $847.50 |
| | SMAJ85A-E3/61 | DIODES | 200 | EA | $0.24 | $48.00 |
| | SMDA24C/TR7 | TVS UNIDIRECTIONAL | 1,000 | EA | $4.30 | $4,300.00 |
| | 54102-0164 | CONNECTOR | 215 | EA | $1.28 | $275.20 |
| | ECA-2AM221 | CONDENSOR | 250 | EA | $0.33 | $82.50 |
| | LR2512LF-01-R100-F | RESISTOR | 250 | EA | $0.24 | $60.00 |
| | LR2512LF-01-R150-F | RESISTOR | 1,000 | EA | $0.24 | $240.00 |
| | LR2512LF-01-R200-F | RESISTOR | 1,000 | EA | $0.23 | $230.00 |
| | LT4356IMS-3 | IC | 180 | EA | $5.95 | $1,071.00 |
| | MAX9155EXT | IC | 2,500 | EA | $2.81 | $7,025.00 |
| | PTH12060WAZ | IC | 430 | EA | $16.23 | $6,978.90 |
| | ADUM2250ARWZ | IC | 130 | EA | $87.43 | $11,365.90 |
| | 10BQ100TRPBF | DIODES | 500 | EA | $0.90 | $450.00 |
| | 52207-0685 | CONNECTOR | 300 | EA | $0.65 | $195.00 |
| | ZMM5236B | DIODES | 300 | EA | $0.90 | $270.00 |
| | TMS320F28379DZWTT | IC | 15 | EA | $186.88 | $2,803.20 |
| | | | | | | |
| 4/14/2022 | SN74AUP1T34DCKR | IC | 300 | EA | $18.98 | $5,694.00 |
| | MM70-314-310B1-1-R300 | CONNECTOR | 150 | EA | $6.46 | $969.00 |
| | 114153 | CONNECTOR | 96 | EA | $6.16 | $591.36 |
| | 914796 | CONNECTOR | 215 | EA | $3.27 | $703.05 |
| | H10-76 | HEADSET | 4 | EA | $354.00 | $1,416.00 |
| | TFP410MPAPREP | IC | 4 | EA | $73.47 | $293.88 |
| | | | | | | |
| | Total | | | | | $76,848.8 |

b.    Among the false and defamatory statements which Yim made about Airtech's business reputation during 2021 and 2022 to Airtech's customers, vendors, manufacturers and suppliers, were the following: (i) Yim falsely told them that Airtech had significant tax issues, implying that Airtech was dishonest and would not survive long; (ii) Yim falsely told them that Airtech was subject to personnel

36

CONFIDENTIAL

departures that undermined its management competence; (iii) Yim falsely told

them that Airtech was experiencing "huge trouble" and "would shrink legally";

(iv) Yim falsely told various vendors, manufacturers and suppliers that Airtech's

customers did not like Airtech and did not want to deal with it.

c.    Yim also sought to evade the Temporary Restraining Order, telling at least two

vendors that if a preliminary injunction were granted he would simply create a

new business entity unknown to Airtech and the Court and use that entity to

conduct transactions with Airtech's customers. In addition, he told vendors to

change certain part numbers in order to hide that they were Airtech numbers, and

to mischaracterize the original part number as "obsolete" when Airtech requested

to purchase it. Furthermore, Yim caused Airtech to quote prices that were higher

than his companies quoted in order to cause its customers to discontinue doing

business with Airtech.

Airtech's investigation of Defendants' wrongdoing is ongoing, is complicated by

the fraudulent efforts of Defendants to conceal their actions, and therefore the

foregoing examples are illustrative only and may be further supplemented as the

investigation and discovery in this action continue.

161.    After leaving Airtech, Yim used Airtech's Trade Secrets to place an order with

Airtech's vendor, Air Rover Inc., on January 28, 2022 for a proprietary part that was originally

sold to Airtech in 2020 with a different power requirement.

**CONFIDENTIAL**

162.     In light of the foregoing and ongoing discovery to date, Airtech's best estimate as of the date of this Second Amended and Supplemental Complaint is that Airtech has lost sales revenues to the Defendants in excess of $15,000,000.00.

## III.   DEFENDANTS' VIOLATIONS OF THE TEMPORARY RESTRAINING ORDER

163.     After Yim left Airtech, a temporary restraining order ("TRO") was issued on March 15, 2022 (D.E. 13) prohibiting Yim from communicating or transacting business with eleven (11) of Airtech's customers and from alienating funds from four (4) bank accounts controlled by the Defendants.

164.     On March 28, 2022, the Court issued a Letter Order (D.E. 37) modifying the TRO ("Modified TRO") by prohibiting the Defendants from transacting any business with the same eleven companies using designs, technical specifications or proprietary data obtained by Airtech's computer system or for parts that Airtech purchased or developed for these customers while Defendants were employed by Airtech.

165.     The Modified TRO also prohibited the Defendants from transacting business with vendors or suppliers using the designs, technical specifications or other proprietary data obtained from Airtech's computer system or for any parts that Airtech purchased or received from these vendors or suppliers when Defendant(s) were employed by Airtech.

### A.  Yim's Evasion of the TRO and Modified TRO and Continued Post-TRO Misappropriation of Airtech's Trade Secrets

166.     After leaving Airtech, Yim used Airtech's Trade Secrets to steal business from Airtech, and took deliberate, premeditated steps to ask Airtech's vendors to slightly modify part numbers to create an illusion that parts originally supplied to Airtech were now somehow different, so as to circumvent the Modified TRO.

38

**CONFIDENTIAL**

167.     After this Court issued the March 28, 2022 Letter Order, Yim contacted an engineer at Airtech's largest customer, Hanwha Systems Co., Ltd., which was one of the eleven (11) protected customers identified in the Modified TRO, on April 2, 2022, and provided a quotation for a stepper motor product that was the subject of an exclusive distribution agreement between Airtech and the product vendor, Phytron, Inc.

168.     Email correspondence between Phytron, Inc. and Yim confirms that Yim was providing instructions to Phytron to make false statements that its business with Hans Inc. was not related to the Modified TRO even though the part at issue was clearly covered by an exclusive distribution agreement with Airtech and prohibited by the Modified TRO.

169.     On March 1, 2022, Hans Inc. submitted a purchase order to purchase $214,373.99 in products from Phytron, Inc. which were covered by the exclusive distribution agreement with Airtech, and Yim convinced Phytron to make a minor change to the part number in an attempt to circumvent the exclusive distribution agreement.

170.     Yim also tried to convince an Airtech vendor, Aperture Optical Sciences, Inc. ("AOS"), to terminate an April 29, 2015 Airtech International Sales Agreement with AOS, by providing a draft Hans Aerospace International Sales Agreement dated November 2, 2022 which is almost identical to an earlier similar Airtech agreement with AOS and shows Yim had a copy of Airtech's agreement in his possession. Yim sent text messages to AOS falsely stating that the TRO was removed and that the Court declined to extend the injunction.

171.     On May 4, 2023, Defendants filed a Motion to Dissolve Restraints (D.E. 132) and Yim provided a Declaration of Byungchan Yim dated May 3, 2023 (D.E. 132-2) (the "Yim Declaration") in support of the Motion to Dissolve Restraints.

CONFIDENTIAL

172.    Yim stated under penalty of perjury that "I do not have any 'customer lists' of Airtech, nor do I have any other allegedly 'confidential' or 'proprietary' information belonging to the company" in Paragraph 14 of the Yim Declaration.

173.    Yim stated under penalty of perjury that "[a]gain, I did not take any confidential, proprietary, or trade secret information from Airtech. I do not have an Airtech customer list, vendor list, price list or anything like that" in Paragraph 37 of the Yim Declaration.

174.    The Court conducted a Preliminary Injunction Hearing on January 29 and 30, and February 5, 2024.

175.    During Yim's cross examination on January 29, 2024, he admitted having received product specifications and a product exclusivity agreement between Airtech and one of the prohibited customers listed in the Modified TRO to his personal Gmail account. Yim also admitted that he did not produce any of the emails from his Gmail account in response to discovery requests to which Defendants had responded much earlier in the action.

176.    On February 14, 2024, the Court granted a Letter Order directed to the parties' joint request to proceed with discovery of certain Gmail accounts belonging to Yim after the revelation of the existence of these email accounts.

177.    Yim produced the first batch of documents from his Gmail accounts on or about March 13, 2024 which included emails from two Gmail accounts.

178.    The first batch of documents from Yim's Gmail accounts included thousands of emails from his Airtech email account that were forwarded to his personal Gmail accounts, schematic diagrams, pictures of products, commercial invoices, freight/air waybills, Airtech invoices, vendor corrective action requests, inspection reports, certificates of conformance, purchase orders, acceptance test reports, certificates of remittance from Korean banks, and

40

**CONFIDENTIAL**

photographs of the passports of employees who work for one of the companies on the list of eleven prohibited companies.

179.    The Gmail document production, containing thousands of pages of Airtech's Trade Secrets, directly contradicts the statements that Yim made under penalty of perjury in his May 3, 2023 Declaration.

180.    More than a one-and-a half years after the issuance of the TRO and March 28, 2022 Letter Order, Yim again, upon information and belief, set up another sham company and fictious individual to circumvent the Court-imposed restraints.

181.    Upon information and belief, Yim set up a new sham company known as BIZARRAVENTURA INC. ("Bizarra") to replace Hans Inc. in a purchase from AIR ROVER, INC. which is a vendor to Airtech and was a vendor to Airtech when Yim was employed by Airtech and, as such, Defendants' transactions with it are covered by the Modified TRO.

182.    Upon information and belief, Yim created the fictious name or alias for himself of "Luis Silva," a non-existent employee of Bizarra so that Yim could hide his true identity and conduct business as Luis Silva from BizarraVentura, Inc.

183.    Yim produced his second batch of documents from his Gmail accounts to Airtech on or about April 4, 2024.

184.    The second batch of documents from Yim's Gmail accounts also included emails from his Airtech email account that were forwarded to his personal Gmail accounts, which had as attachments schematic diagrams, pictures of products, commercial invoices, freight/air waybills, Airtech invoices, vendor corrective action requests, inspection reports, certificates of conformance, purchase orders, acceptance test reports, and an email containing Mr. Lee's social security number, passwords for Airtech's administrator accounts for various

41

computer network sites, Internet Protocol Addresses and passwords for Airtech, the password for the Airtech company Gmail account, and various IDs and passwords.

185.    The second batch of documents from Yim's Gmail accounts also included highly confidential financial documents for Plaintiff that are not found on Airtech's computer network, but only on Mr. Lee's work computer which had been stolen by Yim.

186.    Upon information and belief, Yim copied Trade Secrets from Mr. Lee's work computer when he removed it from Airtech's premises in 2021.

187.    Yim has made at least eight (8) document productions containing Airtech Trade Secrets from three (3) of his Gmail accounts.

## B.    CONCLUSIONS

188.    Yim, the person responsible for maintaining, backing-up and safeguarding Airtech's Trade Secrets, willingly, systematically, maliciously, intentionally, repeatedly, and continuously breached those fiduciary duties, responsibilities and obligations to protect Airtech, Airtech's Trade Secrets, stole tens of thousands of pages of Proprietary Information and repeatedly attempted to deceive the Court and Airtech about his misdeeds.

189.    Through the countless deceptive, false, fraudulent, and self-dealing activities, and through the manufacture and use of sham documents, including the fake invoices, receipts, and emails described above, Yim, Kim, the other Defendants, and other willing participants in their schemes, committed various acts set forth herein in violation of the law. Defendants and their confederates in former Airtech customer companies conspired, participated and abetted with one another and otherwise derived ill-gotten gains from all the illegal activities herein alleged.

42

**CONFIDENTIAL**

190.     Defendants' acts and omissions were willful, wanton, deliberate and malicious, and significant exemplary and punitive damages are warranted against them, jointly and severally.

## CLAIMS FOR RELIEF

## COUNT I

### (Trade Secret Misappropriation Under 18 U.S.C. §§ 1832(a) and 1836(b)(2)(A-D))

191.     Airtech repeats and re-alleges the facts alleged in all preceding paragraphs as if fully set forth herein.

192.     From its founding to the present, Airtech has maintained and protected as confidential its Trade Secrets, being its customer and vendor information, product information including technical specifications, data, price histories, schematics, contracts, testing methods and results, quality assurance, marketing strategies, regulatory compliance, invoices, banking information, transaction history and ways of doing business as confidential Trade Secrets and taken steps to maintain the confidential nature of this information.

193.     Airtech's Trade Secrets have enabled Airtech to develop a multi-million-dollar business over its competitors.

194.     Defendants' scheme to steal and exploit Airtech's Trade Secrets violated 18 U.S.C. § 1832, et seq. and its prohibition against theft and misappropriation of Trade Secrets.

195.     Airtech brings this private, federal civil action for the misappropriation of Airtech's Trade Secrets pursuant to 18 U.S.C. § 1836(b)(1).

196.     Yim misappropriated by improper means and carried away duplicates of and otherwise took without authorization Airtech's Trade Secrets, including its customer and vendor information which were received, possessed, and used by Defendants.

43

**CONFIDENTIAL**

197.    Defendants misappropriated Airtech's Trade Secrets by taking this information and using it in interstate commerce, for their own economic benefit, to directly compete against Airtech by trying to conduct business with Airtech's customers and vendors intending to injure and knowing that this would injure Airtech.

198.    Defendants have derived and continue to improperly derive economic benefit from their theft of Airtech's Trade Secrets and proprietary information and, in doing so, have deprived and continue to deprive Airtech of the benefits it is rightfully entitled to derive from the Trade Secrets stolen from it.

199.    This Court may grant an injunction to prevent the Defendants' actual and further threatened misappropriation of Airtech's Trade Secrets, including requiring from Defendants affirmative acts to be taken to protect Airtech's Trade Secrets pursuant to 18 U.S.C. § 1836, et seq.

200.    This Court, in extraordinary circumstances, may award an order providing for the seizure of property necessary to prevent the propagation or dissemination of the Trade Secrets pursuant to 18 U.S.C. § 1836(b)(2) and such extraordinary circumstances are present here because, among other reasons, an injunction, already issued in this case, has proved inadequate to prevent the continuing propagation and dissemination of the misappropriate Trade Secrets by Defendants and the continuing use by Defendants of those misappropriated Trade Secrets to injure Airtech.

201.    This Court should appoint a special master to locate and isolate all misappropriated trade secret information and to facilitate the return of unrelated property pursuant to 18 U.S.C. § 1836(b)(2)(d)(iv).

**CONFIDENTIAL**

202.    This Court should award Airtech damages for actual losses caused by Defendants' misappropriation, including unjust enrichment and, in the cases of willful and malicious misappropriation as alleged here, double damages pursuant to 18 U.S.C. § 1836(b)(3)(C).

203.    Injunctive relief in addition to money damages is warranted because Airtech has no adequate remedy at law in that the damages set forth above cannot be compensated by monetary damages, alone.

204.    Defendants' misconduct as set forth above has caused and will continue to cause Airtech irreparable harm in that Airtech has lost control of its Trade Secrets, that information has been provided to and is being used by a competitor, namely Defendants, and court-ordered injunctive relief has proved inadequate to protect Airtech during the pendency of this action.

## **PRAYER FOR RELIEF**

WHEREFORE, Airtech requests that judgment be issued in its favor providing the following relief:

1.  Determining that the actions, conduct, and practices of Defendants complained of herein constitute misappropriation of Airtech's Trade Secrets under the DTSA;

2.  An injunction and order permanently restraining Defendants from engaging in such unlawful conduct, disgorging all of Airtech's Trade Secrets in Defendants' possession, custody and/or control, and being prohibited from using Airtech's Trade Secrets;

3.  A seizure by Federal law enforcement of Defendants' computers, computer hard drives, and other memory devices in Defendants' possession that could

**CONFIDENTIAL**

reasonably contain Airtech Trade Secrets at issue, smart phones, tablets, desktop computers, laptop computers, disks, memory files, flash drives, tape back-ups, usernames and passwords for any cloud-based storage services;

4.  Appointment of a Special Master to oversee the removal and destruction of all of Airtech's Trade Secrets from Defendants' devices, storage and possession;

5.  Ordering an accounting of all books and records of Defendants that pertain to the purchases, sales, marketing profits and financial records relevant to the use of Airtech's Trade Secrets to compete against or otherwise steal business away from Airtech;

6.  An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Airtech for all past, present, and future monetary and/or economic damages;

7.  An award of damages for any and all other monetary losses suffered by Airtech in an amount to be determined at trial, plus prejudgment interest;

8.  An award of two times the amount of damages for willful and malicious misappropriation;

9.  An award of costs and reasonable attorneys' fees that Plaintiff has incurred in this action to the fullest extent permitted by law; and

10. Such other and further relief as the Court may deem just and proper.

46

**CONFIDENTIAL**

## COUNT II

### (New Jersey Trade Secrets Act Against Defendants)

205.    Airtech repeats and re-alleges the facts alleged in all preceding paragraphs as if fully set forth herein.

206.    Airtech maintains its customer and vendor information, product information including technical specifications, data, price histories, schematics, contracts, testing methods and results, quality assurance, marketing strategies, regulatory compliance, invoices, banking information, transaction history and ways of doing business as confidential Trade Secrets and continues to maintain the confidential nature of these Trade Secrets.

207.    Airtech possesses Trade Secrets as defined under the New Jersey Trade Secrets Act, N.J.S.A. 56:15-2, et seq.

208.    Airtech communicated such Trade Secrets in confidence to Yim in his capacity of Airtech's Head of Information Technology and General Manager when Yim was employed by Airtech.

209.    Yim misappropriated Airtech's Trade Secrets while employed at Airtech to directly compete against Airtech.

210.    Defendants used the Trade Secrets so received to set up the Defendant companies, the Sham Companies, to conduct business with Airtech's customers and vendors to the detriment of Airtech.

211.    Yim continues to keep and use Airtech's Trade Secrets after having terminated his employment with Airtech.

47

**CONFIDENTIAL**

212.    Yim disclosed Airtech's Trade Secrets to Defendants in breach of his duty to maintain them in confidence and not to disclose them outside Airtech.

213.    Yim provided Airtech's Trade Secrets to Defendants who were and are direct competitors of Airtech, with knowledge of the breach of Yim's duty.

214.    Defendants continues to possess and use Airtech's Trade Secrets to conduct business with Airtech's customers and vendors to the detriment of Airtech.

## PRAYER FOR RELIEF

**WHEREFORE**, Airtech respectfully requests that this Court enter a judgment:

a.    holding that Airtech maintains Trade Secrets;

b.    holding that Yim misappropriated Airtech's Trade Secrets;

c.    holding that Yim breached Airtech's confidence and conveyed its Trade Secrets to the Defendant companies;

d.    holding that Defendants used Airtech's Trade Secrets to compete against Airtech to Airtech's detriment;

e.    holding that Yim's actions were willful;

f.    ordering an accounting of all books and records of Defendants that pertain to the purchases, sales, marketing profits and financial records relevant to the use of Airtech's Trade Secrets to compete against or otherwise steal business away from Airtech;

g.    awarding Airtech compensatory damages;

h.    enjoining future such actions by Yim;

i.    awarding Airtech punitive damages;

j.    awarding Airtech pre- and post-judgment interest;

k.    awarding Airtech reasonable attorneys' fees and costs; and

48

**CONFIDENTIAL**

l.      awarding Airtech such other and further relief as the Court deems just and proper.


## COUNT III

**(against Defendants for violations of the Federal Racketeer Influenced and Corrupt
Organizations Act, 18 U.S.C. § 1961, et seq., ("RICO")
Racketeering**

215.    Airtech repeats and re-alleges the facts alleged in all preceding paragraphs as if
fully set forth herein.

216.    Defendants are liable to Airtech under the Racketeer Influenced and Corrupt
Organizations Act codified as Title IX of the Organized Crime Control Act of 1970 at 18 U.S.C.
§§ 1961, et seq. ("RICO") as alleged herein insofar as they are culpable persons who did and do
conduct and/or participate in the affairs of an enterprise engaged in and/or which affect interstate
and/or foreign commerce through a pattern of racketeering activity as prohibited by 18 U.S.C. §
1962(c) and/or conspired to violate Section 1962(c) as prohibited by 18 U.S.C. § 1962(d)
injuring Airtech in its business and property by reason of those violations such that Airtech may
sue for said violations of Section 1962 "in any appropriate United States district court and shall
recover threefold the damages he [it] sustains and the cost of the suit, including a reasonable
attorney's fee." 18 U.S.C. § 1964(c).

217.    Defendants associated with an enterprise as set forth below and did conduct and
participate and still do conduct and participate in the conduct of such enterprise's affairs a
scheme through a pattern of racketeering activity and for the unlawful purpose of intentionally
defrauding, stealing from, and committing economic espionage against by misappropriating the
Trade Secrets of Airtech and they conspired to do so and still conspire to do so.

49

**CONFIDENTIAL**

218. As alleged, Yim and Kim formed various corporate entities and limited liability companies in multiple states in their scheme to defraud Airtech and use for their benefit misappropriated Airtech Trade Secrets. Specifically, Yim and Kim formed Sham Companies Sensa, Genuine, RFWave, Arc-Tech, and Magic Audio Pro Net with the sole intent to defraud Airtech and convert its Trade Secrets to their economic benefit; to submit fake invoices at grossly inflated prices to misappropriate; and steal monies from Airtech.

219. Yim and Kim also formed Adversary Companies Assured, Hans Inc., Hans LLC, and Bizarra to further their scheme to defraud Airtech and to use for their benefit Trade Secrets misappropriated and stolen from Airtech. Specifically, Yim and Kim formed said Adversary Companies with the sole intent to transact business with Airtech's customers utilizing stolen Trade Secrets to their economic benefit and to the detriment and injury of Airtech.

220. Certain companies that were customers of Airtech before the scheme began, and certain of their officers and employees, with knowledge that Yim was acting against the interests of his employer, Airtech, and using its Trade Secrets to steal business from it, assisted, cooperated with and conspired with Yim, Kim, and the Adversary Companies in the scheme to steal the business of those companies from Airtech using Airtech's Trade Secrets stolen by Yim (hereinafter the "Former Customer Companies and Officers").

221. The Former Airtech Customer Companies and Officers and their employees identified to date who assisted, cooperated, and conspired as members of the enterprise with Defendants are:

      a. Unione Tech Corp. ("Unione"), R806 ISbiztower 57-2, Heungan-daero 427Beon-gil, Dongan- gu, Anyang-si Gyeonggi-do, Korea;

**CONFIDENTIAL**

    **b.**   Se-A Electronics Co., Ltd. ("Se-A"), 513-15 Sangdaewon-dong, Jungwon-gu, Seongnam- si, Gyeonggi-do, Korea;

    **c.**   Yoon Jung Ahn, President of Unione; and

    **d.**   Jiyoung Lee, an employee of SEGI.

222.    Pursuant to and in furtherance of their fraudulent scheme, Defendants committed and agreed to commit among themselves and with the confederate Former Customer Companies and Officers multiple related acts of mail and wire fraud, transmitted the money stolen thereby through interstate or foreign commerce, and misappropriated and used for their benefit Airtech's Trade Secrets against and injuring Airtech. The acts set forth above constitute a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

### A.    The Culpable Persons and the Enterprise

223.    The "Enterprise" as defined under 18 U.S.C. § 1961(4) was and is an association-in-fact that began with Yim and Kim as members. They are the culpable persons who conducted the affairs of the Enterprise as set forth in 18 USC 1962(c) and conspired to violate 18 USC 1962(d) as of the first predicate acts in 2019 (alleged above and outlined below) before the creation of the Sham Companies and Adversary Companies. The membership of the Enterprise then grew as those companies were created and began to participate in the Enterprise by committing acts in furtherance of its purposes in coordination with the other members of the Enterprise and as conducted by the culpable persons controlling the Enterprise and the entity members of the Enterprise insofar as the Sham Companies and Adversary Companies, respectively, led independent legal existences and were able to form such intentions through Yim and Kim as the owners and managers who controlled those companies. Yim and Kim also recruited the Former Customer Companies and Officers to become members of the Enterprise.

51

**CONFIDENTIAL**

The Former Customer Companies and Officers knowingly transacted business with Yim and the Adversary Companies clearly using misappropriated Airtech Trade Secrets to compete against and to steal business from Airtech with those longstanding customers which Airtech had invested to develop and with which it shared protected Trade Secrets.

224.    As alleged, additional legal entities were created by Yim and Kim and Former Customer Companies and Officers became members of the Enterprise at different times. Every member was not involved in every scheme but the culpable persons always controlled the Enterprise and each type of scheme had members, being persons or legal entities, that performed specific roles. In the fraudulent invoicing schemes, Yim and Kim used one or more of the Sham Companies for each. In the misappropriation schemes, they used one of their Adversary Companies and often a Former Customer or an Officer of a Former Customer, sometimes with and sometimes without the knowledge of the Former Customer Company.

225.    The purpose of the Enterprise was and is to steal from and defraud Airtech and companies that did business with it and to misappropriate and use Airtech's Trade Secrets for the benefit of the culpable persons and its members directly and through the Sham Companies and Adversary Companies so as to injure Airtech.

**B.    The Pattern of Racketeering Activity**

226.    The pattern of racketeering activity, as defined in 18 U.S.C. § 1961(1) and § 1961(5), consisted of the following categories of acts committed since 2019, as alleged, and continuously and regularly thereafter through the present:

a.    Stealing from Airtech directly its Trade Secrets and computers;

b.    Defrauding Airtech directly by submitting false and fraudulent expense reimbursement requests and receipts;

52

**CONFIDENTIAL**

c.    Misappropriating Trade Secrets from Airtech and using them to take business away from Airtech by:

1.    Submitting false and fraudulent invoices to Airtech purporting to be from real counterparties, such as Airtech's brokers, giving payment information for accounts controlled by culpable persons Yim and Kim or their Sham Companies which payments ultimately benefited Yim and Kim;

2.    Submitting false and fraudulent invoices from the Sham Companies, giving payment information to accounts in the names of those companies which accounts were controlled by those companies and by Yim and Kim who controlled them and benefited from such payments;

3.    Using the misappropriated Trade Secrets to contact the specific persons with whom Airtech dealt in customer companies developed by Airtech, some of which cooperated and conspired with Yim, Kim and one or more of their Adversary Companies as members of the Enterprise with full knowledge of its nature and purpose to divert from Airtech to the Adversary Companies owned, and controlled by the culpable persons orders that were intended for or would have gone to Airtech and there by diverted revenue from Airtech to the Adversary Companies benefiting Yim and Kim who owned and controlled those companies; and

4.    Using misappropriated Trade Secrets including numerous exclusive sales and technical assistance agreements Airtech had with its various manufacturers, suppliers, vendors, and customers which agreements provided specific property rights in future

53

**CONFIDENTIAL**

transactions to divert those transactions to the Adversary Companies for the benefit of Yim and Kim.

5.      Yim, as the head of information technology, used his access and credentials to manipulate the electronic information in Airtech's computer system to change and delete Airtech's accounting and business records.

**C.      The Racketeering Acts**

227.      The racketeering acts committed included acts in violation of the following provisions of title 18 of the United States Code:

     a.   18 U.S.C. § 1341 – Mail Fraud

     b.   18 U.S.C. § 1343 – Wire Fraud

     c.   18 U.S.C. § 1832 – Economic Espionage and Theft of Trade Secrets

     d.   18 U.S.C. § 2314 – National Stolen Property Act - transmitting through interstate or foreign commerce money stolen, converted, or taken by fraud.

228.      The following racketeering acts, among numerous others, committed before and after the following acts, were committed:

**1.      Fraudulent Invoices**

Racketeering Act One – Mail and Wire Fraud and Transmitting Stolen Money

229.      October 7, 2019, defendants Yim and Kim caused a fraudulent and false invoice to be sent from 5228 Union Avenue, San Jose, CA 95124 to Airtech's office located at 2 Piermont Road, Cresskill, NJ through the instrumentalities of the United States postal system. The invoice was a part of a false and fraudulent scheme to obtain approximately $11,250 claiming that it was a commission owed by Airtech to one of its brokers EAU Group. In reality, $11,250 was not owed at all.

54

**CONFIDENTIAL**

230.    Yim and Kim defrauded and conspired and acted in concert to defraud Airtech in that Yim and Kim created the fraudulent and false invoice, caused it to be sent to Airtech, and Yim directed Airtech to pay the invoice by wiring the money to Kim into her personal account.

231.    Based upon the fraudulent invoice presented by defendants Kim and Yim, Airtech wired $11,250 through interstate wire, from Airtech's bank account located at 1655 W. Redondo Beach Blvd., Gardena, CA to Kim's account located at 270 Park Avenue, New York, NY.

232.    As a direct and proximate cause of defendants' racketeering activity, Airtech has been injured in its business and property, pursuant to 18 U.S.C. § 1341, § 1343, and 2314 in the amount of $11,250.

Racketeering Act Two – Mail and Wire Fraud and Transmitting Stolen Money

233.    On September 30, 2020, defendants Yim and Kim caused a fraudulent and false invoice to be sent from 5228 Union Avenue, San Jose, CA 95124 to Airtech's office located at 2 Piermont Road, Cresskill, NJ through the instrumentalities of the United States postal system. The invoice was a false and fraudulent scheme to obtain approximately $40,000 claiming that it was a commission owed by Airtech to one of its brokers EAU Group. In reality, $40,000 was not owed at all.

234.    Yim and Kim defrauded and conspired and acted in concert to defraud Airtech in that Yim and Kim created the fraudulent and false invoice, caused it to be sent to Airtech, and Yim directed Airtech to pay the invoice by wiring the money to Kim into her personal account.

235.    Based upon the fraudulent documents presented by defendants Kim and Yim, Airtech wired $40,000 through interstate wire, from Airtech's bank account located at 1655

55

**CONFIDENTIAL**

W. Redondo Beach Blvd., Gardena, CA to Kim's account located at 270 Park Avenue, New York, NY.

236.    As a direct and proximate cause of defendants' racketeering activity, Airtech has been injured in its business and property, pursuant to 18 U.S.C. § 1341 and § 1343 and 2314 in the amount of $40,000.

Racketeering Act Three – Mail and Wire Fraud

237.    On October 27, 2020, defendants Yim and Kim caused Sensa to send a false invoice in furtherance of their fraudulent scheme to obtain approximately $1,450 on parts worth $79.60 claiming that it was a sales invoice to Airtech. The invoice was sent via interstate email from Sensa located at 6000 Poplar Avenue, Suite 252, Memphis, TN, 38119 to Airtech located at 2 Piermont Road, Cresskill, NJ.

238.    Yim and Kim, with Sensa defrauded and conspired and acted in concert to defraud Airtech in that, 1) Kim created Sensa; 2) Yim ordered Airtech to purchase the products from Sensa; 3) Yim and Kim created the fraudulent and false invoice causing it to be sent to Airtech; and 4) Yim directed Airtech to pay the invoice by wiring the money to Sensa's account controlled by Yim and Kim.

239.    Based upon the fraudulent communication and documents presented by defendants Kim, Yim, and Sensa, Airtech wired $1,450 through interstate wire, from Airtech's bank account located at 1655 W. Redondo Beach Blvd., Gardena, CA to Sensa's account located at 270 Park Avenue, New York, NY.

240.    As a direct and proximate cause of defendants' racketeering activity, Airtech has been injured in its business and property pursuant to 18 U.S.C. §§ 1341 and 1343 in the amount of $1,370.40.

**CONFIDENTIAL**

Racketeering Act Four – Mail and Wire Fraud Transmitting Stolen Money

241.     On December 7, 2020, defendants Yim and Kim caused Sensa to send a false and fraudulent invoice in furtherance of their fraudulent scheme to obtain approximately $65,322 on parts worth $4,561.80 claiming that it was a sales invoice to Airtech. The invoice was sent via interstate email from Sensa located at 6000 Poplar Avenue, Suite 252, Memphis, TN 38119 to Airtech located at 2 Piermont Road, Cresskill, NJ.

242.     Yim and Kim, with Sensa, defrauded and conspired and acted in concert to defraud Airtech in that, 1) Kim created Sensa; 2) Yim ordered Airtech to purchase the products from Sensa; 3) Yim and Kim created the fraudulent and false invoice causing it to be sent to Airtech; and 4) Yim directed Airtech to pay the invoice by wiring the money to Sensa account controlled by Yim and Kim.

243.     Based upon the fraudulent communication and documents presented by defendants Kim, Yim, and Sensa, Airtech wired $65,322 through interstate wire, from Airtech's bank account located at 1655 W. Redondo Beach Blvd., Gardena, CA to Sensa's account located at 270 Park Avenue, New York, NY.

244.     As a direct and proximate cause of defendants' racketeering activity, Airtech has been injured in its business and property pursuant to 18 U.S.C. §§ 1341, 1343, and 2314 in the amount of $60,760.20.

Racketeering Act Five – Mail and Wire Fraud and Transmitting Stolen Money

245.     On January 8, 2021, defendants Yim and Kim caused Genuine to send a false and fraudulent invoice in furtherance of their fraudulent scheme to obtain approximately $73,184 on parts worth $20,208.32 claiming that it was a sales invoice to Airtech. The invoice was sent

57

CONFIDENTIAL

via interstate email from Genuine located at 4651 Salisbury Road, Suite 400, Jacksonville,

Florida 32256 to Airtech located at 2 Piermont Road, Cresskill, NJ.

246.    Yim and Kim, with Genuine, defrauded and conspired and acted in concert to

defraud Airtech in that, 1) Kim created Genuine; 2) Yim ordered Airtech to purchase the

products from Genuine; 3) Yim and Kim created the fraudulent and false invoice causing it to be

sent to Airtech; and 4) Yim directed Airtech to pay the invoice by wiring the money to Genuine

account controlled by Kim.

247.    Based upon the fraudulent communication and documents presented by

defendants Kim, Yim, and Genuine, Airtech wired $73,184 through interstate wire, from

Airtech's bank account located at 1655 W. Redondo Beach Blvd., Gardena, CA to Genuine's

account located at 255 Second Avenue South, Minneapolis, MN.

248.    As a direct and proximate cause of defendants' racketeering activity, Airtech

has been injured in its business and property pursuant to 18 U.S.C. §§ 1341 and 1343 in the

amount of $52,975.68.

Racketeering Act Six – Mail and Wire Fraud and Transmitting Stolen Money

249.    On January 5, 2021, defendants Yim and Kim caused Genuine to send a false

and fraudulent invoice in furtherance of their fraudulent scheme to obtain approximately $70,897

on parts worth $19,576.81 claiming that it was a sales invoice to Airtech. The invoice was sent

via interstate email from Genuine located at 4651 Salisbury Road, Suite 400, Jacksonville,

Florida 32256 to Airtech located at 2 Piermont Road, Cresskill, NJ.

250.    Yim and Kim, with Genuine, defrauded and conspired and acted in concert to

defraud Airtech in that, 1) Kim created Genuine; 2) Yim ordered Airtech to purchase the

products from Genuine; 3) Yim and Kim created the fraudulent and false invoice causing it to be

58

**CONFIDENTIAL**

sent to Airtech; and 4) Yim directed Airtech to pay the invoice by wiring the money to Genuine account controlled by Kim.

251.     Based upon the fraudulent documents presented by defendants Kim, Yim, and Genuine, Airtech wired $73,184 through interstate wire, from Airtech's bank account located at 1655 W. Redondo Beach Blvd., Gardena, CA to Genuine's account located at 255 Second Avenue South, Minneapolis, MN.

252.     As a direct and proximate cause of defendants' racketeering activity, Airtech has been injured in its business and property pursuant to 18 U.S.C. §§ 1341, 1343, and 2314 in the amount of $54,320.19.

Racketeering Act Seven – Mail and Wire Fraud and Transmitting Stolen Money

253.     On May 6, 2021, defendants Yim and Kim caused RFWave to send a false and fraudulent invoice in furtherance of their fraudulent scheme to obtain approximately $27,375 on parts worth $10,105.43 claiming that it was a sales invoice to Airtech. The invoice was sent via interstate email from RFWave located at 110 Front Street, Suite 300, Jupiter, Florida 33477 to Airtech located at 2 Piermont Road, Cresskill, NJ.

254.     Yim and Kim, with RFWave, defrauded and conspired and acted in concert to defraud Airtech in that, 1) Kim created RFWave; 2) Yim ordered Airtech to purchase the products from RFWave; 3) Yim and Kim created the fraudulent and false invoice causing it to be sent to Airtech; and 4) Yim directed Airtech to pay the invoice by wiring the money to RFWave account controlled by Kim.

255.     Based upon the fraudulent communication and documents presented by defendants Kim, Yim, and RFWave, Airtech wired $27,375 through interstate wire, from

59

CONFIDENTIAL

Airtech's bank account located at 1655 W. Redondo Beach Blvd., Gardena, CA to RFWave's account located at 270 Park Avenue, New York, NY.

256.    As a direct and proximate cause of defendants' racketeering activity, Airtech has been injured in its business and property pursuant to 18 U.S.C. §§ 1341 and 1343 in the amount of $17,269.57.

Racketeering Act Eight – Mail and Wire Fraud Transmitting Stolen Money

257.    On August 9, 2021, defendants Yim and Kim caused Arc-Tech to send a false and fraudulent invoice in furtherance of their fraudulent scheme to obtain approximately $67,500 on parts worth $32,500 claiming that it was a sales invoice to Airtech. The invoice was sent via interstate email from Arc-Tech located at 6303 Blue Lagoon Drive, Suite 400, Miami, FL 33126 to Airtech located at 2 Piermont Road, Cresskill, NJ.

258.    Yim and Kim, with Arc-Tech, defrauded and conspired and acted in concert to defraud Airtech in that, 1) Kim created Arc-Tech; 2) Yim ordered Airtech to purchase the products from Arc-Tech; 3) Yim and Kim created the fraudulent and false invoice causing it to be sent to Airtech; and 4) Yim directed Airtech to pay the invoice by wiring the money to Arc-Tech account controlled by Kim.

259.    Based upon the fraudulent documents presented by defendants Kim, Yim, and Arc-Tech, Airtech wired $67,500 through interstate wire, from Airtech's bank account located at 1655 W. Redondo Beach Blvd., Gardena, CA to Arc-Tech's account located at 270 Park Avenue, New York, NY.

260.    As a direct and proximate cause of defendants' racketeering activity, Airtech has been injured in its business and property pursuant to 18 U.S.C. §§ 1341, 1343, and 2314 in the amount of $35,000.

CONFIDENTIAL

Racketeering Act Nine – Mail and Wire Fraud

261.    On August 23, 2021 and September 8, 2021, defendants Yim and Kim caused Arc-Tech to send a false and fraudulent invoice in furtherance of their fraudulent scheme to obtain approximately $1,150 on parts worth $260 claiming that it was a sales invoice to Airtech. The invoice was sent via interstate email from Arc-Tech located at 6303 Blue Lagoon Drive, Suite 400, Miami, FL 33126 to Airtech located at 2 Piermont Road, Cresskill, NJ.

262.    Yim and Kim, with Arc-Tech, defrauded and conspired and acted in concert to defraud Airtech in that, 1) Kim created Arc-Tech; 2) Yim ordered Airtech to purchase the products from Arc-Tech; 3) Yim and Kim created the fraudulent and false invoice causing it to be sent to Airtech; and 4) Yim directed Airtech to pay the invoice by wiring the money to Arc-Tech account controlled by Kim.

263.    Based upon the fraudulent documents presented by defendants Kim, Yim, and Arc-Tech, on October 8, 2021, Airtech wired $1,150 through interstate wire, from Airtech's bank account located at 1655 W. Redondo Beach Blvd., Gardena, CA to Arc-Tech's account located at 270 Park Avenue, New York, NY.

264.    As a direct and proximate cause of defendants' racketeering activity, Airtech has been injured in its business and property pursuant to 18 U.S.C. §§ 1341 and 1343 in the amount of $890.

Racketeering Act Ten – Mail and Wire Fraud and Transmitting Stolen Money

265.    On November 29, 2021, defendants Yim and Kim caused Arc-Tech to send a false and fraudulent invoice in furtherance of their fraudulent scheme to obtain approximately $67,500 on parts worth $32,500 claiming that it was a sales invoice to Airtech. The invoice was

61

CONFIDENTIAL

sent via interstate email from Arc-Tech located at 6303 Blue Lagoon Drive, Suite 400, Miami,

FL 33126 to Airtech located at 2 Piermont Road, Cresskill, NJ.

266.     Yim and Kim, with Arc-Tech, defrauded and conspired and acted in concert to

defraud Airtech in that, 1) Kim created Arc-Tech; 2) Yim ordered Airtech to purchase the

products from Arc-Tech; 3) Yim and Kim created the fraudulent and false invoice causing it to

be sent to Airtech; and 4) Yim directed Airtech to pay the invoice by wiring the money to Arc-

Tech account controlled by Kim.

267.     Based upon the fraudulent documents presented by defendants Kim, Yim, and

Arc-Tech, on November 30,2021, Airtech wired $67,500 through interstate wire, from Airtech's

bank account located at 1655 W. Redondo Beach Blvd., Gardena, CA to Arc-Tech's account

located at 270 Park Avenue, New York, NY.

268.     As a direct and proximate cause of defendants' racketeering activity, Airtech

has been injured in its business and property pursuant to 18 U.S.C. §§ 1341, 1343, and 2314 in

the amount of $35,000.

### 2.     Misappropriation of Trade Secrets

269.     During Yim's employment with Airtech and thereafter, Yim was not authorized

to use or appropriate Airtech's Trade Secrets to engage in any business away from Airtech.

Racketeering Act Eleven –Multiple Acts Comprised of Thefts of Trade Secrets and
Mail and Wire Fraud

270.     On February 5, 2020, while Yim was still employed by Airtech, Kim formed

Assured. Thereafter, through Assured, Yim, Kim, and SE-A conspired to use and did in fact use

Airtech's Trade Secrets without authorization, to engage in business with Airtech's customer Se-

62

**CONFIDENTIAL**

A from February 2020 to through September 30, 2021, when Yim left the employ of Airtech, in violation of 18 U.S.C. 1341, 1343, and §1832.

271.    While still employed at Airtech, Yim and Assured sold products to SE-A and Assured issued an invoice dated November 22, 2020 in the amount of $10,208.55.

272.    As set forth in detail in the Facts alleged above, Yim and Kim, through Assured, during the time Yim was an employee of Airtech, made eleven separate sales of products in the total amount of $971,914.81 to Se-A using Trade Secrets of Airtech they had misappropriated.

273.    Yim and Kim continued to do business with SE-A through Assured and other Adversary Company entities committing additional predicate acts causing losses to Airtech in amounts not yet known.

Racketeering Act Twelve – Multiple Acts Comprised of Thefts of Trade Secrets

274.    On June 25, 2021 and September 17, 2021, defendant Yim stole two computers containing Airtech's Trade Secrets from Airtech in violation of 18 U.S.C. §1832. In doing so, Yim committed theft of Trade Secrets contained in the computers that included, among others, the customer list, contact information, order history, quote history, vendor list, parts list, parts specification, prices, and necessary permits and licensing requirements. Thereafter, on or before October 24, 2021, Yim made copies of the electronic data contained in the computers in violation of 18 U.S.C. § 1832.

Racketeering Act Thirteen – Theft of Trade Secrets

275.    As set forth above, in a Purchase Order dated June 23, 2023, at which time Yim was still employed by Airtech and so known to all of its customers, Airtech customer Unione, in a Purchase Order signed by its President, Yoon Jung Ahn, and showing its address in South

**CONFIDENTIAL**

Korea, ordered $199,999.00 of products from Assured, with the P.O. showing the contact for

Assured was "Jasmine Legrand," shown above to have been an alias used by Yim.

276.     Said act of theft of Trade Secrets violated 18 U.S.C. 1341, 1343, and 1832.

Racketeering Act Fourteen – Theft of Trade Secrets

277.     On September 27, 2021, Yim formed Hans Inc.to further his scheme to defraud

Airtech. Yim became the president of Hans Inc. Yim and Hans Inc. began using Airtech's Trade

Secrets that were stolen by Yim to compete with Airtech.

278.     Specifically, as alleged herein from October 2021 until the present and

continuing, Hans Inc. began transacting business with Airtech's various customers using

Airtech's Trade Secrets by supplying the same products with the same specifications as Airtech,

using the same vendors as Airtech, and undercutting Airtech's pricing.

279.     As a direct and proximate cause of defendants Yim, Kim, and Hans Inc.'s acts

of racketeering activity, Airtech has been injured in its business and property, pursuant to 18

U.S.C. 1341, 1343, and § 1832, in the minimum amount of $3 million dollars representing the

value of the business taken away by Defendants.

Racketeering Act Fifteen – Theft of Trade Secrets

280.     During Yim's employment with Airtech, as alleged herein Airtech maintained

numerous exclusive sales agreements,  technical assistance agreements, and protected product

letter agreements with manufacturers, suppliers, vendors and/or customers with respect to

designated manufacturers, products, customers or markets of substantial commercial value to

Airtech.

281.     Yim was well aware of the existence of all such valuable agreements, and

indeed played a part in making some or all of them.

64

**CONFIDENTIAL**

282.     These valuable agreements were hard-bargained-for, and in exchange for a very substantial investment of time and resources devoted to the needs of the manufacturers, suppliers, vendors and/or customers, Airtech obtained a property right in certain specified future transactions (the "Exclusive Transactions").

283.     At various times as specified herein, using fraud and artifice, Defendants stole Exclusive Transactions from Airtech and kept the transactions for themselves and their own profit.

284.     On September 27, 2021, Yim formed Hans Inc. to further his scheme to defraud Airtech of its Exclusive Transactions. Yim became the president of Hans Inc. Yim also formed and used other sham corporate entities as cover for his theft of Exclusive Transactions.

285.     As alleged above, on April 2, 2022, Yim contacted an engineer at Airtech customer Hanwha Systems Co. Ltd. quoting a stepper motor that was the subject of an exclusive distribution agreement between Airtech and Hanwa.

286.     As alleged above, after the entry of the Modified TRO, Yim, through Hans Inc., engaged in transactions with Airtech customer Phytron, Inc. regarding a part subject to an exclusive distribution agreement between Airtech and Phytron.

287.     As alleged above, Yim, through Hans Inc., attempted in or about November 2022 to persuade Airtech vendor AOS to terminate its international sales agreement with Airtech and enter into an identical agreement with Hans Inc.

288.     As a direct and proximate cause of Defendants' racketeering activity, Airtech has been injured in its business and property pursuant to 18 U.S.C. §§ 1341, 1343 and 1832 in amounts still being investigated and to be determined at trial.

**CONFIDENTIAL**

### D. The Racketeering Acts are Related, Open Have Been Committed Over a Long Period of Years, and are Ongoing, Posing a Threat of Continued Criminal Activity

289.    The foregoing predicate acts and others not specified or not yet discovered are related to each other and to the Enterprise as whole as they all have been committed against Airtech through specific repeated types of acts of fraud, theft, and misappropriation.

290.    The foregoing predicate acts were committed beginning at least five years ago in 2019 and have been committed periodically since and continue to be committed through the expanding Enterprise controlled by culpable persons Yim and Kim. Thus, the pattern of racketeering acts is demonstrated to have both closed-ended continuity and open-ended continuity.

291.    Defendants are continuing their racketeering activities by continuing to use misappropriated Airtech Trade Secrets to do business with customer's that were Airtech customers and to obtain new customers which acts include contacting Airtech's customers and vendors and falsely stating that Airtech is going out of business.

292.    In December of 2021, Yim, while in New Jersey, contacted Ms. Yoon Jung Ahn from Unione, one of Airtech's customers in Republic of Korea. Yim stated that Airtech's business would be difficult and that it would not survive and go out of business. Such false statements were uttered via interstate and international phone calls and interstate and international emails.

293.    As a direct and proximate cause of defendants Yim and Kim's acts of racketeering activities, Airtech has suffered multiple injuries, lost numerous customers and business opportunities, and have sustained irreparable damages and will continue to do so. As

66

alleged above, Airtech lost its business from SE-A Electronics, Ltd., Unione, Seoul Standard, and Intellics.

## PRAYER FOR RELIEF

**WHEREFORE**, Airtech respectfully requests that this Court enter a judgment pursuant to 18 U.S.C. 1964(c):

a.       awarding Airtech treble damages according to proof;

b.       awarding Airtech pre- and post-judgment interest;

c.       awarding a permanent injunction against Defendants against committing further racketeering activity;

d.       awarding Airtech reasonable attorneys' fees and costs; and

e.       awarding Airtech such other and further relief as the Court deems just and proper.

## COUNT IV
### Violation of Computer Fraud and Abuse Act, 18 U.S.C. § 1030, Against Yim

294.       Airtech repeats and re-alleges the facts alleged in all preceding paragraphs as if fully set forth herein.

295.       As set forth above, against company rules and without authorization, Yim stole two computers from Airtech on June 25, 2021 and September 17, 2021, respectively being Yim's assigned Airtech work computer and Mr. Lee's Airtech work computer, both of which were used in Airtech's business including in interstate and foreign commerce and thus were "protected computers" under the Computer Fraud and Abuse Act, 18 U.S.C. 1030 ("CFAA").

296.       As set forth above, upon information and belief, Yim accessed the data in the computers while they were outside Airtech's offices and, without authorization, copied that data,

67

**CONFIDENTIAL**

including data on Mr. Lee's computer, including Mr. Lee's personal financial information, to which Yim would have no authorized access even if the computers were located in Airtech's offices.

297.    Yim thus intentionally accessed two protected computers without authorization and exceeded his authorized access insofar as no access outside of Airtech was authorized and Yim intentionally obtained information from the computers to which he had no authorized access.

298.    Yim accessed the computers with intent to defraud as his theft of the computers, unauthorized access of them, and unauthorized copying of the data they contained was part of his and the other Defendants' scheme to defraud Airtech and to misappropriate Airtech's valuable Trade Secrets and use the misappropriated information to defraud Airtech and steal sales from it thereby damaging Airtech in all the ways alleged herein causing losses to Airtech in excess of $5,000.00 including by fraudulently invoicing Airtech, and by using misappropriated Trade Secrets to divert sales Airtech would have made to its regular customers as alleged above.

299.    The foregoing facts constitute violations of the CFAA.

300.    When his theft of the computers was discovered, Yim threatened to disclose and impair the confidentiality of information that was on the protected computers, particularly the personal financial information of Mr. Lee, in further violation of the CFAA.

## PRAYER FOR RELIEF

**WHEREFORE**, Airtech respectfully requests that this Court enter a judgment:

a.    declaring that Yim violated 18 U.S.C. §1030;

b.    awarding Airtech compensatory damages;

68

**CONFIDENTIAL**

c.      awarding Airtech liquidated and/or statutory damages;

d.      awarding Airtech punitive damages;

e.      Enjoining Yim and any Defendant possessing or with access to any of the Trade Secrets misappropriated from the stolen computers to return all Trade Secrets to Airtech and to submit to a forensic examination to ensure that no misappropriated Airtech Trade Secrets remain in Defendants' possession, custody or control.

f.      awarding Airtech pre- and post-judgment interest;

g.      awarding Airtech reasonable attorneys' fees and costs; and

h.      awarding such other and further relief as the Court deems just and proper.

## COUNT V
## State Law Conversion

301.    Airtech repeats and re-alleges the facts alleged in all preceding paragraphs as if fully set forth herein.

302.    As set forth above, Yim converted Airtech funds through the fraudulent expense voucher scheme to which funds Airtech had and has an immediate right.

303.    As set forth above, Airtech discovered the scheme and demanded return of the funds but Yim made a payment of only a small fraction of the funds he converted.

304.    Yim has not yet returned the balance of the Airtech funds he converted.

305.    As set forth above, Yim converted two computers to which Airtech always had a right to possess.

306.    As alleged above, while Yim returned the computers to Airtech when Airtech discovered his thefts, he did not return them with all of their contents, not returning a hard drive and not returning all of the valuable data that Airtech had stored on the computers.

69

**CONFIDENTIAL**

307.    Yim has not returned the hardware and digital files he converted and did not return when demand was made to him by Airtech therefor.

308.    In light of the foregoing, Yim has converted and must return to Airtech the balance of the converted funds, computer hardware and digital files.

**WHEREFORE**, Plaintiff respectfully requests that this Court enter a judgment:

a.    finding that Yim intentionally converted property belonging to Airtech;

b.    finding that Yim's conversion was willful;

c.    ordering the return with interest of the funds Yim converted and ordering the return of all computer hardware and digital files converted by Yim and not returned to Airtech;

d.    ordering an accounting of all books and records of Defendants that pertain to the purchases, sales, marketing profits and financial records relevant to the use of Airtech's Trade Secrets to compete against or otherwise steal business away from Airtech;

e.    ordering an accounting of all computer hardware and digital files within the possession, custody or control of the Defendants to locate and secure the return of all property belonging to Airtech;

f.    enjoining future acts of conversion by Yim;

g.    awarding Plaintiff compensatory damages;

h.    awarding Plaintiff liquidated damages;

i.    awarding Plaintiff punitive damages;

j.    awarding Plaintiff pre- and post-judgment interest;

k.    awarding Plaintiff reasonable attorneys' fees and costs; and

l.    awarding such other and further relief as the Court deems just and proper.

**CONFIDENTIAL**

<u>**COUNT VI**</u>
**State Law Theft of Corporate Funds Against All Defendants**

309.    Airtech repeats and re-alleges the facts alleged in all preceding paragraphs as if fully set forth herein.

310.    As set forth above, Yim on his own as to some acts and with other Defendants as to others used his employment by and position of trust within the Airtech corporation to convert and misappropriate Airtech's funds through the various schemes described.

311.    By those acts and omissions, aided and abetted by the other Defendants as hereinabove set forth, defendant Yim intentionally misappropriated funds belonging to Plaintiff and caused Plaintiff to suffer an undue financial loss.  Plaintiff's loss consists of known amounts, among others, of $111,929.92 from the fake expense vouchers; approximately $219,586.76 from the phony invoices created by defendant Yim on behalf of the Sham Companies,  $62,500 from the phony commission invoice submitted by Yim, and $5,645.85 from the sales created by Yim on Amazon.

**WHEREFORE**, Airtech respectfully requests that this Court enter a judgment:

a.    finding that Defendants have stolen corporate funds from Airtech;

b.    ordering an accounting of all books and records of Defendants that pertain to the purchases, sales, marketing profits and financial records relevant to the use of Airtech's Trade Secrets to compete against or otherwise steal business away from Airtech;

c.    declaring that Defendants' actions were willful;

d.    awarding Airtech disgorgement from Defendants of all stolen funds and compensatory damages;

e.    awarding Plaintiff liquidated damages;

71

**CONFIDENTIAL**

f.      awarding Airtech punitive damages;

g.      awarding Airtech pre- and post-judgment interest;

h.      awarding Airtech reasonable attorneys' fees and costs; and

i.      awarding Airtech such other and further relief as the Court deems just

and proper.

<div align="center">

**COUNT VII**
**State Law Breach of Fiduciary Duty Against Yim**

</div>

312.    Airtech repeats and re-alleges the facts alleged in all preceding paragraphs as if
fully set forth herein.

313.    Yim was the general manager and head of information technology at Airtech.

314.    As the general manager of Airtech, Yim managed all the employees of Airtech
and had access to Airtech's finances so that Yim owed a duty of care and loyalty to Airtech.

315.    As the head of information technology, Yim was responsible for setting up the
Airtech computer systems, setting Airtech employee computer accounts, backing up Airtech's
Trade Secrets, and protecting Airtech's Trade Secrets which were maintained on Airtech's
computer system. Without question, Yim stood in a position of ultimate trust vis-à-vis Airtech in
regard to his actions complained of herein.

316.    Yim knew that Plaintiff had granted him certain authority based on his positions
of trust and duty of care and loyalty.

317.    Yim's scheme to provide fake and phony invoices to defraud Airtech, and
transact business with the Sham companies was a breach of his fiduciary duty to Airtech.

**CONFIDENTIAL**

318.    Yim's use of Airtech's Trade Secrets to compete against his employer while still employed by Airtech, his theft of Airtech's Trade Secrets after leaving Airtech, and the acts and omissions set forth in the preceding paragraphs constitute a breach of his fiduciary duty.

319.    Airtech has suffered a loss of business, loss of customers and damage to its reputation due to Yim's actions.

320.    As a direct and proximate result of Yim's breach of fiduciary duty, Plaintiff has been injured in its business and property.

**WHEREFORE**, Airtech respectfully requests that this Court enter a judgment:

a.    holding that Yim intentionally breached his fiduciary duties of care and loyalty to Airtech and that the other Defendants have directly aided and abetted in Yim's breach of his fiduciary duties to Airtech;

b.    holding that Defendants' actions were willful;

c.    holding that Yim breached his fiduciary duties to Airtech;

d.    awarding Airtech compensatory damages;

e.    awarding Plaintiff liquidated damages;

f.    awarding Airtech punitive damages;

g.    awarding Airtech pre- and post-judgment interest;

h.    awarding Airtech reasonable attorneys' fees and costs; and

i.    awarding Airtech such other and further relief as the Court deems just and proper.

73

**CONFIDENTIAL**

## COUNT VIII
### Unjust Enrichment and
### Constructive Trust Against All Defendants

321.    Plaintiff repeats and re-alleges the facts alleged in all preceding paragraphs as if fully set forth herein.

322.    Yim was an employee of Airtech.

323.    As alleged herein, Defendants stole Airtech Trade Secrets and other proprietary Airtech information from Airtech directly, defrauded Airtech using fraudulent reimbursement requests and invoices, used the stolen Airtech Trade Secret information to sell products to Airtech at inflated prices from the defendant Sham Companies which products were ultimately destined to be sold to Airtech's customers, depriving Airtech of its full net profit on those products, used the stolen Airtech Trade Secrets to compete with Airtech through the defendant Adversary Companies diverting sales and profits from Airtech,,and as to all such wrongful acts, Defendants did not pay any compensation to Airtech leaving Airtech injured in the full amount of all monies received by Defendants from such acts.

324.    Defendants reaped profit from the wrongful use ofAirtech's Trade Secrets which was not paid to or shared with Airtech.

325.    Defendants' actions were wrongful and resulted in damage to Airtech.

326.    Defendants were unjustly enriched by their actions.

**WHEREFORE**, Plaintiff respectfully requests that this Court enter a judgment:

a.    holding that Defendants stole money, Trade Secrets, and other items of value from Airtech, defrauded Airtech using said misappropriated Trade Secrets, and stole business from Airtech thereby wrongfully taking profits that rightfully were Airtech's, that Defendants

74

**CONFIDENTIAL**

continue to wrongfully possess such money and property they wrongfully received and profited

from the use of Airtech's Trade Secrets and resale of valuable goods from Plaintiff, , all thereby

damaging Airtech without paying appropriate compensation for the same to Airtech;

b.      ordering an accounting of all books and records of Defendants that pertain to the

purchases, sales, marketing profits and financial records relevant to the use of Airtech's

Trade Secrets to compete against or otherwise steal business away from Airtech;

b.      holding that Defendants' actions were willful;

c.      awarding Airtech compensatory damages in the total amount in which Defendants

were unjustly enriched;

d.      imposing a constructive trust for the benefit of Airtech on all proceeds of and

Defendants' assets resulting from the wrongful transactions;

e.      enjoining future such actions by Defendants using Airtech's Trade Secrets and/or

stealing from and/or defrauding Airtech;

f.      awarding Airtech punitive damages;

g.      awarding Airtech pre- and post-judgment interest;

h.      awarding Airtech reasonable attorneys' fees and costs; and

i.      awarding Airtech such other and further relief as the Court deems just and proper.

## <u>COUNT IX</u>
## Fraud against All Defendants

327.    Airtech repeats and re-alleges the facts alleged in all preceding paragraphs as if

fully set forth herein.

328.    Defendants made material misrepresentations of fact regarding various

commercial transactions in which they induced Plaintiff to engage including:

75

**CONFIDENTIAL**

a.      Yim's submission to Airtech of fake reimbursement vouchers which he knew to be false on which he intended Airtech to rely and upon which Airtech did reasonably rely resulting in damage to Airtech in the amount of money paid to Yim by Airtech as a result of his fake reimbursement voucher scheme;

b.      Yim's formation of Sham Companies through which he did business with Airtech which Yim intended Airtech to make purchase from as if they were real companies, selling products to Airtech at what Defendants knew to be grossly inflated prices, submitting invoices they knew to be fraudulent to Airtech which Airtech reasonably believed to be legitimate and paid, and fraudulently accessed and changed Airtech's records to conceal the sham nature of the transactions from Airtech, thereby resulting in injury to Airtech in the amount by which the products' prices were inflated and in damaging relationships Airtech had with its legitimate vendors;

c.      Yim's submission of what he knew to be fraudulent commission vouchers and invoices purporting to be from real brokers and fraudulently directing the payments thereof by Airtech to be made to accounts controlled by Defendants thereby damaging Airtech in the amount of the payments it made based on the bogus vouchers and invoices; and

d.      Defendants doing business through the Adversary Companies with customers and vendors of Airtech and in all cases in which the customer and vendor companies were not confederates of Defendants participating in their scheme, defrauded them by lying to them about Airtech and the products they sold to them and in later instances by falsely stating to the customers and vendors that the Adversary Company transactions were not violating the Modified TRO when they were violating it, thereby damaging Airtech by

76

**CONFIDENTIAL**

fraudulently diverting business from Airtech causing Airtech to lose revenue and profits and damaging Airtech's relationships with its customers and vendors causing further damage to Airtech by decreasing the amount of sales it made to those customer or in some instances to lose the customer entirely.

329.    Defendants made the representations willfully and maliciously knowing they were false with the intention that Airtech rely upon them which reasonably it did.

330.    Airtech was damaged as a result of each of the multiple frauds and fraudulent schemes.

**WHEREFORE**, Airtech respectfully requests that this Court enter a judgment:

a.    holding that Defendants intentionally defrauded Airtech;

b.    holding that Defendants' fraud was willful;

c.    enjoining future acts of fraud by Defendants;

d.    awarding Airtech compensatory damages;

e.    awarding Plaintiff liquidated damages;

f.    awarding Airtech punitive damages;

g.    awarding Airtech pre- and post-judgment interest;

h.    awarding Airtech reasonable attorneys' fees and costs; and

i.    awarding Airtech such other and further relief as the Court deems just and proper.

### COUNT X
**Tortious Interference with Contract, Contractual Relations, and Prospective Economic Advantage and Unfair Competition against All Defendants**

331.    Airtech repeats and re-alleges the facts alleged in all preceding paragraphs as if fully set forth herein.

**CONFIDENTIAL**

332.     Airtech had express contracts, contractual relations, and expectation of prospective economic advantage based on long-term business relationships, with customers, vendors and brokers all of which Defendants had knowledge at all relevant times.

333.     Defendants were not a party to Airtech's contracts with its customers, including contracts providing exclusive transactional rights to Airtech for which Airtech had bargained, expended substantial time and resources, of which all of which Defendants were well aware, nor did Defendants have any legitimate expectation of economic advantage with any customer, vendor, supplier, manufacturer, or broker who did business with Airtech when Yim was an Airtech employee or thereafter or any right of remuneration therefrom.

334.     Said customers of Airtech included SE-A Electronics, Unione Technologies, Hanwha Systems, Intellics, Korea Electro Optics Co., Inc. Qnion Ltd, Segi Co, and Seoul Standard ("Airtech Customers".

335.     Said vendors of Airtech included Phytron, Aperture Optical Sciences, and Air Rover ("Airtech Vendors").

336.     Said brokers of Airtech included EAU Group ("Airtech Brokers")

337.     As alleged herein, Defendants, wrongfully misappropriated, took and used Airtech's Trade Secrets, confidential and proprietary information to intentionally, unjustifiably, maliciously and wrongfully submit false and fraudulent expense reimbursement requests and receipts to Airtech including purporting to be from an Airtech Broker interfering with the contract with and prospective economic gain Airtech expected from the Airtech Broker and others whose information was misused by Defendants and unfairly competing with and causing damage to Airtech in those contract and economic relationships and with the companies with which Airtech did business through those brokers and vendors.

78

CONFIDENTIAL

338.    As alleged herein, Defendants, wrongfully misappropriated, took and used Airtech's Trade Secrets, confidential and proprietary information to deliberately, intentionally, unjustifiably, maliciously and wrongfully conduct a scheme against Airtech whereby they submitted false and fraudulent invoices from the Sham Companies to Airtech and then accessed the ledgers, books and records of Airtech to fraudulently change the names of the Sham Companies to the names of legitimate vendors that Airtech frequently dealt with thereby intentionally and unjustifiably interfering with Airtech's contractual relations and expected economic advantage from those Airtech vendors injuring Airtech directly by overcharging Airtech for the products sold to it in that way unfairly competing with and injuring Airtech's business and contractual relationships with the affected Airtech Vendors and with the Airtech Customers to which Airtech sold the products it so acquired by its purchases unknowingly from Sham Companies at inflated prices.

339.    As alleged herein, Defendants wrongfully misappropriated, took and used Airtech's Trade Secrets, confidential and proprietary information through their Adversary Companies, deliberately, intentionally, unjustifiably, maliciously and wrongfully to conduct a scheme against Airtech whereby they contacted the specific persons with whom Airtech dealt in Airtech Customers and directly interfered in Airtech's contractual relations with the Airtech Customers and prospective economic advantages of continued sales to the Airtech Customers by making sales of products to those Airtech Customers which would have been made by Airtech by using Airtech Trade Secrets and proprietary information thereby intentionally and fraudulently causing those Airtech Customers to buy from Defendants taking and diverting from Airtech the revenues and profits from those transactions and damaging Airtech's business and contractual relations with those Airtech Customers unfairly competing with and costing Airtech

79

CONFIDENTIAL

additional business all of which damaged Airtech by direct loss of sales, revenues and profits and expected sales revenues and profits and by damaging Airtech's continued and future business with those Customer Companies.

340.    To the extent any of the Airtech Customers or specific officers thereof cooperated and conspired with Defendants and their Adversary Companies to divert sales and business from Airtech they conspired in the interference with contracts, contractual rights and prospective economic advantage of Airtech, unfair competition with Airtech, and the business diversion scheme of Defendants directed against Airtech.

341.    From such diversion of business transactions, Airtech lost its contractual rights and prospective economic advantages and benefits arising therefrom.

342.    Airtech was damaged as a result of such interference.

**WHEREFORE**, Airtech respectfully requests that this Court enter a judgment:

a.    holding that Defendants tortiously interfered with Airtech's contracts, contractual relations, and prospective economic advantage with Airtech Customers, Vendors (including suppliers and manufacturers), and Brokers;

b.    holding that Defendants unfairly competed with Airtech

c.    holding that Defendants' tortious interference and unfair competition was willful;

d.    enjoining future acts of tortious interference and unfair competition by Defendants;

e.    awarding Airtech compensatory damages

f.    awarding Airtech disgorgement by Defendants of all payments and profits received by Defendants due to their misappropriation, interference and unfair competition;

g.    awarding Plaintiff liquidated damages;

80

**CONFIDENTIAL**

h.      awarding Airtech punitive damages;

i.      awarding Airtech pre- and post-judgment interest;

j.      awarding Airtech reasonable attorneys' fees and costs; and

k.      awarding Airtech such other and further relief as the Court deems just and
proper.


### COUNT XI
### Conspiracy against All Defendants

343.    Airtech repeats and re-alleges the facts alleged in all preceding paragraphs as if
fully set forth herein.

344.    Yim, Kim, Yoon Jung Ahn, Jiyoung Lee, Unione, SEGI and the remaining
Defendants agreed between themselves to unlawfully act in concert to commit fraud, conversion,
tortious interference with contract and other wrongdoing against Airtech.

345.    Yim, Kim, Yoon Jung Ahn, Jiyoung Lee and the remaining Defendants agreed
to take specific actions, to wit, to commit fraud, conversion and tortious interference with
contract in furtherance of their agreement inflicting damages against Airtech.

346.    Airtech was damaged and continues to suffer damages as a result of this
conspiracy between the Yim, Kim, Yoon Jung Ahn, Jiyoung Lee, Unione, SEGI and the
remaining Defendants.


**WHEREFORE**, Plaintiff respectfully requests that this Court enter a judgment:

a.      holding that Yim, Kim, Yoon Jung Ahn, Jiyoung Lee, Unione, SEGI and the
remaining Defendants conspired to commit torts and other wrongdoing against Plaintiff;

81

**CONFIDENTIAL**

b.    holding that Yim, Kim, Yoon Jung Ahn, Jiyoung Lee, Unione, SEGI and the remaining Defendants' conspiracy was willful;

c.    enjoining future acts of conspiracy by Yim, Kim, Yoon Jung Ahn, Jiyoung Lee, Unione, SEGI and the remaining Defendants;

d.    awarding Airtech compensatory damages;

e.    awarding Plaintiff liquidated damages;

f.    awarding Airtech punitive damages;

g.    awarding Airtech pre- and post-judgment interest;

h.    awarding Airtech reasonable attorneys' fees and costs; and

i.    awarding Airtech such other and further relief as the Court deems just and proper.

## COUNT XIII
### Breach of Contract Against Yim

347.    Airtech repeats and re-alleges the facts alleged in all preceding paragraphs as if fully set forth herein.

348.    Yim was employed by Airtech.

349.    As an employe of Airtech, Yim and the other employees of Airtech were regularly told by Mr. Lee that the Trade Secrets of Airtech were the life blood of the company and should not be shared nor disclosed to third parties.

350.    As the general manager of Airtech, Yim stood in a position of ultimate trust vis-à-vis Airtech in regard to his actions complained of herein, and often told new employees that Airtech's Trade Secrets were confidential and proprietary and should not be disclosed or shared with any third parties.

351.    Yim knew that Airtech had granted him certain authority based on his position.

82

**CONFIDENTIAL**

352.    Yim, as the head of information technology, was responsible to setting up the computers for existing and new employees, and Yim was responsible for configuring password protection on the computers and Airtech email accounts. Yim regularly told Airtech's employees that they should keep their passwords safe and secure to prevent unauthorized access to Airtech Trade Secrets.

353.    As an employee and general manager of Airtech, Yim often entered into confidentiality agreements or exclusive purchase agreements with Airtech's customers and vendors, which required that Yim maintain the confidentiality of information exchanged and generated with Airtech's customers and vendors.

354.    It was a breach of contract for Yim to provide fake and phony invoices to defraud Airtech, steal corporate funds and property, steal business away from Airtech by purchasing exclusive products from Airtech's vendors and reselling them to Airtech's customers using Airtech's Trade Secrets. Yim's acts and omissions constitute breaches of contract.

355.    Yim's actions of misappropriating and using Airtech's Trade Secrets is also a breach of specific contracts and exclusive purchase agreements with Airtech's customers.

356.    As a direct and proximate result of Yim's breach of numerous contracts, Airtech has suffered an injury to its business and property rights.

**WHEREFORE**, Airtech respectfully requests that this Court enter a judgment:

a.    holding  that  Yim has  breached his contract with Airtech;

b.    holding that Yim has breached contracts and exclusive distribution agreements with Airtech, Airtech's customers and Airtech's vendors;

c.    holding that Yim's actions were willful;

d.    awarding Airtech compensatory damages;

83

**CONFIDENTIAL**

e.      enjoining future such actions by Defendants;

f.      awarding Plaintiff punitive damages;

g.      awarding Airtech pre- and post-judgment interest;

h.      awarding Airtech reasonable attorneys' fees and costs; and

i.      awarding Airtech such other and further relief as the Court deems just and proper.

## COUNT XIV
### Defamation against Yim

357.    Airtech repeats and re-alleges the facts alleged in all preceding paragraphs as if fully set forth herein.

358.    During 2021 and 2021, both before and after he departed from his positions with Plaintiff, Yim made false and defamatory statements about Plaintiff and its President, Mr. Lee.

359.    Yim communicated these false and defamatory statements to third parties including Airtech's current and former customers, vendors and manufacturers.

360.    Among Yim's false and defamatory statements which he made during 2021 and 2022 to Airtech's customers, vendors and manufacturers, Yim falsely told these third parties that Airtech had significant tax issues, implying that Airtech was dishonest and would not survive long; was subject to personnel departures; was experiencing "huge trouble" and "would shrink legally." Yim falsely told Airtech's customers, vendors and manufacturers that various customers did not like Airtech and did not want to conduct business with Airtech.

84

**CONFIDENTIAL**

361.     Yim intentionally made these false statements in an attempt to convince Airtech's customers that it was not reliable so that the customers would terminate their business relationships with Airtech and commence business with Yim and the remaining Defendants.

362.     These false statement severely damaged Airtech's reputation in Airtech's business community and were intentionally designed to deter others from doing business with Airtech.

363.     These actions were intentional, willful, malicious and reckless, and taken for Yim's personal gain.

364.     As a result of the foregoing actions, Airtech was damaged by losing at least two customers and millions of dollars in annual revenues.

**WHEREFORE**, Airtech respectfully requests that this Court enter a judgment:

a.     holding that Yim has defamed Airtech;

b.     holding that Yim's actions were intentional, willful and otherwise actionable;

c.     awarding Airtech compensatory damages;

d.     enjoining future such actions by Defendants;

e.     awarding Airtech punitive damages;

f.     awarding Airtech pre- and post-judgment interest;

g.     awarding Airtech reasonable attorneys' fees and costs; and

h.     awarding such other and further relief to Airtech as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

**CONFIDENTIAL**

Dated: November ___, 2024

Respectfully submitted,

CHO LAW GROUP, LLC


By: */s/ Kenneth K. Cho*
    Kenneth K. Cho
    kcho@cholawgrp.com
    CHO LAW GROUP, LLC
    22 Paris Avenue, Suite 110 D
    Rockleigh, NJ 07647
    Telephone: (201) 822-0032
    Facsimile:  (201) 822-0033

    Ted G. Semaya (*admitted pro hac vice*)
    ted@semayalaw.com
    SEMAYA LAW FIRM
    43 West 43rd Street, Suite 164
    New York, NY 10036-7424
    Telephone: (914) 844-6480

    Susie Kim-Levy (*admitted pro hac vice*)
    susie.kim@skimlawgroup.com
    S. KIM LAW GROUP, PLLC
    745 Fifth Avenue, Suite 500
    New York, NY 10151
    Telephone: (646) 825-2336
    Facsimile:  (646) 825-2351

    *Attorneys for Plaintiff*
    *Airtech International, Inc.*

**CONFIDENTIAL**

VERIFICATION

Jin O. Lee, of full age, hereby certifies:

I am the president of AIRTECH INTERNATIONAL INC., Plaintiff in the above-entitled

matter.  I have read the foregoing Second Amended and Supplemental Complaint and certify that

the allegations contained therein are true to the best of my knowledge, information and belief.

I certify that the foregoing statements are true. I am aware that if any statement made

herein is willfully false, I am subject to punishment.


_____
                                                                JIN O. LEE

Dated:  November ____, 2024

87

**CONFIDENTIAL**

# CONFIDENTIAL

# FILED UNDER SEAL

## EXHIBIT B

### IN

### *Airtech International Inc. v. Byung Chan Yim*

### *a/k/a Roy Yim, et al.*

### Civil Action No. 22-00668-MEF-AME

**CHO LAW GROUP, LLC**
Kenneth K. Cho (KC-3182)
22 Paris Avenue, Suite 110 D
Rockleigh, New Jersey 07647
Tel: (201) 822-0032
Fax: (201) 822-0033
Email: kcho@cholawgrp.com
*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY
-------------------------------------------------------X
AIRTECH INTERNATIONAL, INC.,

                                Civil Case No. 22-0668 (~~EP~~MEF)(AME)

        Plaintiff,

                            **SECOND AMENDED AND
~~-against-~~                           SUPPLEMENTAL
~~-against-~~             **COMPLAINT** ~~FOR INJUNCTIVE
        RELIEF AND DAMAGES~~**

BYUNG CHAN YIM A/K/A ROY YIM,        **JURY TRIAL DEMANDED**
HYO SUN KIM,
ASSURED COMPONENTS LLC,
SENSA TECHNETICS LLC, GENUINE        **FILED UNDER SEAL**
AVIATION LLC, RFWAVE LAB INC.,
ARC-TECH INC., HANS AEROSPACE INC.,
HANS AEROSPACE LLC,
BIZARRAVENTURA INC.,
JOHN DOES 1-10, AND XYZ CO. 1-10,

        Defendants.
-------------------------------------------------------X

        AIRTECH INTERNATIONAL, INC. ("Plaintiff" or "Airtech"), by and through its

attorneys, ~~Kim & Bae, P.C., upon~~Cho Law Group, LLC, Semaya Law Firm and S. Kim Law

Group, LLC, upon personal knowledge with respect to itself and its own actions and upon

information and belief as to all other matters, complaining of BYUNG CHAN YIM a/k/a ROY

YIM ( ~~"Defendant Yim" or "~~Yim"), HYO SUN KIM ~~("Defendant Kim"~~ (or "Kim"), ASSURED

COMPONENTS LLC ("Assured"), SENSA TECHNETICS LLC ("Sensa"), GENUINE

1

**CONFIDENTIAL**

AVIATION LLC ("Genuine"), RFWAVE LAB INC. ("~~Rfwave~~RFWave"), ARC-TECH INC. ("Arc-Tech~~") and~~"),) HANS AEROSPACE INC. ("Hans Inc."),  HANS AEROSPACE LLC ("Hans LLC"),  and BIZARRAVENTURA INC. ("Bizarra") (collectively "Defendants"), brings this action seeking damages ~~and,~~ injunctive relief, and seizure of misappropriated trade secrets against Defendants for violations of the Federal Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. ~~§§ 1962(c), (d), 1964 (c), and 1832 (a)(1), and (5), violations of§~~ 1961, *et seq*., ("RICO"); the Economic Espionage Act of 1996, 18 U.S.C. § 1831 *et seq*., including § 1836 (the Defend Trade Secrets Act of 2016 ("DTSA"); the Computer Fraud and Abuse Act, 18 U.S.C. §1030~~, permanent injunction,~~ ("CFAA"), and the New Jersey Trade Secrets Act, N.J.S.A. 56:15-2, et seq. ("NJTSA") and for conversion, ~~theft of corporate funds,~~ breach of fiduciary duty, quantum meruit, unjust enrichment, ~~and~~ constructive trust, fraud, tortious interference~~, conspiracy~~ with contract, accounting, breach of contract, and defamation and hereby alleges as follows:

## **INTRODUCTION**

1.     In this action, ~~Plaintiff~~Airtech seeks to recover damages and injunctive relief against and recover its trade secrets from its former employee, ~~Defendant~~ Yim, and his co-~~conspirators~~Defendants for misappropriation of trade secrets, fraud, conversion, ~~other violations and breaches of duty and~~ a pattern of racketeering activities ~~all arising from carefully calculated and designed~~for schemes ~~to perpetrate fraud on Airtech.~~ they perpetrated against Airtech and other claims for violations of law and breaches of duty. Airtech is a New Jersey company engaged in selling military defense and aerospace parts ~~Defendant~~ and products. Yim is a former employee of Airtech who was a computer programmer, head of information technology,

2

**CONFIDENTIAL**

and general manager ~~who was employed by Airtech~~ there over his course of employment from approximately June 2005 to September 30, 2021.

2.    Yim was hired in June 2005 as a computer programmer to develop software for Airtech's computer system. Defendant Yim spent a lot of time with the owner and President of Airtech, Mr. Jin Lee ("Mr. Lee"), to learn about Airtech's business, customers, vendors, products, business processes and other proprietary information so that this information could be included in Airtech's computer system.

3.    Yim developed custom software that ran on Airtech's computer system and was also responsible for maintaining the computer system and backing up the proprietary information contained in Airtech's computer system. He was promoted to the head of information technology ("IT"), then to general manager, and retained these responsibilities until he left Airtech.

4.    From June 2005 to September 30, 2021, Yim was responsible for maintaining and upgrading Airtech's computer system, backing up all the proprietary information of the company, setting up new computers and email accounts for new employees, and upgrading the computer hardware and software for Airtech's employees.

5.    After Yim resigned from Airtech and prior to his last day at work, Mr. Lee requested that Yim return all confidential and proprietary information of Airtech and avoid working in a similar business with Airtech's customers and vendors.

~~2.~~6.    During his employment with ~~Plaintiff, defendant~~Airtech, Yim, among other things, embezzled and stole hundreds of thousands of dollars from Airtech by creating false expense reimbursement receipts. Yim's deceitful and illegal activity ~~relating to the use of~~using false expense reimbursement receipts began in or about 2014 and continued until February ~~of~~

3

**CONFIDENTIAL**

2020 as a result of which Yim and his co-~~conspirators~~defendants improperly obtained from ~~Plaintiff~~Airtech a total sum discovered to date of ~~approximately~~ $111,929.92

~~3.~~7.    When Yim was caught by ~~Plaintiff~~Airtech in the aforesaid fraudulent and illegal conduct on February 3, 2020, ~~Yim~~he began ~~yet~~ another scheme to defraud Airtech by ~~forming various~~setting up a network of companies in multiple states to submit false and grossly inflated invoices to Airtech. ~~~~Yim did so with the aid of his mistress~~, Defendant~~ (now wife), Kim.~~~~ Kim was the nominal owner of all of the companies formed for ~~their~~Yim's and Kim's illegal activities. ~~~~Kim conspired with Yim to submit fake invoices to Airtech for ~~the~~ phony sales and fictitious invoices under the ~~guise~~guises of the different entities that Kim and Yim created. Additionally, Yim and Kim submitted fake invoices under the guise of Airtech's broker for commissions that Airtech did not owe. ~~~~Through various illegal acts hereinafter set forth, Defendants improperly obtained over $500,000 in ill-gotten gains.[1]

8.    ~~Furthermore,~~Airtech recently discovered that Yim had been forwarding and storing emails he received to and sent from his Airtech email account, all of which were confidential to Airtech including attachments containing confidential, proprietary information to his personal Gmail accounts while he was employed by Airtech, since at least 2006.

9.    Airtech more recently discovered that Yim also had been forwarding and storing emails that were received by Mr. Lee and other Airtech employees' Airtech email accounts, which were confidential to Airtech including attachments containing confidential, proprietary

---

[1] ~~There is an ongoing audit of the books and accounting to determine the magnitude of Defendants' larceny and other wrongdoing.~~ Airtech has continued to discover more instances of wrongdoing by Yim during the course of this action, including of the forged invoice scheme. The amounts alleged herein will be updated for trial.

4

CONFIDENTIAL

information, to his personal Gmail accounts using a server-level forwarding command that automatically forwarded Airtech emails to Yim's Gmail accounts.

10.     Airtech cannot locate the backup copies of Airtech data, all containing confidential, proprietary Airtech information, that were routinely made by Yim in his capacity as head of IT at Airtech.

11.     While employed by and unbeknownst to Airtech, Yim was secretly and improperly using confidential, proprietary customer and vendor information to secretly and improperly conduct business with Airtech through the Defendant companies.

4.12.     Airtech discovered after Yim's resignation on September 30, 2021, that he stole two computers with all of the data from Airtech's computer systems which contain ~~confidential and vital customer information and critical operational data, and using this data~~Airtech's customer and vendor information including telephone numbers and email addresses, product information including technical specifications, data, price histories, schematics, contracts, testing methods and results, quality assurance information, marketing strategies, regulatory compliance information, invoices, banking information, transaction and price history and ways of doing business (hereinafter referred to as "Trade Secrets"), and that, using these Trade Secrets Yim began to secretly and improperly conduct business with Airtech's customers directly in competition with Airtech. Such illegal conduct continues to this day. Yim has continued to do so even in violation of ~~this Court's pending~~the temporary restraining order the Court entered in this action.

5.13.     The ~~stolen~~ business records and data ~~which~~that Yim stole from Airtech contain highly sensitive, information from export licenses granted by the U.S. Government, confidential

5

**CONFIDENTIAL**

and competitive ~~trade secret information~~ Trade Secrets pertaining to Airtech's operation, clients, ~~and even~~some of which was subject to governmental secrecy laws.[2]

6.14.    Without this Court's intervention, ~~Plaintiff~~Airtech will be irreparably and permanently damaged in its reputation and its ability to carry out its business.

## JURISDICTION AND VENUE

7.15.   This Court has subject matter jurisdiction over this action pursuant to 18 U.S.C. §§ 1030, 1962, 1964, 1832, 1836, and ~~1832. ~~2314. Additionally, this Court has supplemental jurisdiction over ~~Plaintiff's~~Airtech's state law claims pursuant to 28 U.S.C. §1367.

16.     This Court has personal jurisdiction over Yim and Kim in several ways. It has general jurisdiction over them because they resided in this jurisdiction at the time of the filing of the original Complaint as well as their and their companies' continuous and systematic conduct in New Jersey and specific jurisdiction by virtue of their commission of tortious acts within New Jersey and this judicial district, the injuries their acts caused to Airtech, which at all relevant times was a New Jersey corporation and had and has its principal place of business in New Jersey and this judicial district, and through their transaction of business within the State of New Jersey and this judicial district.

17.     This Court has personal jurisdiction over Defendant Companies. It has general jurisdiction over the Defendant Companies that had principal places of business in New Jersey and this District at the time of the filing of the original Complaint which was all of them named

---

[2] For example, certain of the information contained in Airtech's computer systems, as Yim well ~~knows,~~knew, was and is covered by non-disclosure agreements between Airtech and third- parties which obligates Airtech to ~~strict~~strictly protect the confidentiality of such information.

6

CONFIDENTIAL

as Defendants in that Complaint and in the Amended and Supplemental Complaint because the only owners, officers and employees of those companies were Yim and Kim both of whom resided in New Jersey and this District at those times and conducted all of the business of the Defendant Companies. There is also general jurisdiction over the nonresident Defendant Companies added in this complaint because there were and are continuous and systematic contacts between those companies and New Jersey. There is also specific jurisdiction over the added Defendant Companies (as well as the originally sued Defendant Companies) by virtue of their commission of tortious acts within New Jersey and this judicial district, the injuries their acts caused to Airtech, which at all relevant times was a New Jersey corporation and had and has its principal place of business in New Jersey and this judicial district, and through their transaction of business within the State of New Jersey and this judicial district.

18.    Upon information and belief, Defendants Yim and Kim resided in this district until July, 2022, before moving to Las Vegas, Nevada where it appears they continue to reside.

8.19.    Venue is proper in this district pursuant to 28 U.S.C.§1391(b) because a substantial part of the events and omissions that gave rise to this action occurred within this district and Defendants reside within this districtall Defendants were residents of New Jersey when the original Complaint was filed.

**PARTIES**

9.20.    Plaintiff, AIRTECH INTERNATIONAL, INC. ("Airtech"), is a corporation organized and existing under the laws of the State of New Jersey with its principal place of business located at 2 Piermont Road, Cresskill, NJ 07626.

7

**CONFIDENTIAL**

10.21.    Defendant BYUNG CHAN YIM A/K/A "ROY YIM" resides("Yim") resided in the State of New Jersey, with his last known address located at 5 Kings Court, Fort Lee, NJ 07024, until he moved to Las Vegas, Nevada in July 2022.

11.22.    Defendant HYO SUN KIM resides("Kim") resided with defendant Yim, in the State of New Jersey, with her last known address located at 5 Kings Court, Fort Lee, NJ 07024, until she moved to Las Vegas, Nevada with him in July 2022 where it appears she continues to reside with him.

12.23.    Defendant ASSURED COMPONENTS LLC ("Assured") is a limited liability company formed and organized under the laws of the State of New Jersey with its places of business located at 18-20 Lackawanna Plaza, Suite 300, Montclair, NJ 07042 and 5 Kings Court, Fort Lee, NJ 07024.

13.24.    Defendant SENSA TECHNETICS LLC ("Sensa") is a limited liability company formed and organized under the laws of the State of Tennessee with its places of business located at 6000 Poplar Avenue, Suite 252, Memphis, TN 38119 and 5 Kings Court, Fort Lee, NJ 07024. Sensa was dissolved on August 11, 2021 and currentlyAs of February 8, 2022, the date of filing of the original complaint in this action, Sensa's principal place of business was in New Jersey as it was operated by Defendants Yim and Kim who then resided in New Jersey and committed and conspired in the acts alleged herein providing a basis for specific jurisdiction as to each such act and transaction alleged. Sensa was dissolved on August 11, 2021 and currently is in liquidation.

14.25.    Defendant GENUINE AVIATION LLC ("Genuine") is a limited liability company formed and organized under the laws of the State of Florida with its places of business located at 4651 Salisbury Road, Suite 400, Jacksonville, FL 32256 and 5 Kings Court, Fort Lee, NJ 07024. As of February 8, 2022, the date of filing of the original complaint in this action,

8

CONFIDENTIAL

Genuine's principal place of business was in New Jersey as it was operated by Defendants Yim and Kim who then resided in New Jersey and committed and conspired in the acts alleged herein providing a basis for specific jurisdiction as to each such act and transaction alleged.

15.26.    Defendant RFWAVE LAB INC. ("RFWave")is a corporation formed and organized under the laws of the State of Florida with its places of business located at 110 Front Street, Suite 300, Jupiter, FL 33477 and 5 Kings Court, Fort Lee, NJ 07024. As of February 8, 2022, the date of filing of the original complaint in this action, RFWave's principal place of business was in New Jersey as it was operated by Defendants Yim and Kim who then resided in New Jersey and committed and conspired in the acts alleged herein providing a basis for specific jurisdiction as to each such act and transaction alleged.

16.27.    Defendant ARC-TECH INC. ("Arc-Tech") is a corporation formed and organized under the laws of the State of Florida with its places of business located at 6303 Blue Lagoon Drive, Miami, FL 33126 and 5 Kings Court, Fort Lee, NJ 07024. As of February 8, 2022, the date of filing of the original complaint in this action, Arc-Tech's principal place of business was in New Jersey as it was operated by Defendants Yim and Kim who then resided in New Jersey and committed and conspired in the acts alleged herein providing a basis for specific jurisdiction as to each such act and transaction alleged.

17.28.    Defendant HANS AEROSPACE INC. ("Hans Inc.") is a corporation formed and organized under the laws of the State of New Jersey with its places of business located at 2225 Lemoine Avenue, Fort Lee, NJ 07024 and 5 Kings Court, Fort Lee, NJ 07024. Upon information and belief, in July 2022, Hans Aerospace moved its registered address to 4310 Cameron Street, Suite 13, Las Vegas, NV 89103 and moved its principal place of business to Nevada.

9

29.     Upon information and belief, Defendant HANS AEROSPACE LLC ("Hans LLC") is a Nevada Domestic Limited Liability Company formed and organized under the laws of the State of Nevada with its place of business located at 4310 Cameron Street, Suite 13, Las Vegas, NV 89103. The registered agent for HANS AEROSPACE LLC is Byungchan Yim. Hans LLC is operated by Defendants Yim and Kim who committed and conspired in the acts alleged herein which caused harm to Airtech in New Jersey providing a basis for specific jurisdiction as to each such act and transaction alleged.

30.     Defendant BIZARRAVENTURA INC. ("Bizarra") is a corporation formed and organized under the laws of the State of Nevada with its place of business located at 2290 S. Jones Blvd., Suite 100B, Las Vegas, NV 89146. Bizarra is operated by Defendants Yim and Kim who committed and conspired in the acts alleged herein which caused harm to Airtech in New Jersey providing a basis for specific jurisdiction as to each such act and transaction alleged.


**FACTS COMMON TO ALL CAUSES OF ACTION**

18.31.    Plaintiff Airtech is a company engaged in the business of selling military defense and aerospace materials, parts, systems, and other electrical/mechanical parts. It has been in business since 2002 and currently has approximately 1213 employees. Airtech's main customers are companies based in Korea that represents the governmentRepublic of Korea (also referred to as "South Korea's Korea") that do business in its defense and other military departments. sectors. Airtech also does business with vendors located throughout the U.S. Due to

10

the sensitive nature of ~~Plaintiff's~~Airtech's business, confidentiality and protection of information is critical to ~~its business~~it.

32.    The products that Airtech provides to its customers are generally shipped from the United States to South Korea, many of Airtech's vendors are located in states throughout the United States of America, and Airtech provides services and engages in transactions with its vendors and customers which are located in various states in the U.S. and Korea.

33.    Over the past 22 years, Mr. Lee often told his employees that the work that they do for Airtech and information regarding their customers, vendors, products, price histories, financial information, transaction history and way of doing business is confidential (Airtech Trade Secrets) and is the lifeblood of the company that should not be disclosed or shared with others outside the company.

34.    Yim knew this policy of confidentiality well since he was responsible for setting up company computers and email accounts for new employees and would give similar instructions to new employees and require them to select passwords to protect against unauthorized access to their office computers and email accounts.

~~19.~~35.    Airtech's business consists of 1) purchasing general parts necessary for defense and aircraft; and 2) finding ~~and locating different~~ vendors to ~~build and~~ manufacture parts ~~that are~~ tailored to its customers' needs ("Proprietary Items"). ~~~~Accordingly, Airtech's business is highly concentrated, particular, and specialized.

~~20.~~36.    ~~Defendant~~ Yim began his employment with Airtech in or about June 2005. ~~~~He began as a computer system programmer~~, but over~~. Over the years, he gained the trust of Airtech and its owner, Mr. ~~Jin~~ Lee ~~("Mr. Lee")~~, and was promoted to the position of ~~general~~

11

managerGeneral Manager with full authority, among other things to execute orders to buy and

sell products and inventory; issue and sign corporate checks; approve or deny

compensationscompensation to employees, contractors, and salespersons; review, approve and

pay employees' expense reimbursementreimbursements; and view, enter and changecorrect the

ledgers in Airtech's accounting and books of account. and records. Yim was in charge of all of

Airtech's computer and network operating systemsystems and was the manofficer in charge of

the company when Mr. Lee was absent, until September 30, 2021, when he abruptly resigned

withfrom Airtech.

## I.    MISAPPROPRIATION OF AIRTECH'S TRADE SECRETS

### A.    Yim's Access to and Management of Airtech's Trade Secrets

37.    Airtech's customer and vendor information, product information including

technical specifications, data, price histories, schematics, contracts, testing methods and results,

quality assurance, marketing strategies, regulatory compliance, invoices, banking information,

transaction history and ways of doing business (referred to herein as  "Trade Secrets) were so

important to Airtech's business that the company spent more than five hundred thousand dollars

($ 500,000.00) designing, creating, implementing, maintaining and updating its computer system

that is used to collect, store, process, integrate and utilize Airtech's Trade Secrets and other

proprietary information necessary to the operation of its business.

38.    As computer technology and software continued to evolve from what existed

when Airtech's initial computer system was created in 2005, the Airtech computer system was

regularly maintained, backed up and continually updated. The most important system data was

backed-up and continually updated in both a cloud-based system and the company's onsite

server.

12

39.     For every update and evolution of Airtech's computer system, Airtech's Trade Secrets and other proprietary information was ported into each upgraded system. The Trade Secrets and other proprietary information were made accessible to and was used by all of Airtech's computer systems, which enabled each upgrade to access and use all the confidential Trade Secrets about customers, vendors, product specifications, price lists, sales history and price history.

40.     In addition to investing in designing and implementing its own proprietary computer system in order to maintain the secrecy of its Trade Secrets and other proprietary information, Airtech had a robust policy of password protection of each employee's work computer, and restricting and monitoring access to the Airtech premises and company email accounts.

41.     Mr. Lee told existing and new employees that the Trade Secrets and other proprietary information was the lifeblood of the company and instructed them not to share or discuss this information or Airtech's way of doing business with anyone outside the company.

42.     Mr. Lee also instructed Airtech employees to  describe their work only as an "import/export business" without any further details.

43.     Airtech also maintained a company policy that its employees could only conduct business using their Airtech email accounts on the Airtech system whether accessed on site or remotely.

44.     Yim was the head of information technology ("IT") at Airtech and solely responsible for designing, implementing, maintaining, and upgrading Airtech's computer system. He was granted unlimited access to Airtech's Trade Secrets and other proprietary information and its computer systems as the head of IT.

13

**CONFIDENTIAL**

45.     From the time of his hiring in 2005 and throughout his tenure at Airtech Yim was responsible for everything related to the company's computer network including but not limited to purchasing and upgrading the computer system when new software or hardware was necessary; onboarding new employees by setting up their computers, maintaining email accounts and passwords; conducting regular back-ups of Airtech's Trade Secrets and other proprietary information; maintaining a list of all the passwords for all of the Airtech employees; and network security against cyber intrusions and ransomware attacks.

46.     Upon information and belief, Yim made regular back-ups of the source code Trade Secrets and other proprietary information stored in and regarding Airtech's early computer system onto physical back up devices such as hard drives, removeable hard drives, tape back-ups, USB drives and the like.

47.     When computer and internet-based technology sufficiently advanced and improved and computer storage went from physical hard disks to the cloud, Yim backed up Airtech's Trade Secrets and other proprietary information into accounts in secure cloud-based platforms.

48.     Yim maintained company back-ups of Airtech's Trade Secrets and other proprietary information on cloud-based storage services including Just Cloud, Amazon Cloud and Gmail's Google Drive (at least three accounts); and billed the monthly fees for excess storage capacity to Airtech's corporate credit card accounts or submitted invoices for reimbursement from Airtech for payments he made from his personal accounts.

49.     Upon information and belief, Yim maintains an account at Anaconda Cloud, another cloud-based data storage service and stored Airtech's Trade Secrets and other proprietary information on this platform.

14

**CONFIDENTIAL**

50.     Upon information and belief, Yim maintains an account on Github, a computer developer platform for storing and sharing computer code, where he stored the source code for Airtech's computer system and other Airtech Trade Secrets and other proprietary information.

B.  **The Value of Airtech's Trade Secrets**

51.     When Yim joined Airtech as a computer programmer in 2005, he had no experience in the military defense and aerospace parts and systems industries. Yim learned everything about the industry as well as Airtech's business model, customers, vendors, products, methods of testing, quality assurance, marketing strategies, pricing and regulatory compliance from his time working at Airtech.

52.     During the period between 2005 to 2021, Airtech experienced an elevenfold growth in its sales. The growth was fueled by its use of its Trade Secrets and other proprietary information contained in its custom computer system.

53.     Airtech's Trade Secrets and other proprietary information are not known to the public because Airtech maintained and strictly enforced confidential treatment of them.

54.     The misappropriation of Airtech's Trade Secrets and other proprietary information has seriously injured Airtech and is a direct and immediate threat to Airtech's business and its viability.

C.     **Defendants' ~~Scheme to Defraud~~Misappropriation of Airtech's Trade Secrets**
~~a.~~

55.     Even before Yim left Airtech, he was using Airtech's Trade Secrets and other proprietary information to run a series of sham companies (the "Sham Companies") to steal business away from Airtech and to charge inflated prices for products at the expense of Airtech.

15

**CONFIDENTIAL**

56.     After Yim left Airtech, he used Airtech's Trade Secrets and other proprietary information to contact Airtech's customers and vendors in an attempt to lure these customers and vendors away from Airtech and to purchase the same products from or to sell the same products to his new company, Hans Inc.

57.     Yim was successful in using Airtech's Trade Secrets and other proprietary information to convince at least two of Airtech's customers to cease doing business with Airtech and instead deal directly with the Defendant Companies to purchase the same products that Airtech previously sold to those customers. Those two Customer companies and/or confederates of Yim employed by those companies, upon information and belief, were willing members of Defendants' scheme to steal business from Airtech and divert it to Defendants.

58.     Yim systematically forwarded confidential emails and attachments containing Airtech's Trade Secrets to his three (3) personal Gmail accounts maintained with Google.

59.     Yim also used his advanced computer skills to program Airtech's computer system and email servers to automatically forward confidential emails and attachments from Airtech containing Airtech Trade Secrets to his personal email accounts and to continue to do so even after he left Airtech.

## II.     DEFENDANTS' SCHEME TO DEFRAUD

### A. Fake Expense Reimbursement Vouchers

CONFIDENTIAL

21. 60.    During his employment, ~~defendant~~ Yim was given the authority to issue and sign checks on ~~the~~ Airtech's bank account. He also had the authority to approve and pay employee expense reimbursement forms.[3]

22. 61.    On or about February 3, 2020, Airtech discovered that some of the expense reimbursement forms submitted by Yim were inflated, containing fake ~~bogus~~ receipts as follows:

~~Check Date~~ | ~~Amount Yim Actually Paid~~ | ~~Amount Yim Claimed in Reimbursement~~ | ~~Items actually purchased~~
--- | --- | --- | ---
~~1/14/20~~ | ~~$663~~ | ~~$13,175~~ | ~~Integrated circuits from Funklind~~
~~1/21/20~~ | ~~$4,535~~ | ~~$11,500~~ | ~~EPM3128ATI100 from Analogic Ltd~~
~~1/27/20~~ | ~~$2,250~~ | ~~$19,375~~ | ~~OSC1758-400B from Regalo~~
~~Total:~~ | ~~$7,448~~ | ~~$44,050~~ |

| Check Date | Amount Yim Actually Paid | Amount Yim Claimed in Reimbursement | Items Actually Purchased |
| --- | --- | --- | --- |
| 1/14/20 | $663 | $13,175 | Integrated circuits from Funklind |
| 1/21/20 | $4,535 | $11,500 | EPM3128ATI100 from Analogic Ltd |
| 1/27/20 | $2,250 | $19,375 | OSC1758-400B from Regalo |
| Total | $7,448 | $44,050 | |

---

[3]From time to time, the employees of Airtech were reimbursed after purchasing inventory and other equipment necessary for ~~Plaintiff's~~ Airtech's business.

CONFIDENTIAL

~~23.~~62.    When Mr. Lee confronted ~~defendant~~ Yim with the above transactions, Yim ~~stated~~admitted that he took the money wrongly and that he ~~will~~would reimburse Airtech for it. Thereafter, on February 4, 2020, Yim issued a check in the amount of $12,100 to Airtech ~~representing~~which was a partial payment for the wrongful taking.

~~24.~~63.    At that time, Yim had worked for almost 15 years ~~at~~for Airtech, gaining substantial knowledge and experience in conducting Airtech's business. As such, Yim was considered an indispensable ~~member~~employee of Airtech ~~and~~, so Mr. Lee did not terminate ~~Yim~~him, but, rather, stripped him of his check-signing authority.

~~25.~~64.    Thereafter, Yim continued ~~his employment~~ to be employed by Airtech until his sudden and unexpected resignation on September 30, 2021.

~~26.~~65.    Following ~~his~~Yim's resignation, Airtech accidentally learned of Yim's ~~wrongdoings~~wrongdoing and discovered that there was a history and pattern of Yim's submission of reimbursement vouchers with fake receipts dating ~~back~~from 2014 to 2020.

~~27.~~66.    The false and misleading vouchers discovered so far are set forth below:

| Check Date | Amount Yim Actually Paid | Amount Yim Claimed for Reimbursement | Items purchased |
|---|---|---|---|
| 6/10/14 | $360 | $3,050 | Item OPA512SM |
| 9/19/14 | $540 | $5,025 | Item OPA512SM |
| 6/24/15 | $720 | $5,200 | Item OPA512SM |
| 10/15/15 | $1,226 | $5,313 | Item SP8830A |
| 10/20/15 | $692.78 | $2,309 | Item 622-4039-006 |
| 5/2/16 | $714 | $8,400 | Item OP07AJ/883B |
| 9/9/16 | $720 | $5,200 | Item OPA512SM |
| 1/25/17 | $5,142.96 | $8,910 | Item 4798 |
| 4/13/17 | $720.00 | $5,706.40 | Item OPA512SM |
| 9/24/18 | $1,985 | $14,040 | Part EP1K100QI208-2 from Regalo |
| 5/28/19 | $500 | $11,250 | Integrated circuits from GTZ |

18

CONFIDENTIAL

| 9/10/19 | $500 | $14,745 | Integrated circuits from GTZ |
| 1/14/20 | $663 | $13,175 | Integrated circuits from Funklind |
| 1/27/20 | $2,250 | $19,375 | Part OSC1758-400B from Regalo |
| 1/21/20 | $4,535 | $11,500 | EPM3128ATI100-10 from Analogic |

| Total | $21,268.74 | $133,198.40 | The difference $111,929.66 |

28.67.    In each such instance, Yim created fake receipts and invoices and submitted them to Airtech. He then utilized his authority to approve thesehthese fake receipts and invoices and Airtech paid each and every one of the false reimbursement vouchers sothat he submitted by Yim. Indeed, most of the checks were signed by Yim, himself during, when Mr. Lee's absence. [4] Lee was away from the company.

**b.B.  Formation of Sham Companies to Deal with Airtech and Adversary Companies to Compete with Airtech**

68.        On or about February 5, 2020, two days after his fake reimbursement scheme was discovered but, while he still was working at Airtech, Yim created defendant Assured which was formed with a single member, defendant Hyo Sun Kim, and controlled by both Yim and Kim.

29.69.    Upon information and belief, Yim created the fictious name or alias for himself of "Jasmine Legrant," a non-existent employee of Assured, so that Yim could hide his true identity and conduct business as Jasmine Legrant from Assured Components LLC.

---

[4] Airtech's investigation of Yim's scheme to issue and pay fraudulent receipts and theft relating to the expense reimbursement is ongoing and additional such instances may be discovered.

19

CONFIDENTIAL

~~30.~~70.    On or about October 15, 2020, while still working at Airtech, Yim created ~~defendant~~the first Defendant Sham Company, Sensa which was formed with a single member, ~~defendant Hyo Sun~~ Kim, and was controlled by both Yim and Kim.

~~31.~~71.    On or about December 14, 2020, while still working at Airtech, Yim created ~~defendant~~the second Defendant Sham Company, Genuine, which was formed with a single member, ~~defendant Hyo Sun~~ Kim, and was controlled by both Yim and Kim.

~~32.~~72.    On or about April 21, 2021, while still working at Airtech, Yim created ~~defendant~~the third Defendant Sham Company, RFWave, which was formed with a single member, ~~defendant Hyo Sun~~ Kim, and was controlled by both Yim and Kim.

~~33.~~73.    On or about May 3, 2021, while still working at Airtech, Yim created ~~defendant~~the fourth Defendant Sham Company, Arc-Tech, which was formed with a single shareholder, ~~defendant Hyo Sun~~ Kim, and was controlled by both Yim and Kim.

~~34.~~74.    On or about September 27, 2021, three days before his last day at Airtech, Yim created ~~defendant~~ Hans Inc., which is owned by Yim and controlled by both Yim and Kim.

~~35.~~75.    During his employment with Airtech, Yim began using Sensa, Genuine, RFWave, and Arc-Tech (the "Sham Companies") to transact business with Airtech and use Assured and Hans Inc. (the "Adversary Companies") to divert business away from Airtech.~~.~~ All or substantially all of the Sham Companies and the Adversary Companies maintained virtual or front offices for his and their business, ~~yet~~and Yim ~~was crafty and egregious enough to even receive~~applied for and received grants from the Small Business Emergency Assistance Grant Program ~~using these companies~~for Assured.

~~36.~~76.    Yim used the Sham Companies to sell products to Airtech at ~~a~~ grossly inflated ~~price.~~ prices. He arranged for the Sham Companies to be presented as legitimate and unaffiliated

20

~~sellers~~vendors to Airtech.~~–~~ Whenever there was a need to purchase a part, Yim directed Airtech employees to purchase the parts from the Sham Companies.

~~37.~~77.    Thereafter, Yim created fake and fraudulent invoices from these Sham Companies and sent these invoices through email to Airtech. Upon receipt of the fraudulent invoices, Airtech paid them by wiring the payments to the bank accounts for the Sham Companies.

### ~~i~~            1.    Sensa Technetics, LLC

~~38.~~78.    Following its creation in October 2020 the mailing address for Sensa was 100 Park Avenue, Apt. 703, Fort Lee, NJ, ~~defendant Hyo Sun~~ Kim's previous residential address, whereas Sensa's purported head office address was listed as 6000 Poplar Avenue, Suite 250, Memphis, TN 38119. Research ~~concerning~~regarding the Memphis address for Sensa shows that ~~it's~~it is a virtual office in Memphis leased and operated by Regus.

79.    Upon information and belief, Yim created the fictious name or alias for himself of "Chloe Hans," as a purported employee of Sensa, so that he could hide his true identity and conduct business as Chloe Hans from Sensa Technetics, LLC.

~~39.~~80.    On or about October 27, 2020, Airtech needed to purchase I.C. processors for WIMAX. Yim directed an employee ~~in~~of Airtech to place the order for the processors to Sensa. Thereafter, Yim and Kim caused a pro forma invoice #10292020A to be sent via email to Airtech for the purchase in the amount of $1,450. The invoice included Sensa's bank account information.

21

CONFIDENTIAL

40.81.    On or about October 30, 2020, Airtech wired to Sensa ~~an~~the amount of $1,450 representing the purchase price on the invoice.

41.82.    Subsequently, it was discovered that the actual cost of the processors was $79.60.

42.83.    The processors were delivered to Airtech through UPS via interstate commerce.

43.84.    On or about December 7, 2020, Yim directed an employee ~~in~~of Airtech to place another purchase order for IC processors to Sensa.

44.85.    On or about December 8, 2020, Yim and Kim caused a *pro forma* invoice #12082020A to be sent via email to Airtech for the purchase in the amount of $65,322.

45.86.    On or about December 9, 2020, Airtech wired to Sensa ~~an~~the amount of $65,322 representing the purchase price on the invoice.

46.87.    Subsequently, it was discovered that the actual cost of the processors in this second transaction was $4,561.08.

47.88.    The processors were delivered to Airtech via UPS through interstate commerce.

**~~ii.~~    2.    Genuine Aviation, LLC**

48.89.    ~~After receiving the $65,322 wire from Airtech referred to above, defendants Yim and Kim were emboldened and determined to further carry out their scheme to defraud Airtech.~~ On December 14, 2020, Kim created the Sham Company Genuine ~~yet another entity to aid in their scheme.~~. The purported address for Genuine was 4651 Salisbury Road, Suite 400, Jacksonville, Florida 32256. ~~-~~Research ~~concerning~~regarding the address for Genuine shows that it is also ~~another~~a virtual office leased and operated by Regus.

CONFIDENTIAL

90.    Upon information and belief, Yim created the fictious name or alias for himself of "Nicole Amber," a non-existent employee of Genuine, so that he could hide his true identity and conduct business as Nicole Amber from Genuine Aviation LLC.

49.91.    On or about January 8, 2021, Airtech needed to purchase a relay part. Yim directed an employee in Airtech to place the order for the relay part to Genuine. Thereafter, Yim and Kim caused a pro forma invoice #29446 to be sent via email to Airtech for the purchase in the amount of $73,184. The invoice included Genuine's bank account information.

50.92.    On or about January 8, 2021, Airtech wired to Genuine ~~an~~the amount of $36,592 representing half of the purchase price on the invoice. Then on January 13, 2021, Airtech wired via ~~fed wire~~Fedwire to Genuine the balance of the invoice in the amount of $36,592.

51.93.    Subsequently, it was discovered that the actual cost of the relays was $20,208.32.

52.94.    On or about January 13, 2021, the relays were delivered to Airtech via UPS through interstate commerce.

53.95.    On or about March 5, 2021, Airtech needed to purchase more relay parts. Yim directed an employee in Airtech to place the order for the relay part to Genuine. Thereafter, Yim and Kim caused a pro forma invoice #29512 to be sent via email to Airtech for the purchase in the amount of $70,897.

54.96.    On or about March 5, 2021, Airtech wired to Genuine ~~an~~the amount of $35,448.50 representing half of the purchase price on the invoice. Then on March 9, 2021, Airtech wired to Genuine the balance of the invoice in the amount of $35,448.50.

23

CONFIDENTIAL

55.97.    Subsequently, it was discovered that the actual cost of the relays was $19,576.81.

56.98.    On or about March 9, 2021, the relays were delivered to Airtech via UPS through interstate commerce.

### iii    3.    **RFWave Lab Inc.**

57.99.    On April 21, 2021, defendant Kim created yet another entity, defendantthe Defendant Sham Company, RFWave to aid in their scheme. . The purported business address for RFWave is 110 Front Street, Suite 300, Jupiter, Florida 33477.  Research concerningregarding the address for RFWave revealed that it is also anothera virtual office leased and operated by Regus.  The address for the sole officer of RFWave is registered as 5 Kings Court, Fort Lee, NJ 07024, the former home address for Yim and Kim.

100.    Upon information and belief, Yim created the fictious name or alias for himself of "Alex Macas" a non-existent employee of RFWave, so that he could hide his true identity and conduct business as Alex Macas from RFWave Lab LLC.

58.101.    On or about May 6, 2021, Airtech needed to purchase an attenuator part.  Yim directed an employee in Airtech to place the order for the part to RFWave.  Thereafter, Yim and Kim caused a pro forma invoice #IN002775 to be sent via email to Airtech for the purchase in the amount of $27,375.  The invoice contained RFWave's account information.

59.102.    On or about May 7, 2021, Airtech wired to RFWave anthe amount of $27,375 representing the purchase price on the invoice.

60.103.    Subsequently, it was discovered that the actual cost of the attenuators was $10,105.43.

24

61.104.   On or about May 11, 2021, the attenuators were delivered to Airtech via UPS through interstate commerce.

### iv.      ARC   4.      Arc-Tech Inc.

62.105.   On May 3, 2021, defendant Kim and Yim created defendantDefendant Sham Company Arc-Tech as yet another entity to aid in their scheme. . The purported business address for Arc-Tech is 6303 Blue Lagoon Drive, Suite 400, Miami, FL 33126.  Research concerningregarding the address for Arc-Tech revealed that it is also anothera virtual office leased and operated by Regus.

106.      Upon information and belief, Yim created the fictious name or alias for himself of "Jasmine Legrant," a non-existent employee of Arc-Tech (the same name he used in connection with Assured as alleged above), so that he could hide his true identity and conduct business as Jasmine Legrant from Arc-Tech, Inc.

63.107.   On or about August 9, 2021, Airtech needed to purchase lamp flash lamps. Yim created a purchase order from Airtech to purchase the lamps in the amount of $67,500 which was duly sent to Arc-Tech.

64.108.   On or about November 30, 2021, Airtech wired via fed wireFedwire to Arc-Tech an amount of $67,500 representing the purchase price on the lamp flash lamps.

65.109.   Subsequently, it was discovered that the actual cost of the lamps was $32,500.

66.110.   On or about December 6, 2021, the lamps were delivered to Airtech via UPS through interstate commerce.

CONFIDENTIAL

67.111.   On or about August 23, 2021, Airtech needed to purchase more ~~lamp~~ flash lamps.~~.~~ Yim created a purchase order from Airtech to purchase the lamps in the amount of $1,150 which was duly sent to Arc-Tech.

68.112.   On or about October 8, 2021, Airtech wired to Arc-Tech ~~an~~the amount of $1,150 representing the purchase of the lamps.

69.113.   Subsequently, it was discovered that the actual cost of the lamps was $260.

70.114.   On or about September 8, 2021, the lamps were delivered to Airtech via UPS through interstate commerce.

71.115.  The summary of the transactions from Defendants' ~~perpetrated~~ fraud are as follows:

| PO Date | Sham Company | Charge Paid by Airtech | What should have been paid |
|---------|--------------|------------------------|----------------------------|
| 10/27/20 | Sensa Technetics LLC | $1,450 | $79.60 |
| 12/7/20 | Sensa Technetics LLC | $65,322 | $4,561.08 |
| 1/8/21 | Genuine Aviation LLC | $73,184 | $20,208.32 |
| 3/5/21 | Genuine Aviation LLC | $70,897 | $19,576.81 |
| 5/6/21 | RFWave Lab Inc | $27,375 | $10,105.43 |
| 8/9/21 | ARC-Tech Inc | $67,500 | $32,500.00 |
| 8/23/21 | ARC-Tech Inc | $1,150 | $260.00 |
| Total: | | $306,878 | $87,291.24 |

72.116.  Every transaction described above was made ~~with~~through Defendants' concerted effort ~~and intent~~ to intentionally defraud Airtech.

26

73.117.   The discrepancy between what should have been paid by Airtech for the subject

equipment and the amount of the invoices billed and paid to the Sham Companies is

$219,586.76.

74.118.   The scheme perpetrated by defendants Yim and Kim through their Sham

Companies was extensively planned, and it was orchestrated over a substantial period of time,

spanning over a year, with various false and fraudulent documents used to steal from the

PlaintiffAirtech.

75.119.   After the transactions were executed and paid for by Airtech, defendant Yim

went further in his scheme by accessing account ledgers in Airtech's computer systems to change

the names of the vendors. He changed the names of the Sham Companies to the names of

legitimate vendors that Airtech frequently dealt with in the ordinary course of business. Yim

did this to conceal the names of Sham Companies involved, making the discovery of such

transactions extremely difficult. Yim changed the names as follows with the intent to further

conceal his fraud:

| Date | Orig. Name | Changed Name | Amount |
|------|-----------|--------------|--------|
| 10/15/2020 | Sensa Technetics | Arrow Electric | $66,772 |
| 12/14/2020 | Genuine Aviation LLC | Arrow Electric | $144,081 |
| 1/08/2021 | Genuine Aviation LLC | TTI, Inc. | $73,184 |

e.   **C.**      **Forged Commission Vouchers**

76.120.   On or about October 8, 2019, defendant Yim created a phony invoice in the

amount of $11,250 from a broker company, EAU Group, for a consulting commission. He

mailed the invoice to Plaintiff'sAirtech's accounting department and instead of directing the

27

CONFIDENTIAL

funds to EAU Group, Yim instructed that the funds should be wired to ~~defendant Hyo Sun~~ Kim. On October 8, 2019, Airtech wired the funds to Kim as was instructed.

~~77.~~121.    On or about September 30, 2020, Yim created another phony invoice in the amount of $40,000 from EAU Group for a consulting commission. ~~–~~He mailed the invoice to ~~Plaintiff's~~Airtech's accounting department, and as before, instead of directing the funds to EAU Group, Yim instructed the funds to be wired to ~~defendant~~ Kim.~~–~~ On October 9, 2020, Airtech wired the funds to Kim as was instructed.

~~78.~~122.    In ~~addition, in~~ February and October of 2018, Yim, on behalf of Airtech, received a refund of a broker commission in the amounts of $5,625 and $5,625, respectively, totaling $11,250 from EAU Group. ~~–~~To date, Yim has not remitted the said commission to Airtech.[5]

~~d.~~            **D.**        **Amazon Account**

~~79.~~123.    Similar to the fraudulent schemes set forth above, ~~defendant~~ Yim created yet another method to defraud Airtech by creating a seller identity account on amazon.com under the name "Magic Audio Pro Net" to transact business with Airtech.

124.      Yim created the Magic Audio Pro Net account on Amazon to engage in fraudulent transactions with Airtech.

~~80.~~125.    On January 14, 2021, while still working at Airtech, Yim began using his seller identity account, Magic Audio Pro Net, on Amazon to sell HDLEXT-DVI to Airtech for

---

[5] ~~Airtech's investigation of fraud and theft relating to forged commission vouchers is ongoing and additional such instances may be discovered.~~

28

**CONFIDENTIAL**

$4,030.47. Yim then delivered the goods via interstate commerce to Airtech on January 19, 2021.

81.126.   Again, on March 4, 2021, Yim used his Magic Audio Pro Net seller identity account on Amazon to sell HDLEXT-DVI to Airtech and charged $7,135.38. Yim then delivered the goods via interstate commerce to Airtech on March 12, 2021.

82.127.   Upon investigation, Airtech discovered that those parts that it paid $11,165.85 for had a market price of only $5,520, resulting in the misappropriation from Airtech and unjust enrichment by Yim in the amount of $5,645.85.

83.128.   Airtech's investigation of fraud and theft relating to self-dealing and inflated invoices is ongoinghas uncovered a systematic and additional such instances may be discovereddclandestine operation to steal from Airtech.

e.

### E.    Theft of Computers and Data

84.129.   On or about October 21, 2021, while reviewing its surveillance camera videos, Airtech discovered that on June 25, 2021 and September 17, 2021, defendant Yim stole two computers from Airtech prior to his departure fromtermination of employment with Airtech.[6] These computers contained highly sensitive and confidential Trade Secret information about Airtech's clients and its trade secrets.

85.130.   On or about October 21, 2021, Airtech confronted Yim about the theft, and he agreed to return the stolen computers. On or about December 9, 2021, Airtech obtainedreceived

---

[6] One computer was from defendant Yim's desk and the other computer was from Mr. Lee's work stationworkstation.

29

CONFIDENTIAL

the stolen computers from Yim and inspected them. Upon doing so it learned that Yim had removed at least one of the hard drive memory systemsdrives from the computer, which contained most of the valuable data, including Trade Secrets, that Airtech was seeking to protect from theft or misappropriation.

131.    It was Airtech's normal practice to order desktop computers with two hard drives, set up so that one hard drive contained the operating system and the second hard drive contained the data.

86.132.   After the return of the stolen computers, Airtech retained an expert to review the computer system artifacts, active and deleted files, internet history, file and folder access and other data sources of evidence of alteration of data on those computers after Yim had stolen them. Yim's work computer. The expert concluded that the computer operating system on Yim's work computer had been reimaged on October 24, 2021, meaning, upon information and belief, he had copied all the data from his work computer and reinstalled the computers prior operating system to cover his tracks before returning them. the computer. Additionally, the expert also concluded that since the Windows operating system was reinstalled on theYim's work computer on October 23, 2021 at roughly 10 PM UTC when it was in Yim's possession, any data showing the use of the computer before Yim's departure of Airtech was wiped out.

133.    Upon information and belief, Yim also copied all the information contained in Mr. Lee's workstation computer.

87.134.       The stolen data contained the following trade secretsTrade Secrets:

| Category | Information |
|---|---|
| Customer | Customer Name, Tel#, Address, Purchaser Name/Number/e-mail/Cell phone # |

CONFIDENTIAL

| Vendor | Vendor Name, Tel#, Address, Buyer & Accounting Name/Number/e-mail/Cell phone # |
|---|---|
| Inquiry History | Customer inquiry history, customer parts requirements, End-user information, Program name/period/quantity |
| RFQ* History | Quotation history from 2014-2021 covering 5,698 vendors within the US, 131,434 quotes received, 630,309 items submitted to Request For Quote ("RFQ")<br>RFQ History and different quote prices for 78,789 items annually<br>• There are multiple pricing and sources for a given item where ~~we~~Airtech can verify which vendors to contact for the most competitive pricing. |
| Offer History | Offer history from 2014-2021 covering 34,037 offers for 564,128 items (Approximately 70,516 offers per year)<br>• All offers given to all ~~our~~Airtech customers for all items traded by Airtech for the past 8 years~~, Airtech, critically.~~ Critical information for ~~our~~Airtech's business. |
| Purchase Order History | Purchase order history from 2014 to 2021 from the 2,096 vendors located mainly in the US covering 32,957 purchase orders for 83,848 items.<br>• The history of all prices that ~~we actually~~Airtech  paid to each vendor. |
| Export license | Information pertaining to the required export licensing applications ~~from~~to the United States government, the various government  bureaus to submit the applications, different programs, and distinct information for ~~diverse~~regulated parts~~, etc.~~. |
| Accounting | Financial statements, payment history, commission history, inventories, and accounting ~~etc~~records. |

~~88.~~135.   The stolen computers contained critical and sensitive ~~trade secret~~Trade Secret information which Yim is currently using to undercut Airtech pricing and ~~divulging information~~ to illegally compete with Airtech.

~~89.~~136.   Despite Airtech's continued demand to Yim for him to return the hard-drive and the Airtech Trade Secrets and other proprietary information stored thereon, Yim has refused to return the hard drive and ~~began~~is using the data to directly compete against Airtech.

~~f.  Stolen Business and Trade Secrets~~

31

CONFIDENTIAL

137.    ~~As if the aforementioned~~ Yim has been caught "red handed" with Airtech Trade Secrets which include thousands of Airtech company emails with the names, email addresses, telephone numbers and contact information for Airtech's customers and vendors; confidential attachments; schematic diagrams, pictures of products, commercial invoices, Airtech invoices, vendor corrective action requests, inspection reports, certificates of conformance, purchase orders, acceptance test reports, certificate of remittances from South Korean banks; and the ID's personal identifying information and passwords for Airtech's employees and accounts.

138.    Defendant Yim's unauthorized and continued possession of Airtech's Trade Secrets was confirmed during the production of these materials from Yim's three (3) Gmail accounts and through discovery in the present case, and it appear as if there are two (2) additional Gmail accounts for a total of five (5).

**F. Formation of Companies to Compete with Airtech Using Stolen Trade Secret Information and Collaboration with Certain Airtech Customers and their Officers and Employees with Defendants' Scheme**

139.    In yet another part of his scheme to defraud Airtech ~~of hundreds of thousands of dollars was~~, Yim created companies that competed directly with Airtech for business from its existing customers, which were its customers when Yim was employed by Airtech, using the Trade Secret information Yim stole.

~~90.~~140.    Certain of the Airtech customers and their officers and employees, as a result of the defamatory statements about Airtech made to them by Yim, or for other reasons not ~~enough, after defendant Yim left Airtech, Airtech~~ yet discovered ~~that the breadth of his fraudulent,~~ knowing that Yim was using Airtech Trade Secrets and beginning while he was employed by Airtech participated in the Defendants' scheme ~~was far greater~~and collaborated with Defendants

32

by doing business with Yim through the Defendant Adversary Companies rather than anything that it could have imagined. Airtech.

**1.    Assured Components LLC**

91.141.   On February 5, 2020, two days after Yim gotwas caught embezzling through the reimbursement voucher scheme and being stripped of his check-signing authority, Yimhe created defendant Assured, as hereinabove described.

92.142.   Defendant Kim, Yim's former mistress, has served as and now his wife, was and is the registered and authorized representative of Assured. The registered office address of Assured is 18-20 Lackawanna Plaza, Suite 300, Montclair, NJ 07042. Research concerning the registered address for Assured revealed that it is a virtual office leased and operated by Alliance Virtual Offices.

93.143.   Yim was a signatory to the bank account maintained by Assured at JP Morgan Chase Bank. Assured was controlled, managed and operated by Yim.

94.144.   On May 24, 2021, Assured even received a grant of $10,000 from the United States Small Business Emergency Assistance Grant Program.

95.145.   On or about February 6, 2020, Yim, on behalf of Assured, telephoned one of Airtech's customers, UnioneTech (Unione Tech ("Unione"), a purchasing agent for SE-A Electronics) ("Unione ("SE-A")), and began soliciting business from Unione. In doing so,Yoon Jung Ahn, the President of Unione, with knowledge that Yim was acting against the interests of his employer, Airtech, and using its Trade Secrets to steal business from it, cooperated with Yim in this scheme. In perpetrating the scheme, Yim, with the help of Yoon Jung Ahn, took the business of Unione as its customer away from Airtech to the detriment of Airtech. When one of Airtech's staff later raised with Yim the resulting loss of sales to Unione and asked Yim whether

33

**CONFIDENTIAL**

Airtech's owner should be informed, Yim instructed her ~not to inform Airtech's owner on this subject, which instructions she followed since Yim was her boss~..~.

96.146.   Unione began placing purchase orders through Assured from February 2020 until September 30, 2021, when Yim ~departed from~terminated his employment with Airtech. The business ~taken away~stolen by Yim from Airtech is ~demonstrated~measured, in part, by the funds received from ~Se~SE-A ~Electronics to~by Assured Components while Yim was still employed by Airtech as follows:

| | |
|---|---|
| 11/30/2020 | $72,136.4 |
| 12/29/2020 | $69,877.52 |
| 1/28/2021 | $4,461.51 |
| 3/2/2021 | $71,291.64 |
| 3/31/2021 | $36,140.96 |
| 4/30/2021 | $79,132.52 |
| 6/1/2021 | $82,604.7 |
| 6/30/2021 | $95,148.38 |
| 7/30/2022 | $226,770.47 |
| 8/31/2021 | $128,243.52 |
| 9/30/2021 | $106,107.19 |
| | |
| Total | $971,914.81 |

The accumulated diverted orders to Assured from Unione (SE-A Electronics) were worth approximately $970,000 during the time that Yim was employed with Airtech.

147.     In a Purchase Order dated June 23, 2023, at which time Yim was still employed by Airtech and so known to all of its customers, Airtech customer Unione, in a Purchase Order signed by its President, Yoon Jung Ahn, and showing its address in South Korea, ordered $199,999.00 of products from Assured, with the P.O. showing the contact for Assured was "Jasmine Legrand," shown above to have been an alias used by Yim.

34

**CONFIDENTIAL**

## 2.    Hans Aerospace Inc.

97.148.   Incredibly, three days before his departure from Airtech, on September 27, 2021, defendant Yim formed Hans, Inc., yet another company, which he established to defraud Airtech. Yim is the reported officer/director of the corporation with its registered address located at Yim's former home address at 5 Kings Court, Fort Lee, NJ 07024.

98.149.   Defendant Hans isInc. currently is engaged in the same business as Airtech. Yim has been soliciting business on behalf of Hans Inc. from Airtech's customers and reaching out to the customers of Airtech, substantially utilizing the data which he improperly obtained from Airtech's computer systems and related trade secrets. Trade Secrets.

99.150.   In November 2021, one of Airtech's vendors mistakenly sent an invoice to Airtech for an order placed by Yim. Airtech became suspicious and began to contact their customers. To Airtech's disbelief, Yim had contacted ALL of Airtech's customers and solicited their business.

100.151. In or about August 2021, while still employed by Airtech, Yim learned that a customer was going to place an order of parts that were Proprietary Items to Airtech. Then in or about OctoberSeptember 2021 while still employed at Airtech, Yim contacted the vendor who makes the Proprietary Items and placed anfor Airtech's customer and sent a purchase order for thedated September 30, 2021 for seven (7) Proprietary Items in the amount of $134,841321,160.00.

152.     On December 9, 2021, using Airtech's Trade Secrets, Yim ordered 14 Proprietary Items from Airtech's customer totaling $651,980.00.

CONFIDENTIAL

101.153. Thereafter, Yim spoke with all of Airtech's customers in Korea and other persons on the by telephone from New Jersey and via email, and Yim falsely stated that Airtech failed to pay his last salary payment and that he has brought a lawsuit against had sued Airtech for all the wrongdoings. its alleged wrongdoing. These defamatory statements were made to Airtech's customers in an attempt to steal these customers and their business away from Airtech.

102.154. Furthermore, Yim used Airtech's trade secret Trade Secret information, including the trade secret Trade Secret information contained in Airtech's computers, which he misused and stole, to contact substantially all of Airtech's customers and its important vendors that manufacture manufactured and sell the subject sold parts to Airtech, including proprietary custom parts ("Proprietary Items"), and began placing orders. Yim used the trade secret Trade Secret information to undercut Airtech's pricing and placed orders for Proprietary Items and other products that were protected by Airtech's exclusive or technical agreements and letter commitments from vendors or and manufacturers or where Airtech served as the sole source for the products based on its successful effort efforts to identify, develop and market the those products over many years.

103.155. When communicating with Airtech's customers, both during his employment with Airtech and thereafter, defendant Yim made false statements to the customers for the purpose of alienating them from Airtech and taking their business for himself. These statements included, but were not limited to, claims that Airtech had failed to pay his salary due to financial failure and was going out of business. He also falsely stated that he had filed a lawsuit against Airtech to recover his unpaid compensation. As a result, Airtech's damages are beyond insurmountable and staggering Airtech was and continues to be severely damaged by those defamatory statements.

36

**CONFIDENTIAL**

156.    After leaving Airtech, ~~defendant~~ Yim aggressively and maliciously sought to solicit and/or alienate Airtech's customers, vendors, manufacturers and suppliers using Airtech's Trade Secret sensitive, confidential and proprietary information he either learned while at Airtech, stole before he left, or ~~both~~received via automatic email forwarding instructions he left in Airtech's computer network, doing so even after this Court issued a Temporary Restraining Order prohibiting him from committing such acts. ~~In addition, defendant~~

157.    Yim willfully induced Airtech's customers, vendors, manufacturers and suppliers to violate the terms of exclusivity agreements and letter commitments which agreements prevented them from engaging in transactions prejudicial to Airtech and of which ~~defendant~~agreements Yim was well aware. ~~Furthermore, defendant~~

~~104.~~158. Yim's tactics included making defamatory statements about Airtech's financial health, management competence and potential legal liability which were designed to cause Airtech's customers to lose confidence in it. In some cases, he succeeded in taking over the accounts for himself, in others he simply damaged Airtech's business reputation and made it more difficult or impossible for Airtech to secure future orders. ~~Plaintiff lost substantial sales and resulting lower profits in connection with its business with its customers Se-A Electronics, Intellics, Seoul Standard, and Segi (Century), among other customers. In the case of Se-A, Plaintiff lost profits from $2,074,679 worth of sales during the years 2020 to 2021 wherein Plaintiff's profit margin for the applicable products was approximately 15%. Plaintiff lost sales from Intellics during the period of 2021 to 2022 in the amount of $356,430 wherein Plaintiff's profit margin for the applicable products was approximately 15%. Such actions included, but were not limited to, the following:~~

37

CONFIDENTIAL

159.     Airtech lost substantial sales which resulted in its achieving lower profits in connection with its business with its customers SE-A Electronics, Intellics, Seoul Standard, and Segi (Century), among other customers.

160.     In the case of SE-A, Airtech lost profits from $2,074,679 worth of sales during the years 2020 to 2021 when its profit margin for the applicable products was approximately 15%. Airtech lost sales from Intellics during the period of 2021 to 2022 in the amount of $356,430. Such actions included, but were not limited to, the following:

a.     Among the transactions defendant Yim executed after leaving Airtech, including but not limited to transactions occurring after the Court issued a Temporary Restraining Order against such conduct on March 15, 2022, transactions which he could not have executed without using sensitive, confidential and proprietary Trade Secret information were the following : First, on March 29, 2022, Yim sent an offer for item H202203009 to Airtech customer Intellics. Second, on April 2, 2022, Yim sent a quotation to Airtech customer Hanwha for products that were previously handled by Airtech from a restricted vendor. Third, Yim was continuingcontinued to transact business with Qnion Co. Ltd. to sell parts that are proprietary to Airtech (Proprietary Items). Fourth, Yim caused his company, Hans Aerospace Inc., to engage in the following transactions with Airtech customer Seoul Standard:

| Hans Aerospace Inc. Transactions with Seoul Standard | | | | | | |
|---|---|---|---|---|---|---|
| Invoice Date | Part No | Desc. | Q'ty | U M | U/Price | Amount |
| 3/25/2022 | DCS 5R5 224 | CAPACITOR | 300 | EA | $2.17 | $651.00 |
| | HCM49S 14.318MHZ | OSCILLATOR | 1,000 | EA | $2.35 | $2,350.00 |

38

|  |  |  |  |  |  |  |
|---|---|---|---|---|---|---|
|  | A8498SLJTR-T | IC | 200 | EA | $24.84 | $4,968.00 |
|  | SN74AUP1T34DCKR | IC | 300 | EA | $18.98 | $5,694.00 |
|  | W9825G6KH-5I | IC | 32 | EA | $25.00 | $800.00 |
|  | OSD055A3949-81TS | DISPLAY | 3 | EA | $205.00 | $615.00 |
|  |  |  |  |  |  |  |
| 3/31/2022 | NI2020ED29 | LITHIUM BATTERY | 6 | EA | $295.66 | $1,773.96 |
|  | NI3020QE30 | LITHIUM BATTERY | 4 | EA | $299.22 | $1,196.88 |
|  |  |  |  |  |  |  |
| 4/4/2022 | DO3316P-473MLB | INDUSTOR | 195 | EA | $1.20 | $234.00 |
|  | CY7C1380KV33-167AXI | IC | 90 | EA | $54.79 | $4,931.10 |
|  | EP2C35F672I8N | IC | 15 | EA | $210.49 | $3,157.35 |
|  | TPS56528DDA | IC | 24 | EA | $13.05 | $313.20 |
|  | PIC12F683-I/SN | IC | 250 | EA | $2.74 | $685.00 |
|  | TCM2010-101-4P | COIL | 4,000 | EA | $0.36 | $1,440.00 |
|  | CRCW0603127KFKEAHP | RESISTOR | 5,000 | EA | $0.03 | $150.00 |
|  | 24LC02B-I/SN | IC | 110 | EA | $0.36 | $39.60 |
|  | LT4356HMS-1 | IC | 105 | EA | $9.53 | $1,000.65 |
|  | MBRB41H100CTT4G | SCHOTTK | 385 | EA | $1.09 | $419.65 |
|  | MCR100JZHFLR100 | RESISTOR | 4,000 | EA | $0.13 | $520.00 |
|  | MIC29501-3.3WU | IC | 150 | EA | $5.65 | $847.50 |
|  | SMAJ85A-E3/61 | DIODES | 200 | EA | $0.24 | $48.00 |
|  | SMDA24C/TR7 | TVS UNIDIRECTIONAL | 1,000 | EA | $4.30 | $4,300.00 |
|  | 54102-0164 | CONNECTOR | 215 | EA | $1.28 | $275.20 |
|  | ECA-2AM221 | CONDENSOR | 250 | EA | $0.33 | $82.50 |
|  | LR2512LF-01-R100-F | RESISTOR | 250 | EA | $0.24 | $60.00 |
|  | LR2512LF-01-R150-F | RESISTOR | 1,000 | EA | $0.24 | $240.00 |
|  | LR2512LF-01-R200-F | RESISTOR | 1,000 | EA | $0.23 | $230.00 |
|  | LT4356IMS-3 | IC | 180 | EA | $5.95 | $1,071.00 |
|  | MAX9155EXT | IC | 2,500 | EA | $2.81 | $7,025.00 |
|  | PTH12060WAZ | IC | 430 | EA | $16.23 | $6,978.90 |
|  | ADUM2250ARWZ | IC | 130 | EA | $87.43 | $11,365.90 |
|  | 10BQ100TRPBF | DIODES | 500 | EA | $0.90 | $450.00 |

39

CONFIDENTIAL

| | 52207-0685 | CONNECTOR | 300 | EA | $0.65 | $195.00 |
|---|---|---|---|---|---|---|
| | ZMM5236B | DIODES | 300 | EA | $0.90 | $270.00 |
| | TMS320F28379DZWTT | IC | 15 | EA | $186.88 | $2,803.20 |
| | | | | | | |
| 4/14/2022 | SN74AUP1T34DCKR | IC | 300 | EA | $18.98 | $5,694.00 |
| | MM70-314-310B1-1-R300 | CONNECTOR | 150 | EA | $6.46 | $969.00 |
| | 114153 | CONNECTOR | 96 | EA | $6.16 | $591.36 |
| | 914796 | CONNECTOR | 215 | EA | $3.27 | $703.05 |
| | H10-76 | HEADSET | 4 | EA | $354.00 | $1,416.00 |
| | TFP410MPAPREP | IC | 4 | EA | $73.47 | $293.88 |
| | | | | | | |
| | Total | | | | | $76,848.8 |

b.      Among the false and defamatory statements which ~~defendant~~ Yim made about
Airtech's business reputation during 2021 and 2022 to ~~Plaintiff's~~Airtech's
customers, vendors, manufacturers and suppliers, were the following: ~~-~~(i)
~~defendant~~ Yim falsely told them that ~~Plaintiff~~Airtech had significant tax issues,
implying that ~~Plaintiff~~Airtech was dishonest and would not survive long; (ii)
~~defendant~~ Yim falsely told them that Airtech was subject to personnel departures
that undermined its management competence; (iii) ~~defendant~~ Yim falsely told
them that Airtech was experiencing "huge trouble" and "would shrink legally";
(iv) ~~defendant~~ Yim falsely told various vendors, manufacturers and suppliers that
Airtech's customers did not like Airtech and did not want to deal with it.

c.      ~~Defendant~~ Yim also sought to ~~circumvent~~evade the Temporary Restraining Order,
telling at least ~~one vendor~~two vendors that if a ~~Preliminary Injunction~~preliminary
injunction were granted he would simply create a new business entity unknown to

40

~~Plaintiff~~Airtech and the Court and use that ~~entity~~ to conduct transactions with

Airtech's customers. ~~I~~n addition, he told vendors to change certain part numbers

in order to hide ~~them from~~that they were Airtech numbers, and to mischaracterize

the original part number as "obsolete" when Airtech requested to purchase it.

Furthermore, ~~defendant~~ Yim ~~requested~~ caused Airtech to quote ~~Airtech~~ prices that

were higher than his companies quoted in order to ~~promote discontinuation~~

~~of~~cause its customers to discontinue doing business~~.~~ with Airtech.

~~Plaintiff's~~Airtech's investigation of ~~this matter~~Defendants' wrongdoing is

ongoing, is complicated by the fraudulent efforts of Defendants to conceal their

actions, and therefore the foregoing examples are illustrative only and may be

further supplemented as the investigation ~~continues~~and discovery in this action

continue.

### ~~CONCLUSION~~

161. ~~105.~~ After leaving Airtech, Yim used Airtech's Trade Secrets to place

an order with Airtech's vendor, Air Rover Inc., on January 28, 2022 for a proprietary part that

was originally sold to Airtech in 2020 with a different power requirement.

162. In light of the foregoing and ongoing discovery to date, Airtech's best estimate

as of the date of this Second Amended and Supplemental Complaint is that Airtech has lost sales

revenues to the Defendants in excess of $15,000,000.00.

### III.    DEFENDANTS' VIOLATIONS OF THE TEMPORARY RESTRAINING ORDER

41

**CONFIDENTIAL**

163.    After Yim left Airtech, a temporary restraining order ("TRO") was issued on March 15, 2022 (D.E. 13) prohibiting Yim from communicating or transacting business with eleven (11) of Airtech's customers and from alienating funds from four (4) bank accounts controlled by the Defendants.

164.    On March 28, 2022, the Court issued a Letter Order (D.E. 37) modifying the TRO ("Modified TRO") by prohibiting the Defendants from transacting any business with the same eleven companies using designs, technical specifications or proprietary data obtained by Airtech's computer system or for parts that Airtech purchased or developed for these customers while Defendants were employed by Airtech.

165.    The Modified TRO also prohibited the Defendants from transacting business with vendors or suppliers using the designs, technical specifications or other proprietary data obtained from Airtech's computer system or for any parts that Airtech purchased or received from these vendors or suppliers when Defendant(s) were employed by Airtech.

**A.  Yim's Evasion of the TRO and Modified TRO and Continued Post-TRO Misappropriation of Airtech's Trade Secrets**

166.    After leaving Airtech, Yim used Airtech's Trade Secrets to steal business from Airtech, and took deliberate, premeditated steps to ask Airtech's vendors to slightly modify part numbers to create an illusion that parts originally supplied to Airtech were now somehow different, so as to circumvent the Modified TRO.

167.    After this Court issued the March 28, 2022 Letter Order, Yim contacted an engineer at Airtech's largest customer, Hanwha Systems Co., Ltd., which was one of the eleven (11) protected customers identified in the Modified TRO, on April 2, 2022, and provided a

42

quotation for a stepper motor product that was the subject of an exclusive distribution agreement between Airtech and the product vendor, Phytron, Inc.

168.    Email correspondence between Phytron, Inc. and Yim confirms that Yim was providing instructions to Phytron to make false statements that its business with Hans Inc. was not related to the Modified TRO even though the part at issue was clearly covered by an exclusive distribution agreement with Airtech and prohibited by the Modified TRO.

169.    On March 1, 2022, Hans Inc. submitted a purchase order to purchase $214,373.99 in products from Phytron, Inc. which were covered by the exclusive distribution agreement with Airtech, and Yim convinced Phytron to make a minor change to the part number in an attempt to circumvent the exclusive distribution agreement.

170.    Yim also tried to convince an Airtech vendor, Aperture Optical Sciences, Inc. ("AOS"), to terminate an April 29, 2015 Airtech International Sales Agreement with AOS, by providing a draft Hans Aerospace International Sales Agreement dated November 2, 2022 which is almost identical to an earlier similar Airtech agreement with AOS and shows Yim had a copy of Airtech's agreement in his possession. Yim sent text messages to AOS falsely stating that the TRO was removed and that the Court declined to extend the injunction.

171.    On May 4, 2023, Defendants filed a Motion to Dissolve Restraints (D.E. 132) and Yim provided a Declaration of Byungchan Yim dated May 3, 2023 (D.E. 132-2) (the "Yim Declaration") in support of the Motion to Dissolve Restraints.

172.    Yim stated under penalty of perjury that "I do not have any 'customer lists' of Airtech, nor do I have any other allegedly 'confidential' or 'proprietary' information belonging to the company" in Paragraph 14 of the Yim Declaration.

43

CONFIDENTIAL

173.    Yim stated under penalty of perjury that "[a]gain, I did not take any confidential, proprietary, or trade secret information from Airtech. I do not have an Airtech customer list, vendor list, price list or anything like that" in Paragraph 37 of the Yim Declaration.

174.    The Court conducted a Preliminary Injunction Hearing on January 29 and 30, and February 5, 2024.

175.    During Yim's cross examination on January 29, 2024, he admitted having received product specifications and a product exclusivity agreement between Airtech and one of the prohibited customers listed in the Modified TRO to his personal Gmail account. Yim also admitted that he did not produce any of the emails from his Gmail account in response to discovery requests to which Defendants had responded much earlier in the action.

176.    On February 14, 2024, the Court granted a Letter Order directed to the parties' joint request to proceed with discovery of certain Gmail accounts belonging to Yim after the revelation of the existence of these email accounts.

177.    Yim produced the first batch of documents from his Gmail accounts on or about March 13, 2024 which included emails from two Gmail accounts.

178.    The first batch of documents from Yim's Gmail accounts included thousands of emails from his Airtech email account that were forwarded to his personal Gmail accounts, schematic diagrams, pictures of products, commercial invoices, freight/air waybills, Airtech invoices, vendor corrective action requests, inspection reports, certificates of conformance, purchase orders, acceptance test reports, certificates of remittance from Korean banks, and photographs of the passports of employees who work for one of the companies on the list of eleven prohibited companies.

CONFIDENTIAL

179.     The Gmail document production, containing thousands of pages of Airtech's Trade Secrets, directly contradicts the statements that Yim made under penalty of perjury in his May 3, 2023 Declaration.

180.     More than a one-and-a half years after the issuance of the TRO and March 28, 2022 Letter Order, Yim again, upon information and belief, set up another sham company and fictious individual to circumvent the Court-imposed restraints.

181.     Upon information and belief, Yim set up a new sham company known as BIZARRAVENTURA INC. ("Bizarra") to replace Hans Inc. in a purchase from AIR ROVER, INC. which is a vendor to Airtech and was a vendor to Airtech when Yim was employed by Airtech and, as such, Defendants' transactions with it are covered by the Modified TRO.

182.     Upon information and belief, Yim created the fictitious name or alias for himself of "Luis Silva," a non-existent employee of Bizarra so that Yim could hide his true identity and conduct business as Luis Silva from BizarraVentura, Inc.

183.     Yim produced his second batch of documents from his Gmail accounts to Airtech on or about April 4, 2024.

184.     The second batch of documents from Yim's Gmail accounts also included emails from his Airtech email account that were forwarded to his personal Gmail accounts, which had as attachments schematic diagrams, pictures of products, commercial invoices, freight/air waybills, Airtech invoices, vendor corrective action requests, inspection reports, certificates of conformance, purchase orders, acceptance test reports, and an email containing Mr. Lee's social security number, passwords for Airtech's administrator accounts for various computer network sites, Internet Protocol Addresses and passwords for Airtech, the password for the Airtech company Gmail account, and various IDs and passwords.

CONFIDENTIAL

185.     The second batch of documents from Yim's Gmail accounts also included highly confidential financial documents for Plaintiff that are not found on Airtech's computer network, but only on Mr. Lee's work computer which had been stolen by Yim.

186.     Upon information and belief, Yim copied Trade Secrets from Mr. Lee's work computer when he removed it from Airtech's premises in 2021.

187.     Yim has made at least eight (8) document productions containing Airtech Trade Secrets from three (3) of his Gmail accounts.

**B.     CONCLUSIONS**

188.     Yim, the person responsible for maintaining, backing-up and safeguarding Airtech's Trade Secrets, willingly, systematically, maliciously, intentionally, repeatedly, and continuously breached those fiduciary duties, responsibilities and obligations to protect Airtech, Airtech's Trade Secrets, stole tens of thousands of pages of Proprietary Information and repeatedly attempted to deceive the Court and Airtech about his misdeeds.

189.     Through the countless deceptive, false, fraudulent, and self-dealing activities, and through the manufacture and use of sham documents, including the fake invoices, receipts, and emails described above, defendants Yim and, Kim and, the other Defendants, and other willing participants in their schemes, committed various acts set forth herein in violation of the law, as stated below.. Defendants and their confederates in former Airtech customer companies conspired, participated and abetted with one another and otherwise derived ill-gotten gains from all the illegal activities herein alleged.

190.     106. Defendants' acts and omissions were willful, wanton, deliberate and malicious, and significant exemplary and punitive damages are warranted against them, jointly and severally.

46

**CONFIDENTIAL**

## CLAIMS FOR RELIEF

~~Count 1- RICO Conspiracy~~
~~under Section 1962(d) to Violate Section 1962(c)~~
~~as Against Yim and Kim~~

~~107.    Plaintiff~~ COUNT I

**(Trade Secret Misappropriation Under 18 U.S.C. §§ 1832(a) and 1836(b)(2)(A-D))**

191.    Airtech repeats and re-alleges the facts alleged in all preceding paragraphs ~~1 through 106~~ as if fully set forth herein.

~~108.    Defendants Yim and Kim, under the leadership of defendant Yim, the Chief Operating Officer of Airtech and the president of Hans, have conspired to commit or agreed to commit acts in violation of the Federal RICO Act, 18 U.S.C. § 1962 (c) and (d).~~

192.    ~~109.    Defendants conspired, agreed to and did conduct and participate in the conduct of such~~From its founding to the present, Airtech has maintained and protected as confidential its Trade Secrets, being its customer and vendor information, product information including technical specifications, data, price histories, schematics, contracts, testing methods and results, quality assurance, marketing strategies, regulatory compliance, invoices, banking information, transaction history and ways of doing business as confidential Trade Secrets and taken steps to maintain the confidential nature of this information.

193.    Airtech's Trade Secrets have enabled Airtech to develop a multi-million-dollar business over its competitors.

194.    Defendants' scheme to steal and exploit Airtech's Trade Secrets violated 18 U.S.C. § 1832, et seq. and its prohibition against theft and misappropriation of Trade Secrets.

195.    Airtech brings this private, federal civil action for the misappropriation of Airtech's Trade Secrets pursuant to 18 U.S.C. § 1836(b)(1).

47

CONFIDENTIAL

196.     Yim misappropriated by improper means and carried away duplicates of and otherwise took without authorization Airtech's Trade Secrets, including its customer and vendor information which were received, possessed, and used by Defendants.

197.     Defendants misappropriated Airtech's Trade Secrets by taking this information and using it in interstate commerce, for their own economic benefit, to directly compete against Airtech by trying to conduct business with Airtech's customers and vendors intending to injure and knowing that this would injure Airtech.

198.     Defendants have derived and continue to improperly derive economic benefit from their theft of Airtech's Trade Secrets and proprietary information and, in doing so, have deprived and continue to deprive Airtech of the benefits it is rightfully entitled to derive from the Trade Secrets stolen from it.

199.     This Court may grant an injunction to prevent the Defendants' actual and further threatened misappropriation of Airtech's Trade Secrets, including requiring from Defendants affirmative acts to be taken to protect Airtech's Trade Secrets pursuant to 18 U.S.C. § 1836, et seq.

200.     This Court, in extraordinary circumstances, may award an order providing for the seizure of property necessary to prevent the propagation or dissemination of the Trade Secrets pursuant to 18 U.S.C. § 1836(b)(2) and such extraordinary circumstances are present here because, among other reasons, an injunction, already issued in this case, has proved inadequate to prevent the continuing propagation and dissemination of the misappropriate Trade Secrets by Defendants and the continuing use by Defendants of those misappropriated Trade Secrets to injure Airtech.

48

**CONFIDENTIAL**

201.    This Court should appoint a special master to locate and isolate all misappropriated trade secret information and to facilitate the return of unrelated property pursuant to 18 U.S.C. § 1836(b)(2)(d)(iv).

202.    This Court should award Airtech damages for actual losses caused by Defendants' misappropriation, including unjust enrichment and, in the cases of willful and malicious misappropriation as alleged here, double damages pursuant to 18 U.S.C. § 1836(b)(3)(C).

203.    Injunctive relief in addition to money damages is warranted because Airtech has no adequate remedy at law in that the damages set forth above cannot be compensated by monetary damages, alone.

204.    Defendants' misconduct as set forth above has caused and will continue to cause Airtech irreparable harm in that Airtech has lost control of its Trade Secrets, that information has been provided to and is being used by a competitor, namely Defendants, and court-ordered injunctive relief has proved inadequate to protect Airtech during the pendency of this action.

## PRAYER FOR RELIEF

WHEREFORE, Airtech requests that judgment be issued in its favor providing the following relief:

1.   Determining that the actions, conduct, and practices of Defendants complained of herein constitute misappropriation of Airtech's Trade Secrets under the DTSA;

2.   An injunction and order permanently restraining Defendants from engaging in such unlawful conduct, disgorging all of Airtech's Trade Secrets in Defendants'

49

**CONFIDENTIAL**

possession, custody and/or control, and being prohibited from using Airtech's
Trade Secrets;

3.  A seizure by Federal law enforcement of Defendants' computers, computer hard
drives, and other memory devices in Defendants' possession that could
reasonably contain Airtech Trade Secrets at issue, smart phones, tablets, desktop
computers, laptop computers, disks, memory files, flash drives, tape back-ups,
usernames and passwords for any cloud-based storage services;

4.  Appointment of a Special Master to oversee the removal and destruction of all of
Airtech's Trade Secrets from Defendants' devices, storage and possession;

5.  Ordering an accounting of all books and records of Defendants that pertain to the
purchases, sales, marketing profits and financial records relevant to the use of
Airtech's Trade Secrets to compete against or otherwise steal business away from
Airtech;

6.  An award of damages in an amount to be determined at trial, plus prejudgment
interest, to compensate Airtech for all past, present, and future monetary and/or
economic damages;

7.  An award of damages for any and all other monetary losses suffered by Airtech in
an amount to be determined at trial, plus prejudgment interest;

8.  An award of two times the amount of damages for willful and malicious
misappropriation;

50

CONFIDENTIAL

9.   An award of costs and reasonable attorneys' fees that Plaintiff has incurred in this

action to the fullest extent permitted by law; and

10. Such other and further relief as the Court may deem just and proper.

### COUNT II

### (New Jersey Trade Secrets Act Against Defendants)

205.     Airtech repeats and re-alleges the facts alleged in all preceding paragraphs as if

fully set forth herein.

206.     Airtech maintains its customer and vendor information, product information

including technical specifications, data, price histories, schematics, contracts, testing methods

and results, quality assurance, marketing strategies, regulatory compliance, invoices, banking

information, transaction history and ways of doing business as confidential Trade Secrets and

continues to maintain the confidential nature of these Trade Secrets.

207.     Airtech possesses Trade Secrets as defined under the New Jersey Trade Secrets

Act, N.J.S.A. 56:15-2, et seq.

208.     Airtech communicated such Trade Secrets in confidence to Yim in his capacity

of Airtech's Head of Information Technology and General Manager when Yim was employed by

Airtech.

209.     Yim misappropriated Airtech's Trade Secrets while employed at Airtech to

directly compete against Airtech.

**CONFIDENTIAL**

210.     Defendants used the Trade Secrets so received to set up the Defendant companies, the Sham Companies, to conduct business with Airtech's customers and vendors to the detriment of Airtech.

211.     Yim continues to keep and use Airtech's Trade Secrets after having terminated his employment with Airtech.

212.     Yim disclosed Airtech's Trade Secrets to Defendants in breach of his duty to maintain them in confidence and not to disclose them outside Airtech.

213.     Yim provided Airtech's Trade Secrets to Defendants who were and are direct competitors of Airtech, with knowledge of the breach of Yim's duty.

214.     Defendants continues to possess and use Airtech's Trade Secrets to conduct business with Airtech's customers and vendors to the detriment of Airtech.

## PRAYER FOR RELIEF

**WHEREFORE**, Airtech respectfully requests that this Court enter a judgment:

a.     holding  that  Airtech maintains Trade Secrets;

b.     holding that Yim misappropriated Airtech's Trade Secrets;

c.     holding that Yim breached Airtech's confidence and conveyed its Trade Secrets to the Defendant companies;

d.     holding that Defendants used Airtech's Trade Secrets to compete against Airtech to Airtech's detriment;

e.     holding that Yim's actions were willful;

f.     ordering an accounting of all books and records of Defendants that pertain to the purchases, sales, marketing profits and financial records relevant to the use of Airtech's Trade Secrets to compete against or otherwise steal business away from Airtech;

52

**CONFIDENTIAL**

g.    awarding Airtech compensatory damages;

h.    enjoining future such actions by Yim;

i.    awarding Airtech punitive damages;

j.    awarding Airtech pre- and post-judgment interest;

k.    awarding Airtech reasonable attorneys' fees and costs; and

l.    awarding Airtech such other and further relief as the Court deems just and proper.

## COUNT III

### (against Defendants for violations of the Federal Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961, et seq., ("RICO") Racketeering

215.    Airtech repeats and re-alleges the facts alleged in all preceding paragraphs as if fully set forth herein.

216.    Defendants are liable to Airtech under the Racketeer Influenced and Corrupt Organizations Act codified as Title IX of the Organized Crime Control Act of 1970 at 18 U.S.C. §§ 1961, et seq. ("RICO") as alleged herein insofar as they are culpable persons who did and do conduct and/or participate in the affairs of an enterprise engaged in and/or which affect interstate and/or foreign commerce through a pattern of racketeering activity as prohibited by 18 U.S.C. § 1962(c) and/or conspired to violate Section 1962(c) as prohibited by 18 U.S.C. § 1962(d) injuring Airtech in its business and property by reason of those violations such that Airtech may sue for said violations of Section 1962 "in any appropriate United States district court and shall recover threefold the damages he [it] sustains and the cost of the suit, including a reasonable attorney's fee." 18 U.S.C. § 1964(c).

53

**CONFIDENTIAL**

217.    Defendants associated with an enterprise as set forth below and did conduct and participate and still do conduct and participate in the conduct of such enterprise's affairs a scheme through a pattern of racketeering activity and for the unlawful purpose of intentionally defrauding plaintiff Airtech, stealing from, and committing economic espionage against by misappropriating the Trade Secrets of Airtech and they conspired to do so and still conspire to do so.

218.    110.    DefendantsAs alleged, Yim and Kim formed various corporate entities and limited liability companies in multiple states in their scheme to defraud Airtech. and use for their benefit misappropriated Airtech Trade Secrets. Specifically, defendants Yim and Kim formed SENSA TECHNETICS LLC, GENUINE AVIATION LLC, RFWAVE LAB INC., and ARC TECH INC.Sham Companies Sensa, Genuine, RFWave, Arc-Tech, and Magic Audio Pro Net with the sole intent to defraud Airtech and convert its Trade Secrets to their economic benefit; to submit fake invoices at grossly inflated prices to misappropriate; and steal monies from Airtech.

219.    111.    Defendants Yim and Kim also formed a limited liability companyAdversary Companies Assured, Hans Inc., Hans LLC, and a corporationBizarra to further their scheme to defraud Airtech. and to use for their benefit Trade Secrets misappropriated and stolen from Airtech. Specifically, defendants Yim and Kim formed ASSURED COMPONENTS LLC and HANS AEROSPACE, INC.said Adversary Companies with the sole intent to transact business with Airtech's customers utilizing stolen trade secrets Trade Secrets to their economic benefit and to the detriment and injury of Airtech.

220.    112.    Certain companies that were customers of Airtech before the scheme began, and certain of their officers and employees, with knowledge that Yim was acting

54

CONFIDENTIAL

against the interests of his employer, Airtech, and using its Trade Secrets to steal business from it, assisted, cooperated with and conspired with Yim, Kim, and the Adversary Companies in the scheme to steal the business of those companies from Airtech using Airtech's Trade Secrets stolen by Yim (hereinafter the "Former Customer Companies and Officers").

221.     The Former Airtech Customer Companies and Officers and their employees identified to date who assisted, cooperated, and conspired as members of the enterprise with Defendants are:

**a.**   Unione Tech Corp. ("Unione"), R806 ISbiztower 57-2, Heungan-daero 427Beon-gil, Dongan- gu, Anyang-si Gyeonggi-do, Korea;

**b.**   Se-A Electronics Co., Ltd. ("Se-A"), 513-15 Sangdaewon-dong, Jungwon-gu, Seongnam- si, Gyeonggi-do, Korea;

**c.**   Yoon Jung Ahn, President of Unione; and

**d.**   Jiyoung Lee, an employee of SEGI.

222.     Pursuant to and in furtherance of their fraudulent scheme, Defendants committed and agreed to commit among themselves and with the confederate Former Customer Companies and Officers multiple related acts of mail and wire fraud, transmitted the money stolen thereby through interstate or foreign commerce, and misappropriated and used for their benefit Airtech's Trade Secrets against and injuring Airtech. The acts set forth above constitute a pattern of racketeering activity pursuant to 18 U.S.C. § 1961 (5).

**The Enterprises**

**113A.  The** "Enterprises**Culpable Persons and the Enterprise**

223.     The "Enterprise" as defined under 18 U.S.C. § 1961 (4) were plaintiff, Airtech International, Inc., a corporation, from October 7, 2019 through November 30, 2021 and Hans

55

**CONFIDENTIAL**

Aerospace, Inc., a corporation, from November 30, 2021 until present. Yim was the general manager of Airtech from 2011 until September 31, 2021, and thereafter Yimwas and is the president of Hans Aerospace, Inc. until the present day where furtheran association-in-fact that began with Yim and Kim as members. They are the culpable persons who conducted the affairs of the Enterprise as set forth in 18 USC 1962(c) and conspired to violate 18 USC 1962(d) as of the first predicate acts are being committed in 2019 (alleged above and outlined below) before the creation of the Sham Companies and Adversary Companies. The membership of the Enterprise then grew as those companies were created and began to participate in the Enterprise by committing acts in furtherance of its purposes in coordination with the other members of the Enterprise and as conducted by the culpable persons controlling the Enterprise and the entity members of the Enterprise insofar as the Sham Companies and Adversary Companies, respectively, led independent legal existences and were able to form such intentions through that enterpriseYim and Kim as the owners and managers who controlled those companies. Yim and Kim also recruited the Former Customer Companies and Officers to become members of the Enterprise. The Former Customer Companies and Officers knowingly transacted business with Yim and the Adversary Companies clearly using misappropriated Airtech Trade Secrets to compete against and to steal business from Airtech with those longstanding customers which Airtech had invested to develop and with which it shared protected Trade Secrets.

224. As alleged, additional legal entities were created by Yim and Kim and Former Customer Companies and Officers became members of the Enterprise at different times. Every member was not involved in every scheme but the culpable persons always controlled the Enterprise and each type of scheme had members, being persons or legal entities, that performed specific roles. In the fraudulent invoicing schemes, Yim and Kim used one or more of the Sham

56

CONFIDENTIAL

Companies for each. In the misappropriation schemes, they used one of their Adversary Companies and often a Former Customer or an Officer of a Former Customer, sometimes with and sometimes without the knowledge of the Former Customer Company.

225.    The purpose of the Enterprise was and is to steal from and defraud Airtech and companies that did business with it and to misappropriate and use Airtech's Trade Secrets for the benefit of the culpable persons and its members directly and through the Sham Companies and Adversary Companies so as to injure Airtech.

**B.    The Pattern of Racketeering Activity**

226.    ~~114.~~ The pattern of racketeering activity, as defined in 18 U.S.C. § 1961(1) and § 1961(5), consisted of the following categories of acts committed since 2019, as alleged, and continuously and regularly thereafter through the present:

a.    Stealing from Airtech directly its Trade Secrets and computers;

b.    Defrauding Airtech directly by submitting false and fraudulent expense reimbursement requests and receipts;

c.    Misappropriating Trade Secrets from Airtech and using them to take business away from Airtech by:

1.    Submitting false and fraudulent invoices to Airtech purporting to be from real counterparties, such as Airtech's brokers, giving payment information for accounts controlled by culpable persons Yim and Kim or their Sham Companies which payments ultimately benefited Yim and Kim;

57

**CONFIDENTIAL**

2.      Submitting false and fraudulent invoices from the Sham Companies, giving payment information to accounts in the names of those companies which accounts were controlled by those companies and by Yim and Kim who controlled them and benefited from such payments;

3.      Using the misappropriated Trade Secrets to contact the specific persons with whom Airtech dealt in customer companies developed by Airtech, some of which cooperated and conspired with Yim, Kim and one or more of their Adversary Companies as members of the Enterprise with full knowledge of its nature and purpose to divert from Airtech to the Adversary Companies owned, and controlled by the culpable persons orders that were intended for or would have gone to Airtech and there by diverted revenue from Airtech to the Adversary Companies benefiting Yim and Kim who owned and controlled those companies; and

4.      Using misappropriated Trade Secrets including numerous exclusive sales and technical assistance agreements Airtech had with its various manufacturers, suppliers, vendors, and customers which agreements provided specific property rights in future transactions to divert those transactions to the Adversary Companies for the benefit of Yim and Kim.

5.      Yim, as the head of information technology, used his access and credentials to manipulate the electronic information in Airtech's computer system to change and delete Airtech's accounting and business records.

**C.      The Racketeering Acts**

58

**CONFIDENTIAL**

Case 2:22-cv-00668-MEF-AME    Document 271-3    Filed 11/21/24    Page 148 of 259
PageID: 4094

227.    The racketeering acts committed included acts in violation of the following provisions of title 18 of the United States Code:

    a.  18 U.S.C. § 1341 – Mail Fraud

    b.  18 U.S.C. § 1343 – Wire Fraud

    c.  18 U.S.C. § 1832 – Economic Espionage and Theft of Trade Secrets

    d.  18 U.S.C. § 2314 – National Stolen Property Act - transmitting through interstate or foreign commerce money stolen, converted, or taken by fraud.

228.    The following racketeering acts, among numerous others, committed before and after the following acts, were committed:

**1.    Fraudulent Invoices**

Racketeering Act One - – Mail and Wire Fraud and Transmitting Stolen Money

115.

229.    October 7, 2019, defendants Yim and Kim caused a fraudulent and false invoice to be sent from 5228 Union Avenue, San Jose, CA 95124 to Airtech's office located at 2 Piermont Road, Cresskill, NJ through the instrumentalities of the United States postal system. The invoice was a part of a false and fraudulent scheme to obtain approximately $11,250 claiming that it was a commission owed by Airtech to one of its brokers EAU Group. In reality, $11,250 was not owed at all.

230.    116. Yim and Kim defrauded and conspired and acted in concert to defraud Plaintiff Airtech in that Yim and Kim created the fraudulent and false invoice, caused it to be sent to Plaintiff Airtech, and Yim directed Plaintiff Airtech to pay the invoice by wiring the money to Kim into her personal account.

59

231.    ~~117.~~ Based upon the fraudulent invoice presented by defendants Kim and Yim, ~~Plaintiff~~Airtech wired $11,250 through interstate wire, from ~~Plaintiff's~~Airtech's bank account located at 1655 W. Redondo Beach Blvd., Gardena, CA to Kim's account located at 270 Park Avenue, New York, NY.

232.    ~~118.~~ As a direct and proximate cause of defendants' racketeering activity, Airtech has been injured in its business and property, pursuant to 18 U.S.C. § 1341 ~~and §,~~ § 1343, and 2314 in the amount of $11,250.

Racketeering Act Two~~-~~ – Mail and Wire Fraud and Transmitting Stolen Money

233.    ~~119.~~ On September 30, 2020, defendants Yim and Kim caused a fraudulent and false invoice to be sent from 5228 Union Avenue, San Jose, CA 95124 to Airtech's office located at 2 Piermont Road, Cresskill, NJ through the instrumentalities of the United States postal system. ~~-~~The invoice was a false and fraudulent scheme to obtain approximately $40,000 claiming that it was a commission owed by Airtech to one of its brokers EAU Group. ~~-~~In reality, $40,000 was not owed at all.

234.    ~~120.~~ Yim and Kim defrauded and conspired and acted in concert to defraud ~~Plaintiff~~Airtech in that Yim and Kim created the fraudulent and false invoice, caused it to be sent to ~~Plaintiff~~Airtech, and Yim directed ~~Plaintiff~~Airtech to pay the invoice by wiring the money to Kim into her personal account.

235.    ~~121.~~ Based upon the fraudulent documents presented by defendants Kim and Yim, ~~Plaintiff~~Airtech wired $40,000 through interstate wire, from ~~Plaintiff's~~Airtech's bank account located at 1655 W. Redondo Beach Blvd., Gardena, CA to Kim's account located at 270 Park Avenue, New York, NY.

60

CONFIDENTIAL

236.    ~~122.~~    As a direct and proximate cause of defendants' racketeering activity, Airtech has been injured in its business and property, pursuant to 18 U.S.C. § 1341 and § 1343, and 2314 in the amount of $40,000.

Racketeering Act Three ~~-~~ – Mail and Wire Fraud

237.    ~~123.~~    On October 27, 2020, defendants Yim and Kim caused Sensa to send a false invoice in furtherance of their fraudulent scheme to obtain approximately $1,450 on parts worth $79.60 claiming that it was a sales invoice to ~~Plaintiff.~~ Airtech. The invoice was sent via interstate email from Sensa located at 6000 Poplar Avenue, Suite 252, Memphis, TN, 38119 to Airtech located at 2 Piermont Road, Cresskill, NJ.

238.    ~~124.~~    Yim and Kim, with Sensa defrauded and conspired and acted in concert to defraud ~~Plaintiff~~Airtech in that, 1) Kim created Sensa; 2) Yim ordered ~~Plaintiff~~Airtech to purchase the products from Sensa; 3) Yim and Kim created the fraudulent and false invoice causing it to be sent to ~~Plaintiff~~Airtech; and 4) Yim directed ~~Plaintiff~~Airtech to pay the invoice by wiring the money to Sensa's account controlled by Yim and Kim.

239.    ~~125.~~    Based upon the fraudulent communication and documents presented by defendants Kim, Yim, and Sensa, ~~Plaintiff~~Airtech wired $1,450 through interstate wire, from ~~Plaintiff's~~Airtech's bank account located at 1655 W. Redondo Beach Blvd., Gardena, CA to Sensa's account located at 270 Park Avenue, New York, NY.

240.    ~~126.~~    As a direct and proximate cause of defendants' racketeering activity, Airtech has been injured in its business and property pursuant to 18 U.S.C. §§ 1341 and 1343 in the amount of $1,370.40.

Racketeering Act Four ~~-~~ – Mail and Wire Fraud Transmitting Stolen Money

61

CONFIDENTIAL

241.    ~~127.~~ On December 7, 2020, defendants Yim and Kim caused Sensa to send a false and fraudulent invoice in furtherance of their fraudulent scheme to obtain approximately $65,322 on parts worth $4,561.80 claiming that it was a sales invoice to ~~Plaintiff.~~ Airtech. The invoice was sent via interstate email from Sensa located at 6000 Poplar Avenue, Suite 252, Memphis, TN 38119 to Airtech located at 2 Piermont Road, Cresskill, NJ.

242.    ~~128.~~ Yim and Kim, with Sensa, defrauded and conspired and acted in concert to defraud ~~Plaintiff~~Airtech in that, 1) Kim created Sensa; 2) Yim ordered ~~Plaintiff~~Airtech to purchase the products from Sensa; 3) Yim and Kim created the fraudulent and false invoice causing it to be sent to ~~Plaintiff~~Airtech; and 4) Yim directed ~~Plaintiff~~Airtech to pay the invoice by wiring the money to Sensa account controlled by Yim and Kim.

243.    ~~129.~~ Based upon the fraudulent communication and documents presented by defendants Kim, Yim, and Sensa, ~~Plaintiff~~Airtech wired $65,322 through interstate wire, from ~~Plaintiff's~~Airtech's bank account located at 1655 W. Redondo Beach Blvd., Gardena, CA to Sensa's account located at 270 Park Avenue, New York, NY.

244.    ~~130.~~ As a direct and proximate cause of defendants' racketeering activity, Airtech has been injured in its business and property pursuant to 18 U.S.C. §§ 1341, 1343, and ~~1343~~2314 in the amount of $60,760.20.

Racketeering Act Five~~-~~ – Mail and Wire Fraud and Transmitting Stolen Money

245.    ~~131.~~ On January 8, 2021, defendants Yim and Kim caused Genuine to send a false and fraudulent invoice in furtherance of their fraudulent scheme to obtain approximately $73,184 on parts worth $20,208.32 claiming that it was a sales invoice to ~~Plaintiff.~~

CONFIDENTIAL

Airtech. The invoice was sent via interstate email from Genuine located at 4651 Salisbury Road, Suite 400, Jacksonville, Florida 32256 to Airtech located at 2 Piermont Road, Cresskill, NJ.

246.    132.    Yim and Kim, with Genuine, defrauded and conspired and acted in concert to defraud Plaintiff Airtech in that, 1) Kim created Genuine; 2) Yim ordered Plaintiff Airtech to purchase the products from Genuine; 3) Yim and Kim created the fraudulent and false invoice causing it to be sent to Plaintiff Airtech; and 4) Yim directed Plaintiff Airtech to pay the invoice by wiring the money to Genuine account controlled by Kim.

247.    133.    Based upon the fraudulent communication and documents presented by defendants Kim, Yim, and Genuine, Plaintiff Airtech wired $73,184 through interstate wire, from Plaintiff's Airtech's bank account located at 1655 W. Redondo Beach Blvd., Gardena, CA to Genuine's account located at 255 Second Avenue South, Minneapolis, MN.

248.    134.    As a direct and proximate cause of defendants' racketeering activity, Airtech has been injured in its business and property pursuant to 18 U.S.C. §§ 1341 and 1343 in the amount of $52,975.68.

Racketeering Act Six- – Mail and Wire Fraud and Transmitting Stolen Money

249.    135.    On January 5, 2021, defendants Yim and Kim caused Genuine to send a false and fraudulent invoice in furtherance of their fraudulent scheme to obtain approximately $70,897 on parts worth $19,576.81 claiming that it was a sales invoice to Plaintiff. Airtech. The invoice was sent via interstate email from Genuine located at 4651 Salisbury Road, Suite 400, Jacksonville, Florida 32256 to Airtech located at 2 Piermont Road, Cresskill, NJ.

250.    136.    Yim and Kim, with Genuine, defrauded and conspired and acted in concert to defraud Plaintiff Airtech in that, 1) Kim created Genuine; 2) Yim ordered

63

CONFIDENTIAL

~~Plaintiff~~Airtech to purchase the products from Genuine; 3) Yim and Kim created the fraudulent

and false invoice causing it to be sent to ~~Plaintiff~~Airtech; and 4) Yim directed ~~Plaintiff~~Airtech to

pay the invoice by wiring the money to Genuine account controlled by Kim.

251.    ~~137.~~ Based upon the fraudulent documents presented by defendants

Kim, Yim, and Genuine, ~~Plaintiff~~Airtech wired $73,184 through interstate wire, from

~~Plaintiff's~~Airtech's bank account located at 1655 W. Redondo Beach Blvd., Gardena, CA to

Genuine's account located at 255 Second Avenue South, Minneapolis, MN.

252.    ~~138.~~ As a direct and proximate cause of defendants' racketeering

activity, Airtech has been injured in its business and property pursuant to 18 U.S.C. §§ 1341,

1343, and ~~1343~~2314 in the amount of $54,320.19.

<u>Racketeering Act Seven ~~-~~ – Mail and Wire Fraud and Transmitting Stolen Money</u>

253.    ~~139.~~ On May 6, 2021, defendants Yim and Kim caused RFWave to

send a false and fraudulent invoice in furtherance of their fraudulent scheme to obtain

approximately $27,375 on parts worth $10,105.43 claiming that it was a sales invoice to ~~Plaintiff.~~

Airtech. The invoice was sent via interstate email from RFWave located at 110 Front Street,

Suite 300, Jupiter, Florida 33477 to Airtech located at 2 Piermont Road, Cresskill, NJ.

254.    ~~140.~~ Yim and Kim ~~-~~, with RFWave, defrauded and conspired and acted

in concert to defraud ~~Plaintiff~~Airtech in that, 1) Kim created RFWave; 2) Yim ordered

~~Plaintiff~~Airtech to purchase the products from RFWave; 3) Yim and Kim created the fraudulent

and false invoice causing it to be sent to ~~Plaintiff~~Airtech; and 4) Yim directed ~~Plaintiff~~Airtech to

pay the invoice by wiring the money to RFWave account controlled by Kim.

CONFIDENTIAL

255.    ~~141.~~   Based upon the fraudulent communication and documents presented by defendants Kim, Yim, and RFWave, ~~Plaintiff~~Airtech wired $27,375 through interstate wire, from ~~Plaintiff's~~Airtech's bank account located at 1655 W. Redondo Beach Blvd., Gardena, CA to RFWave's account located at 270 Park Avenue, New York, NY.

256.    ~~142.~~   As a direct and proximate cause of defendants' racketeering activity, Airtech has been injured in its business and property pursuant to 18 U.S.C. §§ 1341 and 1343 in the amount of $17,269.57.

<u>Racketeering Act Eight-</u> – <u>Mail and Wire Fraud</u> <u>Transmitting Stolen Money</u>

257.    ~~143.~~   On August 9, 2021, defendants Yim and Kim caused Arc-Tech to send a false and fraudulent invoice in furtherance of their fraudulent scheme to obtain approximately $67,500 on parts worth $32,500 claiming that it was a sales invoice to ~~Plaintiff.~~ Airtech. The invoice was sent via interstate email from Arc-Tech located at 6303 Blue Lagoon Drive, Suite 400, Miami, FL 33126 to Airtech located at 2 Piermont Road, Cresskill, NJ.

258.    ~~144.~~   Yim and Kim, with Arc-Tech, defrauded and conspired and acted in concert to defraud ~~Plaintiff~~Airtech in that, 1) Kim created Arc-Tech; 2) Yim ordered ~~Plaintiff~~Airtech to purchase the products from Arc-Tech; 3) Yim and Kim created the fraudulent and false invoice causing it to be sent to ~~Plaintiff~~Airtech; and 4) Yim directed ~~Plaintiff~~Airtech to pay the invoice by wiring the money to Arc-Tech account controlled by Kim.

259.    ~~145.~~   Based upon the fraudulent documents presented by defendants Kim, Yim, and Arc-Tech, ~~Plaintiff~~Airtech wired $67,500 through interstate wire, from ~~Plaintiff's~~Airtech's bank account located at 1655 W. Redondo Beach Blvd., Gardena, CA to Arc-Tech's account located at 270 Park Avenue, New York, NY.

65

CONFIDENTIAL

260.    ~~146.~~    As a direct and proximate cause of defendants' racketeering

activity, Airtech has been injured in its business and property pursuant to 18 U.S.C. §§ 1341,

1343, and ~~1343~~2314 in the amount of $35,000.

Racketeering Act Nine-–  Mail and Wire Fraud

261.    ~~147.~~    On August 23, 2021 and September 8, 2021, defendants Yim and

Kim caused Arc-Tech to send a false and fraudulent invoice in furtherance of their fraudulent

scheme to obtain approximately $1,150 on parts worth $260 claiming that it was a sales invoice

to ~~Plaintiff.~~ Airtech. The invoice was sent via interstate email from Arc-Tech located at 6303 Blue

Lagoon Drive, Suite 400, Miami, FL 33126 to Airtech located at 2 Piermont Road, Cresskill, NJ.

262.    ~~148.~~    Yim and Kim-, with Arc-Tech, defrauded and conspired and acted

in concert to defraud ~~Plaintiff~~Airtech in that, 1) Kim created Arc-Tech; 2) Yim ordered

~~Plaintiff~~Airtech to purchase the products from Arc-Tech; 3) Yim and Kim created the fraudulent

and false invoice causing it to be sent to ~~Plaintiff~~Airtech; and 4) Yim directed ~~Plaintiff~~Airtech to

pay the invoice by wiring the money to Arc-Tech account controlled by Kim.

263.    ~~149.~~    Based upon the fraudulent documents presented by defendants

Kim, Yim, and Arc-Tech, on October 8, 2021, ~~Plaintiff~~Airtech wired $1,150 through interstate

wire, from ~~Plaintiff's~~Airtech's bank account located at 1655 W. Redondo Beach Blvd., Gardena,

CA to Arc-Tech's account located at 270 Park Avenue, New York, NY.

264.    ~~150.~~    As a direct and proximate cause of defendants' racketeering

activity, Airtech has been injured in its business and property pursuant to 18 U.S.C. §§ 1341 and

1343 in the amount of $890.

Racketeering Act Ten-–  Mail and Wire Fraud and Transmitting Stolen Money

66

CONFIDENTIAL

265.    ~~151.~~    On November 29, 2021, defendants Yim and Kim caused Arc-Tech to send a false and fraudulent invoice in furtherance of their fraudulent scheme to obtain approximately $67,500 on parts worth $32,500 claiming that it was a sales invoice to ~~Plaintiff.~~ Airtech. The invoice was sent via interstate email from Arc-Tech located at 6303 Blue Lagoon Drive, Suite 400, Miami, FL 33126 to Airtech located at 2 Piermont Road, Cresskill, NJ.

266.    ~~152.~~    Yim and Kim~~,~~ , with Arc-Tech, defrauded and conspired and acted in concert to defraud ~~Plaintiff~~Airtech in that, 1) Kim created Arc-Tech; 2) Yim ordered ~~Plaintiff~~Airtech to purchase the products from Arc-Tech; 3) Yim and Kim created the fraudulent and false invoice causing it to be sent to ~~Plaintiff~~Airtech; and 4) Yim directed ~~Plaintiff~~Airtech to pay the invoice by wiring the money to Arc-Tech account controlled by Kim.

267.    ~~153.~~    Based upon the fraudulent documents presented by defendants Kim, Yim, and Arc-Tech, on November 30,2021, ~~Plaintiff~~Airtech wired $67,500 through interstate wire, from ~~Plaintiff's~~Airtech's bank account located at 1655 W. Redondo Beach Blvd., Gardena, CA to Arc-Tech's account located at 270 Park Avenue, New York, NY.

268.    ~~154.~~    As a direct and proximate cause of defendants' racketeering activity, Airtech has been injured in its business and property pursuant to 18 U.S.C. §§ 1341, 1343, and ~~1343~~2314 in the amount of $35,000.

~~Racketeering Act Eleven-Theft~~    **2.    Misappropriation of Trade Secrets**

269.    ~~155.~~    During Yim's employment with Airtech and thereafter, Yim was not authorized to use or appropriate ~~Plaintiff's trade secrets~~Airtech's Trade Secrets to engage in any business away from ~~Plaintiff.~~ Airtech.

~~156.~~ Racketeering Act Eleven –Multiple Acts Comprised of Thefts of Trade Secrets and Mail and Wire Fraud

67

**CONFIDENTIAL**

270.    On February 5, 2020, while Yim was still employed by ~~Plaintiff~~Airtech, Kim formed Assured. Thereafter, through Assured, Yim ~~and,~~ Kim, and SE-A conspired to use and did in fact use ~~Plaintiff's trade secrets~~Airtech's Trade Secrets without authorization, to engage in business with ~~Plaintiff's~~Airtech's customer ~~SeA Electronics, Inc.~~Se-A from February 2020 to through September 30, 2021, when Yim left the ~~present day~~employ of Airtech, in violation of 18 U.S.C. 1341, 1343, and §1832 ~~(a)(5).~~.

271.    ~~157.~~    While still employed at Airtech, Yim and Assured sold products to SE-A and Assured issued an invoice dated November 22, 2020 in the amount of $10,208.55.

272.    As set forth in detail in the Facts alleged above, Yim and Kim, through Assured, during the time Yim was an employee of Airtech, made eleven separate sales of products in the total amount of $971,914.81 to Se-A using Trade Secrets of Airtech they had misappropriated.

273.    Yim and Kim continued to do business with SE-A through Assured and other Adversary Company entities committing additional predicate acts causing losses to Airtech in amounts not yet known.

Racketeering Act Twelve – Multiple Acts Comprised of Thefts of Trade Secrets

274.    On June 25, 2021 and September 17, 2021, defendant Yim stole two computers containing ~~Plaintiff's trade secrets~~Airtech's Trade Secrets from ~~Plaintiff~~Airtech in violation of 18 U.S.C. §1832 ~~(a)(1).~~. In doing so, Yim committed theft of ~~trade secrets~~Trade Secrets contained in the computers that included, among others, the customer list, contact information, order history, quote history, vendor list, parts list, parts specification, prices, and necessary permits and licensing requirements. Thereafter, on or before October 24, 2021, Yim made copies of the electronic data contained in the ~~computer~~computers in violation of 18 U.S.C. § 1832 ~~(a)(2).~~.

68

CONFIDENTIAL

158.    Racketeering Act Thirteen – Theft of Trade Secrets

275.    As set forth above, in a Purchase Order dated June 23, 2023, at which time Yim was still employed by Airtech and so known to all of its customers, Airtech customer Unione, in a Purchase Order signed by its President, Yoon Jung Ahn, and showing its address in South Korea, ordered $199,999.00 of products from Assured, with the P.O. showing the contact for Assured was "Jasmine Legrand," shown above to have been an alias used by Yim.

276.    Said act of theft of Trade Secrets violated 18 U.S.C. 1341, 1343, and 1832.

Racketeering Act Fourteen – Theft of Trade Secrets

277.    On September 27, 2021, Yim formed Hans Inc. to further his scheme to defraud Plaintiff Airtech. Yim became the president of Hans. Inc. Yim and Hans Inc. began using Plaintiff's trade secrets Airtech's Trade Secrets that were stolen by Yim to compete with Plaintiff. Airtech.

278.    159.  Specifically, as alleged herein from October 2021 until the present and continuing, Hans Inc. began transacting business with Plaintiff's Airtech's various customers using Plaintiff's trade secrets Airtech's Trade Secrets by supplying the same products with the same specifications as Plaintiff Airtech, using the same vendors as Plaintiff Airtech, and undercutting Plaintiff's Airtech's pricing.

279.    160.  As a direct and proximate cause of defendants Yim, Kim, and Hans' Hans Inc.'s acts of racketeering activity, Airtech has been injured in its business and property, pursuant to 18 U.S.C. §1832(a)(1)(2)1341, 1343, and (5),§ 1832, in the minimum amount of $3 million dollars representing the value of the business taken away by Defendants.

Racketeering Act Twelve Fifteen – Theft of Trade Secrets

69

CONFIDENTIAL

280.        161.    During Yim's employment with Airtech, as alleged herein Airtech maintained numerous exclusive sales oragreements, technical assistance agreements, and protected product letter agreements with manufacturers, suppliers, vendors and/or customers with respect to designated manufacturers, products, customers or markets of substantial commercial value to Airtech.

281.        162.    Yim was well aware of the existence of all such valuable agreements, and indeed played a part in making some or all of them.

282.        163.    These valuable agreements were hard-bargained-for, and in exchange for a very substantial investment of time and resources devoted to the needs of the manufacturers, suppliers, vendors and/or customers, Airtech obtained a property right in certain specified future transactions (the "Exclusive Transactions").

283.        164.    At various times as specified herein, using fraud and artifice, Defendants stole Exclusive Transactions from PlaintiffAirtech and kept the transactions for themselves and their own profit.

284.        165.    On September 27, 2021, Yim formed Hans Inc. to further his scheme to defraud PlaintiffAirtech of its Exclusive Transactions. Yim became the president of Hans Inc. Yim also formed and used other sham corporate entities as cover for his theft of Exclusive Transactions.

285.        166.    As alleged above, on April 2, 2022, Yim contacted an engineer at Airtech customer Hanwha Systems Co. Ltd. quoting a stepper motor that was the subject of an exclusive distribution agreement between Airtech and Hanwha.

CONFIDENTIAL

286.     As alleged above, after the entry of the Modified TRO, Yim, through Hans Inc., engaged in transactions with Airtech customer Phytron, Inc. regarding a part subject to an exclusive distribution agreement between Airtech and Phytron.

287.     As alleged above, Yim, through Hans Inc., attempted in or about November 2022 to persuade Airtech vendor AOS to terminate its international sales agreement with Airtech and enter into an identical agreement with Hans Inc.

288.     As a direct and proximate cause of Defendants' racketeering activity, Airtech has been injured in its business and property pursuant to 18 U.S.C. §§ 1341, 1343 and ~~1343~~1832 in amounts still being investigated and to be determined at trial.

### D. **The** Racketeering Acts are Related, ~~Open~~ Have Been Committed Over a Long Period of Years, and are Ongoing, Posing a Threat of Continued Criminal Activity

289.     The foregoing predicate acts and others not specified or not yet discovered are related to each other and to the Enterprise as whole as they all have been committed against Airtech through specific repeated types of acts of fraud, theft, and misappropriation.

290.     The foregoing predicate acts were committed beginning at least five years ago in 2019 and have been committed periodically since and continue to be committed through the expanding Enterprise controlled by culpable persons Yim and Kim. Thus, the pattern of racketeering acts ~~are~~ is demonstrated to have both closed-ended continuity and open ~~and ongoing~~ -ended continuity.

291.     ~~167.~~ Defendants are continuing their racketeering activities by ~~contacting Plaintiff's~~continuing to use misappropriated Airtech Trade Secrets to do business with customer's that were Airtech customers and to obtain new customers which acts include

71

contacting Airtech's customers and vendors and falsely stating that ~~Plaintiff~~Airtech is going out of business.

292. ~~168.~~ In December of 2021, Yim, while in New Jersey, contacted Ms. ~~Yoo~~Yoon Jung Ahn from Unione, one of ~~Plaintiff's~~Airtech's customers in Republic of Korea. Yim stated that Airtech's business ~~will~~would be difficult and that it ~~will~~would not survive and go out of business.~~ ~~ Such false statements were uttered via interstate and international phone calls and interstate and international emails.

~~169. Defendants' actions constitute open pattern of racketeering activities because it is continuing well into the future in the regular way the Defendants are conducting their enterprise, Hans Aerospace. It is also the regular way that the enterprise, Hans, is operating.~~

293. ~~170.~~ As a direct and proximate cause of defendants Yim and Kim's acts of racketeering activities, Airtech has suffered multiple injuries, lost numerous customers and business opportunities, and have sustained irreparable damages and will continue to do so. ~~Plaintiff~~As alleged above, Airtech lost its business from ~~SeA~~SE-A Electronics, Ltd., Unione, ~~Qnion,~~ Seoul Standard, ~~Glizzoni~~ and ~~Century, and is faced with losing business opportunity from Hanwha Systems, Inc~~Intellics.

~~There is also a closed pattern of racketeering activity~~

~~171. The racketeering activities described above constitute a closed pattern because it occurred over a two-year period, caused multiple injuries to Airtech, and involved a variety of predicate acts.~~

**PRAYER FOR RELIEF**

72

**CONFIDENTIAL**

WHEREFORE, ~~Plaintiff~~Airtech respectfully requests that this Court enter a judgment pursuant to 18 U.S.C. 1964(c):

a.   awarding ~~Plaintiff~~Airtech treble damages according to proof;

b.   awarding ~~Plaintiff~~Airtech pre- and post-judgment interest;

c.   awarding a permanent injunction against Defendants against committing further racketeering activity;

d.   awarding ~~Plaintiff~~Airtech reasonable attorneys' fees and costs; and

e.   awarding Airtech such other and further relief as the Court deems just and proper.

<div align="center">

**~~Count Two~~ COUNT IV**
**Violation of Computer Fraud ~~&~~and Abuse Act,**
**~~18~~    18 U.S.C. § 1030, Against Yim~~, Kim, Assured, and Hans~~**

</div>

294.   ~~172.~~   ~~Plaintiff~~Airtech repeats and re-alleges the facts alleged in all preceding paragraphs ~~1 through 106~~ as if fully set forth herein.

~~173.   Defendants intentionally exploited and misappropriated one or more computers belonging to Plaintiff.~~

~~174.   Defendants lacked authority to access the computer or exceeded granted authority to access the computers.~~

~~175.   Defendants obtained data from the computer they misappropriated.~~

~~176.   Defendants caused a loss of $5,000 or more during a one-year span misusing the data from Plaintiff's computer(s) which they obtained.\~~

295.   As set forth above, against company rules and without authorization, Yim stole two computers from Airtech on June 25, 2021 and September 17, 2021, respectively being Yim's

<div align="center">73</div>

**CONFIDENTIAL**

assigned Airtech work computer and Mr. Lee's Airtech work computer, both of which were used in Airtech's business including in interstate and foreign commerce and thus were "protected computers" under the Computer Fraud and Abuse Act, 18 U.S.C. 1030 ("CFAA").

296.    As set forth above, upon information and belief, Yim accessed the data in the computers while they were outside Airtech's offices and, without authorization, copied that data, including data on Mr. Lee's computer, including Mr. Lee's personal financial information, to which Yim would have no authorized access even if the computers were located in Airtech's offices.

297.    Yim thus intentionally accessed two protected computers without authorization and exceeded his authorized access insofar as no access outside of Airtech was authorized and Yim intentionally obtained information from the computers to which he had no authorized access.

298.    Yim accessed the computers with intent to defraud as his theft of the computers, unauthorized access of them, and unauthorized copying of the data they contained was part of his and the other Defendants' scheme to defraud Airtech and to misappropriate Airtech's valuable Trade Secrets and use the misappropriated information to defraud Airtech and steal sales from it thereby damaging Airtech in all the ways alleged herein causing losses to Airtech in excess of $5,000.00 including by fraudulently invoicing Airtech, and by using misappropriated Trade Secrets to divert sales Airtech would have made to its regular customers as alleged above.

299.    The foregoing facts constitute violations of the CFAA.

CONFIDENTIAL

300.    When his theft of the computers was discovered, Yim threatened to disclose and impair the confidentiality of information that was on the protected computers, particularly the personal financial information of Mr. Lee, in further violation of the CFAA.

**PRAYER FOR RELIEF**

**WHEREFORE**, ~~Plaintiff~~Airtech respectfully requests that this Court enter a judgment:

a.    declaring that ~~Defendants~~Yim violated 18 U.S.C. §1030;

b.    awarding ~~Plaintiff~~Airtech compensatory damages;

c.    awarding ~~Plaintiff~~Airtech liquidated and/or statutory damages;

d.    awarding ~~Plaintiff~~Airtech punitive damages;

e.    Enjoining Yim and any Defendant possessing or with access to any of the Trade Secrets misappropriated from the stolen computers to return all Trade Secrets to Airtech and to submit to a forensic examination to ensure that no misappropriated Airtech Trade Secrets remain in Defendants' possession, custody or control.

~~e.~~f.    awarding ~~Plaintiff~~Airtech pre- and post-judgment interest;

~~f.~~g.    awarding ~~Plaintiff~~Airtech reasonable attorneys' fees and costs; and

~~g.~~h.    awarding such other and further relief as the Court deems just and proper.

~~Count Three- Permanent Injunction~~

~~177.    Plaintiff~~**COUNT V**
**State Law Conversion**

301.    Airtech repeats and re-alleges the facts alleged in all preceding paragraphs ~~1 through 106~~ as if fully set forth herein.

~~178.    As described above, Defendants have misappropriated the trade secrets of Plaintiff, including but not limited to client lists; client preferences and requirements; product~~

75

**CONFIDENTIAL**



~~prices; quotations from customers, vendors, and manufacturers; parts specifications; and product designs.~~

~~179.    Thereafter, Defendants have used the misappropriated trade secrets of Plaintiff to compete with Plaintiff in its specialized and limited market, causing significant irreparable damage to Plaintiff's relationship with its customers.~~

~~180.    Plaintiff will continue to suffer irreparable harm to its customer base if Defendants continue to utilize misappropriated trade secrets in this manner.~~

~~181.    Remedies available at law, such as monetary damages, are inadequate to compensate for the injury so sustained by Plaintiff.~~

~~182.    A remedy in equity is warranted upon consideration of the balance of hardships between the Plaintiff and Defendants.~~

~~183.    The permanent injunction being sought would not hurt public interest.~~

302.    As set forth above, Yim converted Airtech funds through the fraudulent expense voucher scheme to which funds Airtech had and has an immediate right.

303.    As set forth above, Airtech discovered the scheme and demanded return of the funds but Yim made a payment of only a small fraction of the funds he converted.

304.    Yim has not yet returned the balance of the Airtech funds he converted.

305.    As set forth above, Yim converted two computers to which Airtech always had a right to possess.

306.    As alleged above, while Yim returned the computers to Airtech when Airtech discovered his thefts, he did not return them with all of their contents, not returning a hard drive and not returning all of the valuable data that Airtech had stored on the computers.

CONFIDENTIAL

307.    Yim has not returned the hardware and digital files he converted and did not return when demand was made to him by Airtech therefor.

308.    In light of the foregoing, Yim has converted and must return to Airtech the balance of the converted funds, computer hardware and digital files.

**WHEREFORE**, Plaintiff respectfully requests that this Court enter a judgment:

a.    Permanently enjoining Defendants from engaging in business with the customers of Plaintiff;

b.    awarding Plaintiff reasonable attorneys' fees and costs; and

c.    awarding such other and further relief as the Court deems just and proper.

Count Four  finding that**State Law Conversion**

184.    Plaintiff repeats and re-alleges paragraphs 1 through 106 as if fully set forth herein.

185.    By submitting fake and sham expense reimbursement vouchers, defendant Yim committed conversion of funds from Plaintiff in an amount to be determined at trial, but not less than $111,929.92.

186.    Despite the fact that Plaintiff requested return of said funds, defendant Yim has failed and refused to return the funds to Plaintiff.

**WHEREFORE**, Plaintiff respectfully requests that this Court enter a judgment:

a.    declaring that defendant Yim intentionally converted property belonging to PlaintiffAirtech;

b.    declaringfinding that Yim's conversion was willful;

CONFIDENTIAL

c.      ordering the return with interest of the funds Yim converted and ordering the return of all computer hardware and digital files converted by Yim and not returned to Airtech;

d.      ordering an accounting of all books and records of Defendants that pertain to the purchases, sales, marketing profits and financial records relevant to the use of Airtech's Trade Secrets to compete against or otherwise steal business away from Airtech;

e.      ordering an accounting of all computer hardware and digital files within the possession, custody or control of the Defendants to locate and secure the return of all property belonging to Airtech;

~~c.~~f.      enjoining future acts of conversion by Yim;

~~d.~~g.      awarding Plaintiff compensatory damages;

~~e.~~h.      awarding Plaintiff liquidated damages;

~~f.~~i.      awarding Plaintiff punitive damages;

~~g.~~j.      awarding Plaintiff pre- and post-judgment interest;

~~h.~~k.      awarding Plaintiff reasonable attorneys' fees and costs; and

~~i.~~l.      awarding such other and further relief as the Court deems just and proper.

~~Count Five~~

## COUNT VI
### State Law Theft of Corporate Funds Against All Defendants

309.      ~~187.      Plaintiff~~Airtech repeats and re-alleges the facts alleged in all preceding paragraphs ~~1 through 106~~ as if fully set forth herein.

310.      ~~188.~~      As set forth above, Yim on his own as to some acts and with other Defendants as to others used his employment by and position of trust within the Airtech

78

CONFIDENTIAL

corporation to convert and misappropriate Airtech's funds through the various schemes described.

311.    By those acts and omissions, aided and abetted by the other Defendants as hereinabove set forth, defendant Yim intentionally misappropriated funds belonging to Plaintiff and caused Plaintiff to suffer an undue financial loss.  Plaintiff's loss consists of ~~the sum~~known amounts, among others, of $111,929.92 from the fake expense vouchers; approximately $219,586.76 from the phony invoices created by defendant Yim on behalf of the Sham Companies~~; and,~~ $62,500 from the phony commission invoice submitted by Yim~~;~~, and $5,645.85 from the sales created by Yim on Amazon.

**WHEREFORE**, ~~Plaintiff~~Airtech respectfully requests that this Court enter a judgment:

a.    ~~declaring~~finding that Defendants have stolen corporate funds from ~~Plaintiff~~Airtech;

b.    ordering an accounting of all books and records of Defendants that pertain to the purchases, sales, marketing profits and financial records relevant to the use of Airtech's Trade Secrets to compete against or otherwise steal business away from Airtech;

~~b.~~c.    declaring that Defendants' actions were willful;

~~c.~~d.    awarding ~~Plaintiff~~Airtech disgorgement from Defendants of all stolen funds and compensatory damages;

~~d.~~e.    awarding Plaintiff liquidated damages;

~~e.~~f.    awarding ~~Plaintiff~~Airtech punitive damages;

~~f.~~g.    awarding ~~Plaintiff~~Airtech pre- and post-judgment interest;

~~g.~~h.    awarding ~~Plaintiff~~Airtech reasonable attorneys' fees and costs; and

i.    ~~h.~~    awarding Airtech such other and further relief as the Court deems just and ~~————~~proper.

79

## ~~Count Six~~ COUNT VII
### State Law Breach of Fiduciary Duty Against Yim

~~189.    Plaintiff~~

312.    Airtech repeats and re-alleges the facts alleged in all preceding paragraphs ~~1 through 106~~ as if fully set forth herein.

313.    ~~190.~~ Yim was the general manager and head of information technology at Airtech.

314.    As the general manager of Airtech, ~~defendant~~ Yim managed all the employees of Airtech and had access to Airtech's finances so that Yim owed a duty of ~~fidelity~~ care and loyalty to ~~Plaintiff.~~ Airtech.

315.    As the head of information technology, Yim was responsible for setting up the Airtech computer systems, setting Airtech employee computer accounts, backing up Airtech's Trade Secrets, and protecting Airtech's Trade Secrets which were maintained on Airtech's computer system. Without question, Yim stood in a position of ultimate trust vis-à-vis ~~Plaintiff~~Airtech in regard to his actions complained of herein.

316.    ~~191.    Defendant~~ Yim knew that Plaintiff had granted him certain authority based on his ~~position~~positions of trust and duty of care and loyalty.

317.    ~~192.    It was a violation of his fiduciary duty to~~ Yim's scheme to provide fake and phony invoices to defraud ~~Plaintiff.  Defendant Yim's~~ Airtech, and transact business with the Sham companies was a breach of his fiduciary duty to Airtech.

318.    Yim's use of Airtech's Trade Secrets to compete against his employer while still employed by Airtech, his theft of Airtech's Trade Secrets after leaving Airtech, and the acts and omissions set forth in the preceding paragraphs constitute a breach of his fiduciary duty.

80

CONFIDENTIAL

319.    Airtech has suffered a loss of business, loss of customers and damage to its reputation due to Yim's actions.

320.    As a direct and proximate result of Yim's breach of fiduciary duty, Plaintiff has been injured in its business and property.

193.    As a direct and proximate result of Yim's breach of fiduciary duty, Plaintiff has been injured in its business and property.

**WHEREFORE**, PlaintiffAirtech respectfully requests that this Court enter a judgment:

a.    declaringholding that defendant Yim intentionally breached his fiduciary obligation to Plaintiff and his duty of duties of care and loyalty to PlaintiffAirtech and that the other Defendants have directly aided and abetted in Yim's breach of his fiduciary dutyduties to PlaintiffAirtech;

b.    declaringholding that Defendants' actions were willful;

c.    enjoining future acts of breach of holding that Yim breached his fiduciary duty by Yimduties to Airtech;

d.    awarding PlaintiffAirtech compensatory damages;

e.    awarding Plaintiff liquidated damages;

f.    awarding PlaintiffAirtech punitive damages;

g.    awarding PlaintiffAirtech pre- and post-judgment interest;

h.    awarding PlaintiffAirtech reasonable attorneys' fees and costs; and

i.    awarding Airtech such other and further relief as the Court deems just and proper.

**Count Seven-Quantum Meruit,**

81

**CONFIDENTIAL**

<span style="color:red">COUNT VIII</span>
**Unjust Enrichment and
Constructive Trust
Against All Defendants**

<u>321.</u>    ~~194.~~  Plaintiff repeats and re-alleges <u>the facts alleged in all preceding</u>
paragraphs ~~1 through 106~~ as if fully set forth herein.

~~195.    Defendants obtained property belonging to Plaintiff, and earned income, without~~
~~paying proper compensation to Plaintiff.~~

<u>322.</u>    ~~196.~~  <u>Yim was an employee of Airtech.</u>



<u>323.    As alleged herein, Defendants stole Airtech Trade Secrets and other proprietary
Airtech information from Airtech directly, defrauded Airtech using fraudulent reimbursement
requests and invoices, used the stolen Airtech Trade Secret information to sell products to
Airtech at inflated prices from the defendant Sham Companies which products were ultimately
destined to be sold to Airtech's customers, depriving Airtech of its full net profit on those
products, used the stolen Airtech Trade Secrets to compete with Airtech through the defendant
Adversary Companies diverting sales and profits from Airtech,,and as to all such wrongful acts,
Defendants did not pay any compensation to Airtech leaving Airtech injured in the full amount
of all monies received by Defendants from such acts.</u>

**Defendants reaped profit from the wrongful** ~~disposition of Plaintiff's property~~

<u>324.    use of</u>Airtech's Trade Secrets which was not paid to or shared with
~~Plaintiff~~<u>Airtech</u>.

<u>325.    Defendants' actions were wrongful and resulted in damage to Airtech.</u>

<span style="color:red">CONFIDENTIAL</span>

326.    Defendants were unjustly enriched by their actions.

**WHEREFORE**, Plaintiff respectfully requests that this Court enter a judgment:

197.    Plaintiff was damaged as a result.

~~**WHEREFORE**, Plaintiff respectfully requests that this Court enter a judgment:~~

a.    ~~declaring~~holding  that  Defendants ~~have~~stole money, Trade Secrets, and other items of value from Airtech, defrauded Airtech using said misappropriated Trade Secrets, and stole business from Airtech thereby wrongfully taking profits that rightfully were Airtech's, that Defendants continue to wrongfully possess such money and property they wrongfully  received and profited from the use of Airtech's Trade Secrets and resale of

a.    valuable goods from Plaintiff, , all thereby damaging Airtech without paying appropriate compensation for ~~them~~the same to Airtech;

~~declaring~~b.    ordering an accounting of all books and records of Defendants that pertain to the purchases, sales, marketing profits and financial records relevant to the use of Airtech's Trade Secrets to compete against or otherwise steal business away from Airtech;

b.    holding that Defendants' actions were willful;

c.    awarding ~~Plaintiff~~Airtech compensatory damages in the total amount in which Defendants were unjustly enriched;

d.    imposing a constructive trust for the benefit of Airtech on all proceeds of and Defendants' assets resulting from the wrongful transactions;

~~d.~~e.    enjoining future such actions by Defendants using Airtech's Trade Secrets and/or stealing from and/or defrauding Airtech;

~~e.~~f.    awarding ~~Plaintiff~~Airtech punitive damages;

83

**CONFIDENTIAL**


~~f.~~g.      awarding ~~Plaintiff~~Airtech pre- and post-judgment interest;

~~g.~~h.      awarding ~~Plaintiff~~Airtech reasonable attorneys' fees and costs; and

~~h.~~i.      awarding Airtech such other and further relief as the Court deems just and proper.

### ~~Count Eight~~ COUNT IX
### Fraud against All Defendants

327.      ~~198.~~    ~~Plaintiff~~Airtech repeats and re-alleges the facts alleged in all preceding paragraphs ~~1 through 106~~ as if fully set forth herein.

328.      ~~199.~~ Defendants made material misrepresentations of fact regarding various commercial transactions in which they induced Plaintiff to engage ~~in.~~including:

~~200.     Defendants intended Plaintiff to rely upon these misrepresentations, and Plaintiff did rely upon them.~~

~~201.   Plaintiff.~~a.          Yim's submission to Airtech of fake reimbursement vouchers which he knew to be false on which he intended Airtech to rely and upon which Airtech did reasonably rely resulting in damage to Airtech in the amount of money paid to Yim by Airtech as a result of his fake reimbursement voucher scheme;

b.      Yim's formation of Sham Companies through which he did business with Airtech which Yim intended Airtech to make purchase from as if they were real companies, selling products to Airtech at what Defendants knew to be grossly inflated prices, submitting invoices they knew to be fraudulent to Airtech which Airtech reasonably believed to be legitimate and paid, and fraudulently accessed and changed Airtech's records to conceal the sham nature of the transactions from Airtech, thereby resulting in injury to Airtech in the amount by which the products' prices were inflated and in damaging relationships Airtech had with its legitimate vendors;

84

CONFIDENTIAL

c.      Yim's submission of what he knew to be fraudulent commission vouchers and invoices purporting to be from real brokers and fraudulently directing the payments thereof by Airtech to be made to accounts controlled by Defendants thereby damaging Airtech in the amount of the payments it made based on the bogus vouchers and invoices; and

d.      Defendants doing business through the Adversary Companies with customers and vendors of Airtech and in all cases in which the customer and vendor companies were not confederates of Defendants participating in their scheme, defrauded them by lying to them about Airtech and the products they sold to them and in later instances by falsely stating to the customers and vendors that the Adversary Company transactions were not violating the Modified TRO when they were violating it, thereby damaging Airtech by fraudulently diverting business from Airtech causing Airtech to lose revenue and profits and damaging Airtech's relationships with its customers and vendors causing further damage to Airtech by decreasing the amount of sales it made to those customer or in some instances to lose the customer entirely.

329.      Defendants made the representations willfully and maliciously knowing they were false with the intention that Airtech rely upon them which reasonably it did.

330.      Airtech was damaged as a result of ~~relying upon the misrepresentations, which~~ each of the multiple frauds and fraudulent schemes. ~~were willful and malicious.~~

WHEREFORE, ~~Plaintiff~~Airtech respectfully requests that this Court enter a judgment:

a.      ~~Declaring~~holding that Defendants  intentionally defrauded ~~Plaintiff~~Airtech;

b.      ~~declaring~~holding that Defendants' fraud was willful;

85

CONFIDENTIAL

c.      enjoining future acts of fraud by Defendants;

d.      awarding ~~Plaintiff~~Airtech compensatory damages;

e.      awarding Plaintiff liquidated damages;

f.      awarding ~~Plaintiff~~Airtech punitive damages;

g.      awarding ~~Plaintiff~~Airtech pre- and post-judgment interest;

h.      awarding ~~Plaintiff~~Airtech reasonable attorneys' fees and costs; and

i.      awarding Airtech such other and further relief as the Court deems just and

proper.

<div align="center">

**~~Count Nine~~ COUNT X**
**Tortious Interference with Contract, Contractual Relations, and Prospective Economic**
**Advantage and Unfair Competition against All Defendants**

</div>

331.    ~~202.~~    ~~Plaintiff~~Airtech repeats and re-alleges the facts alleged in all

preceding paragraphs ~~1 through 106~~ as if fully set forth herein.

332.    ~~203.~~    Airtech had express contracts, contractual relations, and

expectation of prospective economic advantage based on long-term business relationships, with

customers, vendors and brokers all of which Defendants had knowledge at all relevant times.

333.    Defendants were not a party to ~~Plaintiff's~~Airtech's contracts with its customers,

including contracts providing exclusive transactional rights to ~~Plaintiff~~Airtech for which

~~Plaintiff~~Airtech had bargained, expended substantial time and resources, ~~and~~of which all of which

Defendants were well aware, nor did Defendants have any legitimate expectation of economic

advantage with any customer, vendor, supplier, manufacturer, or broker who did business with

Airtech when Yim was an Airtech employee or thereafter or any right of remuneration

therefrom.

<div align="center">

86

</div>

204.    Defendants knew of Plaintiff's contractual relationship with its customers, but actively interfered with Plaintiff's contracts with its customers without justification, inducing such customers to breach by diverting the transactions from Plaintiff to Defendants.

334.    205.    Said customers of Airtech included SE-A Electronics, Unione Technologies, Hanwha Systems, Intellics, Korea Electro Optics Co., Inc. Qnion Ltd, Segi Co, and Seoul Standard ("Airtech Customers".

335.    Said vendors of Airtech included Phytron, Aperture Optical Sciences, and Air Rover ("Airtech Vendors").

336.    Said brokers of Airtech included EAU Group ("Airtech Brokers")

337.    As alleged herein, Defendants, wrongfully misappropriated, took and used Airtech's Trade Secrets, confidential and proprietary information to intentionally, unjustifiably, maliciously and wrongfully submit false and fraudulent expense reimbursement requests and receipts to Airtech including purporting to be from an Airtech Broker interfering with the contract with and prospective economic gain Airtech expected from the Airtech Broker and others whose information was misused by Defendants and unfairly competing with and causing damage to Airtech in those contract and economic relationships and with the companies with which Airtech did business through those brokers and vendors.

338.    As alleged herein, Defendants, wrongfully misappropriated, took and used Airtech's Trade Secrets, confidential and proprietary information to deliberately, intentionally, unjustifiably, maliciously and wrongfully conduct a scheme against Airtech whereby they submitted false and fraudulent invoices from the Sham Companies to Airtech and then accessed the ledgers, books and records of Airtech to fraudulently change the names of the Sham Companies to the names of legitimate vendors that Airtech frequently dealt with thereby

87

CONFIDENTIAL

intentionally and unjustifiably interfering with Airtech's contractual relations and expected economic advantage from those Airtech vendors injuring Airtech directly by overcharging Airtech for the products sold to it in that way unfairly competing with and injuring Airtech's business and contractual relationships with the affected Airtech Vendors and with the Airtech Customers to which Airtech sold the products it so acquired by its purchases unknowingly from Sham Companies at inflated prices.

339.    As alleged herein, Defendants wrongfully misappropriated, took and used Airtech's Trade Secrets, confidential and proprietary information through their Adversary Companies, deliberately, intentionally, unjustifiably, maliciously and wrongfully to conduct a scheme against Airtech whereby they contacted the specific persons with whom Airtech dealt in Airtech Customers and directly interfered in Airtech's contractual relations with the Airtech Customers and prospective economic advantages of continued sales to the Airtech Customers by making sales of products to those Airtech Customers which would have been made by Airtech by using Airtech Trade Secrets and proprietary information thereby intentionally and fraudulently causing those Airtech Customers to buy from Defendants taking and diverting from Airtech the revenues and profits from those transactions and damaging Airtech's business and contractual relations with those Airtech Customers unfairly competing with and costing Airtech additional business all of which damaged Airtech by direct loss of sales, revenues and profits and expected sales revenues and profits and by damaging Airtech's continued and future business with those Customer Companies.

340.    To the extent any of the Airtech Customers or specific officers thereof cooperated and conspired with Defendants and their Adversary Companies to divert sales and business from Airtech they conspired in the interference with contracts, contractual rights and prospective

CONFIDENTIAL

economic advantage of Airtech, unfair competition with Airtech, and the business diversion scheme of Defendants directed against Airtech.

341.      From such diversion of business transactions, ~~Plaintiff~~Airtech lost its contractual rights and prospective economic advantages and benefits arising ~~thereof~~therefrom.

342.      ~~206.~~     ~~Plaintiff~~Airtech was damaged as a result of such ~~breaches~~interference.

_____**WHEREFORE**, ~~Plaintiff~~Airtech respectfully requests that this Court enter a judgment:

a.      ~~declaring~~holding that Defendants tortiously interfered with ~~Plaintiff's contracts with its~~ Airtech's contracts, contractual relations, and prospective economic advantage with Airtech Customers, Vendors (including suppliers and manufacturers), and Brokers; ~~customers;~~

b.      ~~declaring~~holding that Defendants unfairly competed with Airtech

~~b.~~c.      holding that Defendants' tortious interference and unfair competition was willful;

~~c.~~d.      enjoining future acts of tortious interference and unfair competition by Defendants;

e.      awarding ~~Plaintiff~~Airtech compensatory damages

~~d.~~f.      awarding Airtech disgorgement by Defendants of all payments and profits received by Defendants due to their misappropriation, interference and unfair competition;

~~e.~~g.      awarding Plaintiff liquidated damages;

~~f.~~h.      awarding ~~Plaintiff~~Airtech punitive damages;

~~g.~~i.      awarding ~~Plaintiff~~Airtech pre- and post-judgment interest;

~~h.~~j.      awarding ~~Plaintiff~~Airtech reasonable attorneys' fees and costs; and

89

i.k.    awarding Airtech such other and further relief as the Court deems just and proper.

Count Ten

## COUNT XI
### Conspiracy against All Defendants

343.    207.    PlaintiffAirtech repeats and re-alleges the facts alleged in all preceding paragraphs 1 through 106 as if fully set forth herein.

208. **Yim, Kim, Yoon Jung Ahn, Jiyoung Lee, Unione, SEGI and the remaining Defendants agreed between themselves to** take actions**unlawfully act in** furtherance of**concert to commit fraud,**

344.    conversion, tortious interference with contract and other wrongdoing against PlaintiffAirtech.

209. **Yim, Kim, Yoon Jung Ahn, Jiyoung Lee and the remaining Defendants** took **agreed to take specific actions, to wit, to commit fraud, conversion and tortious interference**

345.    with contract in furtherance of their agreement inflicting a wrongdamages against PlaintiffAirtech.

346.    210.    PlaintiffAirtech was damaged and continues to suffer damages as a result of this conspiracy between the Yim, Kim, Yoon Jung Ahn, Jiyoung Lee, Unione, SEGI and the remaining Defendants.

**WHEREFORE**, Plaintiff respectfully requests that this Court enter a judgment:

a.    declaring thatholding that Yim, Kim, Yoon Jung Ahn, Jiyoung Lee, Unione, SEGI and the remaining Defendants conspired to commit torts and other wrongdoing against Plaintiff;

90

CONFIDENTIAL

b.    ~~declaring~~holding that Yim, Kim, Yoon Jung Ahn, Jiyoung Lee, Unione, SEGI and the remaining Defendants' conspiracy was willful;

c.    enjoining future acts of conspiracy by Yim, Kim, Yoon Jung Ahn, Jiyoung Lee, Unione, SEGI and the remaining Defendants;

d.    awarding ~~Plaintiff~~Airtech compensatory damages;

e.    awarding Plaintiff liquidated damages;

f.    awarding ~~Plaintiff~~Airtech punitive damages;

g.    awarding ~~Plaintiff~~Airtech pre- and post-judgment interest;

h.    awarding ~~Plaintiff~~Airtech reasonable attorneys' fees and costs; and

i.    awarding Airtech such other and further relief as the Court deems just and proper.

### ~~Count Eleven–Accounting Against All Defendants~~

~~211.    Plaintiff repeats and re-alleges paragraphs 1 through 106 as if fully set forth herein.~~

~~212.    Defendants have sole and exclusive control over business records relating to the marketing and sale of the goods and other property at issue herein.~~

~~213.    Plaintiff cannot determine the full extent of its damages without access to the books and records of the Defendants.~~

~~214.    Therefore, Plaintiff seeks a court-ordered accounting of such books and records as they pertain to the marketing and sales of the goods and other property at issue herein.~~

~~**WHEREFORE**, Plaintiff respectfully requests that this Court enter a judgment:~~

~~a.    declaring that Defendants have sole and exclusive control over important records~~

**CONFIDENTIAL**

~~relating to Plaintiff's business operations;~~

~~b.        directing the appointment of an auditor who shall provide an accounting of such~~

~~records to Plaintiff;~~

~~c.        awarding  Plaintiff  reasonable  attorneys'  fees  and  costs;  and~~

~~d.        awarding  such  other  and  further  relief  as  the  Court  deems  just  and proper.~~

<div align="center">

~~Count Twelve~~ COUNT XIII
**Breach of Contract Against Yim**

</div>

~~215.    Plaintiff~~

347.        Airtech repeats and re-alleges the facts alleged in all preceding paragraphs ~~1~~
~~through 106~~ as if fully set forth herein.

~~216.    Defendant Yim entered into a contract with Plaintiff for employment.~~

348.        ~~217.~~    Yim was employed by Airtech.

349.        As an employe of Airtech, Yim and the other employees of Airtech were
regularly told by Mr. Lee that the Trade Secrets of Airtech were the life blood of the company
and should not be shared nor disclosed to third parties.

350.        As the general manager of Airtech, ~~defendant~~ Yim stood in a position of
ultimate trust vis-à-vis ~~Plaintiff~~Airtech in regard to his actions complained of herein, and often
told new employees that Airtech's Trade Secrets were confidential and proprietary and should
not be disclosed or shared with any third parties.

351.        ~~218.~~    ~~Defendant~~Yim knew that ~~Plaintiff~~Airtech had granted him certain
authority based on his position.

352.        ~~219.~~    Yim, as the head of information technology, was responsible to
setting up the computers for existing and new employees, and Yim was responsible for

<div align="center">

92

</div>

**CONFIDENTIAL**

configuring password protection on the computers and Airtech email accounts. Yim regularly told Airtech's employees that they should keep their passwords safe and secure to prevent unauthorized access to Airtech Trade Secrets.

353.    As an employee and general manager of Airtech, Yim often entered into confidentiality agreements or exclusive purchase agreements with Airtech's customers and vendors, which required that Yim maintain the confidentiality of information exchanged and generated with Airtech's customers and vendors.

354.    It was a breach of ~~the~~ contract ~~between the parties to scheme~~for Yim to provide fake and phony invoices to defraud ~~Plaintiff, and to~~Airtech, steal corporate funds and property~~.~~ ~~Defendant~~, steal business away from Airtech by purchasing exclusive products from Airtech's vendors and reselling them to Airtech's customers using Airtech's Trade Secrets. Yim's acts and omissions constitute breaches of contract.

355.    Yim's actions of misappropriating and using Airtech's Trade Secrets is also a breach of ~~contract~~specific contracts and exclusive purchase agreements with Airtech's customers.

~~1.        220.    As a direct and proximate result of Yim's breach of fiduciary duty, Plaintiff has been injured in its business and property.~~

356.    As a direct and proximate result of Yim's breach of numerous contracts, Airtech has suffered an injury to its business and property rights.

**WHEREFORE**, ~~Plaintiff~~Airtech respectfully requests that this Court enter a judgment:

~~i.~~a. ~~declaring~~    holding that ~~defendant~~Yim has breached ~~the~~his contract with ~~Plaintiff~~Airtech;

b.    ~~declaring that defendant~~holding that Yim has breached contracts and exclusive distribution agreements with Airtech, Airtech's customers and Airtech's vendors;

93

**CONFIDENTIAL**

j.c.        holding that Yim's actions were willful;

d.        awarding Airtech compensatory damages;

e.        enjoining future such actions by Defendants;

f.        awarding Plaintiff punitive damages;

k.        awarding Plaintiff compensatory damages;

l.a.        enjoining future such actions by Defendants;

m.        awarding Plaintiff punitive damages;

n.g.        awarding PlaintiffAirtech pre- and post-judgment interest;

o.h.        awarding PlaintiffAirtech reasonable attorneys' fees and costs; and

p.i.        awarding Airtech such other and further relief as the Court deems just and proper.

**Count Thirteen**

**COUNT XIV**
**Defamation against Yim**

357.        221.    PlaintiffAirtech repeats and re-alleges the facts alleged in all preceding paragraphs 1 through 106 as if fully set forth herein.

358.        222.    During 20112021 and 20122021, both before and after he departed from his positionpositions with Plaintiff, defendant Yim made false and defamatory statements about Plaintiff and its President, Jin OMr. Lee.

359.        223.    Defendant Yim communicated these false and defamatory statements of fact to third parties including Plaintiff'sAirtech's current and former customers, vendors and manufacturers.

94

CONFIDENTIAL

360.    ~~224.~~    Among ~~his~~Yim's false and defamatory statements which he made during 2021 and 2022 to ~~Plaintiff's~~Airtech's customers, vendors and manufacturers, ~~defendant~~ Yim falsely told ~~them~~these third parties that ~~Plaintiff~~Airtech had significant tax issues, implying that ~~Plaintiff~~Airtech was dishonest and would not survive long; was subject to personnel departures; was experiencing "huge trouble" and "would shrink legally~~". To Plaintiff's.~~." Yim falsely told Airtech's customers, vendors and manufacturers ~~during that period of time, Yim falsely informed them~~ that various customers did not like ~~Plaintiff~~Airtech and did not want to ~~deal~~conduct business with ~~it~~Airtech.

361.    ~~225.~~    ~~Defendant~~ Yim ~~took~~intentionally made these ~~actions~~false statements in an attempt to convince ~~Plaintiff's~~Airtech's customers that ~~Plaintiff~~it was not reliable so that ~~they~~the customers would terminate their business relationships with ~~Plaintiff~~Airtech and commence business with Yim and the remaining Defendants.

362.    ~~226.~~    These ~~actions tended to lower Plaintiff's~~false statement severely damaged Airtech's reputation in ~~its~~Airtech's business community and were intentionally designed to deter others from ~~associating~~doing business with ~~Plaintiff~~Airtech.

363.    ~~227.~~    These actions were intentional, willful, malicious and reckless, and taken for Yim's personal gain.

364.    ~~228.~~    As a result of the foregoing~~, Plaintiff~~ actions, Airtech was damaged by losing at least two customers and millions of dollars in annual revenues.

**WHEREFORE**, ~~Plaintiff~~Airtech respectfully requests that this Court enter a judgment:

a.    ~~declaring~~holding that ~~defendant~~ Yim has defamed ~~Plaintiff~~Airtech;

95

b.      ~~declaring~~holding that ~~defendant~~ Yim's actions were intentional, willful and otherwise actionable;

c.      awarding Airtech compensatory damages;

d.      enjoining future such actions by Defendants;

~~c.a.      Plaintiff compensatory damages;~~

~~d.a.      enjoining future such actions by Defendants;~~

~~e.a.      awarding Plaintiff punitive damages;~~

e.      awarding Airtech punitive damages;

f.      awarding ~~Plaintiff~~Airtech pre- and post-judgment interest;

g.      awarding ~~Plaintiff~~Airtech reasonable attorneys' fees and costs; and

h.      awarding such other and further relief to Airtech as the Court deems just and proper.

**~~Count Fourteen- New Jersey Trade Secrets Act against Yim~~**

~~229.    Plaintiff repeats and re-alleges paragraphs 1 through 106 as if fully set forth herein.~~

~~230.    Plaintiff possessed trade secrets as defined under the New Jersey Trade Secrets Act, N.J.S.A. 56:15-2, et seq.~~

~~231.    Plaintiff communicated such trade secrets in confidence to defendant Yim.~~

~~232.    Defendant Yim disclosed Plaintiff's trade secrets in breach of that confidence.~~

~~233.    Defendant Yim provided Plaintiff's trade secrets to competitors of Plaintiff with knowledge of the breach of confidence.~~

~~234.    Plaintiff's competitors used the trade secrets so received to the detriment of the Plaintiff.~~

96

**CONFIDENTIAL**

WHEREFORE, Plaintiff respectfully requests that this Court enter a judgment:

a.      declaring that defendant Yim has breached Plaintiff's confidence and conveyed

        its trade secrets to its competitors;

b.      declaring that defendant Yim's actions were willful;

c.      awarding Plaintiff compensatory damages;

d.      enjoining future such actions by defendant Yim;

e.      awarding Plaintiff punitive damages;

f.      awarding Plaintiff pre- and post-judgment interest;

g.      awarding Plaintiff reasonable attorneys' fees and costs; and

h.      awarding such other and further relief as the Court deems just and proper.


**JURY DEMAND**

Plaintiff demands a trial by jury.


Dated: July 19, 2022November ____, 2024

_____                                       Respectfully submitted,

                                             CHO LAW GROUP, LLC


                                             By: */s/ Kenneth K. Cho*
                                                  Kenneth K. Cho


97

**CONFIDENTIAL**

kcho@cholawgrp.com
CHO LAW GROUP, LLC
22 Paris Avenue, Suite 110 D
Rockleigh, NJ 07647
Telephone: (201) 822-0032
Facsimile:  (201) 822-0033

Ted G. Semaya (*admitted pro hac vice*)
ted@semayalaw.com
SEMAYA LAW FIRM
43 West 43rd Street, Suite 164
New York, NY 10036-7424
Telephone: (914) 844-6480

Susie Kim-Levy (*admitted pro hac vice*)
susie.kim@skimlawgroup.com
S. KIM LAW GROUP, PLLC
745 Fifth Avenue, Suite 500
New York, NY 10151
Telephone: (646) 825-2336
Facsimile:  (646) 825-2351

*Attorneys for Plaintiff*
*Airtech International, Inc.*

CONFIDENTIAL

<u>VERIFICATION</u>

Jin O. Lee, of full age, hereby certifies:

I am the president of AIRTECH INTERNATIONAL INC., Plaintiff in the above-entitled

matter.  ~~I have held this position since 2002 when I founded Airtech.  My responsibilities include~~

~~monitoring the contractual agreements and financial records of AIRTECH INTERNATIONAL~~

~~INC. I have read the foregoing~~<u>I have read the foregoing Second</u> Amended and Supplemental

Complaint and certify that the allegations contained therein are true to the best of my knowledge,

information and belief.

I certify that the foregoing statements are true. I am aware that if any statement made

herein is willfully false, I am subject to punishment.

_____
                                                             JIN O. LEE

Dated:  ~~July 19, 2022~~<u>November ____, 2024</u>

99

**CONFIDENTIAL**

**<u>CONFIDENTIAL</u>**


**<u>FILED UNDER SEAL</u>**




**EXHIBIT C**






**IN**

***Airtech International Inc. v. Byung Chan Yim***

***a/k/a Roy Yim, et al.***

**Civil Action No. 22-00668-MEF-AME**

1                  UNITED STATES DISTRICT COURT
2               FOR THE DISTRICT OF NEW JERSEY

3    ━━━━━━━━━━━━━━━━━━━━━━━

4    AIRTECH INTERNATIONAL INC.,
                                    CIVIL ACTION NUMBER:
5         Plaintiff,
                                    2:22-cv-668-MEF
6             vs.
                                    Preliminary Injunction
7    BYUNG CHAN YIM, et al.,        Hearing

8         Defendants.               VOLUME I, Pages 1 - 148
     ━━━━━━━━━━━━━━━━━━━━━━━

9         Frank R. Lautenberg Post Office and Courthouse
          Two Federal Square
10        Newark, New Jersey  07102
          January 29, 2024

11

12

13   B E F O R E:            THE HONORABLE MICHAEL E. FARBIARZ,
                             UNITED STATES DISTRICT COURT JUDGE

14

15   A P P E A R A N C E S:

16        KIM & BAE P.C. BY:
          CHRISTINE M. BAE, ESQ.
          CARLTON R. ASHER, ESQ.
17        2160 North Central Road
          Suite 303
18        Fort Lee, New Jersey  07024

19            appeared on behalf of the Plaintiff;

20

21           Lisa A. Larsen, RPR, RMR, CRR, FCRR
22                 Official Court Reporter
              Lisa_Larsen@njd.uscourts.gov
23                    (973)776-7741

24

25        Proceedings recorded by mechanical stenography.
          Transcript produced by computer-aided transcription.

BYUNG CHAN YIM - DX - BY MR. ROBERTS

 1  belongs to Airtech in order to do business with the

 2  11 companies listed in the order?

 3  A.   No.  It is not required, no.

 4  Q.   Last question:  Are you using any information, any

 5  information that you gained from Airtech that gives you an

 6  unfair advantage to compete against them in the marketplace

 7  that other companies don't have?

 8  A.   No, no.

 9       MR. ROBERTS:  I have no further questions at this time.

10       THE COURT:  Mr. Roberts, thank you.

11       Here is what we're going to do:  We're going to take a

12  little break before the cross begins.  It's now 1:31.  We'll

13  be back and start the cross at 1:55.  We are adjourned until

14  then.

15       (Recess taken.)

16       THE DEPUTY CLERK:  All rise.

17       THE COURT:  Let's be seated.

18       Mr. Asher, you're ready to begin cross?

19       Let's have the witness resume the witness box.

20       (Brief pause.)

21       THE COURT:  Mr. Yim, I want to remind you that you

22  remain under oath.

23       THE WITNESS:  Yes.  I understand.

24       THE COURT:  Have a seat.

25       Mr. Asher, over to you.

1    reference to the first page itself.

2  A.    Yes, yes.

3  Q.    The first page appears to be an e-mail from you to an

4    Airtech customer called Phytron.

5         Do you see that?

6  A.    Yes, yes.

7  Q.    In the e-mail it says:  (Reading.)

8           I think we need to change your part number

9           from VSS33.200.0.6-VGPL32/100 to...

10          Another number.

11          It goes on to say this new number:  (Reading.)

12           ...(HA means Hans Aerospace) because of the

13          attached protection letter provided to Airtech.

14          Would you please give me a quote with using new

15          number, the Hans number, and change the attached

16          specification from Airtech to Hans Aerospace and

17          protection letter with the new number for me.

18          Do you see that?

19  A.    Yes.

20  Q.    This shows an e-mail.  Namely -- the e-mail that I have

21    been reading into the record says it was January 19, 2022.

22         Do you see that date?

23  A.    Yes.

24  Q.    Where did he get all this information concerning Airtech?

25  A.    So this is a manufacturing company that I have been

1  developing since 2010.  So by using my private e-mail, there

2  were times when something like this was communicated in the

3  e-mail when the company e-mail did not work.  So there were

4  such documents as these at that time.

5  Q.    You just referred to private e-mail.

6         What are you referring to?

7  A.    So not the company computer.  And when the company e-mail

8  did not work -- so there were times -- and also there were

9  times when the researcher would send something about the item

10 from 2010, so that's when.

11 Q.    Whose researcher are you referring to?

12 A.    A researcher that's at Hanwha System.

13 Q.    At whose?

14 A.    A researcher that was at Hanwha System.

15 Q.    That's a company in Korea?

16 A.    Yes.  That's correct.

17 Q.    Here in early January 2021 -- excuse me, January 2022,

18 Phytron, the company in question, is located in Vermont; isn't

19 that true?

20 A.    Yes, that's true.

21 Q.    Did you get any pricing information with respect to

22 entering into a transaction for Hans Aerospace with Phytron?

23 A.    Yes, I did.

24 Q.    Where did you get that information?

25 A.    The quotation was received from Phytron.

1    Q.    Where and when?

2    A.    I received it in my private e-mail.

3    Q.    Your private e-mail, is it a -- it's an e-mail account?

4    A.    Yes.

5    Q.    What account is it?

6    A.    It's my Gmail.

7    Q.    Okay.  You're saying that in January 2021 -- excuse me,

8    January 2022 you were receiving into an account -- a private

9    account?

10   A.    Yes, yes.

11   Q.    Isn't it a fact that this is information that you've had

12   over a number of years for Airtech in your dealings with

13   Phytron?

14   A.    It's not that Airtech is the only one who had it.  Like I

15   told you before, I had it as well, too, in my own private

16   e-mail.

17   Q.    Tell us, from your memory, what is your Gmail e-mail

18   address?

19   A.    It's BCYIN0526@gmail.com.

20   Q.    None of it's been produced in this case.  None.

21        Did you give the e-mail from that account to your

22   lawyers or not?

23   A.    I did not.

24   Q.    Is there a reason why you didn't?

25   A.    That was because that's my private e-mail.

1    Q.   Did you -- withdraw that.

2         Let me turn to, in Plaintiff's Exhibit 77, a specific

3    page which is about three or four pages into the exhibit.  The

4    control number is PI000498.

5         THE COURT:  Mr. Asher, do you anticipate seeking access

6    to that e-mail, for example, through a subpoena?

7         MR. ASHER:  We have sought numerous requests in front

8    of the magistrate judge, and we've obtained pursuant to

9    various efforts, and ultimately we have served subpoenas on

10   Phytron --

11        THE COURT:  I'm asking if you're anticipating

12   subpoenaing the Gmail account that's just been described.

13        MR. ASHER:  We haven't done that.

14        THE COURT:  I'm asking if you're anticipating that.

15        MR. ASHER:  Yes.  That would be useful and appropriate.

16        THE COURT:  Mr. Yim, it is possible that the lawyer for

17   the plaintiff will apply to the Court for permission to get

18   access to your e-mail.  Knowing that that is the situation as

19   you now know, deleting e-mails from your account could cause

20   very serious legal difficulties.

21        I'm going to direct you to discuss that with your own

22   lawyer, and he can give you guidance as to how to proceed, but

23   you do not want to make a mistake.

24        Mr. Roberts, can you make sure that after the

25   proceedings today you discuss with your client the spoliation,

1    other obligations that may attach at this point?

2         MR. ROBERTS:  Positive.

3         THE COURT:  Mr. Asher, how much more do we have?

4         MR. ASHER:  Give me two minutes, Your Honor.

5              (Brief pause.)

6         MR. ASHER:  I'd like to offer --

7         THE COURT:  Mr. Asher, my question is how much more do

8    you have?

9         MR. ASHER:  Two minutes, Your Honor, or less, or less.

10             (Brief pause.)

11        MR. ASHER:  I think we have basically two documents and

12   a question.

13        THE COURT:  Okay.

14   BY MR. ASHER:

15   Q.   Previously you testified in response to your counsel's

16   question that you had changed the part number only once of...

17             (Brief pause.)

18        MR. ASHER:  I'd like to show the witness Plaintiff's

19   Exhibit 76.

20        THE COURT:  You're going to offer that, I assume.

21        MR. ASHER:  Yes.

22        THE COURT:  Mr. Roberts will take a look at it and give

23   us his position.

24        MR. ASHER:  I'm showing it to Mr. Roberts.

25             (Brief pause.)

1  to Wahid:  (Reading.)

2          I want you to respond back to Airtech like

3      Phytron does not have any business with Hans

4      relevant to your court order.

5      Do you see those language?

6  A.   Yes.

7  Q.   You actually asked Phytron's representative to inform

8  Airtech that Phytron does not have any business with Hans

9  relative to your court order?  Why did you --

10         THE COURT:  What's the answer to that question?

11         THE WITNESS:  Just a moment.

12         (Brief pause.)

13  A.   Yes, that's correct.

14         THE COURT:  Mr. Yim, it is exceedingly important --

15  Mr. Yim, listen to me.

16         It is exceedingly important that you do not delete or

17  change anything at all in your Gmail account.  The

18  consequences could be very serious.

19         Do you understand that?

20         THE WITNESS:  Yes, yes.

21         THE COURT:  Are you sure you understand?

22         THE WITNESS:  Yes.

23         THE COURT:  Mr. Roberts, I'm going to direct you to

24  discuss this with your client as soon as we're done today.

25         MR. ROBERTS:  I understand the issue already, Judge.

1          THE COURT:  What I would say is the document we have

2     just looked at, the testimony we have just heard as to 477,

3     whatever else might be said about it, is so serious that I

4     think you should talk to him right away.

5          You'll do that, Mr. Roberts?

6          MR. ROBERTS:  I do, Your Honor, but at the same time,

7     the colloquy here with the individual concerns what the court

8     order means and -- because when you read it, it has to do with

9     trade secrets --

10         THE COURT:  I'm not making any findings or referrals or

11    anything of the kind.  I'm talking about making sure that

12    there's nothing that could later seem like spoliation if a

13    subpoena issues.

14         MR. ROBERTS:  I understand, Your Honor.  The Gmail

15    account issue came up today.  He's been told not to delete his

16    Gmail account.  I'm happy for them to pursue the Gmail

17    account.

18         What I'm remained focused on is that he's got a

19    colloquy with an individual here.  He's perfectly free to

20    compete with the company on part numbers that are available,

21    things that are not exclusively produced, designed, and

22    manufactured -- which they don't manufacture anything -- by

23    Airtech.

24         If you read the -- I know the Court has -- language

25    in the order is such that it attributes very specific

1  trade secret-type properties for the order to be enforceable

2  against him.  What he's saying here is that doesn't exist

3  here.  You have an exclusivity agreement.  We change the new

4  part number, I got a contract, and they're out.  That's

5  competition.  That's not:  "I stole your design idea."

6  That's --

7         THE COURT:  I understand the interpretation.  I do.

8  BY MR. ASHER:

9  Q.   Turning, Mr. Yim, to another page of the e-mail, it's

10 P1000476, at the top it says explicitly:  (Reading.)

11         I am sending this e-mail using my personal

12         e-mail address because this is very important

13         information to me and Hanwha Systems.  It should

14         be only under you and me.

15         Who are you trying to mask or withhold this

16 information, especially important given this relates to a

17 pending subpoena for --

18         THE COURT:  Let him answer the question you put to him.

19 A.   So to answer this question about the subpoena that came

20 for the company, in order to prepare for that, I used my

21 private e-mail.

22         MR. ASHER:  Just one minute, Your Honor.

23         (Brief pause.)

24         MR. ASHER:  One last thing, Your Honor, would be to ask

25 this witness what he said at his deposition earlier in this

## CONFIDENTIAL

## FILED UNDER SEAL

## EXHIBIT D

**IN**

*Airtech International Inc. v. Byung Chan Yim*

*a/k/a Roy Yim, et al.*

**Civil Action No. 22-00668-MEF-AME**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

━━━━━━━━━━━━━━━━━━━━━━━━

AIRTECH INTERNATIONAL INC.,

    Plaintiff,             CIVIL ACTION NUMBER:

       vs.                2:22-cv-668-MEF

BYUNG CHAN YIM, et al.,      Preliminary Injunction
                          Hearing
    Defendants.

━━━━━━━━━━━━━━━━━━━━━━━━    VOLUME III, Pages 291 - 348

Frank R. Lautenberg Post Office and Courthouse
Two Federal Square
Newark, New Jersey  07102
February 5, 2024

**B E F O R E:**           THE HONORABLE MICHAEL E. FARBIARZ,
                      UNITED STATES DISTRICT COURT JUDGE

** ALL PARTIES PRESENT VIA ZOOM **

**A P P E A R A N C E S:**

    KIM & BAE P.C. BY:
    CHRISTINE M. BAE, ESQ.
    CARLTON R. ASHER, ESQ.
    2160 North Central Road
    Suite 303
    Fort Lee, New Jersey  07024

       appeared on behalf of the Plaintiff;

Lisa A. Larsen, RPR, RMR, CRR, FCRR
Official Court Reporter
Lisa_Larsen@njd.uscourts.gov
(973)776-7741

**Proceedings recorded by mechanical stenography.
Transcript produced by computer-aided transcription.**

 1  entails other forms of sanction that go beyond the merits of

 2  this case.

 3       I think that there are serious sanctions there in terms

 4  of entering the temporary and permanent injunction at this

 5  point --

 6       THE COURT:  Hang on, Mr. Asher.  I hear you on that,

 7  but that gets beyond where we are.  I think Mr. Roberts is

 8  being very fair-minded and very thoughtful in saying this is a

 9  potential issue.  And in complete fairness to him and his

10  colleague, they haven't had a chance to resolve it between

11  when we discussed it and today, and he wants to get it

12  resolved before there's a resolution of his motion.

13       That sounds like what you would have wanted, and it

14  sounds like what you said yesterday.

15       MR. ASHER:  I agree, Your Honor.  I agree with what you

16  said, Your Honor, and I appreciate your time and also what my

17  adversary has said just now.  I just wanted the Court to

18  understand there are other non-production concerns.

19       In an e-mail that I sent just this weekend

20  concerning -- with respect to the Google issue, we want to

21  work with them in a cooperative way to get to the bottom of

22  the Gmail accounts efficiently and in a cooperative manner.

23  Yes.

24       THE COURT:  Here is what I'm going to do:  I am

25  going to issue an order, probably tomorrow, that, number one,

1  directs some kind of resolution of the Gmail issue.  The word

2  "sanctions" is not going to be used.  I totally understand

3  what Mr. Roberts is saying about learning about it in real

4  time.

5        He's got to do some investigation.  I'm sure he'll do

6  that faithfully and expeditiously.  He wants this motion

7  resolved.  He's not incentivized to drag his feet.  He wants

8  to move.

9        The other thing the order will say is that the

10  motion is denied but it will make it crystal clear, crystal

11  clear, that the motion is denied without prejudice to being

12  renewed as soon as the Gmail issue is done.

13        I say to all of you I'm denying the motion simply

14  because I'm sympathetic to everyone having learned new

15  information and wanting to prepare papers that are tailored to

16  that so that you can be laying out the best arguments in light

17  of it.  And also I'm hopeful that in light of what's happened

18  and the possibility of credibility findings, all of it, that

19  the specific relief that is sought might itself be reflective

20  of conversations between Mr. Roberts on the one hand and

21  Mr. Asher on the other.

22        So I'll put an order out like that tomorrow, and then

23  we can take it from there.

24        Mr. Roberts, does that make sense from your

25  perspective?

1          MR. ROBERTS:  It does.

2          THE COURT:  Mr. Asher, that makes sense enough from

3    yours?

4          MR. ASHER:  It does.

5          THE COURT:  Okay.  Thank you all.  We're adjourned,

6    then.

7          My apologies again.  We got started extraordinarily

8    late because of computer problems on this end, and I'm sorry

9    that that landed on all of you.  My apologies.

10         MR. ASHER:  Thank you for giving us your time, Judge.

11   Much appreciated.

12         THE COURT:  Thank you all.

13             (Which were all the proceedings held in the

14              above-entitled matter on said date.)

15                     *   *   *   *   *

16

17

18

19

20

21

22

23

24

25

## CONFIDENTIAL

## FILED UNDER SEAL

## EXHIBIT E

**IN**

***Airtech International Inc. v. Byung Chan Yim***

***a/k/a Roy Yim, et al.***

**Civil Action No. 22-00668-MEF-AME**

D_Gmail012751



CONFIDENTIAL

<u>**CONFIDENTIAL**</u>

<u>**FILED UNDER SEAL**</u>

**EXHIBIT F**

**IN**

***Airtech International Inc. v. Byung Chan Yim***

***a/k/a Roy Yim, et al.***

**Civil Action No. 22-00668-MEF-AME**

D_Gmail000069

# Honeywell

# Commercial Invoice 8009589202

Issue date: 24.JUN.2020

| | | |
|---|---|---|
| S O L D | 6 3 7 9 | AIRTECH INTL INC 2 PIERMONT RD CRESSKILL NJ 07626 USA |
| T O | | |

| | | |
|---|---|---|
| S H I P | 6 7 5 9 | AIRTECH INTL INC 2 PIERMONT RD CRESSKILL NJ 07626 USA |
| T O | | |

| | | |
|---|---|---|
| S H I P | F R O | COM DEV EUROPE LIMITED (T/A HONEYWELL) Lochend Ind Est, Queen Anne Dr EDINBURGH EH28 8PL UNITED KINGDOM |
| | M | |

COM DEV EUROPE LIMITED
(T/A HONEYWELL)
Lochend Ind Est, Queen Anne Dr
EDINBURGH EH28 8PL
UNITED KINGDOM

**Freight**

**Forwarder**

**Billing information**
Sales Order#: 8150672
Payment Terms: Net 30 Days

**Shipping information**
Gross Weight    : 1.200 KG
Ship Conditions: Air 2nd Day

**Packing List:** 8009589202
**Master Bill of Lading#:** DHL TO WORLD AISE UK --
**Inco terms**    : EXW SELLER'S FACILITY
**Ship Method**    : WILL CALL

**ITN:**

| No. of Packages | Type of Packaging | Net Weight | Gross Weight |
|---|---|---|---|
| 1 | BOX | 1.200 KG | 1.200 KG |

| Item | Honeywell Part # \| Customer Part # | Quantity/UOM | License # / Expiration Date | Commodity Code | CNTRY/STATE-PROVINCE OF ORIGIN | |
|---|---|---|---|---|---|---|
| | | Package Dimensions | | | PO / SO # | Cust. PO# |
| | | 27X13X19 CM | | | | |
| | **Description** | **Classification** | | | | |
| +000010 | XPM 11206 \| XPM 11206 X-BAND CIRCULATOR | 200.000  EA | NON US PARTS / 31.12.2030 See ZUKML | 85261000 | GB/ | 8150672    5180118003 |
| | | 7A611.X ML4.B.1 | | | GB/ GB/ GB/ GB/ GB/ GB/ GB/ GB/ GB/ GB/ GB/ GB/ | |

ZUKML    Export licence number: GBSIE2020/03361 Licence expiry date: 09/04/2022

**Serial #'s:** 19012,19013,19014,19015,19016,19017,19018,19019,19020,19021,19022,19023,19024,19025,19026,19027,19028
19029,19030,19031,19032,19033,19034,19035,19036,18987,18988,18989,18990,18991,18992,18993,18994,18995
18996,18997,18998,18999,19000,19001,19002,19003,19004,19005,19006,19007,19008,19009,19010,19011,19062
19063,19064,19065,19066,19067,19068,19069,19070,19071,19072,19073,19074,19075,19076,19077,19078,19079
19080,19081,19082,19083,19084,19085,19086,19037,19038,19039,19040,19041,19042,19043,19044,19045,19046
19047,19048,19049,19050,19051,19052,19053,19054,19055,19056,19057,19058,19059,19060,19061,18912,18913
18914,18915,18916,18917,18918,18919,18920,18921,18922,18923,18924,18925,18926,18927,18928,18929,18930
18931,18932,18933,18934,18935,18936,18887,18888,18889,18890,18891,18892,18893,18894,18895,18896,18897
18898,18899,18900,18901,18902,18903,18904,18905,18906,18907,18908,18909,18910,18911,18962,18963,18964
18965,18966,18967,18968,18969,18970,18971,18972,18973,18974,18975,18976,18977,18978,18979,18980,18981
18982,18983,18984,18985,18986,18937,18938,18939,18940,18941,18942,18943,18944,18945,18946,18947,18948
18949,18950,18951,18952,18953,18954,18955,18956,18957,18958,18959,18960,18961

**Unit Condition:** NEW
**Platform:** Multiple Space Applications

**HONEYWELL CONTACT INFORMATION**
PHONE:
FAX:

E-MAIL:
WEBSITE:

TOLL FREE PHONE:
TOLL FREE FAX:

Page: 1 of 2

CONFIDENTIAL

D_Gmail000070

# Honeywell

# Commercial Invoice 8009589202 ||| |||||||||||||||||| ||| |||

Issue date: 24.JUN.2020

| Item | Honeywell Part # \| Customer Part # | Quantity/UOM | Net Weight | Commodity Code | CNTRY/STATE-PROVINCE OF ORIGIN | |
|---|---|---|---|---|---|---|
| | Description | Classification | License # / Expiration Date | | PO / SO # | Cust. PO# |
| | | | | | UNIT PRICE: 31.00  USD | |
| | | | | | CUSTOMS VALUE: 6,200.00  USD | |

End User HANWHA THALES   Ult. Country of Destination South Korea

   TOTAL CUSTOMS VALUE   6,200.00  USD

CLC CODE: ML5b

THE GOODS ARE BEING EXPORTED UNDER STANDARD INDIVIDUAL EXPORT LICENCE NUMBER :: GBSIE2020/03361

NOTE 1: PLEASE SHIP VIA : UPS ACCOUNT # Y74R41

TO:
WORLD ASIA LOGISTICS, LTD. (C/O: Airtech Int'l Inc.)
Unit 6 Eastern Perimeter Road Hatton Cross
Heathrow Airport, MIDDLESEX, TW6 2GE, UK
Ph: +44 208 897 6485
Fx: +44 208 897 1491
Attention: Natalie Lee
Email: Natalie.Lee@myworldasia.com

CONFIDENTIAL

**<u>CONFIDENTIAL</u>**

**<u>FILED UNDER SEAL</u>**

**EXHIBIT G**

**IN**

***Airtech International Inc. v. Byung Chan Yim***

***a/k/a Roy Yim, et al.***

**Civil Action No. 22-00668-MEF-AME**

*988 JFK 85872566*

HAWB . : HFINYA8B0006

| Shipper's Name and Address AIRTECH INTERNATIONAL, INC. 106 STONEHURST CT. NORTHVALE, NJ 07647 | Shipper's Account Number | Not Negotiable **Air Waybill** Issued by | **988-85872566** H & FRIENDS FREIGHT, INC. 145-43 226TH STREET, SPRINGFIELD GARDENS, NY 11413 |
|---|---|---|---|
| | | | Copies 1,2 and 3 of this Air Waybill are Originals and have the same validity |
| Consignee's Name and Address SEGI PRECISION ENG CO. 24-17 OJEONG-RO 39BUN-GIL BUNCHEON-SI, GYEONGGI-DO 14445 SOUTH KOREA | Consignee's Account Number | | It is agreed that the goods described herein are accepted in apparent good order and condition ( except as noted) for carriage SUBJECT TO THE CONDITIONS OF CONTRACT ON THE REVERSE HERE OF. ALL GOODS MAY BE CARRIED BY ANY OTHER MEANS INCLUDING ROAD OR ANY OTHER CARRIER UNLESS SPECIFIC CONTRARY INSTRUCTIONS ARE GIVEN HERE ON BY THE SHIPPER, AND SHIPPER AGREES THAT THE SHIPMENT MAY BE CRRIED VIA INTERMEDIATE SROPPING PLAGES WHICH THE CARRIER DEEMS APPROPRIATE. HE SHIPPER'S ATTENTION increase such limitation of liability by declaring a higher value for carriage and paying a suppiementacharge if required. |

| Issuing Carrier's Agent Name and City H & FRIENDS FREIGHT, INC. | Accounting Information |
|---|---|

| Agent's IATA Code 01-1-9237/0023 | Account No. |
|---|---|

| Airport of Departure (Addr, of first Carrier) and requested Routing JFK AIRPORT, NY. USA | | | | | | | HLICN  FREIGHT PREPAID | |
|---|---|---|---|---|---|---|---|---|

| to ICN | By first Carrier OZ | Routing and Destination | to | by | to | by | Currency USD | Chgs. Code | WT/VAL PPD ✔ COLL | OTHER PPD ✔ COLL | Declared Value for N.V.D. | Declared Value for 35712.00 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|

| Airport of Destination INCHEON, KOREA | Flight/Date 5Y2678/02 | For Carrier Use | Flight/Date | Amount of Insurance N.I.L. | INSURANCE - if carrier offers insuranse and such insurance is requested in accordance with conditions on reverse here of indicate amount to be insured in figures in box marked Amount of Insurance. |
|---|---|---|---|---|---|

Handing
AES ITN : X20181101279047

These commodities, technology or software were exported from the United in accordance with the Export Administration Regulations Ultimate

Diversion contrary to U.S. law prohibited

SCI

| No. of Pieces RCP | Gross Weight | kg lb | Rate Class Commidity Item No | Chargable Weight | Rate Charge | Total | Nature and Quantity of Goods ( Incl. Dimensions or Volume) |
|---|---|---|---|---|---|---|---|
| 1 20x11x11x1 | 5.00 11.00 | K L | Q | 7.00 15.00 | K L | AS ARRANGED | DETAILS ARE AS PER ATTACHED INVOICE INV NO. 9181031001 PO NO. 201803001 |
| 1 | 5.00 | | | | | AS ARRANGED | |

| Prepaid | Weight Charge | Collect | Other Charges |
|---|---|---|---|
| | AS ARRANGED | | |

| | Valuation Charge | |
|---|---|---|

| | Tax | |
|---|---|---|

| | Total other Charges Due Agent | | Shipper certifies that the particulars in the face here of are correct and that insofar as any part of the consignment containers dangerous goods such part is property described by name and is in proper condition for carriage by air according to the applicable Dangerous Goods Regulations. H & FRIENDS FREIGHT, INC. AS AGENT FOR SHIPPER AIRTECH INTERNATIONAL, INC. |
|---|---|---|---|

| | Total other Charges Due Carrier | | |
|---|---|---|---|

| | | | Signature of Shipper or His Agent |
|---|---|---|---|

| Total Prepaid | Total Collect | H & FRIENDS FREIGHT, INC. AS AGENT FOR CARRIER ASIANA AIRLINES |
|---|---|---|

| Currency Conversion Rates | ccCharges in Dest. Currency | 01 Nov 2018 | JFK, NY | samuelkim |
|---|---|---|---|---|

| For Carriers Use onry at Destination | Charges at Destination | Total Collect Charges | Executed on (Date) | at (Place) | Signature of Issuing Carrier or its Agent |
|---|---|---|---|---|---|

HAWB . : HFINYA8B0006

ORIGINAL 3 ( FOR SHIPPER )

D_Gmail000081

## CONFIDENTIAL

## FILED UNDER SEAL

## EXHIBIT H

## IN

### *Airtech International Inc. v. Byung Chan Yim*

### *a/k/a Roy Yim, et al.*

### Civil Action No. 22-00668-MEF-AME

# BALL THRUST BEARING INSPECTION REPORT    "Bottom Washers Only"



| | | #3 | #4 | | #4 | | |
|---|---|---|---|---|---|---|---|
| **Bottom OD WASHER RACE** | Hardness HRC | 60 | 60.5 | | #3 | | |
| | ID (as measured) | 41.8973 | 41.8989 | | | | |
| | ID (corrected) | 41.8973 | 41.8989 | | | | |
| | OD (measured) MEAN AVE. /O.O.R./TAPER | 45.2738 | 45.275 | | | | |
| | OD (corrected) | 45.2738 | 45.2750 | | | | |
| | WIDTH (as measured) | 1.052 | 1.06 | | | | |
| | WIDTH (corrected) | 1.0520 | 1.0600 | | | | |
| | OOR | 0.0013 | 0.0013 | | | | |
| | ID Radius/Chamfer | 0.125 | 0.125 | | | | |
| | OD Radius/Chamfer | 0.125 | 0.125 | | | | |
| | Faro arm groove radius | 1.5353 | 1.5375 | | | | |
| | FLATNESS | 0.002 | 0.002 | | | | |
| | PARALLEL | 0.0007 | 0.0005 | | | | |
| | PERPENDICULARITY | 0.0015 | 0.0015 | | #3 | | |
| | Temperature (°F) | 68 | 68 | | | | |
| **BALLS** | Hardness HRC | 62.0000 | 62.0000 | | #4 | | |
| | DIAMETER [as measured] | 1.5000 | 1.5000 | | | | |
| | OD (corrected) | 1.5000 | 1.5000 | | | | |
| | Length (corrected) | 0.0000 | 0.0000 | | | | |
| | GRADE | 48.0000 | 48.0000 | | | | |
| | Surface texture ID/OD/Width (RMS) | | | | | | |
| | Temperature (°F) | 68.0000 | 68.0000 | | | | |
| **spacers** | ID [as measured] | 0.7100 | 0.7100 | | | | |
| | OD (as measured) | 1.2900 | 1.2900 | | | | |
| | Body Width (as measured) | 0.2400 | 0.2400 | | | | |
| | Lid Thickness (as measured) | | | | | | |
| | # OF POCKETS | 88.0000 | 88.0000 | | | | |
| | Date | 6/5/2014 | 6/5/2014 | | | | |

| STACK HEIGHT | As measured | |
|---|---|---|
| | AXIAL RUNOUT | |
| BEARING # | 13189/1060 P/5 | QUANTITY ORDERED |
| JOB # | 2103549 | QUANTITY MADE |
| CUSTOMER | AIRTECH | QUANTITY PASSED |
| DATE DUE | 5/16/2013 | QUANTITY FAILED |
| DATE Q.C. | 6/3/2013 | |

| INSPECTED | *Daniel J. Halding* |
|---|---|
| APPROVED I | DJH |

CONFIDENTIAL

# FARO Technologies Inc.

SCHEERER

| | |
|---|---|
| 125 Technology Park | http://www.faro.com |
| FL 32746 | support@faro.com |
| Lake Mary | (407) 333-9911 |
| USA | 05 Jun 2014 11:40 AM |

## Session Information

| | |
|---|---|
| Part Name | 13189/1060 P5 |
| Session Name | 2103549-4 |
| Note | BOTTOM WASHER |
| Operator | DJH |
| Company Name | SCHEERER BEARING CORP |
| Address | 645 DAVISVILLE ROAD |
| Telephone No. | 215-443-5252 |
| Email Address | DANIELH@SCHEERERBEARING.COM |
| Ambient Temperature | 68 |

Template Mode
Length 2
Actual
Length 1.3830in
LX 0.0001in
LY 1.3830in
LZ 0.0003in
Z
X

### Length 2

|  | actual | nominal |
|---|---|---|
| Length | 1.3830in | |
| LX | 0.0001in | |
| LY | 1.3830in | |
| LZ | 0.0003in | |

### World

|  | actual | nominal |
|---|---|---|

### Plane 1

*Readings:43.*

|  | | actual | nominal |
|---|---|---|---|
| Flatness | ⌓ | 0.0007in | |

### Plane 2

*Readings:37.*

|  | | actual | nominal |
|---|---|---|---|
| Flatness | ⌓ | 0.0011in | |

### Cylinder 1

*Readings:89.*

|  | | actual | nominal |
|---|---|---|---|
| Diameter | | 41.8989in | |
| Cylindricity | ⌭ | 0.0040in | |

### Cylinder 2

*Readings:100.*

|  | | actual | nominal |
|---|---|---|---|
| Diameter | | 45.2750in | |
| Cylindricity | ⌭ | 0.0016in | |

CONFIDENTIAL

D_Gmail000214

## ⬮ Torus 1

*Readings:265.*

| | actual | nominal |
|---|---|---|
| Center.x | -31.1041in | |
| Center.y | -0.8946in | |
| Center.z | 0.6065in | |
| MajorDiameter | 43.5698in | |
| MinorDiameter | 1.5375in | |

## Length 1

| | actual | nominal |
|---|---|---|
| Length | 1.0534in | |
| LX | 0.0001in | |
| LY | 1.0534in | |
| LZ | 0.0002in | |

CONFIDENTIAL                                                                        D_Gmail000215

# FARO Technologies Inc.



SCHEERER

| | |
|---|---|
| 125 Technology Park | http://www.faro.com |
| FL 32746 | support@faro.com |
| Lake Mary | (407) 333-9911 |
| USA | 05 Jun 2014 09:54 AM |

## Session Information

| | |
|---|---|
| Part Name | 13189/1080 P5 |
| Session Name | 2103549-3 |
| Note | BOTTOM WASHER |
| Operator | DJH |
| Company Name | SCHEERER BEARING CORP |
| Address | 645 DAVISVILLE ROAD |
| Telephone No. | 215-443-5252 |
| Email Address | DANIELH@SCHEERERBEARING.COM |
| Ambient Temperature | 68 |



CONFIDENTIAL

D_Gmail000216

## Length 2

|  | actual | nominal |
|---|---|---|
| Length | 1.3858in | |
| LX | 0.0002in | |
| LY | 1.3858in | |
| LZ | 0.0003in | |

## World

|  | actual | nominal |
|---|---|---|

## Plane 1

*Readings:49.*

|  | actual | nominal |
|---|---|---|
| Flatness | 0.0005in | |

## Plane 2

*Readings:37.*

|  | actual | nominal |
|---|---|---|
| Flatness | 0.0009in | |

## Cylinder 1

*Readings:99.*

|  | actual | nominal |
|---|---|---|
| Diameter | 41.8973in | |
| Cylindricity | 0.0018in | |

## Cylinder 2

*Readings:97.*

|  | actual | nominal |
|---|---|---|
| Diameter | 45.2738in | |
| Cylindricity | 0.0015in | |

CONFIDENTIAL

D_Gmail000217

### Torus 1

Readings:282.

| | actual | nominal |
|---|---|---|
| Center.x | -28.3687in | |
| Center.y | -0.8919in | |
| Center.z | 2.4530in | |
| MajorDiameter | 43.5514in | |
| MinorDiameter | 1.5353in | |

### Length 1

| | actual | nominal |
|---|---|---|
| Length | 1.0669in | |
| LX | 0.0001in | |
| LY | 1.0669in | |
| LZ | 0.0002in | |

CONFIDENTIAL

D_Gmail000218

<u>**CONFIDENTIAL**</u>

<u>**FILED UNDER SEAL**</u>

**EXHIBIT I**

**IN**

***Airtech International Inc. v. Byung Chan Yim***

***a/k/a Roy Yim, et al.***

**Civil Action No. 22-00668-MEF-AME**



**Environmental Control Units Manufacturer**

12679 FM 3311, Tyler, TX 75708 - Phone: 903.877.3430 - Fax: 903.877.2793 - www.airrover.com

# CERTIFICATE OF CONFORMANCE

| | |
|---|---|
| **Manufacturer's Name:** | **AIR ROVER, INC.** |
| **Address:** | **12679 FM 3311 - Tyler, TX 75708-2419** |
| **Phone:** | **1-800-858-6287** |
| **Cage Code:** | **0C1U1** |

| | |
|---|---|
| **Purchase Order Number:** | 5140707007 |
| **Company Name:** | AIRTECH INTERNATIONAL, INC. |
| **Unit Model:** | RULCR60CA-15kW |
| **Air Rover Part Number:** | FL60BA25 (70-1348) |
| **Quantity:** | 1 |
| **Serial Number(s) (if applicable):** | 91981215 |
| **Air Rover Sales Order:** | 0012182C |

I further certify that the supplies or services are of the quality specified and conform in all respects with the contract requirements, including specifications, drawings, preservation, packaging, marking requirements, physical item identification (part number), and are in the quantity shown in this Certificate of Conformance.

**EXPORT CONTROLLED DATA:** This document may contain technical data or other information whose export is restricted by the Arms Export Control Act (Title 22, U.S.C., Sec. 2751, et seq.). Violations of this export law are subject to severe criminal penalties. The export controlled information contained herein should not be disclosed to non-U.S. persons without prior approval from the U.S. government. In addition, such information may not be transferred, transshipped, or otherwise be disposed of in any other country, either in their original form or after being incorporated into other end-items, without the prior written approval of the U.S. Department of State.

3/19/2015

**Dieudonné T. Tshimwang**
LEAD ENGINEER

Page **1** of **2**

CONFIDENTIAL

D_Gmail001315




**Environmental Control Units Manufacturer**

12679 FM 3311, Tyler, TX 75708 - Phone: 903.877.3430 - Fax: 903.877.2793 - www.airrover.com

# CERTIFICATE OF CONFORMANCE

**Manufacturer's Name:**      **AIR ROVER, INC.**

**Address:**      **12679 FM 3311 - Tyler, TX 75708-2419**

**Phone:**      **1-800-858-6287**

**Cage Code:**      **0C1U1**

---

**Purchase Order Number:**      5140707007

**Company Name:**      AIRTECH INTERNATIONAL, INC.

**Unit Model:**      RULCR60CA-15kW

**Air Rover Part Number:**      FL60BA25 (70-1348)

**Quantity:**      1

**Serial Number(s) (if applicable):**      91991215

**Air Rover Sales Order:**      0012182C

       I further certify that the supplies or services are of the quality specified and conform in all respects with the contract requirements, including specifications, drawings, preservation, packaging, marking requirements, physical item identification (part number), and are in the quantity shown in this Certificate of Conformance.

**EXPORT CONTROLLED DATA:** This document may contain technical data or other information whose export is restricted by the Arms Export Control Act (Title 22, U.S.C., Sec. 2751, et seq.). Violations of this export law are subject to severe criminal penalties.  The export controlled information contained herein should not be disclosed to non-U.S. persons without prior approval from the U.S. government. In addition, such information may not be transferred, transshipped, or otherwise be disposed of in any other country, either in their original form or after being incorporated into other end-items, without the prior written approval of the U.S. Department of State.

3/19/2015

**Dieudonné T. Tshimwang**
LEAD ENGINEER

Page **2** of **2**

CONFIDENTIAL      D_Gmail001316

# CONFIDENTIAL

# FILED UNDER SEAL

# EXHIBIT J

## IN

*Airtech International Inc. v. Byung Chan Yim*

*a/k/a Roy Yim, et al.*

**Civil Action No. 22-00668-MEF-AME**



외화송금확인서
**CERTIFICATE OF REMITTANCE**
고객용
🅢 신한은행
SHINHAN BANK

에스엔티모티브(주) 귀하 　　　　　　　　송금일자(DATE) : 2014-12-29

항상 신한은행을 이용해 주셔서 감사합니다.
· 동일수취인 임으로 다시 송금하시고자 하는 경우에는 이 확인서를 가지고 오시면 더 빠르게 처리해드립니다.
· 개인송금, 유학생경비, 일반해외제비는 인터넷 뱅킹을 이용하여 고객이 직접 송금거래를 할 수 있으며, 송금수수료 및 환율을 우대해 드립니다.

| REF-No. : 810-146105352 | 송금액 (AMOUNT) : | USD | 80,658.00 |
|---|---|---|---|

MT103 SINGLE CUSTOMER CREDIT TRANSFER

SETTLEMENT BANK(결제은행)　　　　　　　　　　　　　:

: 20 / SENDER'S REFERENCE(송금번호)　　　　　　　　: 　810-146105352

: 23E / INSTRUCTION CODE(지시코드)　　　　　　　　 :

: 32A / VALUE DATE / CURRENCY / INTERBANK SETTLED AMOUNT 　141229USD80658,
　　　　(지급인자/통화/송금액)

: 50K / ORDERING CUSTOMER(송금인)　　　　　　　　: 　S AND T MOTIV CO.,LTD.
　　　　　　　　　　　　　　　　　　　　　　　　　363, YEORACKSONGJEONG-RO, CHEOLMA
　　　　　　　　　　　　　　　　　　　　　　　　　MYEON, KIJANG-GUN, BUSAN
　　　　　　　　　　　　　　　　　　　　　　　　　SOUTH KOREA

: 57 / BENEFICIARY BANK(수취은행)　　　　　　　　 : 　BWILUS66XXX

: 59 / BENEFICIARY CUSTOMER(수취인)　　　　　　　 : 　084301126
　　　　　　　　　　　　　　　　　　　　　　　　　AIR TECH INTERNATIONAL INC.
　　　　　　　　　　　　　　　　　　　　　　　　　ROCKLEIGH, NJ 07647, USA 22 PARIS
　　　　　　　　　　　　　　　　　　　　　　　　　AVE, SUITE 1030

: 70 / REMITTANCE INFORMATION(송금내역)　　　　　 : 　4501154765

*Invoice #*
*-9141121010*

: 71A / DETAILS OF CHARGES(국외수수료 부담자)　　　: 　SHA

: 72 / SENDER TO RECEIVER INFORMATION(은행간 지시사항) : 　/ACC/
　　　　　　　　　　　　　　　　　　　　　　　　　//WILSHIRE STATE BANK

| 거 래 일 | 거래외국환은행 지정(확인) 번호 | 거래구분 | 송금종류 | 송금인구분 | 거주자구분 | 국가코드 |
|---|---|---|---|---|---|---|
| 20141229 | | 취결 | T/T | 민간 | 거주자 | US |
| 지급 사유 | 11(사전송금방식 통관수입 대금지급) | | | | | |
| 기타 사항 | | | | | | |

귀하께서 신청하신 외화송금을 위와 같이 처리하였음을 확인합니다. 결제은행은 고객께서 지정하지 않으신 경우 변경될 수 있습니다.
We hereby certify that overseas remittance will be made as above.
Settlement bank may vary unless specifically designated by customer.

신한은행 양산금용센 　　　　　　　　 지점
(055 -383 -7771)

외화송금확인서 (2006.10 제정)　　　　　　　　　　　　　　　　　　　3-803-0050(21.0×29.7) NCR용지54g/m²

CONFIDENTIAL　　　　　　　　　　　　　　　　　　　　　　　　　　D_Gmail000858

## CONFIDENTIAL

## FILED UNDER SEAL

## EXHIBIT K

**IN**

***Airtech International Inc. v. Byung Chan Yim***

***a/k/a Roy Yim, et al.***

**Civil Action No. 22-00668-MEF-AME**

**From:** <r.yim@hansaerospace.com>
**To:** <ROY0526YIM@GMAIL.COM>
**Subject:**
**Date:** Tue, 15 Nov 2022 18:16:10 +0000
**Attachments:** MOM_ADD_HTC_Aitech_10-11-2016.docx

---

안녕하세요. Hans Aerospace 임병찬입니다.
감사합니다.
**Roy Yim**
**Hans Aerospace**
**4310 Cameron Street, Suite 13, Las Vegas, NV, 89103, USA**
**Phone: 401-329-2167(Cell: 201-527-7654) Fax: 800-241-1692**
**D&B D-U-N-S#: 118388852, DDTC#: M45745**
*ISO 9001:2015 and AS9120:2016 Certified*

Any technical data included in this e-mail is Export Controlled.  Export of this information in any form is restricted by the Arms Export Control Act ( Title 22, U.S.C., sec 2751 et seq.) or the Export Administration act of 1979, as amended seq.  This information or element thereof, in any form, shall not be disclosed to a foreign person (including foreign person employees), entity, or exported from the United States without U.S. Government authority and the express written authorization of Hans Aerospace. This document may contain Hans Aerospace Proprietary Information and is to be used only for the purposes for which it has been supplied and is not to be duplicated or disclosed in whole or in part without written permission from a duly authorized representative of Hans Aerospace.

CONFIDENTIAL

D_Gmail015373

**AirTech**
International,Inc.

106 Stonehurst Ct.
Northvale, NJ 07647
Phone: 1-201-784-9933
Fax: 1-201-784-4466

| MOM(Minutes Of Meeting) | |
|---|---|

| Title | Minutes of Meeting about rotary joint delivery and sourcing possible supplier | | |
|---|---|---|---|
| Date | October 14th, 2016 | | |
| Revision | Rev,00 | First writing | |
| **Attendants** | Company | Name | Signature |
| | ADD | MinSang Kwon | |
| | | JongMann Kim | |
| | HTC | DongMyung Park | |
| | | YongIn Joung | |
| | | SeungUk Oh | |
| | Airtech | Roy Yim | |

## 1. Rotary Joint delivery status

■ E/L Approval Status

- Approved Date: September 15, 2016

- Approved validation: 48 months

- Approval organization: State of Department(DSP-5, hardware)

- Mass production phase for mechanical product commonly will be approved

  without problem once State of Department approve development phase.

■ Shipment Schedule

- DSTI to Airtech: in two days after FAT

- Airtech to HTC: in three days receiving from DSTI

## 2. Rotary Joint sourcing possible supplier status

■ Venturetec

- Location: Germany

- Website: http://www.venturetec.de/en/

- Status:

  a. Ask a quotation with specification

  b. Respond from Venturetec:

D_Gmail015374

106 Stonehurst Ct.
Northvale, NJ 07647
Phone: 1-201-784-9933
Fax: 1-201-784-4466

- Will provide a quote as soon as possible

- Company introduction materials attached


■ GAT(Germany)

- Location: Germany

- Website: http://www.gat-mbh.de/en/

- Status

a. Ask a quotation with specifications

b. Respond from GAT:

- Asked some questionnaire about coolant media

D_Gmail015375

<u>**CONFIDENTIAL**</u>

<u>**FILED UNDER SEAL**</u>

**EXHIBIT L**

**IN**

*Airtech International Inc. v. Byung Chan Yim*

*a/k/a Roy Yim, et al.*

**Civil Action No. 22-00668-MEF-AME**

**From:** Chloe Kim <kimchloe1209@gmail.com>

**To:** Lovely여보~ <roy0526yim@gmail.com>

**Subject:** Fwd: FW: Draft Letter

**Date:** Fri, 17 Dec 2021 16:13:38 +0000

**Attachments:** MEMO_FOR_POLICE_v2_by_Airtech.docx; Exhibit_AB.pdf; Exhibit_CD.pdf;
Exhibit_EF.pdf; Exhibit_GH.pdf; Exhibit_IJ.pdf; Exhibit_K.pdf; Exhibit_M.pdf;
Exhibit_O.pdf; Exhibit_Q.pdf; Exhibit_S..pdf; Exhibit_T.pdf; Exhibit_V.xls; Exhibit_W.pdf

**Inline-Images:** image006.jpg; image007.jpg; image008.jpg

---

---------- Forwarded message ---------
From: **ROY YIM** <airtechuscom@gmail.com>
Date: Thu, Nov 4, 2021, 5:57 PM
Subject: Fwd: FW: Draft Letter
To: <kimchloe1209@gmail.com>

---------- Forwarded message ---------
보낸사람: <esther@airtechus.com>
Date: 2021년 11월 5일 (금) 오전 6:28
Subject: FW: Draft Letter
To: <bjkim@kimbae.com>
Cc: <JINLEE@airtechus.com>, <haileyjo@kimbae.com>, <amiller@kimbae.com>, <daniel@airtechus.com>

Good afternoon Mr Kim

This is Esther from Airtech

As per your requested I have attached Exhibits and note about, need to be deleted on MEMO FOR POLICE

Attached are:

Exhibit A.B.C.D.E.F.G.H.I.J.K.M.O.Q.S.T

MEMO FOR POLICE

1. Regarding #2(page 3~4): We don't know the broker markup price as we don't have any evidence for that. It needs to be investigated.

2. Regarding #2(page 3): "NEED PROOF YIM HAD NO AUTHORITY TO SELF-DEAL OR USE BROKERS". I think it needs to be deleted because it doesn't have to do with this issue.

3. Regarding #3(page 5): We'd like to delete some of part that we noted "delete" because we don't know how Yim explained to the consultant exactly.

CONFIDENTIAL

D_Gmail018786

4. Regarding #5(page 6): We added the ownership of 'Assured Components LLC' in Exhibit W.

*Best regards,*

*Esther*

---

**From:** BJ Kim <bjkim@kimbae.com>
**Sent:** Thursday, November 4, 2021 12:40 PM
**To:** jinlee@airtechus.com
**Cc:** haileyjo@kimbae.com; amiller@kimbae.com; esther@airtechus.com
**Subject:** Draft Letter

Dear Esther:

Attached please find our 1st draft (without additional items – we will send you the final version later, but please start working on gathering info based on this 1st draft).

Please find/fill in the items highlighted and send us the information at your convenience.

Thank you.

B. J. Kim  |  Partner

_____

CONFIDENTIAL                                                                    D_Gmail018787

cid:image012.jpg@01CF0098.E9B66EF0

Kim & Bae Building

2160 North Central Road, Suite 303,  Fort Lee, NJ 07024
T (201) 585-2288-Direct Ext: 214  |   F (201) 585-2246

45 Rockefeller Plaza, Suite 2000, New York, NY 10111

T (212) 319-6888

---

**From:** jinlee@airtechus.com [mailto:jinlee@airtechus.com]
**Sent:** Thursday, November 4, 2021 10:11 AM
**To:** 'BJ Kim' <bjkim@kimbae.com>
**Cc:** haileyjo@kimbae.com; amiller@kimbae.com; daniel@airtechus.com; esther@airtechus.com
**Subject:** RE: Draft Letter and Settlement Agreement.

Good morning,

Please find the attachment. The revised sentences are marked in red color...

Thanks,

Jin O. Lee

**Airtech Int'l Inc**.

Tel:1-201-784-9933

Fax:1-201-784-4466

e-mail:jinlee@airtechus.com

Any technical data included in this e-mail is Export Controlled.  Export of this information in any form is restricted by the Arms Export Control Act ( Title 22, U.S.C., sec 2751 et seq.) or the Export Administration act of 1979, as amended seq. This information or element thereof, in any form, shall not be disclosed to a foreign person (including foreign person employees), entity, or exported from the United States  without U.S. Government authority and the express written authorization of Airtech International Inc.

---

**From:** BJ Kim <bjkim@kimbae.com>
**Sent:** Wednesday, November 3, 2021 04:51 PM

D_Gmail018788

**To:** jinlee@airtechus.com
**Cc:** haileyjo@kimbae.com; amiller@kimbae.com
**Subject:** RE: Draft Letter and Settlement Agreement.


Good information, we can use English translation to save time just on the additions.


Thank you.


B. J. Kim  |  Partner



cid:image012.jpg@01CF0098.E9B66EF0

Kim & Bae Building

2160 North Central Road, Suite 303,  Fort Lee, NJ 07024
T (201) 585-2288-Direct Ext: 214  |   F (201) 585-2246

45 Rockefeller Plaza, Suite 2000, New York, NY 10111

T (212) 319-6888


---

**From:** jinlee@airtechus.com [mailto:jinlee@airtechus.com]
**Sent:** Wednesday, November 3, 2021 4:00 PM
**To:** 'BJ Kim' <bjkim@kimbae.com>
**Cc:** haileyjo@kimbae.com; amiller@kimbae.com
**Subject:** RE: Draft Letter and Settlement Agreement.


2nd attachment


Jin O. Lee

**Airtech Int'l Inc**.

Tel:1-201-784-9933

Fax:1-201-784-4466

e-mail:jinlee@airtechus.com

Any technical data included in this e-mail is Export Controlled.  Export of this information in any form is restricted by the Arms Export Control Act ( Title 22, U.S.C., sec 2751 et seq.) or the Export Administration act of 1979, as amended seq. This information or element thereof, in any form, shall not be disclosed to a foreign person (including foreign person employees), entity, or exported from the United States  without U.S. Government authority and the express written authorization of Airtech International Inc.

---

**From:** BJ Kim <bjkim@kimbae.com>
**Sent:** Wednesday, November 3, 2021 03:46 PM
**To:** jinlee@airtechus.com
**Cc:** haileyjo@kimbae.com; amiller@kimbae.com
**Subject:** RE: Draft Letter and Settlement Agreement.

where is the attachment?

B. J. Kim  |  Partner

_____


cid:image012.jpg@01CF0098.E9B66EF0

Kim & Bae Building

2160 North Central Road, Suite 303,  Fort Lee, NJ 07024
T (201) 585-2288-Direct Ext: 214  |   F (201) 585-2246

45 Rockefeller Plaza, Suite 2000, New York, NY 10111

T (212) 319-6888

---

**From:** jinlee@airtechus.com [mailto:jinlee@airtechus.com]
**Sent:** Wednesday, November 3, 2021 11:56 AM
**To:** 'BJ Kim' <bjkim@kimbae.com>

CONFIDENTIAL

**Cc:** haileyjo@kimbae.com; amiller@kimbae.com
**Subject:** RE: Draft Letter and Settlement Agreement.


Dear Attorney Kim,


I'm sending the revised report for Yim's embezzlement (Korean only) to write a Police report. If you need I'll send you the English.


Thanks,


Jin O. Lee

**Airtech Int'l Inc**.

Tel:1-201-784-9933

Fax:1-201-784-4466

e-mail:jinlee@airtechus.com

Any technical data included in this e-mail is Export Controlled.  Export of this information in any form is restricted by the Arms Export Control Act ( Title 22, U.S.C., sec 2751 et seq.) or the Export Administration act of 1979, as amended seq. This information or element thereof, in any form, shall not be disclosed to a foreign person (including foreign person employees), entity, or exported from the United States  without U.S. Government authority and the express written authorization of Airtech International Inc.

---

**From:** BJ Kim <bjkim@kimbae.com>
**Sent:** Friday, October 29, 2021 03:27 PM
**To:** jinlee@airtechus.com
**Cc:** haileyjo@kimbae.com; amiller@kimbae.com
**Subject:** RE: Draft Letter and Settlement Agreement.


Dear Mr. Lee:


I just spoke to attorney lee representing yim.

I told him the names of companies yim used to do wrong and our reason for seeking $380k.  I also told him that we have concrete evidence showing his wrongdoing.  he said the deadline we gave is very short.  I said it is not: it would take a very short time for yim to decide on acknowledging the wrongdoings through the companies I mentioned.  if he acknowledges this first then we can finalize the settlement terms by setting up a new deadline. he will speak to his client and will get back to me asap.  I will keep you posted.

                                    D_Gmail018791

B. J. Kim | Partner



Kim & Bae Building

2160 North Central Road, Suite 303, Fort Lee, NJ 07024
T (201) 585-2288-Direct Ext: 214 | F (201) 585-2246

45 Rockefeller Plaza, Suite 2000, New York, NY 10111

T (212) 319-6888

**From:** jinlee@airtechus.com [mailto:jinlee@airtechus.com]
**Sent:** Thursday, October 28, 2021 12:38 PM
**To:** 'BJ Kim' <bjkim@kimbae.com>
**Cc:** haileyjo@kimbae.com
**Subject:** RE: Draft Letter and Settlement Agreement.

Ok. I'll call you now

Thanks,

Jin O. Lee

**Airtech Int'l Inc**.

Tel:1-201-784-9933

Fax:1-201-784-4466

e-mail:jinlee@airtechus.com

Any technical data included in this e-mail is Export Controlled. Export of this information in any form is restricted by the Arms Export Control Act ( Title 22, U.S.C., sec 2751 et seq.) or the Export Administration act of 1979, as amended seq. This information or element thereof, in any form, shall not be disclosed to a foreign person (including foreign person employees), entity, or exported from the United States without U.S. Government authority and the express written authorization of Airtech International Inc.

CONFIDENTIAL

**From:** BJ Kim <bjkim@kimbae.com>
**Sent:** Thursday, October 28, 2021 12:03 PM
**To:** jinlee@airtechus.com
**Cc:** haileyjo@kimbae.com
**Subject:** RE: Draft Letter and Settlement Agreement.

I will try, but I have a mtg after 1 pm. ☹

if I cant call, will do so first thing tomorrow morning.

B. J. Kim  |  Partner



cid:image012.jpg@01CF0098.E9B66EF0

Kim & Bae Building

2160 North Central Road, Suite 303,  Fort Lee, NJ 07024
T (201) 585-2288-Direct Ext: 214  |  F (201) 585-2246

45 Rockefeller Plaza, Suite 2000, New York, NY 10111

T (212) 319-6888

**From:** jinlee@airtechus.com [mailto:jinlee@airtechus.com]
**Sent:** Thursday, October 28, 2021 11:37 AM
**To:** 'BJ Kim' <bjkim@kimbae.com>
**Cc:** haileyjo@kimbae.com; amiller@kimbae.com
**Subject:** RE: Draft Letter and Settlement Agreement.

Can you call me after 1:00 ~ 2:00 pm? I have a meeting until 1:00pm

Thanks,

Jin O. Lee

**Airtech Int'l Inc**.

Tel:1-201-784-9933

Fax:1-201-784-4466

e-mail:jinlee@airtechus.com

Any technical data included in this e-mail is Export Controlled.  Export of this information in any form is restricted by the Arms Export Control Act ( Title 22, U.S.C., sec 2751 et seq.) or the Export Administration act of 1979, as amended seq. This information or element thereof, in any form, shall not be disclosed to a foreign person (including foreign person employees), entity, or exported from the United States  without U.S. Government authority and the express written authorization of Airtech International Inc.

---

**From:** BJ Kim <bjkim@kimbae.com>
**Sent:** Thursday, October 28, 2021 10:44 AM
**To:** jinlee@airtechus.com
**Cc:** haileyjo@kimbae.com; amiller@kimbae.com
**Subject:** Draft Letter and Settlement Agreement.

Dear Mr. Lee:

Please review, we didn't mention the payment and this will need to be addressed BEFORE the agreement is signed.

I will call you shortly.

B. J. Kim  |  Partner

_____

cid:image012.jpg@01CF0098.E9B66EF0

CONFIDENTIAL

Kim & Bae Building

2160 North Central Road, Suite 303,  Fort Lee, NJ 07024
T (201) 585-2288-Direct Ext: 214  |   F (201) 585-2246

45 Rockefeller Plaza, Suite 2000, New York, NY 10111

T (212) 319-6888

---

**From:** jinlee@airtechus.com [mailto:jinlee@airtechus.com]
**Sent:** Tuesday, October 26, 2021 1:40 PM
**To:** 'BJ Kim' <bjkim@kimbae.com>
**Cc:** haileyjo@kimbae.com; amiller@kimbae.com
**Subject:** RE: Draft Letter


김변호사님, 안녕 하십니까?


임변찬쪽 변호사 Letter를 보고 어제,오늘 고민하였는데 결론은 꼭 형사고발로 까지 가는 것보다는, 임변찬이가 모든 것들은 Return/Refund하고 더 이상 우리회사와 같은 Business에 발 붙이지 못하게 하는 것이 최선일 것 같다는 생각입니다. 물론 이런 것을 Accept하지 않는 다면 저로서도 어쩔수 없이 민/형사소송을 하여야 할 것 같습니다.


제 요구사항을 정리하면 아래와 같습니다.

1. Computer 2대를 기존내용에 대하여 전혀 지우거나 Copy, Download 한 것 없이 내일이나 모래까지 정해진 시간에 저희 사무실로 가지고 와서 반납하고 반납시에 내용을 확인해서 지운 것이 없어야 한다.
2. 회사에 근무하던 기간인 2020.2.5일 동거녀인 Kim, Hyo Sun 이름으로 설립한 회사 "Assured Components LLC"와 2021.9.27일 설립한 회사 "Hans Aerospace Inc." 를 통하여Airtech Int'l Inc.의 Data와 거래선들과 Vendors 를 이용하여 거래한 전체내역을 제공하고 거래한 모든 거래선과 Vendors에게 더이상 거래를 못하고 현재 Open된 발주건들은 전부 Airtech International Inc.로 이관한다는 Letter나 e-mail을 보내고 거래선의 Confirm Letter나 e-mail을 받아서 제공할 것
3. Airtech International Inc 근무 기간동안 횡령한 회사 돈을 전부 Refund 할 것 (11/05/2021까지) ➔ Paper Company들을 만들어서 횡령하고 Commission 송금 거을 횡령한 것들은 이번주까지는 임변찬쪽에 알리지 않아야할 것 같습니다. 이유는 지난 번에 변호사님에게 들였던 Case 3중에 아직 한 건이 더 있는데 아직 납품이 완료되지 않고 이번주까지 저희들에게 납품되게 되어 있는데, 이 품목을 받지 못할 경우 저희가 Customer에게 심각한 납기 지연등이 발생하게 되어 있기 때문 입니다. 따라서 이 품목을 받고 이야기 하는 것이 임변찬 우리가 이런 것들은 전혀 모르는 줄 알고 물건을 납품할 것 같습니다.
4. 앞으로 최소한 10년(?)이내 Airtech이 거래 했거나 거래하고 있는 Customers and Vendors는 사업적이든 개인적이든 접촉하지





## <u>CONFIDENTIAL</u>

## <u>FILED UNDER SEAL</u>

## EXHIBIT M

## IN

## *Airtech International Inc. v. Byung Chan Yim*

## *a/k/a Roy Yim, et al.*

## Civil Action No. 22-00668-MEF-AME

```
Status Report For:     HANS AEROSPACE INC.
Report Date:           7/23/2024
Confirmation Number:   242053413683
```

**IDENTIFICATION NUMBER, ENTITY TYPE AND STATUS INFORMATION**

```
Business ID Number:    0450707162
Business Type:         DOMESTIC PROFIT CORPORATION
Status:                DISSOLVED WITHOUT ASSETS
Original Filing Date:  09/27/2021
Stock Amount:          1000
Home Jurisdiction:     NJ
Status Change Date:    03-30-2023
```

**REVOCATION/SUSPENSION INFORMATION**

```
DOR Suspension Start   N/A
Date:
DOR Suspension End     N/A
Date:
Tax Suspension Start   N/A
Date:
Tax Suspension End     N/A
Date:
```

**ANNUAL REPORT INFORMATION**

```
Annual Report Month:   SEPTEMBER
Last Annual Report     03/30/2023
Filed:
Year:                  2022
```

**AGENT/SERVICE OF PROCESS (SOP)INFORMATION**

```
Agent:                 BYUNGCHAN YIM
Agent/SOP Address:     5 KINGS CT ,FORT LEE,NJ,07024
Address Status:        DELIVERABLE
Main Business Address: 2225 LEMOINE AVE, FORT LEE, NJ, 07024 0702
Principal Business     N/A
Address:
```

**ASSOCIATED NAMES**

```
Associated Name:       N/A
Type:                  N/A
```

**PRINCIPALS**

Following are the most recently reported officers/directors (corporations), managers/members/managing members (LLCs), general partners (LPs), trustees/officers (non-profits).

| | |
|---|---|
| Title: | OTHER |
| Name: | BYUNGCHAN YIM, |
| Address: | 5 KINGS CT, FORT LEE, , , |

**FILING HISTORY -- CORPORATIONS, LIMITED LIABILITY COMPANIES, LIMITED PARTNERSHIPS AND LIMITED LIABILITY PARTNERSHIPS**

To order copies of any of the filings below, return to the service page, https://www.njportal.com/DOR/businessrecords/Default.aspx and follow the instructions for obtaining copies. Please note that trade names are filed initially with the County Clerk(s) and are not available through this service. Contact the Division for instructions on how to order Trade Mark documents.

Charter Documents for Corporations, LLCs, LPs and LLPs

| | |
|---|---|
| Original Filing (Certificate)Date: | 2021 |

Changes and Amendments to the Original Certificate:

| Filing Type | Year Filed |
|---|---|
| Dissolved Without Assets | 2023 |

Note:
Copies of some of the charter documents above, particularly those filed before June 1988 and recently filed documents (filed less than 20 work days from the current date), may not be available for online download.

- For older filings, contact the Division for instructions on how to order.
- For recent filings, allow 20 work days from the estimated filing date, revisit the service center at https://www.njportal.com/DOR/businessrecords/Default.aspx periodically, search for the business again and build a current list of its filings. Repeat this procedure until the document shows on the list of documents available for download.

The Division cannot provide information on filing requests that are in process. Only officially filed documents are available for download.

<u>**CONFIDENTIAL**</u>

<u>**FILED UNDER SEAL**</u>

**EXHIBIT N**

**IN**

*Airtech International Inc. v. Byung Chan Yim*

*a/k/a Roy Yim, et al.*

**Civil Action No. 22-00668-MEF-AME**

INCLUDES LATE ELECTION(S) FILED PURSUANT TO REV. PROC. 2013-30.

| Form **1120-S** | **U.S. Income Tax Return for an S Corporation** | | OMB No. 1545-0123 |
|---|---|---|---|
| Department of the Treasury Internal Revenue Service | Do not file this form unless the corporation has filed or is attaching Form 2553 to elect to be an S corporation. Go to *www.irs.gov/Form1120S* for instructions and the latest information. | | **2022** |

For calendar year 2022 or tax year beginning _____ , ending _____

| | | | |
|---|---|---|---|
| **A** S election effective date 07/11/2022 | Name HANS AEROSPACE LLC | | **D** Employer identification number **\*\*-\*\*\*7260** |
| **B** Business activity code number (see instructions) 423600 | TYPE OR PRINT | Number, street, and room or suite no. If a P.O. box, see instructions. 4310 CAMERON ST, STE 13 | **E** Date incorporated 07/11/2022 |
| **C** Check if Sch. M-3 attached ☐ | | City or town, state or province, country, and ZIP or foreign postal code Las Vegas, NV 89103 | **F** Total assets (see instructions) $ 1,055,339. |

**G** Is the corporation electing to be an S corporation beginning with this tax year? See instructions. ☒ Yes ☐ No

**H** Check if: (1) ☐ Final return  (2) ☐ Name change  (3) ☐ Address change  (4) ☐ Amended return  (5) ☐ S election termination

**I** Enter the number of shareholders who were shareholders during any part of the tax year . . . . . . . . . . . 1

**J** Check if corporation: (1) ☐ Aggregated activities for section 465 at-risk purposes (2) ☐ Grouped activities for section 469 passive activity purposes

**Caution:** Include **only** trade or business income and expenses on lines 1a through 21. See the instructions for more information.

| | | | | |
|---|---|---|---|---|
| **Income** | **1a** Gross receipts or sales . . . . . . . . . . . . . . . . . . . . | **1a** | 945,081. | |
| | **b** Returns and allowances . . . . . . . . . . . . . . . . . . . | **1b** | 14,904. | |
| | **c** Balance. Subtract line 1b from line 1a . . . . . . . . . . . . . . . . . . . . | | **1c** | 930,177. |
| | **2** Cost of goods sold (attach Form 1125-A) . . . . . . . . . . . . . . . . . . . | | **2** | 557,324. |
| | **3** Gross profit. Subtract line 2 from line 1c . . . . . . . . . . . . . . . . . . . | | **3** | 372,853. |
| | **4** Net gain (loss) from Form 4797, line 17 (attach Form 4797) . . . . . . . . . . . | | **4** | |
| | **5** Other income (loss) (see instructions - attach statement) . . . . . . . . . . . . | | **5** | |
| | **6** Total income (loss). Add lines 3 through 5 . . . . . . . . . . . . . . . . . . | | **6** | 372,853. |
| **Deductions** (see instructions for limitations) | **7** Compensation of officers (see instructions - attach Form 1125-E) . . . . . . . . . | | **7** | 250,000. |
| | **8** Salaries and wages (less employment credits) . . . . . . . . . . . . . . . . . | | **8** | 63,001. |
| | **9** Repairs and maintenance . . . . . . . . . . . . . . . . . . . . . . . . . | | **9** | |
| | **10** Bad debts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | **10** | |
| | **11** Rents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | **11** | 6,450. |
| | **12** Taxes and licenses . . . . . . . . . . . . . . . . . . . . . . . . . . . | | **12** | 21,182. |
| | **13** Interest (see instructions) . . . . . . . . . . . . . . . . . . . . . . . . . | | **13** | |
| | **14** Depreciation from Form 4562 not claimed on Form 1125-A or elsewhere on return (attach Form 4562) | | **14** | |
| | **15** Depletion (**Do not deduct oil and gas depletion.**) . . . . . . . . . . . . . . . | | **15** | |
| | **16** Advertising . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | **16** | |
| | **17** Pension, profit-sharing, etc., plans . . . . . . . . . . . . . . . . . . . . . | | **17** | |
| | **18** Employee benefit programs . . . . . . . . . . . . . . . . . . . . . . . . | | **18** | 183. |
| | **19** Other deductions (attach statement) . . . . . . . . . . . . . . . . . . . . . | | **19** | 39,171. |
| | **20** Total deductions. Add lines 7 through 19 . . . . . . . . . . . . . . . . . . | | **20** | 379,987. |
| | **21** Ordinary business income (loss). Subtract line 20 from line 6 . . . . . . . . . . | | **21** | -7,134. |
| **Tax and Payments** | **22a** Excess net passive income or LIFO recapture tax (see instructions) . . . | **22a** | | |
| | **b** Tax from Schedule D (Form 1120-S) . . . . . . . . . . . . . . . | **22b** | | |
| | **c** Add lines 22a and 22b (see instructions for additional taxes) . . . . . . . . . . . | | **22c** | 0. |
| | **23a** 2022 estimated tax payments and 2021 overpayment credited to 2022 . . | **23a** | | |
| | **b** Tax deposited with Form 7004 . . . . . . . . . . . . . . . . . | **23b** | | |
| | **c** Credit for federal tax paid on fuels (attach Form 4136) . . . . . . . . | **23c** | | |
| | **d** Add lines 23a through 23c . . . . . . . . . . . . . . . . . . . . . . . . | | **23d** | |
| | **24** Estimated tax penalty (see instructions). Check if Form 2220 is attached . . . . . . . . . . ☐ | | **24** | |
| | **25** Amount owed. If line 23d is smaller than the total of lines 22c and 24, enter amount owed . . . . . . | | **25** | 0. |
| | **26** Overpayment. If line 23d is larger than the total of lines 22c and 24, enter amount overpaid . . . . . | | **26** | |
| | **27** Enter amount from line 26: **Credited to 2023 estimated tax** _____ **Refunded** | | **27** | 0. |

| Sign Here | Under penalties of perjury, I declare that I have examined this return, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete. Declaration of preparer (other than taxpayer) is based on all information of which preparer has any knowledge. | | May the IRS discuss this return with the preparer shown below? See instructions. ☒ Yes ☐ No |
|---|---|---|---|
| | Signature of officer _____ Date _____ Title _____ | | |

| Paid Preparer Use Only | Print/Type preparer's name YEJI MUN | Preparer's signature YEJI MUN | Date | Check ☐ if self-employed | PTIN P\*\*\*\*8923 |
|---|---|---|---|---|---|
| | Firm's name ▸ MUN & ASSOCIATES LLC | | | Firm's EIN ▸ \*\*-\*\*\*0045 | |
| | Firm's address ▸ 6480 SPRING MOUNTAIN ROAD , LAS VEGAS, NV 89146 | | | Phone no. (702)790-1468 | |

For Paperwork Reduction Act Notice, see separate instructions.  03/15/2023 12:28:07PM    Form **1120-S** (2022)
UYA

CONFIDENTIAL    YIM007495

Form 1120-S (2022)    HANS AEROSPACE LLC    **–***7260    Page **2**

| Schedule B | Other Information (see instructions) | | | | | Yes | No |
|---|---|---|---|---|---|---|---|

**1** Check accounting method: a ☐ Cash  b ☒ Accrual
   c ☐ Other (specify) _____

**2** See the instructions and enter the:
   a Business activity    AIRCRAFT SUPPLY/SERVICE  b Product or service    Household electron

**3** At any time during the tax year, was any shareholder of the corporation a disregarded entity, a trust, an estate, or a
   nominee or similar person? If "Yes," attach Schedule B-1, Information on Certain Shareholders of an S Corporation . . . . . . . . . | X

**4** At the end of the tax year, did the corporation:
   **a** Own directly 20% or more, or own, directly or indirectly, 50% or more of the total stock issued and outstanding of any
   foreign or domestic corporation? For rules of constructive ownership, see instructions. If "Yes," complete (i) through (v)
   below . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | X

| (i) Name of Corporation | (ii) Employer Identification Number (if any) | (iii) Country of Incorporation | (iv) Percentage of Stock Owned | (v) If Percentage in (iv) Is 100%, Enter the Date (if applicable) a Qualified Subchapter S Subsidiary Election Was Made |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |

   **b** Own directly an interest of 20% or more, or own, directly or indirectly, an interest of 50% or more in the profit, loss, or
   capital in any foreign or domestic partnership (including an entity treated as a partnership) or in the beneficial interest of a
   trust? For rules of constructive ownership, see instructions. If "Yes," complete (i) through (v) below . . . . . . . . . . . . . | X

| (i) Name of Entity | (ii) Employer Identification Number (if any) | (iii) Type of Entity | (iv) Country of Organization | (v) Maximum Percentage Owned in Profit, Loss, or Capital |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |

**5a** At the end of the tax year, did the corporation have any outstanding shares of restricted stock? . . . . . . . . . . . . . | X
   If "Yes," complete lines (i) and (ii) below.
   (i)  Total shares of restricted stock . . . . . . . . . . 0
   (ii) Total shares of non-restricted stock . . . . . . . 0
   **b** At the end of the tax year, did the corporation have any outstanding stock options, warrants, or similar instruments? . . . . . . | X
   If "Yes," complete lines (i) and (ii) below.
   (i)  Total shares of stock outstanding at the end of the tax year    0
   (ii) Total shares of stock outstanding if all instruments were executed    0

**6** Has this corporation filed, or is it required to file, Form 8918, Material Advisor Disclosure Statement, to provide
   information on any reportable transaction?. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | X

**7** Check this box if the corporation issued publicly offered debt instruments with original issue discount . . . . . . . . . . . . ☐
   If checked, the corporation may have to file Form 8281, Information Return for Publicly Offered Original Issue Discount
   Instruments.

**8** If the corporation (a) was a C corporation before it elected to be an S corporation or the corporation acquired an
   asset with a basis determined by reference to the basis of the asset (or the basis of any other property) in
   the hands of a C corporation, and (b) has net unrealized built-in gain in excess of the net recognized built-in gain
   from prior years, enter the net unrealized built-in gain reduced by net recognized built-in gain from prior years.
   See instructions. . . . . . . . . . . . . . . . . . . . . . . . . .$

**9** Did the corporation have an election under section 163(j) for any real property trade or business or any farming business
   in effect during the tax year? See instructions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | X

**10** Does the corporation satisfy one or more of the following? See instructions . . . . . . . . . . . . . . . . . . . . . | X
   **a** The corporation owns a pass-through entity with current, or prior year carryover, excess business interest expense.
   **b** The corporation's aggregate average annual gross receipts (determined under section 448(c)) for the 3 tax years
   preceding the current tax year are more than $27 million and the corporation has business interest expense.
   **c** The corporation is a tax shelter and the corporation has business interest expense.
   If "Yes," complete and attach Form 8990, Limitation on Business Interest Expense Under Section 163(j).

**11** Does the corporation satisfy **both** of the following conditions? . . . . . . . . . . . . . . . . . . . . . . . . . . | X
   **a** The corporation's total receipts (see instructions) for the tax year were less than $250,000.
   **b** The corporation's total assets at the end of the tax year were less than $250,000.
   If "Yes," the corporation is not required to complete Schedules L and M-1.

UYA                                                                                 Form **1120-S** (2022)

03/15/2023 12:28:07PM

Form 1120-S (2022)  **HANS AEROSPACE LLC**  \*\*-\*\*\*7260  Page **3**

## Schedule B  Other Information  (see instructions) (continued)

| | | Yes | No |
|---|---|---|---|
| 12 | During the tax year, did the corporation have any non-shareholder debt that was canceled, was forgiven, or had the terms modified so as to reduce the principal amount of the debt? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . If "Yes," enter the amount of principal reduction . . . . . . . . . . . . . . . . $ | | X |
| 13 | During the tax year, was a qualified subchapter S subsidiary election terminated or revoked? If "Yes," see instructions . . . . . . . . . . | | X |
| 14a | Did the corporation make any payments in 2022 that would require it to file Form(s) 1099? . . . . . . . . . . . . . . . . . . | | X |
| b | If "Yes," did or will the corporation file required Form(s) 1099? . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | |
| 15 | Is the corporation attaching Form 8996 to certify as a Qualified Opportunity Fund? . . . . . . . . . . . . . . . . . . . . . If "Yes," enter the amount from Form 8996, line 15 . . . . . . . . . . . . $ | | X |

## Schedule K  Shareholders' Pro Rata Share Items

| | | | | Total amount |
|---|---|---|---|---|
| **Income (Loss)** | 1 | Ordinary business income (loss) (page 1, line 21) . . . . . . . . . . . . . . . . . . | 1 | −7,134. |
| | 2 | Net rental real estate income (loss) (attach Form 8825). . . . . . . . . . . . . . . | 2 | |
| | 3a | Other gross rental income (loss) . . . . . . . . . . . . . . . | 3a | |
| | b | Expenses from other rental activities (attach statement). . . . . . . . | 3b | |
| | c | Other net rental income (loss). Subtract line 3b from line 3a . . . . . . . . . . . . | 3c | |
| | 4 | Interest income . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 4 | |
| | 5 | Dividends:  a Ordinary dividends . . . . . . . . . . . . . . . . . . . . . . . | 5a | |
| | | b Qualified dividends . . . . . . . . . . . . . . | 5b | |
| | 6 | Royalties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 6 | |
| | 7 | Net short-term capital gain (loss) (attach Schedule D (Form 1120-S)) . . . . . . . . . | 7 | |
| | 8a | Net long-term capital gain (loss) (attach Schedule D (Form 1120-S)) . . . . . . . . | 8a | |
| | b | Collectibles (28%) gain (loss). . . . . . . . . . . . . | 8b | |
| | c | Unrecaptured section 1250 gain (attach statement) . . . . . | 8c | |
| | 9 | Net section 1231 gain (loss) (attach Form 4797) . . . . . . . . . . . . . . . . . . | 9 | |
| | 10 | Other income (loss) (see instructions) . . . . . . Type | 10 | |
| **Deductions** | 11 | Section 179 deduction (attach Form 4562). . . . . . . . . . . . . . . . . . . . . | 11 | |
| | 12a | Charitable contributions . . . . . . . . . . . . . . . . . . . . . . . . . . . | 12a | |
| | b | Investment interest expense . . . . . . . . . . . . . . . . . . . . . . . . . | 12b | |
| | c | Section 59(e)(2) expenditures . . . . . . . . . Type | 12c | |
| | d | Other deductions (see instructions) . . . . . . . . . . Type | 12d | |
| **Credits** | 13a | Low-income housing credit (section 42(j)(5)) . . . . . . . . . . . . . . . . . . | 13a | |
| | b | Low-income housing credit (other) . . . . . . . . . . . . . . . . . . . . . . | 13b | |
| | c | Qualified rehabilitation expenditures (rental real estate) (attach Form 3468, if applicable) . . . . . . . | 13c | |
| | d | Other rental real estate credits (see instructions) . . . . Type | 13d | |
| | e | Other rental credits (see instructions) . . . . . . . . Type | 13e | |
| | f | Biofuel producer credit (attach Form 6478) . . . . . . . . . . . . . . . . . . | 13f | |
| | g | Other credits (see instructions) . . . . . . . . . . . . Type | 13g | |
| **International** | 14 | Attach Schedule K-2 (Form 1120-S), Shareholders' Pro Rata Share Items—International, and check this box to indicate you are reporting items of international tax relevance . . . . . . . . . . ☐ | | |
| **Alternative Minimum Tax (AMT) Items** | 15a | Post-1986 depreciation adjustment . . . . . . . . . . . . . . . . . . . . . . | 15a | |
| | b | Adjusted gain or loss . . . . . . . . . . . . . . . . . . . . . . . . . . . | 15b | |
| | c | Depletion (other than oil and gas) . . . . . . . . . . . . . . . . . . . . . . | 15c | |
| | d | Oil, gas, and geothermal properties—gross income . . . . . . . . . . . . . . . | 15d | |
| | e | Oil, gas, and geothermal properties—deductions . . . . . . . . . . . . . . . . | 15e | |
| | f | Other AMT items (attach statement) . . . . . . . . . . . . . . . . . . . . . | 15f | |
| **Items Affecting Shareholder Basis** | 16a | Tax-exempt interest income . . . . . . . . . . . . . . . . . . . . . . . . . | 16a | |
| | b | Other tax-exempt income . . . . . . . . . . . . . . . . . . . . . . . . . . | 16b | |
| | c | Nondeductible expenses . . . . . . . . . . . . . . . . . . . . . . . . . . | 16c | |
| | d | Distributions (attach statement if required) (see instructions) . . . . . . . . . . . . . | 16d | |
| | e | Repayment of loans from shareholders . . . . . . . . . . . . . . . . . . . . | 16e | |
| | f | Foreign taxes paid or accrued . . . . . . . . . . . . . . . . . . . . . . . | 16f | |

UYA

Form **1120-S** (2022)

03/15/2023 12:28:07PM

CONFIDENTIAL  YIM007497

Form 1120-S (2022)  **HANS AEROSPACE LLC**                                    \*\*-\*\*\*7260  Page **4**

| Schedule K | | Shareholders' Pro Rata Share Items *(continued)* | | | | Total amount | |
|---|---|---|---|---|---|---|---|
| **Other Information** | 17a | Investment income | | | 17a | | |
| | b | Investment expenses | | | 17b | | |
| | c | Dividend distributions paid from accumulated earnings and profits | | | 17c | | |
| | d | Other items and amounts (attach statement) | | | | | |
| **Recon- ciliation** | 18 | Income (loss) reconciliation. Combine the amounts on lines 1 through 10 in the far right column. From the result, subtract the sum of the amounts on lines 11 through 12d and 16f | | | 18 | | -7,134. |

| Schedule L | Balance Sheets per Books | Beginning of tax year | | End of tax year | |
|---|---|---|---|---|---|
| | **Assets** | (a) | (b) | (c) | (d) |
| 1 | Cash | | | | 503,347. |
| 2a | Trade notes and accounts receivable | | | 298,406. | |
| b | Less allowance for bad debts | ( ) | | ( ) | 298,406. |
| 3 | Inventories | | | | |
| 4 | U.S. government obligations | | | | |
| 5 | Tax-exempt securities (see instructions) | | | | |
| 6 | Other current assets (attach statement) | | | | |
| 7 | Loans to shareholders | | | | |
| 8 | Mortgage and real estate loans | | | | |
| 9 | Other investments (attach statement) | | | | |
| 10a | Buildings and other depreciable assets | | | | |
| b | Less accumulated depreciation | ( ) | | ( ) | |
| 11a | Depletable assets | | | | |
| b | Less accumulated depletion | ( ) | | ( ) | |
| 12 | Land (net of any amortization) | | | | |
| 13a | Intangible assets (amortizable only) | | | | |
| b | Less accumulated amortization | ( ) | | ( ) | |
| 14 | Other assets (attach statement) | | | | 253,586. |
| 15 | Total assets | | 0. | | 1,055,339. |
| | **Liabilities and Shareholders' Equity** | | | | |
| 16 | Accounts payable | | | | 91,625. |
| 17 | Mortgages, notes, bonds payable in less than 1 year | | | | |
| 18 | Other current liabilities (attach statement) | | | | 302,419. |
| 19 | Loans from shareholders | | | | 298,998. |
| 20 | Mortgages, notes, bonds payable in 1 year or more | | | | |
| 21 | Other liabilities (attach statement) | | | | |
| 22 | Capital stock | | | | 369,431. |
| 23 | Additional paid-in capital | | | | |
| 24 | Retained earnings | | | | -7,134. |
| 25 | Adjustments to shareholders' equity (attach stmt.) | | | | |
| 26 | Less cost of treasury stock | | ( ) | | ( ) |
| 27 | Total liabilities and shareholders' equity | | 0. | | 1,055,339. |

UYA                                                                         Form **1120-S** (2022)

Do Not File
Client Copy

03/15/2023 12:28:07PM

CONFIDENTIAL                                                                   YIM007498

Form 1120-S (2022)    HANS AEROSPACE LLC                                    **-***7260    Page **5**

| Schedule M-1 | Reconciliation of Income (Loss) per Books With Income (Loss) per Return |
|---|---|

Note: The corporation may be required to file Schedule M-3. See instructions.

| | | | | | |
|---|---|---|---|---|---|
| 1 | Net income (loss) per books | −7,134. | 5 | Income recorded on books this year not included on Schedule K, lines 1 through 10 (itemize): | |
| 2 | Income included on Schedule K, lines 1, 2, 3c, 4, 5a, 6, 7, 8a, 9, and 10, not recorded on books this year (itemize) _____ | | a | Tax-exempt interest $ _____ | |
| 3 | Expenses recorded on books this year not included on Schedule K, lines 1 through 12 and 16f (itemize): | | 6 | Deductions included on Schedule K, lines 1 through 12 and 16f, not charged against book income this year (itemize): | |
| a | Depreciation $ _____ | | a | Depreciation $ _____ | |
| b | Travel and entertainment $ _____ | | 7 | Add lines 5 and 6 | |
| | | | 8 | Income (loss) (Schedule K, line 18). | |
| 4 | Add lines 1 through 3 | −7,134. | | Subtract line 7 from line 4 | −7,134. |

| Schedule M-2 | Analysis of Accumulated Adjustments Account, Shareholders' Undistributed Taxable Income Previously Taxed, Accumulated Earnings and Profits, and Other Adjustments Account (see instructions) |
|---|---|

| | | (a) Accumulated adjustments account | (b) Shareholders' undistributed taxable income previously taxed | (c) Accumulated earnings and profits | (d) Other adjustments account |
|---|---|---|---|---|---|
| 1 | Balance at beginning of tax year | | | | |
| 2 | Ordinary income from page 1, line 21 | | | | |
| 3 | Other additions | | | | |
| 4 | Loss from page 1, line 21 | ( 7,134.) | | | |
| 5 | Other reductions | ( ) | | | ( ) |
| 6 | Combine lines 1 through 5 | −7,134. | | | |
| 7 | Distributions | | | | |
| 8 | Balance at end of tax year. Subtract line 7 from line 6 | −7,134. | | | |

UYA                                                                         Form **1120-S** (2022)

03/15/2023 12:28:07PM

CONFIDENTIAL                                                      YIM007499

| Form **1125-A** | **Cost of Goods Sold** | |
|---|---|---|
| (Rev. November 2018) | | OMB No. 1545-0123 |
| Department of the Treasury Internal Revenue Service | Attach to Form 1120, 1120-C, 1120-F, 1120S, or 1065. Go to *www.irs.gov/Form1125A* for the latest information. | |

| Name | | Employer identification number |
|---|---|---|
| HANS AEROSPACE LLC | | \*\*–\*\*\*7260 |

| | | | |
|---|---|---|---|
| 1 | Inventory at beginning of year . . . . . . . . . . . . . . . . . . . . . . . . . | 1 | |
| 2 | Purchases . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2 | 549,090. |
| 3 | Cost of labor . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 3 | |
| 4 | Additional section 263A costs (attach schedule) . . . . . . . . . . . . . . . . . | 4 | |
| 5 | Other costs (attach schedule) . . . . . . . . . . . . . . . . . . . . . . . | 5 | 8,234. |
| 6 | **Total.** Add lines 1 through 5 . . . . . . . . . . . . . . . . . . . . . . . | 6 | 557,324. |
| 7 | Inventory at end of year . . . . . . . . . . . . . . . . . . . . . . . . . | 7 | |
| 8 | **Cost of goods sold.** Subtract line 7 from line 6. Enter here and on Form 1120, page 1, line 2 or the appropriate line of your tax return. See instructions . . . . . . . . . . . . . . . . . . . | 8 | 557,324. |

9a Check all methods used for valuing closing inventory:

(i) ☒ Cost

(ii) ☐ Lower of cost or market

(iii) ☐ Other (Specify method used and attach explanation.) _____

b Check if there was a writedown of subnormal goods . . . . . . . . . . . . . . . . . . . . . . . . . . . . ☐

c Check if the LIFO inventory method was adopted this tax year for any goods (if checked, attach Form 970) . . . . . . . . . . . . ☐

d If the LIFO inventory method was used for this tax year, enter amount of closing inventory computed under LIFO . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 9d | |

e If property is produced or acquired for resale, do the rules of section 263A apply to the entity? See instructions . . ☐ Yes ☒ No

f Was there any change in determining quantities, cost, or valuations between opening and closing inventory? If "Yes," attach explanation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ☐ Yes ☒ No

For Paperwork Reduction Act Notice, see instructions.          Form **1125-A** (Rev. 11-2018)
UYA

Do Not File
Client Copy

03/15/2023 12:28:07PM

CONFIDENTIAL          YIM007500

## Cost of Goods Sold
## 1125-A Line 5: Other Costs

| Business Name | Employer identifying number |
|---|---|
| HANS AEROSPACE LLC | **-***7260 |

| Description | Amount |
|---|---|
| 1. FREIGHT-IN | 8,234. |
| 2. | |
| 3. | |
| 4. | |
| 5. | |
| 6. | |
| 7. | |
| 8. | |
| 9. | |
| 10. | |
| Total | 8,234. |

Do Not File
Client Copy

UYA

03/15/2023 12:28:07PM

CONFIDENTIAL

YIM007501

Form **1125-E**
(Rev. October 2016)
Department of the Treasury
Internal Revenue Service

# Compensation of Officers

Attach to Form 1120, 1120-C, 1120-F, 1120-REIT, 1120-RIC, or 1120S.

Information about Form 1125-E and its separate instructions is at *www.irs.gov/form1125e.*

OMB No. 1545-0123

| Name | Employer identification number |
|---|---|
| HANS AEROSPACE LLC | \*\*–\*\*\*7260 |

**Note:** Complete Form 1125-E only if total receipts are $500,000 or more. See instructions for definition of total receipts.

| (a) Name of officer | (b) Social security number (see instructions) | (c) Percent of time devoted to business | Percent of stock owned | | (f) Amount of compensation |
|---|---|---|---|---|---|
| | | | (d) Common | (e) Preferred | |
| 1  BYUNCHAN YIM | 7680 | 100.00 % | 100.0 % | % | 250,000. |
| | | % | % | % | |
| | | % | % | % | |
| | | % | % | % | |
| | | % | % | % | |
| | | % | % | % | |
| | | % | % | % | |
| | | % | % | % | |
| | | % | % | % | |
| | | % | % | % | |
| | | % | % | % | |
| | | % | % | % | |
| | | % | % | % | |
| | | % | % | % | |
| | | % | % | % | |
| | | % | % | % | |
| | | % | % | % | |
| | | % | % | % | |
| | | % | % | % | |
| | | % | % | % | |
| | | % | % | % | |

| | | | |
|---|---|---|---|
| 2 | Total compensation of officers . . . . . . . . . . . . . . . . . . . . . | 2 | 250,000. |
| 3 | Compensation of officers claimed on Form 1125-A or elsewhere on return . . . . . . . . . . . . | 3 | |
| 4 | Subtract line 3 from line 2. Enter the result here and on Form 1120, page 1, line 12 or the appropriate line of your tax return . . . . . . . . . . . . . . . . . . . . . . . | 4 | 250,000. |

For Paperwork Reduction Act Notice, see separate instructions.
UYA

Form **1125-E** (Rev. 10-2016)

03/15/2023 12:28:07PM

CONFIDENTIAL

671121

| | | | | |
|---|---|---|---|---|
| ☐ Final K-1 | | ☐ Amended K-1 | | OMB No. 1545-0123 |

**Schedule K-1**
**(Form 1120-S)**          **2022**

Department of the Treasury
Internal Revenue Service          For calendar year 2022, or tax year

beginning _____ ending _____

**Shareholder's Share of Income, Deductions, Credits, etc.**          See separate instructions.

| **Part III** | **Shareholder's Share of Current Year Income, Deductions, Credits, and Other Items** |
|---|---|
| 1 Ordinary business income (loss) <br> ★      −7,134. | 13 Credits |
| 2 Net rental real estate income (loss) | |
| 3 Other net rental income (loss) | |
| 4 Interest income | |
| 5a Ordinary dividends | |
| 5b Qualified dividends | 14 Schedule K-3 is attached if checked . . . . . . . . ☐ |
| 6 Royalties | 15 Alternative minimum tax (AMT) items |
| 7 Net short-term capital gain (loss) | |
| 8a Net long-term capital gain (loss) | |
| 8b Collectibles (28%) gain (loss) | |
| 8c Unrecaptured section 1250 gain | |
| 9 Net section 1231 gain (loss) | 16 Items affecting shareholder basis |
| 10 Other income (loss) | |
| | 17 Other information <br> V★        STMT |
| 11 Section 179 deduction | |
| 12 Other deductions | |

---

| **Part I** | **Information About the Corporation** |
|---|---|

A  Corporation's employer identification number
    REDACT-7260

B  Corporation's name, address, city, state, and ZIP code

    HANS AEROSPACE LLC
    4310 CAMERON ST
    STE 13
    Las Vegas, NV 89103

C  IRS Center where corporation filed return

    OGDEN, UT  84201

D  Corporation's total number of shares

   Beginning of tax year . . .   100.000000
   End of tax year . . . . . .   100.000000

| **Part II** | **Information About the Shareholder** |
|---|---|

E  Shareholder's identifying number
    ★★★−★★−7680

F  Shareholder's name, address, city, state, and ZIP code

    BYUNCHAN YIM
    11746 LONGWORTH RD
    LAS VEGAS, NV 89135

G  Current year allocation percentage . . .   100.0000 %

H  Shareholder's number of shares

   Beginning of tax year . . . . . . .   100.000000
   End of tax year . . . . . . . . . . .   100.000000

I  Loans from shareholder

   Beginning of tax year . . . . . . . $ _____
   End of tax year . . . . . . . . . . $ _____

For IRS Use Only

| 18 | ☐ More than one activity for at-risk purposes* |
|---|---|
| 19 | ☐ More than one activity for passive activity purposes* |

\* See attached statement for additional information.

For Paperwork Reduction Act Notice, see the Instructions for Form 1120-S.          www.irs.gov/Form1120S          **Schedule K-1 (Form 1120-S) 2022**
UYA

03/15/2023 12:28:07PM

CONFIDENTIAL          YIM007503

## Statement A - QBI Pass-through Entity Reporting

| Corporation's name: HANS AEROSPACE LLC | | Corporation's EIN: ▮▮▮▮▮7260 |
|---|---|---|
| Shareholder's name: BYUNCHAN YIM | | Shareholder's identifying number: ***-**-7680 |

| | | Trade or Business |
|---|---|---|
| | | EIN: **-***7260 |
| | | ☐ PTP |
| | | ☐ Aggregated |
| Shareholder's share of: | | ☐ SSTB |

QBI or qualified PTP items subject to shareholder-specific determinations:

| | | |
|---|---|---|
| | Ordinary business income (loss) . . . . . . . . . . . . . . . . . . . . . . | −7,134. |
| | Rental income (loss) . . . . . . . . . . . . . . . . . . . . . . . . . . . | |
| | Royalty income (loss) . . . . . . . . . . . . . . . . . . . . . . . . . . | |
| | Section 1231 gain (loss) . . . . . . . . . . . . . . . . . . . . . . . . | |
| | Other income (loss) . . . . . . . . . . . . . . . . . . . . . . . . . . . | |
| | Section 179 deduction . . . . . . . . . . . . . . . . . . . . . . . . . | |
| | Other deductions . . . . . . . . . . . . . . . . . . . . . . . . . . . | |
| W-2 wages . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | 313,001. |
| UBIA of qualified property . . . . . . . . . . . . . . . . . . . . . . . . . | | |
| Section 199A dividends . . . . | | |

## Statement C - QBI Pass-through Entity Reporting -
## Patrons of Specified Agricultural and Horticultural Cooperatives

| Corporation's name: | | Corporation's EIN: |
|---|---|---|
| Shareholder's name: | | Shareholder's identifying number: |

| | | Cooperative |
|---|---|---|
| | | EIN: |
| | | ☐ PTP |
| | | ☐ Aggregated |
| Shareholder's share of: | | ☐ SSTB |

QBI items allocable to qualified payments subject to shareholder-specific determinations:

| | | |
|---|---|---|
| | Ordinary business income (loss) . . . . . . . . . . . . . . . . . . . . . . | |
| | Rental income (loss) . . . . . . . . . . . . . . . . . . . . . . . . . . . | |
| | Royalty income (loss) . . . . . . . . . . . . . . . . . . . . . . . . . . | |
| | Section 1231 gain (loss) . . . . . . . . . . . . . . . . . . . . . . . . | |
| | Other income (loss) . . . . . . . . . . . . . . . . . . . . . . . . . . . | |
| | Section 179 deduction . . . . . . . . . . . . . . . . . . . . . . . . . | |
| | Other deductions . . . . . . . . . . . . . . . . . . . . . . . . . . . | |
| W-2 wages allocable to qualified payments . . . . . . . . . . . . . . . . . . | | |
| Section 199A(g) deduction . . . . | | |

03/15/2023 12:28:07PM

CONFIDENTIAL
YIM007504

## Schedule K-1 - Supplemental Information
Supporting Statement for Schedule K-1

**Corporation:** HANS AEROSPACE LLC          **EIN:** \*\*-\*\*\*7260
**Shareholder:** BYUNCHAN YIM          **ID Number:** \*\*\*-\*\*-7680

| Description | Amount |
|---|---|
| Nonpassive ordinary income included in line 1 | $-7,134. |

03/15/23  12:28 PM

CONFIDENTIAL

YIM007505

# 2022 Other Deductions - Supporting Details for Form 1120-S, Line 19

| Name(s) shown on return | Employer identifying number |
|---|---|
| HANS AEROSPACE LLC | **-***7260 |

| | | |
|---|---|---|
| 1. Bank fees | 1 | 712. |
| 2. Janitorial | 2 | 1,455. |
| 3. Legal and professional fees | 3 | 24,940. |
| 4. Utilities | 4 | 62. |
| 5. AUTO EXPENSE | 5 | 5,275. |
| 6. HEALTH INSURANCE | 6 | 3,539. |
| 7. MOVING EXPENSE | 7 | 312. |
| 8. OFFICE EXPENSE | 8 | 1,714. |
| 9. TRAVEL EXPENSE | 9 | 793. |
| 10. INTERNET/COMPUTER | 10 | 369. |
| 11. | 11 | |
| 12. | 12 | |
| 13. | 13 | |
| 14. | 14 | |
| 15. | 15 | |
| 16. | 16 | |
| 17. | 17 | |
| 18. | 18 | |
| 19. | 19 | |
| 20. | 20 | |
| 21. | 21 | |
| 22. | 22 | |
| 23. | 23 | |
| 24. | 24 | |
| 25. | 25 | |
| 26. | 26 | |
| 27. | 27 | |
| 28. | 28 | |
| 29. | 29 | |
| 30. | 30 | |
| 31. | 31 | |
| 32. | 32 | |
| 33. | 33 | |
| 34. | 34 | |
| 35. | 35 | |
| 36. | 36 | |
| 37. | 37 | |
| 38. | 38 | |
| 39. | 39 | |
| 40. | 40 | |
| 41. | 41 | |
| 42. | 42 | |
| 43. | 43 | |
| 44. | 44 | |
| 45. | 45 | |
| 46. | 46 | |
| 47. | 47 | |
| 48. | 48 | |
| 49. | 49 | |
| 50. | 50 | |
| 51. | 51 | |
| 52. | 52 | |
| 53. | 53 | |
| 54. | 54 | |
| **Total Other Deductions** | | 39,171. |

03/15/2023 12:28:07PM

Do Not File Client Copy

CONFIDENTIAL          YIM007506

## Statement A - QBI Pass-through Entity Reporting

| Corporation's name: HANS AEROSPACE LLC | Corporation's EIN: **–***7260 |
|---|---|
| Shareholder's name: | Shareholder's identifying number: |

| | | Trade or Business |
|---|---|---|
| | | EIN: **–***7260 |
| | | ☐ PTP |
| | | ☐ Aggregated |
| Shareholder's share of: | | ☐ SSTB |

QBI or qualified PTP items subject to shareholder-specific determinations:

| | | |
|---|---|---|
| | Ordinary business income (loss) | −7,134. |
| | Rental income (loss) | |
| | Royalty income (loss) | |
| | Section 1231 gain (loss) | |
| | Other income (loss) | |
| | Section 179 deduction | |
| | Other deductions | |
| W-2 wages | | 313,001. |
| UBIA of qualified property | | |
| Section 199A dividends | | |

## Statement C - QBI Pass-through Entity Reporting –
## Patrons of Specified Agricultural and Horticultural Cooperatives

| Corporation's name: | Corporation's EIN: |
|---|---|
| Shareholder's name: | Shareholder's identifying number: |

| | | Cooperative |
|---|---|---|
| | | EIN: |
| | | ☐ PTP |
| | | ☐ Aggregated |
| Shareholder's share of: | | ☐ SSTB |

QBI items allocable to qualified payments subject to shareholder-specific determinations:

| | | |
|---|---|---|
| | Ordinary business income (loss) | |
| | Rental income (loss) | |
| | Royalty income (loss) | |
| | Section 1231 gain (loss) | |
| | Other income (loss) | |
| | Section 179 deduction | |
| | Other deductions | |
| W-2 wages allocable to qualified payments | | |
| Section 199A(g) deduction | | |

03/15/2023 12:28:07PM

CONFIDENTIAL
YIM007507

**2022**                    **Schedule L - Current Assets**

| Business Name | Federal Employer ID Number |
|---|---|
| HANS AEROSPACE LLC | **-***7260 |

| Description | Beginning of tax year | End of tax year |
|---|---|---|
| 1. | | |
| 2. | | |
| 3. | | |
| 4. | | |
| 5. | | |
| 6. | | |
| 7. | | |
| 8. | | |
| 9. | | |
| 10. | | |
| 11. | | |
| 12. | | |
| 13. | | |
| 14. | | |
| 15. | | |
| Totals | | |

Do Not File
Client Copy

**Schedule L - Other Assets**

| Description | Beginning of tax year | End of tax year |
|---|---|---|
| 1. PREPAID EXPENSES | | 242,606. |
| 2. SECURITY DEPOSIT | | 10,980. |
| 3. | | |
| 4. | | |
| 5. | | |
| 6. | | |
| 7. | | |
| 8. | | |
| 9. | | |
| 10. | | |
| 11. | | |
| 12. | | |
| 13. | | |
| 14. | | |
| 15. | | |
| Totals | | 253,586. |

03/15/2023 12:28:07PM

CONFIDENTIAL                                                                    YIM007508

**2022**                **Schedule L - Current Liabilities**

| Business Name | Federal Employer ID Number |
|---|---|
| HANS AEROSPACE LLC | **-***7260 |

| Description | Beginning of tax year | End of tax year |
|---|---|---|
| 1. UNEARNED REVENUE | | 302,419. |
| 2. | | |
| 3. | | |
| 4. | | |
| 5. | | |
| 6. | | |
| 7. | | |
| 8. | | |
| 9. | | |
| 10. | | |
| 11. | | |
| 12. | | |
| 13. | | |
| 14. | | |
| 15. | | |
| Totals | | 302,419. |

**Schedule L - Other Liabilities**

| Description | Beginning of tax year | End of tax year |
|---|---|---|
| 1. | | |
| 2. | | |
| 3. | | |
| 4. | | |
| 5. | | |
| 6. | | |
| 7. | | |
| 8. | | |
| 9. | | |
| 10. | | |
| 11. | | |
| 12. | | |
| 13. | | |
| 14. | | |
| 15. | | |
| Totals | | |

03/15/2023 12:28:07PM

CONFIDENTIAL                                                        YIM007509